Thomas Tarbutton
_____
NAME
CDCR# BE8274
_____
PRISON IDENTIFICATION/BOOKING NO.
Folsom State Prison, PO Box 950
_____
ADDRESS OR PLACE OF CONFINEMENT
Folsom, CA 95763
_____

| Note: | It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his or her name, address, telephone and facsimile numbers, and e-mail address. |
|---|---|

FILED
CLERK, U.S. DISTRICT COURT

JUL 15 2021

CENTRAL DISTRICT OF CALIFORNIA
BY    DIA    DEPUTY

Related DDS
**PAID**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

THOMAS FRANKLIN TARBUTTON
_____
FULL NAME (Include name under which you were convicted )

Petitioner,

v.

WARDEN RICK HILL
_____
NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

CV 8:21cv1209-MWF-AS
To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION Orange County, CA
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number )
CV 10932
CV 01801

### INSTRUCTIONS - PLEASE READ CAREFULLY

1.  To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2.  In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3.  Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4.  Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5.  You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6.  You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7.  When you have completed the form, send the original and two copies to the following address:

    Clerk of the United States District Court for the Central District of California
    United States Courthouse
    ATTN: Intake/Docket Section
    255 East Temple Street, Suite TS-134
    Los Angeles, California 90012

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention   Folsom State Prison:  Folsom, California
   b. Place of conviction and sentence   Orange County, California

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*.
   a. Nature of offenses involved *(include all counts)*: 17 counts of Grand Theft; 11 counts of Security Fraud; 9 counts of Forgery; 1 count of Ponzi scheme; 38 counts of $3.2M enhancements; 9 counts of $500K enhancements
   b. Penal or other code section or sections: CPC487(a); CCC25401; CPC 470(d); CCC25541; CPC12022.6(a)(4); CPC186.11(a)(1)/(2)

   c. Case number:  No. 11CF2747
   d. Date of conviction:  January 20, 2016
   e. Date of sentence:  November 3, 2017
   f. Length of sentence on each count: 34 Years, 4 Months:  5 Year Base Term of CCC25541 with all concurrent sentencing.
   g. Plea *(check one)*:
      ☒ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial *(check one)*:
      ☒ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?   ☒ Yes  ☐ No
   If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
   a. Case number:  No. G055717
   b. Grounds raised *(list each)*:
      (1) Trial Court's failure to properly instruct [Arg. I,II]
      (2) Trial Court's failure to stay sentences [Arg. III,IV]

(3) Trial Court's abuse of discretion at sentencing [Arg. V]

(4) _____

(5) _____

(6) _____

c. Date of decision:   June 4, 2020

d. Result   Denied [Please note, I filed a Habeas Petition during the pendency of the direct appeal due to the omission of issues].

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision?   ☒ Yes   ☐ No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a. Case number:   S263185

b. Grounds raised *(list each)*:

(1) Trial Court's failure to properly instruct

(2) Trial Court's failure to stay sentences

(3) Trial Court's abuse of discretion at sentencing

(4) _____

(5) _____

(6) _____

c. Date of decision:   August 19, 2020

d. Result   Denied [Please note, I filed a Habeas Petition during the pendency of the 'PFR' due to the omission of issues]

5. If you did not appeal:

a. State your reasons _____

_____

_____

_____

_____

b. Did you seek permission to file a late appeal?   ☐ Yes   ☐ No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☒ Yes   ☐ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a. (1) Name of court:   4th Appellate District, Div. 3

(2) Case number:   No. G058686

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*:   12/20/2019

(4) Grounds raised *(list each)*:

    (a) Constructive Amendment after the close of evidence

    (b) Excluded from critical stage, denial of peremptory challenge

    (c) Perjured Testimony used to obtain the conviction

    (d) Outrageous Government Conduct

    (e) Violations of Due Process and International Treaty

    (f) False Evidence offered at trial (Continued on Page 4.1)

(5) Date of decision: June 4, 2020

(6) Result Denied. I filed Habeas Petition along with request to con-
solidate it with direct appeal. Request denied along with appeal.

(7) Was an evidentiary hearing held?   ☐ Yes   ☒ No

b. (1) Name of court: California Supreme Court

    (2) Case number: CSC No. S263665

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: July 31, 2020

    (4) Grounds raised *(list each)*:

        (a) Constructive Amendment after the close of evidence

        (b) Excluded from critical stage, denial of peremptory challenge

        (c) Perjured Testimony used to obtain the conviction

        (d) Outrageous Government Conduct

        (e) Violations of due process and International Treaty

        (f) False Evidence offered at trial (Continued on Page 4.1)

    (5) Date of decision: February 10, 2021

    (6) Result Denied

    (7) Was an evidentiary hearing held?   ☐ Yes   ☒ No

c. (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

<u>Continuation of No. 6a(4) and 6b(4):</u>

(4)  Grounds raised...

    (g)  Trial Court has acted without fundamental jurisdiction

    (h)  Prosecutorial Misconduct

    (i)  Ineffective Assistance of Trial and Appellate Counsel

PETITION OVERVIEW

- Exhibit No. 4:   Page:  193
- Exhibit No. 5:   Page:  194
- Exhibit No. 6:   Page:  195
- Exhibit No. 7:   Page:  196
- Exhibit No. 8:   Page:  197
- Exhibit No. 9:   Page:  198
- Exhibit No. 10: Page:  199
- Exhibit No. 11: Page:  200
- Exhibit No. 12: Page:  201
- Exhibit No. 13: Page:  202
- Exhibit No. 14: Page:  203
- Exhibit No. 15: Page:  204
- Exhibit No. 16: Page:  205
- Exhibit No. 17: Page:  206
- Exhibit No. 18: Page:  207
- Exhibit No. 19: Page:  208
- Exhibit No. 20: Page:  209

* Index of Supporting Case References:  Page: 210

9.) <u>Verification:</u>  I, Thomas Tarbutton, the Petitioner as referenced above, declare under penalty of perjury that I am the Defendant identified in Case No. 11CF2747 (Orange Co. Sup. Ct.), the Appellant in direct appeal No. G055717 and the Petitioner in pro per of Habeas Petition Case No. G058686.  As to the instant petition, petition overview, exhibits, declarations, requests and supplemental motions, I have prepared and read all documents in this submission.  The facts as stated are true of my own knowledge, except as to matters that are stated on my own information and belief, and as to those matters, I believe them to be true.  I declare that the foregoing is true and correct and that this declaration was executed by me on this the ___15th___ day of ___Jay___, 2020 at Folsom State Prison, Folsom, California.

Respectfully,

By:_____
Thomas Tarbutton CDCR#BE8274
Folsom State Prison  Housing# 1-B1-09
P.O. Box 715071
Represa, California 95671

(5) Date of decision: _____

(6) Result _____

_____

(7) Was an evidentiary hearing held?    ☐ Yes ☐ No

7.   Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes    ☒ No

    If yes, answer the following:

    (1) Docket or case number (if you know): _____

    (2) Result: _____

_____

    (3) Date of result (if you know): _____

    (4) Citation to the case (if you know): _____

8.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than five grounds.  Summarize briefly the <u>facts</u> supporting each ground.  For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:**   *Exhaustion Requirement:*  In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court.  This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

a.   Ground one:   CONSTRUCTIVE AMENDMENT AFTER THE CLOSE OF EVIDENCE

    (1) Supporting FACTS:   I have provided a summary of this CLAIM 1 on Page 14 following this form.  The facts and evidence have been presented and exhausted in state court, and provided here in ATTACHMENT 'A'.

    (2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes   ☒ No *
    (3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes   ☒ No
    (4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☒ Yes   ☐ No

    * This Claim was raised in the appellate court concurrent w/appeal

b.   Ground two:   CRITICAL STAGE CONDUCTED IN PETITIONER'S INVOLUNTARY AB-SENCE, AND DENIAL OF STATE-CREATED RIGHT OF PEREMPTORY CHALLENGE

    (1) Supporting FACTS:   I have provided a summary of this CLAIM 2 on Page 16 following this form.  The facts and evidence have been presented

and exhausted in state court, and     provided here starting on
Page 22 of ATTACHMENT 'A'.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     ☐ Yes   ☒ No ✶
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?     ☐ Yes   ☒ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?     ☒ Yes   ☐ No
✶ This Claim was raised in the appellate court concurrent w/appeal

c.  Ground three:  PERJURED TESTIMONY USED TO OBTAIN THE CONVICTION
                   [Factual Innocence Claim]

(1) Supporting FACTS:  I have provided a summary of this CLAIM 3 on Page
17 following this form.  The facts and evidence have been presented
and exhausted in state court, and     provided here starting on
Page 35 of ATTACHMENT 'A'.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     ☐ Yes   ☒ No ✶
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?     ☐ Yes   ☒ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?     ☒ Yes   ☐ No
✶ This Claim was raised in the appellate court concurrent w/appeal

d.  Ground four:  OUTRAGEOUS GOVERNMENT CONDUCT
                  [Forcible Transnational Abduction]

(1) Supporting FACTS:  I have provided a summary of this CLAIM 4 on Page
18 following this form.  The facts and evidence have been presented
and exhausted in state court, and     provided here starting on Page
1 of ATTACHMENT 'B'.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     ☐ Yes   ☒ No ✶
(3) Did you raise this claim in a Petition for Review to the California Supreme Court?     ☐ Yes   ☒ No
(4) Did you raise this claim in a habeas petition to the California Supreme Court?     ☒ Yes   ☐ No
✶ This Claim was raised in the appellate court concurrent w/appeal

e.  Ground five:  CUMULATIVE ERRORS OF THE PROSECUTION THAT VIOLATE DUE PRO-
CESS, INTERNATIONAL TREATY, AND FUNDAMENTAL FAIRNESS

(1) Supporting FACTS:  I have provided a summary of this CLAIM 5 on Page
18 following this form.  The facts and evidence have been presented
and exhausted in state court, and     provided here starting on Page
40 of ATTACHMENT 'B'.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?     ☐ Yes   ☒ No ✶

<u>Continuation of No. 8:</u>

   f.  Ground six:  FALSE EVIDENCE USED TO CONVICT

     (1)  Supporting Facts:  I have provided a summary of this CLAIM 6 on Page 20 following this form.  The facts and evidence have been presented and exhausted in state court, and  provided here starting on Page 60 of ATTACHMENT 'B'.

     (2)-(4):  This claim was not raised in the direct appeal but it was raised in a Habeas Petition submitted concurrent with the pendency of that appeal.  It was not included in the CA Supreme Court's PFR, but it was raised in a Habeas Petition submitted to the Supreme Court during the pendency of that PFR.  For a Procedural History, please see the following PETITION OVERVIEW, Page 25.

   g.  Ground seven:  PROSECUTORIAL MISCONDUCT

     (1)  Supporting Facts:  I have provided a summary of this CLAIM 7 on Page 20 following this form.  The facts and evidence have been presented and exhausted in state court, and  provided here starting on Page 1 of ATTACHMENT 'C'.

     (2)-(4):  This claim was not raised in the direct appeal but it was raised in a Habeas Petition submitted concurrent with the pendency of that appeal.  It was not included in the CA Supreme Court's PFR, but it was raised in a Habeas Petition submitted to the Supreme Court during the pendency of that PFR.

   h.  Ground eight:  THE TRIAL COURT HAS ACTED WITHOUT FUNDAMENTAL
                                     JURISDICTION

     (1)  Supporting Facts:  I have provided a summary of this CLAIM 8 on Page 21 following this form.  The facts and evidence have been presented and exhausted in state court, and  provided here starting on Page 44 of ATTACHMENT 'C'.

     (2)-(4)  This claim was not raised in the direct appeal but it was raised in a Habeas Petition submitted concurrent with the pendency of that appeal.  It was not included in the CA Supreme Court's PFR, but it was raised in a Habeas submitted during the pendency of PFR.

   i.  Ground nine:  INEFFECTIVE ASSISTANCE OF COUNSEL

     (1)  Supporting Facts:  I have provided a summary of this CLAIM

Continuation of 8(i):

9 on Page 22 following this form.  The facts and evidence have been presented and exhausted in state court, and   provided here starting on Page 70 of ATTACHMENT 'C'.

    (2)-(4)  This claim was not raised in the direct appeal but it was raised in a Habeas Petition submitted to the appellate court during the pendency of the appeal.  It was not included in the PFR submitted by appellate counsel to the CA Supreme Court but it was raised in a Habeas Petition submitted to the Supreme Court during the pendency of that PFR.

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☐ Yes   ☒ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☐ Yes   ☒ No

    \* This Claim was raised in the appellate court concurrent w/appeal

9. If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____

_____

_____

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐ Yes   ☒ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

    (5) Date of decision: _____

    (6) Result _____

    (7) Was an evidentiary hearing held?   ☐ Yes ☐ No

b.  (1) Name of court: _____

    (2) Case number: _____

    (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

    (4) Grounds raised *(list each)*:

        (a) _____

        (b) _____

        (c) _____

        (d) _____

        (e) _____

        (f) _____

    (5) Date of decision: _____

(6) Result _____

_____._____

(7) Was an evidentiary hearing held?    ☐ Yes ☐ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?    ☐ Yes  ☒ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?    ☐ Yes  ☒ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _JUNE 22, 2021___          _____
                *Date*                        *Signature of Petitioner*

```
N/A:  Please see $5.00 Filing Fee attached
```

_____
_____ Petitioner _____

_____
_____ Respondent(s) _____

**DECLARATION IN SUPPORT
OF REQUEST
TO PROCEED
*IN FORMA PAUPERIS***

I, _____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed? ☐ Yes ☐ No

   a. If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. _____
   _____

   b. If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. _____

2. Have you received, within the past twelve months, any money from any of the following sources?
   a. Business, profession or form of self-employment? ☐ Yes ☐ No
   b. Rent payments, interest or dividends? ☐ Yes ☐ No
   c. Pensions, annuities or life insurance payments? ☐ Yes ☐ No
   d. Gifts or inheritances? ☐ Yes ☐ No
   e. Any other sources? ☐ Yes ☐ No

   If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: _____
   _____
   _____

3. Do you own any cash, or do you have money in a checking or savings account? *(Include any funds in prison accounts)*
   ☐ Yes ☐ No

N/A:  Please see $5.00 Filing Fee attached

If the answer is yes, state the total value of the items owned: _____

_____

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes   ☐ No

If the answer is yes, describe the property and state its approximate value: _____

_____

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: _____

_____

_____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _____          _____
                     *Date*                                    *Signature of Petitioner*

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $ _____ on account to his credit

at the _____ institution where he is

confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said

institution: _____

_____

_____

_____          _____
     *Date*                                 *Authorized Officer of Institution/Title of Officer*

United States District Court
Central District of California
255 East Temple Street, Suite TS-134
Los Angeles, CA  90012

Enclosed please find my Petition for Writ of Habeas Corpus by a
Person in State Custody.  The facts supporting my claims have been
presented and exhausted through the California Supreme Court as has
the evidence upon which these issues rely.  The facts supporting the
claims as raised are included as ATTACHMENT 'A' [CLAIMS 1-3],
ATTACHMENT 'B' [CLAIMS 4-6], and ATTACHMENT 'C' [CLAIMS 7-9].  The
evidence as exhausted is incorporated as ATTACHMENT 'D'.  Also in-
cluded is the Central District Form CV-69 along with the denials
from the state Appellate and Supreme Courts.  In addition to these
documents, I have provided a PETITION OVERVIEW which presents brief
summaries of each CLAIM along with a procedural history that shows
federal review and remedy is warranted.  The Petition and ATTACHMENTS
are stacked as follows:
* Federal Habeas Form CV-69 [Pages 1-11]
* State Appellate Denial [Page 12]
* State Supreme Court Denial [Page 13]
* PETITION OVERVIEW [Pages 14-34]
* ATTACHMENT 'A' [CLAIMS 1-3]
* ATTACHMENT 'B' [CLAIMS 4-6]
* ATTACHMENT 'C' [CLAIMS 7-9]
* ATTACHMENT 'D' [Exhibits, Declarations, Exhibits, Request For
                  Judicial Notice]
* ATTACHMENT 'E' [Table of Referenced Authorities]


Respectfully,


Thomas Tarbutton  CDCR# BE8274
Petitioner in pro se
Folsom State Prison  Housing #1-C1-11
PO Box 950
Folsom, CA  95763

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 6/4/2020 by M. Castaneda, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re THOMAS FRANKLIN TARBUTTON | G058686 |
| on Habeas Corpus. | (Super. Ct. No. 11CF2747) |
|  | O R D E R |

THE COURT:*

      Petitioner's petition for writ of habeas corpus filed on December 19, 2019, is DENIED.  Petitioner's motion filed on December 19, 2019, to consolidate case No. G058686 with consolidated case Nos. G055717 and G057092 is DENIED. Petitioner's motion for sanctions filed on May 26, 2020, is DENIED.

                         MOORE, ACTING P. J.

*Before Moore, Acting P. J., Fybel, J., and Ikola, J.

SUPREME COURT
FILED

FEB 1 0 2021

Jorge Navarrete Clerk

_____
Deputy

S263665

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re THOMAS FRANKLIN TARBUTTON on Habeas Corpus.

The petition for writ of habeas corpus is denied.

CANTIL-SAKAUYE
*Chief Justice*

PAGE 13

## PETITION OVERVIEW

1.)   Introduction                                              Pg. 14

2.)   CLAIM Summaries                                           Pg. 14

3.)   Procedural History                                        Pg. 25

4.)   Compliance with Procedural Standards                      Pg. 28

5.)   Facts and Evidence Presented in State Court               Pg. 30

6.)   Petitioner's Due Diligence in Presenting Fully
      Developed Factual Claims                                  Pg. 31

7.)   The State Courts' Decisions Provide No Indication of
      Factual Findings, No Application of Decisional Law,
      No Explication for Denial of the Claims, Neither is
      There any Suggestion of any Adjudication Whatsoever       Pg. 32

8.)   De Novo Review of the Claims is Merited                   Pg. 34

9.)   Remedy Requested                                          Pg. 34

1.)   <u>INTRODUCTION</u>:  In submitting this Petition for Federal Review,
I believe it necessary to provide a relatively brief overview of each
CLAIM and the journey they have collectively traveled to reach this
point.  Therefore in addition to the ensuing summary of the indi-
vidual CLAIMS, I am providing a recap of procedural history that,
along with the Petition's attachments of facts, exhibits, decla-
rations, Request for Judicial Notice-- demonstrate  that these
verified CLAIMS are properly before the Federal Court, devoid of
procedural default, and deserved of remediation.

Respectfully Submitted,

By: _____

     Thomas Tarbutton (Hereafter 'Petitioner')

2.)   <u>CLAIM SUMMARIES</u>:

      (A)   CLAIM 1:  Constructive Amendment After the Close of
                      Evidence

            (i)   Summary:  The Petitioner was brought to trial on

PETITION OVERVIEW: PAGE 14

allegations relating to 19 investment transactions charged as 17 counts of Grand Theft.  The theory of False Pretense as the form and elements of theft, while not indicated in any charging document, was exclusively and explicitly articulated by the Prosecutor.  From the Preliminary Hearing through the close of evidence at trial, no other theory of theft was expressed by charge or by word from the Prosecution.

However after the close of evidence, the Prosecutor added an additional theory of Embezzlement as an alternative basis for conviction on these 17 counts of Grand Theft.  To do this, the Prosecutor exploited a defect of nondescript language being used in the accusatory pleading; and in adding this new theory of theft as an optional opportunity for conviction on the existing False Pretense counts, he effectively amends the charges to include offenses not originally alleged.

These new allegations added after the close of evidence dramatically broadens the revised timing of the supposed misconduct.  From the False Pretense's specific charge date as stated in the Information, the new Embezzlement theory encompasses an indeterminate time frame that has no distinguishable start date, no claimed date of discovery, and only alleged to have ended on or sometime before October of 2010. Also distinctly different in the new allegations is the actual property in question, and the supposed criminal conduct shifts from the singular acts of the False Pretense theory's taking "possession and ownership" to now include the Embezzlement theory's course of business recurring over a period of time that with some alleged investor-victims span up to 13 years.  Therefore with these changes being instituted by the alternative basis for conviction added after the close of evidence, this new theory constitutes a variance on the dates of the offenses, a constructive amendment of the alleged acts, and a duplicity in the charged counts.

This action taken by the Prosecution without a motion to amend, is aided by the errors of the Trial Court.  Though lacking fundamental jurisdiction due to subject matter preclusion through the 'Doctrine of Specialty', statutes of limitation, and procedural due process--

the Trial Court encouraged the defects of constructive amendment by
materially misstating the procedural facts to the jury.  By the
Court instructing the jurors and allowing them to consider the
alternative  theory as a basis for guilt, the constructive amend-
ment effectively permitted a conviction of the Petitioner on un-
charged offenses.  Without a requirement of a unanimous verdict,
and absent any special findings from the jurors as to the theory of
theft used in each finding of guilt, the unreliable result and the
violations of Petitioner's constitutional rights that are derivatives
of such action, requires the reversal of the conviction so acquired.

(ii)  Supporting Facts and Evidence:  The Facts and Evi-
dence supporting this CLAIM have been exhausted in State Court and
is presented here in ATTACHMENT 'A', Page 1.

(iii)  Clearly Established Federal Law:  This CLAIM was
presented to State Court on clearly established federal law as
determined by U.S. Supreme Court decisions.  These include  those
listed on Page 21 of ATTACHMENT 'A' [See 1.9(C)].

(B)  CLAIM 2:  Critical Stage Conducted in Petitioner's
Involuntary Absence, and Denial of Petitioner's
State-Created Right of Peremptory Challenge

(i)  Summary:  The Petitioner was denied due process when
in his involuntary absence, the master calender court conducted a
critical stage of the criminal process that held significant conse-
quences for him as the accused.  By taking this action, the court
precluded any opportunity for the Petitioner to be advised by counsel
as to the legal issues and significant rights affected by this pro-
ceeding.  Following the violation of this right to be present, the
court then deprived the Petitioner of his state-created right of
peremptory challenge that is designed to safeguard the structural
integrity of the judicial process, by ruling it was only available
to him at that critical stage from which he had been excluded.  This
ruling of the court that forfeits the Petitioner's right that is
intended to ensure an impartial judge and fair trial, also subjected
him to ineffective assistance of counsel, actual denial of counsel
altogether at a critical stage, and violation of his constitutional

right to autonomously act as secured by the **Sixth** Amendment.

(ii)  Supporting Facts and Evidence:  The Facts and Evidence supporting this CLAIM have been exhausted in State Court and are presented here in ATTACHMENT 'A', starting on Page 22.

(iii)  Clearly Established Federal Law:  This CLAIM was presented to State Court on clearly established federal law as determined by U.S. Supreme Court decisions.  These include those as listed on Page 33 of ATTACHMENT 'A' [See 2.9(C)].

(C)  CLAIM 3:  Perjured Testimony Used to Obtain the Conviction [Factual Innocence Claim]

(i)  Summary:  The Prosecution used perjured testimony as the exclusive evidentiary foundation to presume all elemental facts required for conviction.  This perjured testimony was enabled by the Trial Court's predisposition that adopted a false presumption void of established facts, and resulted in a judicial advocacy of the Prosecution's elemental theory of the offenses.  This improper and incorrect opinion of the Trial Court precluded the jury's determination of the material matters associated and removed the Prosecution's burden of proof beyond a reasonable doubt for the elements of the charges.  Considering the Petitioner's neglected pre-trial discovery request of specific information that would have exposed this perjury, the Trial Court's wrongful support for the false evidentiary presumption not only permitted the Prosecution's knowing use of perjured testimony to obtain the Petitioner's conviction, but also allowed their continued suppression of the direct evidence that demonstrates his factual innocence.

(ii)  Supporting Facts and Evidence:  The Facts and Evidence supporting this CLAIM have been exhausted in State Court and are presented here in ATTACHMENT 'A', starting on Page 35.

(iii)  Clearly Established Federal Law:  This CLAIM was presented to State Court on clearly established federal law as determined by U.S. Supreme Court decisions.  These include those as listed on Page 55 of ATTACHMENT 'A' [See 3.9(C)].

(D)   CLAIM 4:   Outrageous Government Conduct [Forcible
                 Transnational Abduction]

(i)   Summary:   The Prosecution Team-- acting without
authority and in violation of Treaties in Force-- commissioned and
compensated Panamanian Officials to forcibly abduct the Petitioner
outside their collective territorial jurisdictions and convey him
by force and fraud without warrant, cause, or evidence of crimi-
nality.   The conduct of the Prosecution Team-- and Panamanian
Officials acting under a false pretense of U.S. authority-- that
conspires, carries out, and conceals the Forcible Transnational
Abduction of the Petitioner denies him constitutional protections
that include those of the Fourth, Fifth, Sixth and Fourteenth
Amendments.   Collectively, the false accounts presented by the
Prosecution Team, the Treaty provisions violated, the illicit acts
committed, the exculpatory evidence withheld, the constitutional
rights denied, and the peremptory norms of the international comm-
unity derogated-- are tantamount to outrageous governmental conduct
that offends the universal sense of justice and warrants dismissal
of the Petitioner's criminal case.

(ii)   Supporting Facts and Evidence:   The Facts and Evi-
dence supporting this CLAIM have been exhausted in State Court and
are presented here in ATTACHMENT 'B', starting on Page 1.

(iii)   Clearly Established Federal Law:   This CLAIM was
presented to State Court on clearly established federal law as
determined by U.S. Supreme Court decisions.   These include those
as listed on Page 38 of ATTACHMENT 'B' [See 4.9(C)].

(E)   CLAIM 5:   Cumulative Errors of the Prosecution that
                 Violate Procedural Due Process, International
                 Treaty, and Fundamental Fairness

(i)   Summary:   Following the initial Felony Complaint,
the Prosecution added additional charges on three separate occasions.
However when doing so, they amend the allegations-- actually and
constructively-- by methods that are void of fair procedure and in
violation of international treaty.   One example of this is the

Prosecution adding charges, that pursuant to the particulars of the Petitioner's arrest, are precluded by the 'Doctrine of Specialty'. This rule that prohibits the trying and/or punishing of additional charges at the time and in the manner executed by the Prosecution, is clearly established through U.S. Supreme Court decision and international treaty.

Another example of these errors of due process is the Prosecution adding security fraud charges that are based on the same transactional acts alleged in the original complaint as grand theft, but when brought to trial alongside the original counts, they are done so alleging elements that are inconsistent and factually irreconcilable with those concurrently alleged in the original grand theft offenses.  To mask the contradicting theories from the jury's purview, the Prosecution introduces improper expert testimony that is elementally-oxymoronic, which is then followed by their material alteration of the respective 'security fraud' jury instruction by eliminating operative terminology and guidance as provided by U.S. Supreme Court decisions, that should have highlighted the contradictions in the divergent theories.

Also included in these actually added offenses is the allegation of an overall scheme to defraud, but despite the course of business that is the elemental subject of this count predating the charge and predicate security fraud offenses by up to ten years, the Prosecution-- with actual and constructive knowledge of salient facts exhibited by investors -- fails to establish subject matter jurisdiction due to the bar of statute of limitation.

All of this is aided by a judicial abuse of discretion that allows the Prosecution to freely amend these allegations in clear violation of established federal law as determined by U.S. Supreme Court decision, international treaty, and constitutional due process.

(ii)  Supporting Facts and Evidence:  The Facts and Evidence supporting this CLAIM have been exhausted in State Court and are presented here in ATTACHMENT 'B', starting on Page 40.

(iii)  Clearly Established Federal Law:  This CLAIM was

presented to State Court on clearly established federal law as
determined by U.S. Supreme Court decisions.  These include those
as listed on Page 58 of ATTACHMENT 'B' [See 5.9(C)].

    (F)  CLAIM 6:  False Evidence Used to Convict

        (i)  Summary:  False Evidence was offered against the
Petitioner at trial by the Prosecutor, the Prosecution's Expert
Witnesses, and through the perjured testimony of the alleged
investor-victims.  Examples of this false evidence that was material
to guilt and punishment include:  The Prosecution's knowing use of
a false presumption as evidentiary fact;  the Prosecutor's willful
misrepresentations of documentary evidence;  the Prosecution's
preparation and introduction of false documentary evidence and its
improper expert opinion used to support;  the Prosecution's use of
an industry-expert opinion and testimony that provides statements
known to be not true;  the Prosecutor's promotion of a false repre-
sentation of 'flight' that is improperly used to convey conduct
associated with guilt, and;  the Prosecution's introduction of per-
jured testimony suborned from its witnesses.

        (ii)  Supporting Facts and Evidence:  The Facts and Evi-
dence supporting this CLAIM have been exhausted in State Court and
are presented here in ATTACHMENT 'B', starting on Page 60.

        (iii)  Clearly Established Federal Law:  This CLAIM was
presented to the State Courts on clearly established federal law
as determined by U.S. Supreme Court decisions.  These include those
as listed on Page 82 of ATTACHMENT 'B' [See 6.9(C)].

    (G)  CLAIM 7:  Prosecutorial Misconduct

        (i)  Summary:  The Petitioner's conviction was obtained
as a result of prosecutorial misconduct which so infected the in-
tegrity of the proceedings that the cumulative injurious effect
denied the Petitioner his rights of fundamental fairness and due
process.  These improper methods employed by the Prosecution Team
from investigation through post-conviction include their complicity
in the issues raised in the concurrent claims of:  CLAIM 1-  The

PETITION OVERVIEW:  PAGE 20

Prosecution's use of a constructive amendment to the allegations after the close of evidence;  CLAIM 3- The Prosecution's use of a presumption known to be false as the evidentiary fact for all charges;  CLAIM 4- The outrageous conduct of the Prosecution Team to commission, carry out, and conceal the forcible transnational abduction of the Petitioner from the country of Panama;  CLAIM 5- The Prosecution's adding of charges in violation of international treaty and due process, and;  CLAIM 6- The Prosecution's deliberate use of false evidence to obtain the conviction.

Compounding the prejudice of these acts, the Prosecution has also engaged in misconduct that includes:  The suppression of relevant materials and information that was explicitly discovery-requested by the Petitioner;  The Prosecution's adoption and protection of an unqualified and incompetent determination of probable cause;  The Prosecution's employ and exploitation of a selective and arbitrary prosecution that protects their defective investigation and harbors their witnesses from culpability for their illicit acts;  The Prosecution's intentional and bad faith failure to preserve exculpatory evidence;  The Prosecutor's improper communication with members of the jury;  The Prosecutor's deliberate misstatements of material fact during trial, and;  The Prosecution's deceptive tactics not only in determining an excessive bail amount but also in calculating maximum punishment.

     (ii)  Supporting Facts and Evidence:  The Facts and Evidence supporting this CLAIM have been exhausted in State Court and are presented here in ATTACHMENT 'C', starting on Page 1.

     (iii)  Clearly Established Federal Law:  This CLAIM was presented to State Court on clearly established federal law as determined by U.S. Supreme Court decisions.  These include those as listed on Page 42 of ATTACHMENT 'C' [See 7.9(C)].

  (H)  CLAIM 8:  The Trial Court Has Acted Without Fundamental Jurisdiction

     (i)  Summary:  The Trial Court has acted without fundamental jurisdiction over the person of the Petitioner and certain

subject matter of the proceedings.  In addition, the Trial Court's abuses of discretion, identifiable by actions conducted in excess of its authority, are of sufficient magnitude as to constitute jurisdictional defects that warrant reversal of the judgment as rendered.  Examples of these actions taken in excess of juris-diction as defined by constitutional, statutory, and decisional standards, include:  The Trial Court's de facto grant of immunity to the alleged investor-victims through the erroneous decision to expire statute of limitations for overt acts that are components of a separate criminal investigation;  The Trial Court's improper predisposition that advocates the Prosecution's presumption of a false evidentiary characterization that is elemental to all charged offenses;  The Trial Court's passive permission that enabled the Prosecutor to improperly and constructively amend the allegations after the close of evidence;  The Trial Court's failure to provide the Petitioner a full and fair opportunity to litigate his forcible transnational abduction that is so outrageous its conduct and ex-ploitation should cause the Trial Court's divesture of its juris-diction;  The Trial Court's trying and punishing of the Petitioner for offenses that pursuant to U.S. Supreme Court decision he is not triable or punishable;  The Trial Court's scheduling and controlling of the criminal proceedings in a manner that denied the Petitioner a fair trial, and;  The Trial Court's failure to disclose information relevant to the question of judicial bias and its neglect of the due process duty of recusal.

(ii)  Supporting Facts and Evidence:  The Facts and Evi-dence supporting this CLAIM have been exhausted in State Court and are presented here in ATTACHMENT 'C', starting on Page 44.

(iii)  Clearly Established Federal Law:  This CLAIM was presented to State Court on clearly established law as determined by U.S. Supreme Court decisions.  These include those as listed on Page 67 of ATTACHMENT 'C' [See 8.9(C)].

(I)  CLAIM 9:  The Ineffective Assistance of Counsel

(i)  Summary:  The Petitioner herein claims that Trial

Counsel acting on his behalf committed errors so serious or omitted
actions of such importance that he was not functioning as counsel
guaranteed the Petitioner by the Sixth Amendment to the United States
Constitution.   The Petitioner contends that this deficient perfor-
mance of Trial Counsel has prejudiced his defense by depriving him
of effective assistance of counsel, due process, and a fair trial.
The prejudiciality of Trial Counsel's deficient performance is de-
monstrated by Counsel's failure to prepare and investigate, thereby
subjecting Petitioner to a trial in which Counsel introduces abso-
lutely zero evidence that is derivative of any pre-trial preparation.
Also deficient was Trial Counsel's failure to file, or failure to
timely file, the appropriate motions that were essential to the
Petitioner's defense.   Counsel's failure to file, includes:  The
failure to file a discovery motion that would compel disclosure of
exculpatory evidence explicitly requested by the Petitioner that
was being suppressed by the Prosecution;  The failure to file a
motion that would fully and fairly litigate the Petitioner's for-
cible transnational abduction from the country of Panama as com-
missioned by the Prosecution Team;  The failure to file a motion
for sanctions/dismissal based on the Prosecution's failure to
preserve evidence due to its improper motives to protect the in-
competence of its investigation;  The failure to file for dis-
qualification of the Trial Judge due to the errors of the Master
Calender Court, and;  The failure to file a motion for appointment
of experts that would testify as to industry-specific information
that demonstrates the actual innocence of the Petitioner.

The abject failure of Trial Counsel to introduce any evidence and
expert testimony resulted in an unchallenged prosecutorial pro-
cess that run amok with the false presumptions of the Prosecutor
being adopted by the Trial Court as evidentiary fact, elementally-
oxymoronic testimony being offered as expert option, and the
industry-specific information that is probative of factual innocence
being suppressed and ignored.

Along with the failure to subject the Prosecution's fallacious
allegations to any meaningful or adversarial testing, the Trial

PETITION OVERVIEW:  PAGE 23

Counsel neglected to advocate the affirmative defense of the
Petitioner that demonstrates and explains the actual investment
premise that is consistent with the behavior, and thus the under-
standing, of the alleged investor-victims. This awareness of these
investors demonstrated by their actions would be contrasted by the
psychogenic origins of the criminal prosecution of the Petitioner
that is founded in and identical to the theory contained in fraud-
ulent compensation claims filed by these investors and attorney
Patrick Lund who was relied upon for the Prosecution Team's in-
vestigation.

Also deficient and prejudicial is Trial Counsel's failure to be
competent and diligent by neglecting to object to the decisions of
the Trial Court that include the erratic and erroneous application
by the Court of statute of limitation principles required to es-
tablish fundamental jurisdiction, the Trial Court's wrongful advo-
cacy of the Prosecution's theories used to obtain a finding of
guilt, and the Trial Court's improper and material alteration of
U.S. Supreme Court decisions used in instructing the jury on
elemental definitions.

Trial Counsel's deficiencies are also evident in his failure to
hold the Prosecution Team accountable for illicit acts committed,
improper communications with jurors, material misstatments of facts,
and their use of false evidence to obtain the conviction. Trial
Counsel's complete failure to object to the pervasive prosecutorial
misconduct is a by-product of his conflict of interest that seeks
to protect his own self-interests and those within his social circle
rather than provide Petitioner with effective defense and rep-
resentation.

In addition to ineffective assistance of Trial Counsel is that of
Appellate Counsel, that despite Petitioner's preservation and sub-
sequent insistence of these issues-- including 'IAC' of Trial
Counsel-- to be raised on direct appeal, not one is argued in the
Appellant's Opening Brief of Appeal No. G055717

     (ii)  Supporting Facts and Evidence:  The Facts and Evi-
dence supporting this CLAIM have been exhausted in State Court and

are presented here in ATTACHMENT 'C', starting on Page 70.

(iii)  Clearly Established Federal Law:  This CLAIM was
presented to State Court on clearly established federal law as
determined by U.S. Supreme Court decisions.  These include those
as listed on Page 104 of ATTACHMENT 'C' [See 9.9(C)].

3.)  PROCEDURAL HISTORY:  To demonstrate that the CLAIMS as pre-
sented are cognizable before the Federal Court, the Petitioner
provides the following procedural history.  As noted in the Trans-
mittal Summary (cover letter), attached as Exhibit No. 5 [ATTACH-
MENT 'D', Page 40] is a Request for Judicial Notice that was pre-
sented to the State Courts pursuant to CA Evid. Code, and is being
incorporated herewith according to Rule 201 of the Federal Rules
of Evidence.  Included in this, is the request to judicially notice
the records of Petitioner's proceedings which encompass:  Superior
Court Case No.11CF2747 (Orange Co., CA);  The appellate record of
the direct appeal No.G055717 (Fourth App. Dist., Div. 3); the re-
cord of State Habeas Petition No. G058686 submitted with a Request
to Consolidate with direct appeal (Fourth App. Dist., Div. 3), and;
State Habeas Petition No.S263665 submitted to the CA Supreme Court.
Thus for obvious reasons of economy in recounting procedural events,
the Petitioner will provide reference to these judicially noticed
records where these facts may be verified.

(A)  Found Guilty at Trial:  After standing trial from
12/10/2015 to 1/20/2016, Petitioner was found guilty by a jury on
all counts and enhancements [12RT2269-2276].

(B)  Objections Filed in Trial Court as Pro Per Defendant: After
waiting an approximate year for Trial Counsel to file for corrective
relief, Attorney Jerry Schaffer conflicted off of Petitioner's Case
No. 11CF2747 [1CT187-188; 1/13/2017].  On 2/24/2017, Petitioner went
pro per [1CT191], and during this status sought corrective action
from the Trial Court for the issues now being presented in CLAIMS
of this Federal Habeas Petition.  These 'objections' filed by the
Petitioner as a pro per defendant made contemporaneously through
various motions [e.g. CPC §1181 at 10CT2017-2184], were ample and

timely to bring the errors to the attention of the Trial Court
and enable it to take corrective action.  Thus pursuant to Lee v.
Kemna, 534 US 362 (2002), such pleadings were sufficient to serve
legitimate state interest and preserve the associated claims for
appellate review.  A list of the extensive filings as pro per were
provided with Habeas Petition No. S263665 submitted to the State
Supreme Court and is incorporated herewith as Exhibit No. 14 [See
Page 76 of ATTACHMENT 'D'].

(C)  Sentencing:  After denying all motions [1CT204-205], and
striking all challenges [e.g. 12CT2579-2587], the Trial Court on
11/13/2017 sentenced the Petitioner to 34 years, 4 months in state
prison [1CT208-226].

(D)  Notice of Appeal to Filing of the 'AOB':  On 12/10/2017,
a notice of appeal was lodged/received by the Clerk of the 4th
Appellate District, Division 3 (Case No. G055717).  Incorporated
as Exhibit 1 [See Page 3 of ATTACHMENT 'D'], is a Declaration of
Petitioner's attempts to communicate with the appellate project and
appointed appellate counsel, the prominent and preserved issues to
be raised on direct appeal.  These letters span the length of time
from notice of appeal to the filing of the 'AOB'.  However after
receiving no substantive correspondence back from the appellate pro-
ject or counsel, an 'AOB' is filed on 10/26/2018 (No. G055717) with
none of the noted issues included.  The Petitioner is not provided
any notice from counsel as to the issues being raised or not raised
until after the filing of the 'AOB' [See Exhibit No. 2 at Page 5
of ATTACHMENT 'D'].

(E)  Notice to Appellate Court to Set Aside the 'AOB' as Filed:
Attached as Exhibit No. 2 [Page 5 of ATTACHMENT 'D'] is a Declaration
and Request of the Petitioner to set aside the 'AOB' to allow its
re-filing due to the defects of omission of the respective issues.
This motion was signed by the Petitioner on 12/02/2018 and eventually
received by the State Court of Appeal on 1/16/2019 [See Page 12 of
ATTACHMENT 'D'].

PETITION OVERVIEW:  PAGE 26

(F)  Filing of State Habeas Petition with Request to
     Consolidate with Direct Appeal:   Incorporated as Exhibit
No. 13 [See Page 72 of ATTACHMENT 'D'] is the Petitioner's Decla-
ration of due diligence in filing of a State Habeas Petition at his
earliest practicable opportunity.   A State Petition for Writ of
Habeas Corpus was filed in the 4th Appellate District, Div. 3 on
12/20/2019.   This petition identified as Case No. G058686 was filed
within 90 days of the final due date for the Appellant Reply Brief
for the Direct Appeal denoted as No. G055717.   Attached to this state
Habeas Petition was Petitioner's Request to Consolidate such with
the direct appeal.   This Request was presented as argument of in-
effective assistance of appellate counsel as purpose of the Habeas
filing.   A true and genuine copy of the Request to Consolidate is
incorporated as Exhibit No. 17 [See Page 96 of ATTACHMENT 'D'].

(G)  Filings in Habeas Case No. G058686:   Without any response
received from the Respondent pursuant to a court ordered Informal
Response, the Petitioner filed what was essentially a Request for
Ruling.   In this pleading, the Petitioner outlined his compliance
with state procedure in filing the Habeas Petition.   A copy of this
pleading is incorporated as Exhibit No. 19 [See Page 115 of ATTACH-
MENT 'D'].   Eventually Petitioner learned that Respondent had re-
quested and was granted extensions; of which Petitioner had received
no notice.   After Respondent's Informal Response was finally filed,
Petitioner filed an Informal Reply, and again attached a copy of
Exhibit No. 19 demonstrating the cognizability of all Claims as
presented.

(H)  Denial of State Habeas Petition No. G058686:   On 6/04/2020,
the Court of Appeal denied the Habeas Petition No. G058686. A copy
of that denial is located at Page No. 13 above; and as ordered,
states no finding of any procedural default.   The Court also in that
order denies Petitioner's request to consolidate the petition with
his direct appeal.   Additionally on that same day, the Court denied
Petitioner's direct appeal Case No. G055717.

(I)  Filing of State Habeas Petition No. S263665 in State
     Supreme Court:   On 7/31/2020, within 60 days of its denial

in State Appellate Court, the Petitioner filed a State Habeas
Petition as Case No. S263665 in the CA Supreme Court.  Included
in that filing are the facts and evidence reiterated in this
Federal Habeas Petition through ATTACHMENTS 'A','B', and 'C'.  The
Exhibits, Declarations, Request for Judicial Notice and Request for
Evidentiary Hearing as presented here as ATTACHMENT 'D', is a
copy of that which was provided in the State Habeas Petition sub-
mitted to the CA Supreme Court.

(J)  <u>Denial of State Habeas Petition No. S263665</u>:  On 2/10/2021,
the California Supreme Court denied Habeas Petition No. S263665. A
copy of that denial is included as Page No. 14 above.  The Court
in denying provides no factual finding, states no procedural default,
indicates no application of decisional law, neither does it explicate
any reasons or grounds for the denial.

4.)  <u>COMPLIANCE WITH PROCEDURAL STANDARDS</u>:  As noted in No. 3 above,
the denials in state court provide no finding of procedural default.
Also of note is the Appellate Court's denial of Petitioner's Request
to Consolidate the Habeas Petition with his direct appeal (No. 3H),
which in so doing, precludes any posturing of a '<u>Waltreus</u>' default
due to the fact that these issues were not raised on appeal [<u>In re
Waltreus</u> (1965) 62 C2d 218].  As proof of compliance with state
standards, Petitioner references argument and authority presented
to the state courts through Exhibit No. 19 [See Page 115 of ATTACH-
MENT 'D'], and summarizes in brief as follows:

(A)  <u>Timely</u>:  As noted in No. 2 of Exhibit No. 19, the Habeas
Petition filed in Appellate Court in parallel with the ongoing direct
appeal was deemed timely.  Upon denial in appellate court, its filing
in the State Supreme Court within 60 days was deemed timely.

(B)  <u>Issues Preserved in Trial Court</u>:  As noted in No. 3A of
Exhibit No. 19, and reiterated in No. 3B above, the Petitioner did
object and preserve the respective issues in Trial Court, despite
'IAC' of Trial Counsel.

(C)  <u>All Reasonably Available Documentary Evidence</u>:  A Request
for Judicial Notice is incorporated as Exhibit No. 5 [Page 40 of

ATTACHMENT 'D'], as it was in Habeas Petitions No. G058686 and No.
S263665.  Along with that which is judicially noticed, the add-
itional Exhibits and Declarations of ATTACHMENT 'D', as demonstrated
in No. 3C of Exhibit No. 19, provided the State Courts with all
evidence that was reasonably available.  As to evidence that despite
Petitioner's best efforts was unobtainable, Petitioner attached
a Request for Evidentiary Hearing as Exhibit No. 20 submitted to
the State Supreme Court [See Page 127 of ATTACHMENT 'D'].

    (D)  <u>Alleged Facts with Sufficient Particularity</u>:  In presenting
the contentions of the State Habeas Petitions, the Petitioner had
set forth all verified claims with ample and satisfactory speci-
ficity; as is further demonstrated in No. 3B of Exhibit No. 19
[See Page 115 of ATTACHMENT 'D'].

    (E)  <u>'IAC' of Appellate Counsel Precludes 'DIXON' Default</u>:
Incorporated as Exhibit No. 17 is the Request to Consolidate the
Habeas Petition No. G058686 with the direct appeal [See Page 96
of ATTACHMENT 'D'].  In this request, the Petitioner addressed the
'IAC' of appellate counsel that necessitated the filing of the
Habeas Petition.  This 'IAC' is again raised in CLAIM IX of the
state Habeas Petitions filed in Appellate and Supreme Court. In
conjunction with these claims, Petitioner made requests of Trial
and Appellate Counsel for explanations on why these issues were
neglected.  Copies of those attempts are incorporated as Exhibit
No. 12 [See Page 67 of ATTACHMENT 'D'].  In all instances, no
response was received from either counsel, and as explained in
No. 5 of Exhibit No. 19, there is no reasonable explanation or tac-
tic for these decisions of counsel. It must also be noted that the
Petitioner notified the Appellate Court over 16 months prior to
their denials that the 'AOB' was defective in its failure to raise
meritorious issues that are of greater significance than those
argued by Appellate Counsel [See Page 5 of .ATTACHMENT 'D'].  There-
fore the Appellate Court would be complicit in any subsequent
'<u>Dixon</u>' default finding by its failure to heed the objections to
the 'AOB' made by Petitioner almost a year and a half before its
finality.  Irrespective of this argument, neither state court--

Appellate or Supreme-- found a 'Dixon' default [In re Dixon (1953) 41 C2d 756].

   (F) No 'Waltreus' Default: As noted in No.4H above, the Appellate Court denied the request to consolidate the Habeas Petition No. G058686 with the Direct Appeal No. G055717, thus precluding any 'Waltreus' default due to the fact that these issues contained in Habeas claims were not raised on appeal [In re Waltreus, supra].

   (G) Sufficiency of Evidence: As noted in No. 6 of Exhibit No. 19 [Page 123 of ATTACHMENT 'D'], the Petitioner did preserve the Insufficiency of Evidence claim by raising it in Trial Court on statutory grounds in his CPC §1181 Motion for New Trial [1OCT2024-2045]. Therefore as stated in his Habeas Petition submitted to the CA Supreme Court, in the event that any review may require a finding or questioning of the sufficiency of the evidence, the Petitioner claims 'IAC' of appellate counsel in failing to raise this issue that was cognizable on direct appeal.

5.) EVIDENCE PRESENTED HAS BEEN EXHAUSTED IN STATE COURT: This Federal Habeas Petition is being submitted with the Exhibits as indexed in ATTACHMENT 'D'. As noted therein, these exhibits, declarations, and requests for action- were all presented in State Court and properly exhausted through the CA Supreme Court. Included in these is Exhibit No. 5 [Page 40 of ATTACHMENT 'D'] which is a Request for Judicial Notice that pursuant to State Courts and Evidence Code is evidence that may be relied upon to contradict other evidence and support or disprove findings of fact and judgments based thereon [Del Bosque v. Singh (1937) 10 CA2d 487, 489].

Of special note and evidentiary importance are the facts/propositions that are indisputable and/or easily ascertainable relative to the Petitioner's factual innocence CLAIM 3 [Page 35 of ATTACHMENT 'A']. The tenor of this judicially noticed evidence has been the subject of not only all Habeas Petitions submitted but also as well as various attempts by Petitioner to access discoverable evidence as far back as FBI Interview on 1/25/2011 [11CT2482-2483] and pretrial Discovery Requests made on 3/07/2014 [11CT2475]. Along with

PETITION OVERVIEW: PAGE 30

Discovery Requests, the Petitioner has made requests of Trial Counsel [See Exhibit No. 9 of ATTACHMENT 'D'; also 11CT2449-2464], filed Discovery Motions [CPC §1054.5 at 10CT2204-2237], and filed a Motion for Appointment of Experts [10CT2449-2254]. In following up on his attempts in Trial Court, Petitioner requested Evidentiary Hearings in his Appellate Habeas Petition and attached the mentioned Request for Judicial Notice. In State Supreme Court, Petitioner again attached the Request for Judicial Notice as well as filing the Request for Evidentiary Hearing that is incorporated herewith as Exhibit No. 20 [See Page 127 of ATTACHMENT 'D']. After exhausting all reasonable methods for discovery, the Petitioner is reiterating the Request for Judicial Notice in Federal Court, and is doing so under Federal Rule of Evidence, Rule 201 [See Page 41 of ATTACHMENT 'D']. As to any unresolved credible issues of disputed fact, the Petitioner is reiterating his Request for Evidentiary Hearing as incorporated herewith as Exhibit No. 20.

6.) <u>DUE DILIGENCE IN PRESENTING FULL FACTUALLY-DEVELOPED CLAIMS</u>: As noted in No. 5 above, the Petitioner has exercised due diligence in discovering evidence relative to the CLAIMS as presented. To assist the State Court in adjudication of those CLAIMS as raised, The Petitioner requested the mentioned Judicial Notice and Evidentiary Hearing as well as requesting from other parties the explanation for their respective action or non-action as it relates to the CLAIMS of the Habeas Petition. These efforts of the Petitioner summarized in brief, include:

(A) Request for Judicial Notice: Incorporated as Exhibit No. 5 [Page 40 of ATTACHMENT 'D'], and based on the authorities as presented therein, Petitioner requested judicial notice of the records of related proceedings; tax-reporting facts and propositions; treaties, Law of Organization of Nations, Law of Foreign Nation; Mathematical Calculations, and; Industry-specific information. The relevance and judicial noticeability of this evidence is noted in the Request as well as referenced where applicable in the Petition.

(B) Evidentiary Hearing:  Incorporated as Exhibit No. 20 [Page 127 of ATTACHMENT 'D'], is the Request for Evidentiary Hearing presented to the State Supreme Court.  The matters of note include evidence of Patrick Lund's involvement as referenced in Petitioner's requests to the CA State Bar [See Page 80 of ATTACH-MENT 'D'] and the Motion to Discover the records of the OCDA's investigation of Lund relative to his secreting away of the asset base transferred by the Petitioner [Page 87 of ATTACHMENT 'D'].  Also included are  matters of the Trial Court's refusal to dis-close a disqualifying bias and any evidence probative of a legal arrest and lawful conveyance.

(C) Requests Made of Trial and Appellate Counsel:  Incorpo-rated as Exhibit No. 12 [Page 67 of ATTACHMENT 'D'], are copies of letters sent to Trial and Appellate Counsel requesting any explanation for their deficient performances as raised continuously throughout post-trial motions and State Habeas Petitions.  These letters were sent to respective counsel along with a copy of the State Habeas Petition filed in Appellate Court, and again followed up  with a similar  request along with a copy of the Habeas filed in State Supreme Court.  No response from either counsel has been received.

(D) Requests Made of California Governor and Attorney General: Incorporated as Exhibit No. 8 [See Page 55 of ATTACHMENT 'D'] are copies  of letters sent to the California Governor and Attorney General along with a copy of the State Habeas Petition filed in Appellate Court, and again followed up with a similar request along a copy of the Habeas filed in Supreme Court.  Addressed in these letters is a request for rational justification for the disparate treatment given the Petitioner as raised in CLAIM 4 [See Page 25 of ATTACHMENT 'B'] and CLAIM 7 [See Page 23 of ATTACHMENT 'C']. As of today's date, no response has been provided by either State Official.

7.) STATE DENIALS PROVIDE NO INDICATION OF ANY ADJUDICATION:  As incorporated as Page 12 and 13 above, the denials of the State

PETITION OVERVIEW:  PAGE 32

Courts provide no details or reasons for their decisons.  This
absence of explanation indicates that no adjudication occurred.

   (A)  No Factual Findings:  The Ninth Circuit in Taylor v.
Maddox, 366 F.3d 992, 1000-1001 (9th Cir. 2004)- indicated that
without a doubt, the simplest example of 'unreasonable determination'
is "the situation where the state court should have made a finding
of fact but neglected to do so.  In that situation, [any] state-
court factual determination is perforce unreasonable and there is
nothing to which the presumption of correctness can attach".

   (B)  No Decional Law Applied:  In Early v. Packer, 537 US 3
(2002), the Supreme Court indicated that AEDPA deference is required
where state court decisions rely on law that is consistent  with,or
analogous to Supreme Court decisions; but this 'Early' standard does
not require such application when state courts' decisions col-
lectively offer no decisional law or explication for the actions
taken [Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002)].

   (C)  No Procedural Bar:  A state court's decision void of any
indication of procedural default, presumes that no bar exists [See
Harris v. Reed, 489 US 255, 265 (1989); Smith v. Oregon Bd. of Parole,
736 F.3d 857, 859 (9th Cir. 2013); Curiel v. Miller, 830 F.3d 864,
871 (9th Cir. 2016)]

   (D)  No Adjudication on the Merits:  The "language of 28 U.S.C.
2254(d) makes it clear that this provision applies only when a
federal claim was adjudicated on the merits in state court" [Johnson
v. Williams, 568 US 289, 302 (1013)]; but this 'adjudication on the
merits' requires substantive resolution of the claims advanced rather
than a court's disposition based on grounds undisclosed or for
reasons unspecified [Miller v. Johnson, 200 F.3d 274, 281 n.4 (5th
Cir. 2000)].

   (E)  Petitioner's State Denials are not Resultant of an
          Adjudication on the Merits:  Without any explanation what-
soever, and absent any state ruling on the merits, there is there-
fore no state decision to review to determine whether the decision
was contrary to, or involved unreasonable application/determination

of law and fact [<u>Chaker v. Crogan</u>, 428 F.3d 1215, 1220-1221 (9th
Cir. 2005)].

8.) <u>DE NOVO REVIEW OF THE CLAIMS IS MERITED</u>:  Without indication
or plausible possibility of procedural default as in the Petitioner's
State Habeas Petitions, and absent a state ruling on the merits,
there is no state decision to review for determination pursuant to
the AEDPA standards set forth in §2254(d)(1) or (2).  In such cir-
cumstances, the Ninth Circuit states "we hold that when it is clear
that a state court has not reached the merits of a properly raised
issue, we must review it de novo" [<u>Pirtle v. Morgan</u>, supra].

9.) <u>REMEDY REQUESTED</u>:  Along with full de novo review of each
CLAIM  as presented, the Petitioner prays for relief and remedy
to include but not necessarily limited to the following:

   (A)  Resolution of all Disputed Issues of Fact:  Along with
taking Judicial Notice of the evidence as presented in Exhibit No.
5 [Page 40 of ATTACHMENT 'D'], the Petitioner requests for an Evi-
dentiary Hearing as moved for in Exhibit No. 20 [Page 127 of ATTACH-
MENT 'D'].  This includes those facts required to fully litigate
CLAIM 3, CLAIM 4, CLAIM 5, CLAIM 7, CLAIM 8 and CLAIM 9.

   (B)  Reversal of Petitioner's Conviction:  As a result of the
violations of Petitioner's constitutional rights as set forth in
the CLAIMS, the Petitioner prays for reversal of his conviction.

   (C)  Dismissal of All Charges:  As a result of the outrageous
conduct of the Prosecution Team, and pursuant to Petitioner's
factual innocence as raised in CLAIM 3, the Petitioner prays for
dismissal of all charges with prejudice.

   (D)  All Other Relief:  The Petitioner prays for all further
relief as deemed just and proper by the Court.

Respectfully Submitted this the 22ⁿᵈ day of June , 2021

By: _____

Thomas Tarbutton CDCR #BE8274 as Petitioner in pro se

PETITION OVERVIEW:  PAGE 34

# ATTACHMENT A

<u>CONTENTS</u>:

CLAIM 1

> CLAIM Summary                              Page  1
> Contents of CLAIM [Index]                  Page  2
> Facts Supporting CLAIM                     Page  3

CLAIM 2

> CLAIM Summary                              Page 22
> Contents of CLAIM [Index]                  Page 23
> Facts Supporting CLAIM                     Page 24

CLAIM 3

> CLAIM Summary                              Page 35
> Contents of Claim [Index]                  Page 35
> Facts Supporting CLAIM                     Page 36

CLAIM 1:   CONSTRUCTIVE AMENDMENT AFTER THE CLOSE OF EVIDENCE

SUMMARY:   The Petitioner was brought to trial on allegations re-
lating to 19 investment transactions represented as 17 counts of
Grand Theft.  The theory of false pretense as the form and elements
of theft, while not indicated in any charging document, was ex-
clusively and explicitly articulated by the Prosecutor.  From the
Preliminary Hearing through the close of evidence at trial, no
other theory of theft was expressed by charge or by word from the
Prosecution.

However after the close of evidence, the Prosecutor added an add-
itional theory of embezzlement as an alternative basis for con-
viction on these 17 counts of Grand Theft.  To do this, the Prose-
cutor exploited a defect of nondescript language being used in the
accusatory pleading; and in  adding this new theory of theft as an
alternate opportunity for conviction on the existing false pretense
counts, he effectively amends the charges to include offenses not
originally alleged.

The new allegations added after the close of evidence dramatically
broadens the new timing of the supposed misconduct.  From the False
Pretense's specific charge date as stated in the Information, the
new Embezzlement theory encompasses an indeterminate time frame that
has no distinguishable start date, no claimed date of discovery, and
only alleged to have ended on or sometime before October of 2010.
Also distinctly different in the new allegations is the actual pro-
perty in question, and the supposed criminal conduct shifts from the
singular acts of the False Pretense theory's taking "possession and
ownership" to now include the Embezzlement theory's course of busi-
ness recurring over a period of time that with some alleged investor-
victims span up to 13 years.  Therefore with these changes being in-
stituted by the alternative basis for conviction added after the close
of evidence, this new theory constitutes a variance on the dates of
the offenses, a constructive amendment of the alleged acts, and a
duplicity in the charged counts.

ATTACHMENT 'A':  PAGE 1

This action taken by the Prosecution without a motion to amend, is aided by the errors of the Trial Court.  Though lacking fundamental jurisdiction due to subject matter preclusion through the "Doctrine of Specialty", statutes of limitation, and procedural due process-- the Trial Court encouraged the defects of constructive amendment by materially misstating the procedural facts to the jury.  In instructing the jurors that allowed the alternative theory, the constructive amendment permitted a conviction on uncharged offenses.  Without the requirement of a unanimous verdict, and absent any special findings from the jurors as to the theory of theft used for each finding of guilt, the unreliable result and the violations of Petitioner's constitutional rights that are derivates of such action, require a reversal of the conviction so acquired.

CONTENTS OF CLAIM 1:

1.1  The Insufficient Language of the Accusatory Pleading     Pg.  3

1.2  The Information is Defective But Not Yet Prejudicial     Pg.  4

1.3  Adding Alternative Theory After the Close of Evidence     Pg.  5

1.4  The Two Theories Represent Distinctly Different
     Allegations     Pg.  6

1.5  The Prejudicial Defects Resulting from the New Theory     Pg.  8

1.6  The Violations of Petitioner's Constitutional Rights     Pg. 11

1.7  The Trial Court's Abuse of Discretion     Pg. 17

1.8  Ineffective Assistance of Counsel     Pg. 18

1.9  This Claim Merits Federal Review and Remedy     Pg. 20

1.1   THE INSUFFICIENT LANGUAGE OF THE ACCUSATORY PLEADING:   A
criminal defendant is entitled to "notice of the specific charge"
against him [Cole v. Arkansas, 333 US 196, 201 (1948)]; and under
the void-for-vagueness doctrine, this notice requires that a penal
code as cited "must define the criminal offense with sufficient de-
finiteness" [Kolender v. Lawson, 461 US 352, 357 (1983)].

(A)   Petitioner's Accusatory Pleading- Information:  As noted in
the People's Trial Brief (see 5CT951), the Petitioner was held to
answer on the Grand Theft charges identified in the Information as
Counts 1-4,6,8,10-12,15-17, and 22-26 (see Information filed 8/21/14
at 4CT893-902).

(B)   Language Used to Give Notice:  To give notice of the specific
charges against the Petitioner, the Information as filed uses overly
broad statutory language:
        e.g.Count 6:  On or about November 14, 2007, in violation of
Section 487(a) of the Penal Code (Grand Theft), a felony, Thomas Fran-
klin Tarbutton did unlawfully take money and personal property of
Marty A., which had a value exceeding Four Hundred Dollars ($400). To
wit: $50,000.

(C)   Date Used to Give Notice of the Offense:  As noted by the
Trial Court in instructing the jury, the dates of each count as ac-
cused in the Information coincide with the date each respective al-
leged investor-victim provided their investment funds to the Peti-
tioner (see 11RT2123).  In the Count 6 example provided above, the
November 14, 2007 date of the offense-- as corroborated by the test-
imony of Marty Almquist (see 2RT293)-- corresponds to the actual date
Marty A. gave the Petitioner $50,000 to invest.

(D)   The Language of the Information is Insufficient:  Aside from
the precise date, the statutory language of the Information used to
give nature and cause of the CPC487(a) offenses provides no notice
as to the theory and elements of the allegations.  A charging docu-
ment has been found insufficient when failing to provide sufficient
detail in order to adequately defend charges [Cole v. Arkansas, supra].
However such error is not a basis for reversal if it "did not mislead

ATTACHMENT 'A':  PAGE 3

the defendant to his prejudice" [United States v. Bonano, 858 F.2d 1427, 1430-31 (9th Cir. 1988); Fed. Rules of Crim. Proc. 7(c)(3)].

1.2   THE INFORMATION IS DEFECTIVE BUT NOT YET PREJUDICIAL:   A defective pleading is not prejudicial if the defendant has received notice sufficient to prepare a defense [Hamling v. United States, 418 US 87 (1974)].

(A)   Adequate Notice of Grand Theft by False Pretense:   In the Petitioner's case, he received sufficient notice of the Prosecution's theory of False Pretense despite it not being specified in any charging document.   This theory and its elements were exclusively and explicitly represented by the Prosecutor from Preliminary Hearing through the close of evidence at trial:

(i)   Day 1 of Preliminary Hearing (8/06/14):   Prosecutor Pierce when responding to Judge Makino's question as to the theory for the form of theft, states: "The form of theft, your honor is... a theft by false pretenses (see 2CT444-445).

(ii)   People's Opposition to 995 Motion (11/06/15):   Prosecutor Pierce reiterates the theory of theft by false pretense as well as the required elements detailed in CALCRIM No. 1804 (see 4CT934-935); and provides additional detail stating that the false pretense was only verbally represented (see 4CT936).

(iii)   People's Trial Brief (12/10/15):   Prosecutor Pierce states: "The people are proceeding on a theory of Grand Theft by False Pretense" (see 5CT960).

(iv)   Opening Statement at Trial (12/15/15):   In opening statements to the jury, Prosecutor Pierce declares "In this particular case, we're going under the theory of False Pretense" (see 1RT54).

(v)   Trial Testimony (12/15/15 to 01/14/16):   In questioning the alleged investor-victims, Prosecutor Pierce elicits testimony consistent with the element of reliance on a verbal representation of false pretense (e.g. Marty A.: would not have invested had he not believed the verbally represented false pretense, see 2RT279).

ATTACHMENT 'A':  PAGE 4

(B)  Notice of False Pretense Sufficient to Prepare a Defense:
Since being presented by the Prosecutor at the Preliminary Hearing,
no basis, theory or elements other than Grand Theft by False Pre-
tense had been introduced.   Therefore the Petitioner to prepare a
defense for this theory and allegations, was sufficiently put on
notice, in spite of the insufficient detail of the charging docu-
ment.  Defective, but not prejudicial-- thus per <u>Hamling</u>(supra),
nothing to affect the proceeding (also see Fed. Rules of Crim.
Proc. 7(c)(3); CPC960).

## 1.3  ADDING ALTERNATIVE THEORY AFTER THE CLOSE OF EVIDENCE:

(A)  Closing Argument:  Despite only giving notice of the False
Pretense theory and allegations, Prosecutor Pierce after the close
of evidence, in his closing arguments before the jury on 1/14/16,
adds a new theory of Embezzlement and its associated elements as
an alternative basis for conviction on the Grand Theft counts:

(i) Prosecutor's Two Theories:  "There is 17 counts of vio-
lating Penal Code 487, which is Grand Theft.  Okay.  I am going to
talk about there are two theories that we are presenting to you re-
gards to the Grand Theft" (11RT2107).  "We are going to argue two
theories about Grand Theft.  That the money was stolen, Grand Theft
by a False Pretense, Okay, and that it was stolen by Embezzlement"
(11RT2109).

(ii)  Prosecutor's No Unanimity Needed:  "Here is the deal
...when it comes to a specific count, you all have to agree that a
Grand Theft was commited.  However, you as a jury don't have to be
unanimous as to which theory" (11RT2109)

(iii)  Elements of the New Theory:  In describing the ele-
ments of the new Embezzlement theory, the Prosecutor alleges the
fraudulent use of property ("in this case money") by the Petitioner
for his own benefit (11RT2119).

(B)  Insufficient Pleading Turns Prejudicial:  It is not until
after the close of evidence when the Prosecutor adds the alternative
basis for conviction does the defect of the accusatory pleading and

**ATTACHMENT 'A':  PAGE 5**

its insufficient language turn prejudicial.  Because this new theory, as demonstrated below, alleges different property, different acts and different timing than the False Pretense theory, the adding it after the close of evidence not only exploits a vagueness in the Information, but it also deprives the Petitioner of various constitutional rights that according to Cole v. Arkansas (supra), includes fair notice and procedural due process.

1.4  THE TWO THEORIES REPRESENT DISTINCTLY DIFFERENT ALLEAGTIONS:
To distinguish the different allegations of the new theory of Embezzlement, it is necessary to compare the contrasting elements of both theories:

(A)  False Pretense Theory:  Theft by False Pretense was the only theory alleged by the Prosecution from Preliminary Hearing through the close of evidence at trial (see 1.2(A) above).  As stated in the CALCRIM No. 1804 instruction given the jurors (see 5CT1144), it requires proof that the Petitioner deceived an investor by false representation; and because the investor "relied" on the false pretense, they let the Petitioner take "possession and ownership" of the money.  Due to this theory's element of taking "possession and ownership" of the property, the Information lists a relatively specific date that corresponds with the date the alleged investor victim invested the money with the Petitioner.  However according to this theory, to invest the money, the investor had to have "relied" or believed in a verbal representation made by the Petitioner.  Thus once the funds were given to the Petitioner, the alleged crime occured instantaneously.  In the Count 6 example given in 1.1(B) above, the November 14, 2007 date of the offense is the day the Petitioner took "possession and ownership" of the $50,000; and as noted by Marty A. in his testimony, he would not have invested had he not "believed" the alleged false pretense (see 2RT279).

(B)  Embezzlement Theory:  The adding of the Embezzlement theory after the close of evidence prompts the CALCRIM No. 1806 jury instruction (see 5CT1146);  which to convict requires proof of fraudulent use of property by a person to whom it had been entrusted.

ATTACHMENT 'A':  PAGE 6

To add this new theory during his closing remarks, Prosecutor Pierce only specifically references "FBO" (for benefit of) bank account transactions: "Certainly in this case, certainly as to the FBO accounts; these would be classic examples of embezzlement" (1RT2111). However as noted by the Prosecutor it was into these FBO accounts where the Petitioner deposited the "interest payments _from_ the investment", and the alleged embezzlement occurred because "by the end of the entire scheme all those (FBO) accounts were cleaned (out)" (1RT2111).

   (C)  Material Differences of the Two Theories:  The precise date of the Grand Theft counts as alleged in the Information represents the date of the False Pretense's taking "possession and ownership" of the specified property by the Petitioner.  However the new theory of Embezzlement as added by the Prosecutor after the close of evidence changes both date and property.  In presenting this new theory during closing argument, the Prosecutor alleges the property is not the investment money given by the investors to the Petitioner, but instead it is the recurring disbursements made by the Petitioner into the investors "FBO" accounts.  In the example of Count 6 provided in 1.1(B) above, Prosecutor Pierce asks Marty A. regarding his FBO account: "That's where the supposed profits for your investment were going?"; to which Marty A. responded "The monthly interest from the trust deeds went into those accounts" (2RT271).

Now during his closing remarks, the Prosecutor explains the "the money from the interest payment...was going into an (FBO) account that Mr. Tarbutton ran, and when the whole thing collapsed...all the money was gone" (11RT2134).  This 'whole thing' or also called the "entire scheme" by Mr. Pierce (see 11RT2111), is direct reference to Count 38 and the testimony of Orange Co. District Attorney's (OCDA) forensic accountant, Scott Weitzman, and his 'Ponzi Scheme' examination (see 6RT1269).  However when testifying to this 'entire scheme', Mr. Weitzman states he could not determine when the alleged fraudulent-use activity began (see 8RT1450), but only that by October of 2010 these 'FBO' accounts had little or no money in them (see 8RT1452;8RT1479).  Thus the new Embezzlement theory changes the

ATTACHMENT 'A':  PAGE 7

dates of the alleged offenses from the precise date of the False
Pretense to now incorporate an unspecified timeframe of unknown
duration;  and the property in question, goes from being the in-
vestment funds given by the investors to the Petitioner, to now
include the recurring disbursements made by the Petitioner on
these investments that he was depositing into accounts for the
benefit of a few respective investors.

1.5  THE PREJUDICIAL DEFECTS RESULTING FROM THE NEW THEORY: The
adding of the new allegations as an alternative basis for conviction
results in various prejudicial defects:

(A) Variance:  A fatal variance may occur when evidence intro-
duced at trial indicates an irreconcilable discrepency in the timing
of the charged offenses [U.S. v. Tsinhnahijinnie, 112 F.3d 988,
991-92 (9th Cir. 1997)].  In the Petitioner's case, the added theory
of Embezzlement dramatically changes the noticed date of the of-
fenses.  From the precise date of the Information which corresponds
to the investors acting on a reliance in the False Pretense, the
Embezzlement theory as added relies on OCDA's Scott Weitzman's
testimony of an unknown timeframe that has an indeterminable be-
ginning and alleged to have ended sometime on or before October of
2010 (see 1.4(C) above).  This discrepency between a precise date
and an unknown timeframe as alleged in the respective theories,
constitutes a fatal variance which actually prejudices Petitioner's
ability to identify the scope of the allegations and deprives him
of a meaningful opportunity to prepare an appropriate defense
[Berger v. U.S., 295 US 78, 82 (1969)].

(B)  Constructive Amendment:  A Constructive Amendment occurs
when the evidence presented·at trial is intended to prove a crime
different from the charged offense [Stirone v. U.S., 361 US 212,
217 (1960)]; or when jury instructions broaden the scope of alle-
gations by permitting conviction on uncharged offenses [U.S. v.
Randall, 171 F.3d 195, 210 (4th Cir. 1999)].  In the Petitioner's
case, by adding the Embezzlement theory after the close of evidence
the Prosecution alleges theft as the fraudulent use of funds

ATTACHMENT 'A':  PAGE 8

disbursed by Petitioner into the FBO accounts (see 1.4(B) above).
These monthly disbursements made by Petitioner and his subsequent
supposed fraudulent use thereof are separate acts relating to dif-
ferent property recurring over an indeterminate period that ends
sometime on or before October 2010.  Insomuch that the Supreme
Court has determined that separate conduct or transactions occur
if distinct and separate acts take place at different times [Block-
burger v. U.S.,284 US 299, 301 (1932)], thus these separate acts,
different property and different timing of the Prosecution's Em-
bezzlement theory define such as distinct allegations that are dis-
parate from the Grand Theft counts charged in the Information.
Therefore the Prosecutor's attempt to prove criminal acts that are
not charged by adding them after the close of evidence as an al-
ternative theory, and then instructing the jury on the new alle-
gations as an optional basis for conviction, is considered a
constructive amendment and determined by the courts to be per se
prejudicial; reversible error [Stirone, supra; United States v.
Cotton, 535 US 625, 629 (2002)].

   (C)  Duplicity in the Charges:  To incorporate the allegations
of embezzlement that are introduced through the impermissable
Constructive Amendment, the Prosecutor does so by adding them after
the close of evidence as an alternative theory for conviction for
the False Pretense Grand Theft counts (see 11RT2111).  Because the
Embezzlement allegations are based on separate and distinct acts,
to add them as an optional basis to the False Pretense allegations
subjects the Petitioner to duplicity by charging him with two dis-
tinguishable offenses in a single count.  Duplicitous charging is
fatally prejudicial, as in the Petitioner's case, when specific
charges are obscured, thereby preventing the jury from separately
deciding the issue of guilt or innocence with respect to each par-
ticular offense and creating uncertainty as to whether the con-
viction was based on a unanimous decision [U.S. v. Ramirez-Martinez,
273 F.3d 903, 915 (9th Cir. 2001)].  Compounding the prejudice is
the jury's instruction of CALCRIM No. 1861 which does not require
unanimous decisions, and when coupled with the absence of special

**ATTACHMENT 'A':  PAGE 9**

findings (see 11RT2243-2244;5CT1148), any remedy for the dup-
licitous charging is unrealistic.  Generally the issue of duplicity
is addressed before trial but in the Petitioner's case, the right
to challenge has not been waived because the prejudiciality was
nonexistent until the alternative allegations that created the
duplicity were added after close of evidence at trial [see <u>U.S. v
Sturdivant</u>, 244 F.3d 71,76 (2d Cir. 2001)].

   (D)  Defect of Pleading That Leads Petitioner to His Prejudice:
As noted above, the void-for-vagueness doctrine requires that a
Penal statute define the criminal offenses with sufficient defini-
tiveness and in a manner that does not encourage arbitrary enforce-
ment  [<u>Kolender v. Lawson</u>, supra].  This doctrine concern is also
identifiable in California state cases such as <u>In re Jamil H</u>. (1984)
158 CA3d 556 where the review court indicated that when a violation
of a statute depends on a violation of another statute, the language
of the first statute is in itself not sufficient to define the of-
fense and both statutes must be set out in the accusatory pleading
in order to withstand due process scrutiny.  In the Petitioner's
case, the Prosecutor exploits the vague language of the Information
to effectively charge the Embezzlement allegation as an alternative
basis for conviction for the False Pretense counts.  In adding this
new offense and instructing the jury on its elements of fraudulent
appropriation of property by a person to whom it had been entrusted,
the Prosecution depends on a violation of CPC503 "Embezzlement" to
define the Grand Theft offense of the charged CPC487(a).  Thus the
vague language of the Information and the failure to include both
statutes in the accusatory pleading, allows the Prosecutor to add
charges without any notice to the Petitioner.  This defect that
misleads the Petitioner to prejudice renders the Information in-
valid (Fed. Rules of Crim. Proc. 7(C)(3);CPC1404).  Corroborative of
the need to include both statutes in the Information is seen in the
CALCRIM No. 1806 instruction given to the jury which does list both
the CPC503 embezzlement statute along with the Grand Theft statute
in order to define the offense for the jurors (see 5CT1088).  There-
fore to instruct the jury by defining the Grand Theft counts with

CPC503 Embezzlement statute and its descriptive language after with-
holding any notice of such from the Petitioner until after the
close of evidence, violates procedural due process and other con-
stitutional rights as set forth below.

1.6 THE VIOLATIONS OF THE PETITIONER'S CONSTITUTIONAL RIGHTS:   When
the Prosecutor added the theory of Embezzlement as an alternative
basis for conviction on  the Grand Theft counts, it allowed a var-
iance on the dates of the offenses, a constructive amendment for
the alleged conduct  and an impermissable duplicity in the charges.
The fact that this occurred after the close of evidence at trial
has far-reaching constitutional implications:

    (A)  Petitioner's Sixth Amendment Rights:

        (i)  Right to Notice:  The Sixth Amendment accords the Peti-
tioner the right "to be informed of the nature and the cause of the
accusation".  The Petitioner was 'informed' through Prosector
Pierce's recitation of the False Pretense theory from Preliminary
Hearing through close of evidence (see 1.2(A) above).  No other
'nature' or 'cause' was expressed during this time.  Not until after
the close of evidence and Mr. Pierce's addition of the alternative
basis was the Petitioner informed of the embezzlement allegations.
The U.S. Supreme Court has stated: "The initiation of judicial crim-
inal proceedings...marks the commencement of the criminal prosec-
utions to which alone the explicit guarantees of the Sixth Amend-
ment are applicable" [Kirby v. Illinois, 406 US 682, 689-90 (1972)].
Therefore the Prosecutor's decision to add this basis and const-
ructively amend the charges at the end of  judicial criminal pro-
ceeding  deprived the Petitioner of his Sixth Amendment right to
notice of the charges [Cole v. Arkansas, supra].

        (ii)  Right of Confrontation:  The Sixth Amendment's
Confrontation Clause provides a criminal defendant the right to di-
rectly confront adverse witnesses [Maryland v. Craig, 497 US 836,
846 (1990)]; and this extends to further examination when the pro-
secution introduces a new matter [United States v. Jones, 982 F.2d
380, 384-85 (9th Cir. 1992)].  Thus without notice of the charges

ATTACHMENT 'A':  PAGE 11

that were characterized by the Embezzlement theory introduced after the close of evidence, the Petitioner is unable to confront the alleged elements and testimony applied retroactively by the constructive amendment.  Without any "opportunity for effective cross-examination", the Petitioner is deprived of his constitutional right of confrontation [Delaware v. Fensterer, 474 US 15, 20 (1985)].

(iii)  Right to Effective Assistance of Counsel:  The 9th Circuit in Sheppard v. Rees, 909F.2d 1234, 1237 (9th Cir. 1990) states what appears identical to the Petitioner's claim:  "A trial cannot be fair unless the nature of the charges are adequately made known to him...in a timely fashion...[here] the prosecutor ambushed the defendant with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled.  This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceedings".

In the Petitioner's case, by the adding of the new Embezzlement theory after the close of evidence, he was denied effective assistance of counsel by precluding any practicable opportunity to subject these amended allegations to any meaningful adversarial testing.  When there has been an actual or constructive denial of assistance altogether, the adversarial process becomes presumptively unreliable [U.S. v. Cronic, 466 US 648, 659 (1984)].  When Sixth Amendment violations "pervade the entire proceeding", then harmless error analysis is inapplicable and the violations are enough, without showing of prejudice, to overturn the conviction regardless of the severity of the results [Satterwhite v. Texas, 486 US 249, 256 (1988)].

(B)  Petitioner's Fifth Amendment Rights:  In adding the new theory after the close of evidence, the Prosecution subjects the Petitioner to double jeopardy and violations of his Fifth Amendment rights.  This is demonstrated by the Prosecutor's use of different property, the alleged "scheme" involving this different property,

ATTACHMENT 'A':  PAGE 12

and the forensic testimony relied upon for this "scheme".

(i)  Different Property:  As described in 1.4 above, the Prosecutor when attempting to illustrate the fraudulent use element of Embezzlement, references different 'property' than that of the False Pretense theory.  The property he identifies-- not the checks from investors to the Petitioner-- but rather it was the "alleged or supposed interest payments that were the from the investment were put into those [FBO] accounts" and it was this property/money that "by the end of the entire scheme all those accounts were cleaned" (11RT2111).

(ii)Embezzlement's Scheme:  This "scheme" as referenced by the Prosecutor is the Ponzi scheme alleged as count 38 (CCC25541; see Information at 4CT900).  In the Prosecutor's effort to demon- strate the elements of embezzlement, he relies entirely on the tes- timony of OCDA's forensic accountant, Scott Weitzman: "...and here is where Mr. Weitzman's testimony comes into play...the investment money [profit from investment] was not going to them, the investors, it was going into an account Mr. Tarbutton ran and when the whole thing collapsed, all the money was gone" (11RT2134-35).  The rele- vancy of this elemental reference is that these are the same com- ponents and testimonial evidence the Prosecution argues as proof of the "scheme to defarud" (Count 38).

(iii)  Weitzman's Testimony Used to Argue Embezzlement:  Forensic Accountant Weitzmen testifies that during 500 hours of forensic analysis (7RT1360), he was looking for evidence consistent with a Ponzi scheme (see 8RT1418).  In that analysis of Petitioner's records, he noted the disbursements made by the Petitioner directly to the investors and also that which were deposited by the Peti- tioner into the FBO accounts; and noticed that by October 2010, the FBO accounts had little or no money in them (see 8RT1452).  Mr. Weitzman indicates his testimony is primarily related to the Ponzi scheme (8RT1456), and does not associate his testimony with any other charged offense; going so far as to say that he did not intend to include Grand Theft counts in his analysis, doesn't recall being

ATTACHMENT 'A':  PAGE 13

asked to (see 8RT1457), and is unaware if the investors lost any money in their investments with the Petitioner (8RT1463).

(iv)  Embezzlement Theory is a Lesser Included Offense of the Ponzi Scheme Charge (Count 38):  Because no other proof or testimony for the embezzlement allegation is offered except that which is relied upon for the Ponzi Scheme Count 38, the Prosecution's evidentiary dependence on Weitzman's testimony establishes this new theory-- not as an alternative basis for conviction for the Grand Theft counts-- but as a lesser included offense of the Ponzi count [see Brown v. Ohio, 432 US 161, 167-68 (1977)].  Insomuch that a defendant may not be convicted of two crimes when one is a necssary 'LIO' of the other [United States v. Martinez-Lopez, 864 F.3d 1034, 1053-54 (9th Cir. 2017)], the Prosecutor by adding a 'LIO' of the "entire scheme" allegation as an alternative basis for conviction on all 17 Grand Theft counts, subjected the Petitioner to multiple punishments for the Ponzi offense of Count 38; resulting in a violation of his Fifth Amendment rights [Ohio v. Johnson, 467 US 493, 498 (1984)].

(C)  Violations of Due Process:  The Due Process Clause of the Fourteenth Amendment prohibits deprivation of a protected liberty interest without fair procedure:

(i) Improper Procedure:  "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that...are among the constitutional rights of every accused" [Cole v. Arkansas, supra at 201].  In California this fair procedure is noticed in Art.1, Sec.14 of the CA Constitution by stating: "Felonies shall be prosecuted by law, either by Indictment...or by Information" (also see CPC682;CPC727).  Therefore the wrongful government action that adds the embezzlement allegation after the close of evidence is in violation of the fair procedure mandated by law and thus deprives the Petitioner of procedural and substantive due process guaranteed through the Fourteenth Amendment to the U.S. Constitution.  With such a "departure from the form [and] mode prescribed" the pleading and proceeding are invalid (see CPC1404

and the forensic testimony relied upon for this property and "scheme":

and Fed. Rules of Crim. Proc. 7(C)(3)).

    (ii)  Doctrine of Specialty:  As set forth below in CLAIMS 4 and 5, according to the Prosecutor, the Petitioner was arrested and extradited from the country of Panama (e.g. 5CT950).  While the methods used by members of the Prosecution Team are tantamount to a 'forcible transnational abduction' (see Claim 4), the illicit acts commissioned, carried out, and concealed by the Prosecution do not eliminate the rights of due process and equal protection ac-corded the Petitioner had the arrest been conducted in a manner authorized by law.  Of particular note is the Doctrine of Specialty that is a "right conferred upon persons brought from a foreign country" that protects such a defendant from being tried, or tried and/or punished for offenses added after extradition including charges based on the same act for which he was extradited [United States v. Rauscher, 119 US 407 (1886)].  This doctrine is also in-cluded as Article VIII of the US-Panama Bilateral Extradition Treaty (see 5CT1779-1780); and thereby enforced by the Supremacy Clause of the U.S. Constitution Art.VI, Cl.2.  Therefore when the Prosecutor constructively amends the Grand Theft charges with the Embezzlement theory that is based on different acts, different property, dif-ferent timing, he adds offenses for which Petitioner was not extra-dited and thus precluded by the Doctrine of Specialty.  This becomes more prejudicial when considering these 'post' extradition allegations have been duplicitly charged via constructive amendment with the 'pre' extradition charges of Grand Theft by False Pretense.  This procedural fact infects these original counts with Doctrine of Specialty preclusion resulting from no unanimity instruction or special findings (see 11RT2242-44;5CT1148).  As a consequence, the Petitioner was tried and punished in violation of the Doctrine of Specialty and due process.

    (iii)  Discovery Violations:  The Prosecution has a due pro-cess obligation to disclose favorable evidence [Brady v. Maryland, 373 US 83, 87 (1963)]; and this duty is ongoing [Imbler v. Pacht-man, 424 US 409, 427 fn.25 (1976)].  When the Prosecution added the Embezzlement theory, they not only constructively amended the charges

ATTACHMENT 'A':  PAGE 15

but also actuated the constitutional mandate to disclose evidence material to the theory and allegations. The Embezzlement theory that alleges fraudulent use of funds for the benefit of the Petitioner (see CALCRIM No. 1806 at 5CT1146;11RT2242), is negated or mitigated by evidence of Petitioner's legitimate use of funds. OCDA's forensic accountant Scott Weitzman does testify he found evidence of transactions that were consistent with legitimate business transaction (8RT1449-1450); but none are shown on his spreadsheets he prepared and introduced into evidence as forensically accurate (see Trial Exhibits No.76-87;6CT1249-1250). The significance is further magnified by Mr. Weitzman's testimony that he reviewed all items of Petitioner's bank records and anything pertaining to the investors' investments are noted on his spreadsheets (10CT2112). However as noted by Petitioner through pre-sentencing motions-- and raised in CLAIM 6 below-- not only is there evidence that demonstrates the fallacy of Mr. Weitzman's forensic spreadsheets, but also missing from these reports is any accounting of Petitioner's legitimate use of funds for the benefit of the investors (see 11CT2370-2401). Considering that the Petitioner specifically requested accurate accounting to be provided by the OCDA's forensic accountant through pre-trial discovery requests (see 11CT2475-2481)- thus the Prosecution's adding allegations after the close of evidence, following their introduction of forensic accounting that neglects favorable evidence material to such theory, violates their discovery obligations and the Petitioner's right to due process.

　　　(iv)　Statute of Limitations: The Supreme Court's decision in Pennoyer v. Neff, 95 US 714 (1877), as applied to the Fourteenth Amendment's requirement of due process, guarantees the Petitioner that his rights can be adjudicated only by a court that has proper jurisdiction. In California, to ensure subject matter jursidiction, an accusatory pleading must allege facts showing that prosecution is not barred by statute of limitations [see In re Demillo (1975) C3d 598, 601]; and the Prosecutor has the burden during trial of proving the statute of limitations has not expired [People v. Lopez (1997) 52 CA4th 728, 737]. In the Petitioner's case, as noted in 1.5(A) above, the Embezzlement theory created a variance on the

ATTACHMENT 'A': PAGE 16

<u>CLAIM II: PERSONALLY PRESENT AND PEREMPTORY CHALLENGE</u>

based on factors/events that had already occurred outside petitioner's presence/knowledge and absent any practicable opportunity for petitioner to be advised by counsel. Whereas the sixth amendment right attaches and applies to the period from arraignment to trial which "perhaps [is] the most critical period of proceedings" where a defendant must have "sufficient time to advise with counsel" [#2.10 '*Powell*'] – therefore Judge King's actions that eliminate any logistical opportunity for consult and advisement, constitutes an actual denial of petitioner's right to assistance altogether at a critical stage. Such error is presumptively prejudicial and reversible [#2.11 '*Perry*']. No showing of prejudice is required beyond showing that the petitioner was denied assistance of counsel during a critical portion of proceedings. *[#2.12 'Geders'].*

<u>6. THE ACTIONS OF THE MASTER CALENDER COURT DENIED THE PETITIONER HIS SIXTH AMENDMENT-SECURED RIGHT TO AUTONOMY:</u>
The U.S. Supreme Court in <u>McCoy v. Louisiana</u> [#2.13] indicated that the sixth amendment secures the right for a defendant to autonomously make fundamental choices about the proper way to protect his liberty. When control of an issue within the defendant's prerogative has been usurped, such depriving of this sixth amendment – secured autonomy has been recognized as structural [#2.14 '*Mckaskle*']. In looking at the statutory language of CCP 170.6, it clearly provides that either a party or attorney may establish a judicial officer's prejudice [CCP 170.6(a)(2)] against the party or attorney [CCP 170.6(a)(1)]. This language confirms that the petitioner had the right and prerogative to autonomously establish the prejudice to ensure that such judge "shall not try" the respective matter. Therefore, the actions of Judge King to conduct a critical stage of the proceedings in the petitioner's absence and his subsequent decisions that rule petitioner's right of peremptory challenge was forfeited by the deficient performance of Mr. Schaffer – demonstrates Judge King usurping control of a fundamental right where the statutory law of CCP 170.6 clearly establishes the petitioner's prerogative to autonomously act. The "McCoy" court states that since the sixth amendment violation is defendant's autonomy, 'IAC' jurisprudence need not apply and relief doesn't require a showing of prejudice. They reasoned that when defendant's sixth amendment right to autonomy is violated it constitutes a "structural" error which is not subject to harmless error review. Structural errors signal flaws in fundamental fairness thereby infecting the framework of process and proceedings [#2.4 'Fulminante']. Thus, the structural error that deprives the petitioner the autonomous right to enforce fair trial provisions requires reversal without the need to show prejudice.

<u>7.) THE MASTER CALENDAR COURT ACTED WITH ABUSE OF DISCRETION IN THE MATTERS RELATED TO THE PETITIONER.</u>

timing of the offenses, changing the precise dates of the False Pre-
tense theory to an indeterminate time frame of embezzlement due to
Mr. Weitzman's inability to define a date of demarcation from the
Petitioner's legitimate use of funds to the alleged fraudulent use
(8RT1449-1450).  More telling are the 302 Reports prepared by FBI
Special Agent Jessie Murray, who when questioning alleged investor-
victim William Steiner, notes that Mr. Steiner discovered "over the
years" the facts now serving as the bases for the offenses (see
11CT2508-2510).  The ambiguity of this statement when viewed in con-
text with Mr. Steiner's 13 year investment period with the Peti-
tioner (see 11CT2346-2351), and combined with the indeterminate time
frame of the Embezzlement theory, spotlights the Prosececution's
failure to designate the dates of the offenses and discovery; and
consequently their neglect of the due process and jurisdictional
requirement of proving the theory is not barred by statute of
limitations.

1.7  TRIAL COURT'S ABUSE OF DISCRETION:  Based on a standard where
the reason or rulings of a judge are clearly untenable, irrational,
arbitrary or contrary to law [United States v. Evans, 728 F.3d 953
(9th Cir. 2013)], the statements made to the jury by the Petitioner's
Trial Court are qualifiable by such standard to be Judicial Abuse
of Discretion.  The Trial Court after tacitly permitting the Pro-
secutor to constructively amend the allegations during closing ar-
guments (see 1.3(A) above), instructed the jury on CALCRIM No.1861
which does not require the jurors to agree on the form of theft
(5CT1090).  During this instruction, the Court stated: "The defen-
dant has been prosecuted for theft under two theories:  Grand Theft
by False Pretense and Grand Theft by Embezzlement" (11RT2243-2244;
5CT1148).  However, as stated in 1.6(A)(i) above, "the initiation of
criminal proceedings...marks the commencement of the criminal prose-
cution" [Kirby v. Illinois, supra], and per due process and Art 1,
Sec.14 of the CA Constitution, this may only be commenced by Indict-
ment or by Information.  Therefore according to these **applicable**
standards, the Petitioner was not "prosecuted" under two theories

ATTACHMENT 'A':  PAGE 17

and the instruction given the jurors by the Trial Court is con-
trasted by the verbatim language of the Sixth Amendment's "in
all criminal prosecutions, the accused shall enjoy the right to be
informed of the nature and cause of the accusation".  It is also
important to note that the Petitioner objected to the alternative
basis for conviction as made through pre-sentencing motions as noted
in 1.9 below, that include his CPC1181 Motion for New Trial (Pro-
secutorial Misconduct at 10CT2123; Judicial Error at 10CT2167) and
on statutory grounds in his CPC1185 (see 10CT2197).  All pre-
sentencing motions and arguments were denied by the Trial Court
(1CT204-205).  Whereas "upon the trial judge rests the duty of
seeing that the trial is conducted with solicitude for the rights of
the accused" [Glasser v. United States, 315 US 60, 71 (1942)],  thus
the decisions of the Petitioner's Trial Court, that allow the im-
proper constructive amendment, misrepresent the procedural facts
of the criminal proceedings, misdirect the jury, and deny the Pet-
itioner the constitutional rights associated when raised contem-
poraneously; constitutes such decisions and rulings irrational and
thereby abuses of the court's discretion.

## 1.8 INEFFECTIVE ASSISTANCE OF COUNSEL:

(A)  Trial Counsel:  The trial counsel has a duty to preserve
issues for appeal by placing objections on the record [People v.
Daniels (1991) 52 C3d 815, 841].  As noted in 1.3 above, the Pro-
secutor added the alternative basis after the close of evidence
without a motion, and without any objection from trial counsel. In
bringing this issue on a State Habeas Petition, the Petitioner
cited People v. Dominguez (2008) 166 CA4th 658 wherein the review
court reversed based on an alternative basis added after the close
of evidence.  In Dominguez, the appellant cited a similar case found
in People v. Burnett (1999) 71 CA4th 151.  In Burnett, the review
court reversed by finding of 'IAC' due to defense counsel's failure
to object to the additional basis being added after the close of
evidence.

(B)  Appellate Counsel:  Despite trial counsel's 'IAC' by not

objecting, the Petitioid preserve the issue by the 'con-
temporaneous objection' [Puckett v. U.S., 556 US 129, 133
(2009)] made through hesentencing motions after trial counsel
conflicted off after ction.  Therefore irrespective of trial
counsel's 'IAC', thesees were cognizable on appeal.

    (i)  Right to tive Assistance of Counsel on Direct
        Appeal: .ioner was entitled to effective assis-
tance of counsel on a: appeal in state court as guaranteed
through the due proceause of the Fourteenth Amendment [Evitts
v. Lucey, 469 US 387,39 (1985)].  In addressing whether an
attorney was ineffector failing to present an issue, the court
compares the neglecteues to those actually raised.  If the ig-
nored issues were clestronger, then appellate counsel was de-
ficient.  To show pre?, a petitioner must show that there's a
"reasonable probabiline omitted claim would have "altered the
outcome" of the appea it been raised [Stallings v. United
States, 536 F.3d 624,(7th Cir. 2006)].

    (ii)  Deficied Prejudicial:  As noted in the declaration
attached as Exhibit Nthe Petitioner had identified the most im-
portant issues of lawultiple correspondences with appellate
counsel.  The Petition submitting this claim in a Habeas pet-
ition to the state apte court concurrent with the direct appeal
due to appellate coun omission, requested a letter from counsel
explaining the decisjt to raise this issue.  A copy of this
letter to counsel is:hed as Exhibit No.12.  No response from
counsel has been recenor is there any justifiable reason to
omit this claim fron direct appeal.  Appellate counsel had ar-
gued a tangential isé failing to instruct on unanimity (see
'AOB' of Appeal No.G?, Argument I, Page 111) but fails to
raise this claim, isnd prejudice that precludes such instruction
altogether.  If appe: counsel would have included this claim,
the argument as rais the 'AOB' is inconsequential due to the
structural errors anc se prejudiciality of the the issues as
set forth here aboveerefore, appellate counsel's failure to
raise is 'IAC'.

1.9  THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY:  This Claim and the issues raised merit Federal Review pursuant to 28 U.S.C. 2254 as the facts and evidence presented are properly before the court. With the Petitioner's conviction and state custody a direct result of the violation of the U.S. Constitution, laws and Treaties of the U.S., proper remedy is warranted.

(A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of Orange County Superior Court, the Petitioner through pro per pleadings filed in Trial Court prior to sentencing, properly preserved the issues identifiable in CLAIM 1 above.  These 'objections' are found in the appellate record included as: Prosecutorial Misconduct (CPC §1181 Motion at 1OCT2123);  Judicial Error (CPC §1181 at 1OCT 2167);  'IAC' of Trial Counsel (CPC §1181 at 1OCT2136-2139); Arrest of Judgment (CPC §1185 at 1OCT2197).  As noted in No. 3C of the Procedural History included in the PETITION OVERVIEW, all pro per motions and actions were denied by the Trial Court prior to sentencing; and in so doing  offered no factual findings, applied no decisional law addressing the materiality or prejudiciality of the issues associated, nor compelled any evidence/testimony to resolve credible, disputed issues of fact.

(B)  Issues Exhausted in State Court:  As noted in Procedural History included in the PETITION OVERVIEW, the Petitioner motioned the Appellate Court to set aside his direct appeal brief as filed by Appellate Counsel due to the omission of issues of greater significance.  After the Appellate Court disregarded this request, the Petitioner filed a state Habeas Petition concurrent with his direct appeal in which the issues raised in CLAIM 1 were included as CLAIM I of that petition.  That state petition (No.G058686) was denied on 6/04/2020.  Petitioner filed virtually the same petition in the California Supreme Court on 7/31/2020.  This state petition (Case No. S263665) was denied on 2/20/2021.  Both denials provided no factual findings, no explanation, no application of decisional law, no evidentiary action to resolve any credible, disputed issues of fact, nor any indication that any adjudication of any issue was administered.

ATTACHMENT 'A':  PAGE 20

(C)  Evidence and Authorities Presented to State Court:  In submitting these issues in state court, the Petitioner presented such on the same facts and evidence referenced herein by attached Exhibit, Declaration, and Request for Judicial Notice (Exhibit 5).  As to applicable federal law established by U.S. Supreme Court decision, the Petitioner offered such authorities that included: Stirone v. U.S., 361 US 212 (1960) [Constructive Amendment]; Russell v. U.S., 369 US 749 (1962) [Variance]; Cole v. Arkansas, 333 US 196 (1946) [Undisclosed Charges]; Kolender v. Lawson, 461 US 352 (1983) [Overbroad Statute]; Berger v. U.S., 295 US 78 (1969) [Prosecutorial Misconduct/Variance]; Crawford v. Washington, 541 US 36 (2004) [Crawford Violation]; Pointer v. Texas, 380 US 400 (1965) [Confrontation Denial]; United States v. Rauscher, 119 US 407 (1886) [Doctrine of Specialty].

(D)  Review and Remedy:  In the PETITION OVERVIEW attached to the Federal Habeas Form CV-69, the Petitioner demonstrates that this CLAIM merits de novo review due to the fact that there is no state ruling to review with AEDPA deference.  In this de novo review as prayed by the Petitioner, he also requests Judicial Notice of the evidence as presented in Exhibit No. 5 [Page 40 of ATTACHMENT 'D']. In the Court's determination of issues as presented in this CLAIM, the Petitioner prays for resolution of all disputed facts by reference to that which is judicially noticeable and obtainable by Evidentiary Hearing as incorporated by Exhibit No. 20 [Page 127 of ATTACHMENT 'D'].  As to relief, Petitioner prays for all just and proper including but not limited to reversal of the conviction acquired through the aforedescribed prejudicial means in state superior court.

CLAIM 2:   CRITICAL STAGE CONDUCTED IN PETITIONER'S INVOLUNTARY
ABSENCE AND DENIAL OF STATE-CREATED RIGHT OF PEREMPTORY
CHALLENGE THAT IS TYPICALLY AVAILABLE TO ALL CRIMINAL
DEFENDANTS

SUMMARY:   The Petitioner was denied due process when in his invol-
untary absence, the master calender court conducted a critical stage
of the criminal process that held significant consequences for him
as the accused.   By taking this action, the court precluded any
opportunity for the Petitioner to be advised by counsel as to the
legal issues and significant rights affected by this proceeding.
Following the violation of his right to be present, the court then
deprived the Petitioner of his state-created right of peremptory
challenge that is designed to safeguard the structural integrity
of the judicial process, by ruling it was only available to him at
that critical stage from which he had been excluded.   This ruling
of the court that forfeits the Petitioner's right that is intended
to ensure an impartial judge and fair trial, also subjects him to
ineffective assistance of counsel, actual denial of counsel al-
together at a critical stage, and violation of his Sixth Amendment-
Secured right to autonomously act.

<u>CONTENTS OF CLAIM 2</u>:

2.1   Statement of Procedural Facts                          Pg. 24

2.2   The Master Calender Court Erred by Conducting a
      Critical Stage of the Criminal Proceedings in the
      Petitioner's Involuntary Absence                       Pg. 25

2.3   The Master Calender Court Erred by Depriving the
      Petitioner His Statutory Right of Peremptory
      Challenge                                              Pg. 26

2.4   The Ruling of the Master Calender Court Subjects
      the Petitioner to Ineffective Assistance of Counsel    Pg. 27

2.5   The Actions of the Master Calender Court Denied
      the Petitioner Effective Assistance of Counsel at
      a Critical Stage                                       Pg. 28

2.6   The Actions of the Master Calender Court Denied
      the Petitioner His Sixth Amendment-Secured Right
      to Autonomy                                            Pg. 29

2.7   The Master Calender Court Acted with Abuse of
      Discretion in the Matters Related to the Petitioner's
      Criminal Proceedings                                   Pg. 30

2.8   The Deficient Performance and Prejudice of Trial
      and Appellate Counsel Subsequent to Judge King's
      Abuse of Discretion                                    Pg. 31

2.9   This Claim Merits Federal Review and Remedy            Pg. 32

## 2.1   STATEMENT OF PROCEDURAL FACTS:

(A)  December 9, 2015:  The Petitioner appeared 'in-custody' in Courtroom 'C-5' of the Orange County Superior Court with Judge King presiding (For transcript references, see 8CT1891-1894).  The purpose of this appearance in front of Judge King as the supervisor of the Master Calender was to receive assignment of a trial judge. However upon appearing, Judge King informed the Petitioner that his trial counsel Jerry Schaffer was ill and unable to appear.  As a result, Judge King stated "We're just going to put the matter over until tomorrow" (8CT1893).  Prosecutor Pierce added he'd received emails/voicemails from Schaffer "that he has been sick over the weekend with a pretty severe case of the flu, and is still sick today" (8CT1893-1894).  No other information was provided the Petitioner nor any indication of assignment of a trial judge.

(B)  December 10, 2015:  The Petitioner, without any contact with trial counsel Schaffer, again appeared 'in-custody' in Courtroom 'C-5' with Judge King presiding.  Unlike the previous day, Mr. Schaffer did appear after the matter was called (For transcript references, see 8CT1896-1904;1RT1-6).  It was at this appearance that Petitioner learned the trial court assignment of Judge Jensen in West Court, and after brief consult with Mr. Schaffer, expressed his desire to 'paper' Judge Jensen.  However while attempting to exercise his Ca. Code of Civil Proc. 170.6 statutory right of peremptory challenge, Judge King stated "The court instructed my staff to  contact the parties to advise them that matter was set for Judge Jensen" (8RT1899;1RT3), and that because "under 170.6 when a case is set out for trial in a Master Calender...once the parties are notified they're required to then file the 170.6" (8CT1900;1RT3); and since "it is at that point that counsel is required to file the 170.6... the court does find that it is untimely" (8CT1901-1902;1RT3-4).

(C)  December 10, 2015 to January 20, 2016:  The Petitioner stood trial in front of Judge Jensen until January 20, 2016 at which time he was found guilty on all counts (see 12RT2269-2276).

(D)  January 21, 2016 to November 2, 2017:  After waiting an

**ATTACHMENT 'A':  PAGE 24**

approximate year for trial counsel to file for post-trial relief, Mr. Schaffer conflicted off of the Petitioner's case (January 13, 2017;see 1CT187-188).  After a brief stint with the Public Defender's office, Petitioner went 'pro per' (February 24, 2017;see 1CT191). During his 'pro per' status, Petitioner sought to address the denial of his statutory right typically available to all criminal defendants and assert his right to an impartial judge.  These attempts, identifiable in at least nine different arguments/motions are listed in 2.9 below.  All have been denied by the respective courts.

(E)  November 3, 2017:  Petitioner was sentenced by Judge Jensen to 34 years, 4 months in state prison (1CT208-226).

## 2.2  MASTER CALENDER COURT ERRED BY CONDUCTING A CRITICAL STAGE OF THE CRIMINAL PROCEEDINGS IN PETITIONER'S INVOLUNTARY ABSENCE:

(A)  Right to **be Personally Present:**  All cases in which a felony is charged, the accused is given the right to be personally present at all proceedings unless waived.  This right is implemented by statute (e.g. CPC977(b)(1)), protected by the California Constitution (Art.I, Sec. 15 "personally present with counsel"), and enforced by the Due Process clause of the U.S. Constitution which grants a defendant the right to be present at any stage of the criminal process that holds significant consequence [Kentucky v. Stincer, 482 US 745 (1987)].  This right of due process has been found to be violated when critical stages are conducted while a defendant was involuntary absent [Illinois v. Allen, 397 US 337 (1970)].

(B)  Violation of Petitioner's Right to be Present:  When Judge King on December 8th, "instructed" his staff to contact counsel to advise that the Petitioner's trial was set for Judge Jensen, he conducted a critical stage of the criminal proceedings with the Petitioner involuntarily absent.  The significant consequence of this stage, and thus defining such as critical [Cone v. Bell, 535 US 685, 696 (2002)], is that trial by a judge who is not impartial is considered a structural error by the CA Supreme Court [People v. Stewart (2004) 33 C4th 425] and the U.S. Supreme Court [Arizona v. Fulminante, 499 US 279 (1991)].  Because of this significance, the

peremptory challenge of California's CCP170.6 is a structural safe-
guard to ensure that no trial judge may try a criminal action when
prejudice is declared (CCP170.6(a)(1)).   The U.S. Supreme Court in
United States v. Gagnon, 470 US 522 (1985) indicated that the pre-
sence of a defendant is a condition of due process to the extent
that a fair and just hearing would be thwarted by his absence [at
526].   Therefore by assigning the criminal action to Judge Jensen
on December 8th outside of Petitioner's presence and knowledge,
Judge King conducts a critical stage that "affects the framework
within which the trial proceeds" [Arizona v. Fulminante, supra], and
subjects the Petitioner to a violation of his fair trial guarantee.
Any opposition to the critical significance of this stage is undone
when considering that as detailed in 2.3 below, no other opportunity
was provided the Petitioner to assert this right that is typically
available to all criminal defendants.

## 2.3 MASTER CALENDER COURT ERRED BY DEPRIVING PETITIONER HIS
##      STATUTORY RIGHT OF PEREMPTORY CHALLENGE:

Notwithstanding the rights violated by the Master Calender Court's
decision as noted in 2.2 above, but the prejudicial effect and stru-
tural error may have been ameliorated had Judge King, during Peti-
tioner's only appearance in which he was notified of trial court
assignment, not ruled that a peremptory challenge was untimely.  As
found in the transcripts (8CT1902;1RT5), no other reason was cited.
However when focusing on the issue of timing, Judge King's use of
'untimely' is in error when considering the statutory language of
CCP170.6 reads that no judge may try a criminal case if such judge
"is prejudiced against a party or attorney or the interest of a
party or attorney appearing in the action", and it is "party or an
attorney [who] may establish this prejudice" (CCP170.6(a)(1)/(a)(2)
underlines added).  Whereas CPC685 designates "party" specifically
as the defendant in a criminal action,  Judge King's ruling of un-
timely therefore is lacking in justification because it completely
eliminates the remedy of CCP170.6 due to a prejudice against the
"party" aka defendant.  Furthermore, Judge King's 'untimely' is also
shown to be an error, well understood and established in existing
law, when considering CCP170.6(a)(2) presupposes all parties are

personally present before the Master Calender Judge when assignment
is made [Stevens v. Superior Court (1997) 52 CA4th 55, 59-61]. Thus
when Judge King instructed his staff on December 8th "to contact the
parties" (8CT1899;1RT2), the "party" identifiable as the defendant
was never notified-- by Judge King, staff, or Trial Counsel-- until
the appearance on December 10th. Inasmuch as the CA Supreme Court
in Solberg v. Superior Court (1977) 10 C3d 192, 196 indicates the
peremptory challenge be brought at the earliest opportunity; the
Petitioner's December 10th appearance therefore, is the earliest
possible opportunity for the "party" to declare "prejudice" and
thereby ensure his due process guarantee of an impartial judge via
his statutory right of CCP170.6. Instead of mitigating the violation
of Petitioner's rights caused by Judge King's decision to exclude
him from a critical stage of the judicial process, the Master Cal-
ender Court invites irreparable harm by depriving the Petitioner his
statutory right of peremptory challenge that may have rectified the
error.

2.4   THE RULING OF THE MASTER CALENDER COURT SUBJECTS THE PETITIONER
      TO INEFFECTIVE ASSISTANCE OF COUNSEL:

The U.S. Supreme Court has indicated that the Sixth Amendment rights
to effective counsel attaches to critical stages of pre-trial pro-
ceedings [U.S. v. Wade, 388 US 224 (1967)]. Therefore Judge King's
ruling as stated December 10th on record (5CT1896-1904;1RT1-6), that
deprived Petitioner the right of the "party" to exercise his per-
emptory challenge, effectuated a violation of his constitutional
right to effective counsel at a critical stage. Considering "for-
feiture" is described by the U.S. Supreme Court as "the failure to
make the timely assertion of a right" [U.S. v. Olano, 507 US 733
(1993)]; thus the ruling of Judge King, whereby it is defense coun-
sel's failure to timely assert the statutory right of peremptory
challenge due to a prejudice against the "attorney" that deprives
the Petitioner of his right of peremptory challenge due to a pre-
judice against the "party"-- constitutes a deficient performance of
counsel that forfeits Petitioner's substantive and structural rights
that ensure an impartial judge and fundamental fairness. Therefore

such performance of counsel that denies the Petitioner of the rights
to which due process of law entitles, is substandard, presumptively
prejudicial, and identifiably ineffective [Williams v. Taylor, 529 US
393 (2000)].  Please note that 'IAC' of trial counsel due to the
failure to file any motion or writ pursuing the issue of judicial
disqualification is also raised in CLAIM 9 below.

## 2.5  THE ACTIONS OF THE MASTER CALENDER COURT DENIED THE PETITIONER
EFFECTIVE ASSISTANCE OF COUNSEL AT A CRITICAL STAGE:

With Judge King's ruling of untimely (8CT1902;1RT5), he precludes
any practical possibility of Petitioner conferring with counsel re-
garding the trial judge assignment.  As noted in 2.1 above, Peti-
tioner had no contact with counsel relative to Judge Jensen's as-
signment until December 10th appearance in Courtroom 'C-5'.  There-
fore Judge King's decision of 'untimely' on December 10th was based
on factors/events that had already occurred outside of Petitioner's
presence/knowledge, and absent any practicable opportunity for the
Petitioner to be advised by counsel.  Insomuch that the Sixth Amend-
ment rights attach and apply to the period from arraignment to trial
which "perhaps [is] the most critical period of proceedings" where
a defendant must have "sufficient time to advise with counsel" [Po-
well v. Alabama, 287 US 45, 57-59 (1932)]; therefore Judge King's
actions that eliminate any logistical opportunity for consult and
advisement, constitutes an actual denial of Petitioner's right to
assistance altogether at a critical stage.

The Ninth Circuit in determining whether a procedure is a critical
stage, applies a three factor test, any one of which may be sufficient
to identify a proceeding as critical: (1) Whether the failure to pur-
sue strategies or remedies results in a loss of significant rights;
(2) Whether counsel would be useful in helping the defendant under-
stand the legal issues, and; (3) Whether the proceeding tests the
merits of the case [McNeal v. Adams, 623 F.3d 1283, 1289 (9th Cir.
2010)].  In the Petitioner's case. Factors (1) and (2) are clearly
relatable to the proceeding in question as well as the legal issues
involved and the fundamental rights affected.  Also when considering
the Trial Court's subsequent appearance of actual bias as raised in

ATTACHMENT 'A':  PAGE 28

CLAIM 8 below, and its prejudicial impact on the merits of the case, all three factors as used by the Ninth Circuit establish this proceeding as a critical stage for purposes of Sixth Amendment protections.  Thus with depriving the Petitioner of assistance of counsel altogether at this critical stage, such error is presumptively prejudicial and reversible [Perry v. Leeke, 488 US 272, 279-80 (1989)].  No showing of prejudice is required beyond showing that the Petitioner was denied assistance of counsel during a critical portion of the judicial proceedings [Gedders v. United States, 425 US 80, 88-91 (1976)].

## 2.6  THE ACTIONS OF THE MASTER CALENDER COURT DENIED THE PETITIONER HIS SIXTH AMENDMENT-SECURED RIGHT TO AUTONOMY:

The U.S. Supreme Court in McCoy v. Louisiana, 138 S.Ct. 1500 (2017), indicated that the Sixth Amendment secures the right for a defendant to autonomously make fundamental choices about the proper way to protect his liberty.  When control of an issue within the defendant's prerogative has been usurped, such depriving of this Sixth Amendment-secured autonomy has been recognized as a structural error [McKaskle v. Wiggins, 465 US 168, 177 (1984)].

In looking at the statutory language of CCP170.6, it clearly provides that either a "party" or "attorney" may declare a judicial officer's prejudice (CCP170.6(a)(2)) against the "party" or "attorney" (CCP 170.6(a)(1)).  This language confirms that the Petitioner had the right and prerogative to autonomously declare and establish the prejudice to ensure that such judge "shall not try" the respective matter.  Therefore, the actions of Judge King to conduct a critical stage of the proceedings in the Petitioner's absence and his subsequent decisions that rule Petitioner's right of peremptory challenge was forfeited by the deficient performance of Mr. Schaffer-- demonstrates Judge King usurping control of a fundamental right where the statutory law of CCP170.6 clearly establishes the Petitioner's prerogative to autonomously act.  The "McCoy" Court states that since the Sixth Amendment violation is defendant's autonomy, 'IAC' jurisprudence need not apply and relief doesn't require a showing of prejudice.  The Court reasoned that when this right to

CLAIM 8 below, and its prejudicial impact on the merits of the case, all three factors as cited establish this proceeding

a

autonomy is violated it constitutes a 'structural' error which is not subject to harmless-error review.  Structural errors signal flaws in fundamental fairness thereby infecting the framework of process and proceedings [Arizona v. Fulminante, supra].  Thus the structural error that deprived the Petitioner his autonomous right to enforce fair trial provisions that are typically available to all criminal defendants requires reversal without the need to show prejudice.

2.7  THE MASTER CALENDER COURT ACTED WITH ABUSE OF DISCRETION IN THE
     MATTERS RELATED TO THE PETITIONER'S CRIMINAL PROCEEDINGS:

Judicial abuse of discretion generally is determinable when the reasons or rulings of a judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result [State v. Egger, 237 Neb. 688, 467 N.W. 2d 411 (1991)].  In the Petitioner's case, Judge King's only rationality for denial of Petitioner's peremptory challenge is the timing requirement found in CCP170.6(a)(2) (8CT1900;1RT3).  However this is clarified by the well established law of Stevens [supra] and Solberg [supra], that provides for logical application when parties are not before the court at the time of assignment.  Moreover, there is no justification for Judge King to violate the Petitioner's right to be personally present by handling a critical stage of the judicial proceedings in hia absence.  Therefore Judge King's only basis for denying the Petitioner the substantive right of CCP170.6: untimely-- is in error because it is predicated on his act that is unconstitutional.  Thus Judge King's reason and rulings are untenable thereby depriving the Petitioner of the fundamental rights of impartial judge and fair trial.  Furthermore, the Supreme Court in Henry v. Mississippi, 379 US 443 (1985) indicated that a defendant may not forfeit an important federal right by reason of a state rule which is merely procedural and serves no legitimate state interest.

It is important to note that the Petitioner is not alone in his grievance with Judge King.  During this same period, the OCDA issued a press release responding to Judge King denying rights of peremptory challenges in other select cases (see 11CT2521-2523).  In this statement from the OCDA, they agree that the CCP170.6 gives "every party

ATTACHMENT 'A':  PAGE 30

the right to exercise" a peremptory challenge and "the authority
conveyed by 170.6 is a substantial right that is a part of our sys-
tem of due process and exists to ensure fair and impartial trials".
Thus the OCDA argues that which is well understood and established
law that a "court abuses its discretion when it erroneously denies
a motion to disqualify a judge" [citing People v. Superior Court
(Maloy) (2001) 91 CA4th 391, 395].

## 2.8   THE DEFICIENT PERFORMANCE AND PREJUDICE OF TRIAL AND APPELLATE
COUNSEL SUBSEQUENT TO JUDGE KING'S ABUSE OF DISCRETION:

As noted in the Petition Overview, these claims submitted for federal
Habeas review are being presented free from procedural defect.   There-
fore an 'IAC' issue of trial and appellate counsel is not included
to argue cause and prejudice of any state default but instead to
indicate the ineffectiveness associated with their inaction.

(A)   Trial Counsel:  Courts have recognized 'IAC' when counsel
has failed to file appropriate pre-trial motions [e.g. Kimmelman
v. Morrison, 477 US 365, 385 (1986)].  In the Petitioner's case,
any remedy for the errors committed by the Master Calender Court
were ignored by trial counsel; no Writ of Mandate or Challenge for
Cause (CCP170.3).  The failure to file any motion despite the con-
stitutional errors of Judge King and what eventually appears to be
an actual bias and a disqualifying conflict of interest of the as-
signed trial court, Judge Jensen (see CLAIM 8.8)- subjected the
Petitioner to an unfair and defective trial process.  Thus the de-
ficient performance of trial counsel Schaffer is 'IAC'.

(B)   Appellate Counsel:  As noted in the declaration attached as
Exhibit No.1, the Petitioner had identified the paramount issues to
be raised on appeal.  Despite the structural errors associated with
the contentions argued herein, appellate counsel neglected to in-
clude such in the 'AOB' of direct appeal No.G055717.  Because these
issues have infected the trial mechanism and require reversal, they
supersede the issues raised by appellate counsel in the 'AOB'.  Thus
pursuant to the authorities cited in CLAIM 1.8 [Evitts v. Lucey,
supra; Stallings v. United States, supra], and the standards set
forth therein, appellate counsel's performance is deficient and

prejudicial, therefore ineffective.  It is also important to note
that 'IAC' of trial counsel as argued in 2.8(A) above was reviewable
on direct appeal due to the Petitioner sufficiently developing the
claim in trial court through his Motion for New Trial found in the
appellate record at 1OCT2137 [U.S. v. Nickerson, 556 F.3d 1014, 1017
(9th Cir. 2009)].

2.9  THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY:  This Claim and
the issues raised merit Federal Review pursuant to 28 U.S.C. 2254
as the facts and evidence presented are properly before the court.
With the Petitioner's conviction and state custody a direct result
of the violation of the U.S. Constitution, laws and Treaties of the
U.S., proper remedy is warranted.

   (A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of
Orange County Superior Court, the Petitioner through pro per plea-
dings filed in Trial Court prior to sentencing, properly preserved
the issues identifiable in CLAIM 2 above.  These 'objections' are
found in the appellate record included as: Improper Denial of Per-
emptory Challenge and right to be present (CPC §1185 Motion at 1OCT
2199-2200); Judicial error (CPC §1181 at 1OCT2161; 1OCT2174); 'IAC'
(CPC §1181 at 1OCT2137).  In addition, the Petitioner filed three
(3) Challenges for Cause against the Trial Judge (CCP §170.3 at
1OCT1967-2014; 12CT2657-2663; 12CT2827-2836).  The Petitioner also
attempted to contact the Office of Judicial Counsel for mediation
in the disqualification of Trial Judge (12CT2655-2656).  As noted
in No. 3C of the Procedural History included in the PETITION OVER-
VIEW, all pro per motions and actions were denied by the Trial
Court prior to sentencing; and in so doing offered no factual
findings, applied no decisional law addressing the materiality or
prejudiciality of the issues associated, nor compelled any evidence/
testimony to resolve credible, disputed issues of fact.

   (B)  Issues Exhausted in State Court:  As noted in Procedural
History included in the PETITION OVERVIEW, the Petitioner motioned
the Appellate Court to set aside his direct appeal brief as filed
by Appellate Counsel due to the omission of issues of greater

ATTACHMENT 'A':  PAGE 32

significance.  After the Appellate Court disregarded this request/
motion, the Petitioner filed a state Habeas Petition concurrent with
his direct appeal in which the issues raised in CLAIM 2 were in-
cluded as CLAIM II of that petition.  That state petition
(No.G058686) was denied on 6/04/2020.  Petitioner filed virtually
the same petition in the California Supreme Court on 7/31/2020.
This state petition (Case No. S263665) was denied on 2/20/2021.
Both state denials provided no factual findings, no explanation, no
application of decisional law (state or federal), no evidentiary
action to resolve any credible, disputed issues of fact, nor gave
any indication that any adjudication of any issue was administered.

It should also be noted that prior to the filing of the state habeas
petition concurrent with his direct appeal, the Petitioner as the
pro per defendant in Case No. 11CF2747 sought appellate review and
coercive action resulting from the Trial Court's striking of the
three CCP §170.3 Challenges for Cause filed in Superior Court.  All
three Writs of Mandate filed in appellate court were denied without
explanation (12CT2590-2623; 12CT2630-2650; Exhibit No. 3).

(C)  Evidence and Authorities Presented to State Court:  In sub-
mitting these issues in state court, the Petitioner presented such
on the same facts and evidence referenced herein by attached Exhibit,
Declaration, and Request for Judicial Notice (Exhibit 5).  As to
applicable federal law established by U.S. Supreme Court decision,
the Petitioner offered such authorities that included:  Illinois v.
Allen, 397 US 337 (1970) [Right to be Present]; Geders v. U.S.,
425 US 80 (1996) [Counsel Consultation Denied]; McCoy v. Louisiana,
138 S. Ct. 1500 (2018), Rock v. Arkansas, 483 US 44 (1987) [Right
to Autonomously Act]; Hicks v. Oklahoma, 447 US 343 (1980) [Denied
State-Created Right]; Estelle v. McGuirre, 502 US 62 (1991) [Errors
by the State Denied Fair Trial].

(D)  Review and Remedy:  In the PETITION OVERVIEW attached to
the Federal Habeas Form CV-69, the Petitioner demonstrates that this
CLAIM merits de novo review due to the fact that there is no state
ruling to review with AEDPA deference.  In this de novo review as

ATTACHMENT 'A':  PAGE 33

prayed by the Petitioner, he also requests Judicial Notice of the evidence as presented in Exhibit No. 5 [Page 40 of ATTACHMENT 'D']. In the Court's determination of issues as presented in this CLAIM, the Petitioner prays for resolution of all disputed facts by reference to that which is judicially noticeable, and also that which is obtainable by Evidentiary Hearing as incorporated by Exhibit No. 20 [Page 127 of ATTACHMENT 'D']. As to relief, Petitioner prays for all just and proper including but not limited to reversal of the conviction acquired in state superior court through the afore-described prejudicial means.

ATTACHMENT 'A': PAGE 34

## CLAIM 3:  PERJURED TESTIMONY USED TO OBTAIN THE CONVICTION

**SUMMARY:**  The Prosecution used perjured testimony as the exclusive evidentiary foundation to presume the elemental facts required for conviction.  This perjured testimony was enabled by the Trial Court's predisposition that adopted a false presumption void of established facts, and resulted in a judicial advocacy of the Prosecution's elemental theory of the offenses.  This improper and incorrect opinion of the Trial Court precluded the jury's determination of the associated material matters and removed the Prosecution's burden of proof beyond a reasonable doubt for the elements of the charges. Considering the Petitioner's neglected pre-trial discovery request for specific information that would have exposed this perjury, the Trial Court's wrongful support for the false evidentiary presumption not only permitted the Prosecution's knowing use of perjured testimony to obtain the Petitioner's conviction but also allowed their continued suppression of the direct evidence that demonstrates his factual innocence.

## CONTENTS OF CLAIM 3:

| | | |
|---|---|---|
| 3.1 | Overview of the Theft by False Pretense Allegations | Pg. 36 |
| 3.2 | To Prove the Element of Reliance Specific to the False Pretense | Pg. 37 |
| 3.3 | The Prosecution's Exclusive Use of Presumptions as Evidentiary and Elemental Fact | Pg. 41 |
| 3.4 | Improper Judicial Opinion that Adopts Presumptions Void of Established Fact | Pg. 44 |
| 3.5 | Trial Court's Improper Opinion Unduly Influences the Trial Process | Pg. 45 |
| 3.6 | Defining "Interest" Specific to the False Pretense | Pg. 46 |
| 3.7 | Conviction Obtained Through False Testimony | Pg. 48 |
| 3.8 | Prejudicial Impact of Trial Court's Improper Influence | Pg. 51 |
| 3.9 | This Claim Merits Federal Review and Remedy | Pg. 54 |

CLAIM II: PERSONALLY PRESENT AND PEREMPTORY CHALLENGE

2.) MASTER CALENDAR COURT ERRED BY CONDUCTING A CRITICAL STAGE OF THE PROCEEDINGS IN PETITIONER'S INVOLUNTARY ABSENCE:

A.) Right to be personally present: In all cases in which a felony is charged, the accused is given the right to be present at all proceedings unless waived. This right is implemented by statute [CPC977(b)(1)]; protected by the California Constitution [Art I, Sec 15 "Personally present with counsel"] and enforced by the due process clause of the U.S. Constitution which grants a defendant the right to be present at any stage of the criminal proceedings that is critical to its outcome [#2.1 'Stincer']. The right, and by consequence due process, has been found to be violated when critical stages are conducted while a defendant was involuntarily absent [#2.2 'Allen']

B.) Violation of petitioner's right to be present: When Judge King on December 8th, "instructed" his staff to contact counsel to advise that the matter was set for Judge Jensen, he conducted a critical stage of the criminal proceedings with the petitioner involuntarily absent. Demonstrative of the criticality of this stage is that trial by a "judge who [is] not impartial" is identifiable as a structural error by the California Supreme Court [#2.3 'Stewart']; and the peremptory challenge of CCP 170.6 is a structural safeguard to ensure that no trial judge may try a criminal case when prejudice is established. (CCP 170.6(a)(1)]. Therefore, by assigning the Petitioner's trial to Judge Jensen on December 8th outside of Petitioner's presence and knowledge, Judge King conducted a stage that impacts the trial mechanism and "affects the framework within which the trial proceeds" {#2.4 "Fulminante']. Any argument that this is not a critical state is moot when considering that as detailed in No. 3, no other opportunity was provided the Petitioner to exercise his rights associated with this phase of the proceedings.

3.) MASTER CALENDAR COURT ERRED BY DEPRIVING PETITIONER HIS STATUTORY RIGHT OF PEREMPTORY CHALLENGE:

Notwithstanding the rights violated by the Master Calendar Court's decision as noted in No. 2 above, but the prejudicial effect and structural error could have been ameliorated had Judge King, during petitioner's only appearance in which he was notified of trial court assignment, not ruled that a peremptory challenge was untimely. No other reason was cited [8CT1902; 1RT5]. However, focusing on the issue of timing: Judge King's use of untimely is in error when considering the statutory language of CCP 170.6 reads that no judge may try a criminal case if such judge "is prejudiced against a party or attorney" and it is the "party or attorney [who] may establish this prejudice" [CCP 170.6(a)(1);(a)(2) underlines added]. Whereas CPC 685 designates "party" specifically as the defendant – Judge King's ruling of untimely, therefore is in error because it completely eliminates the remedy of CCP 170.6 due to a prejudice against the defendant aka "party". Furthermore, Judge King's "untimely" is also shown to be in error when considering CCP 170.6(a)(2) presupposes parties are personally

40

**3.1**  OVERVIEW OF THE THEFT BY FALSE PRETENSE ALLEGATIONS:   At trial, the Petitioner faced charges of Grand Theft that were alleged under the Prosecution's theory of theft by False Pretense.  Because the perjured testimony is used by the Prosecution to establish evidentiary presumptions exclusive to this false pretense, a brief description of its industry-specific subject matter and the elements required for this theory is necessary.

(A)  The Subject Matter of the False Pretense:  Anyone looking at the Petitioner's case--identified as Case No.11CF2747, Orange Co. Sup. Ct.-- and the amount of paperwork alluded to by the Prosecution, comes to the immediate conclusion that this is a complicated and complex case.  In fact, Prosecutor Pete Pierce opens the trial by telling the jury "it's a complicated case", and that they'll hear perhaps "sometimes in excrutiating detail" the intricacies of private mortgage ownership (1RT49).  The Prosecutor also at closing arguments, thanks the jurors for the time and effort to pay attention to a "long and comlicated case" (11RT2106).  This case however is not complicated, and could be proved or disproved with a modicum of documentary evidence specific to private mortgage ownership-- perhaps even a single exhibit per alleged investor-victim.  This exhibit if introduced, is what CA Evidence Code §410 would describe as "Direct Evidence" for it would prove "without an inference or presumption" the material fact that is the foundation of guilt <u>or</u> innocence.

(B)  The Alleged Verbal Representation of the False Pretense:  The Prosecution brought the Petitioner to trial on 17 counts of Grand Theft (CPC487(a); see Information at 4CT893-902: counts 1-4,6,8,10-12,15-17,22-26).  As set forth in CLAIM 1.2, the only theory of theft alleged by the Prosecution from Preliminary Hearing through the close of evidence at trial was Theft by False Pretense.  The Prosecutor from written briefs through closing remarks argued that the Petitioner verbally represented an investment premise that assured each investor he or she would be secured as the vested beneficiary/ lender for specific private mortgages (e.g. 4CT934-936; 5CT949; 11RT 2214).  It was this theory of a verbally represented false pretense that educed each alleged investor-victim to testify to a belief that

they were the lender of respective mortgages.  As an example of this, consider:

(i)  Larry Richardson (Counts 8-10):  This theory is summed up in the following exchange between Prosecutor Pierce and Mr. Richardson:

Pierce:  "...is it your testimony that you believed that you were the actual lender; fair statement?"

Richardson:  "Oh yes"  (8RT1515, lines 7-9)

Pierce:  "...so is it a fair statement that you were a lender based on oral representations made by Mr. Tarbutton?"

Richardson:  "Yes"

Pierce:  "...you never got anything in writing?"

Richardson:  "No"  (8RT1515, lines 15-21)

(ii)  Other Investors:  These 'lender' belief statements are are also sworn to by other investors, including but not limited to:  Mr. Almquist at 2RT349 (Counts 1-6);  Mr. Steiner at 6RT975 and 9RT1631 (Count 11);  Mr. Infantino at 5RT894 (Counts 15-17);  Ms. Duncan at 7RT1147 (Counts 18-19);  Mr. Pinault at 6RT1005 (Count 24), and; Ms. O'Connell at 8RT1554 (Count 26).

(C)  The Element of Reliance Specific to the Alleged False Pretense:  Under the Due Process Clause of the U.S. Constitution, the Prosecution is required to prove beyond a reasonable doubt every element of the crime with which the defendant is charged [In re Winship, 397 US 358 (1970].  Applying this principle to the false pretense theory and the language of CALCRIM No. 1804 instruction eventually given the jury, due process requires the Prosecution to prove beyond a reasonable doubt that "...the [investor] let the [Petitioner] take possession and ownership of the [investment capital] because the [investor] relied on the representation or pretense" (CALCRIM No. 1804 referenced at 5CT1144 and 11RT2241; underline added).

3.2  To Prove the Element of Reliance Specific to the False Pretense: In County Court of Ulster County v. Allen, 442 US 140 (1979), the Supreme Court indicated that it is often necessary for the trier of

ATTACHMENT 'A':  PAGE 37

fact to determine the existence of an element of the crime-- that is, an "ultimate" or "elemental" fact-- from the existence of one or more "evidentiary" or "basic" facts; and if "basic" or "evidentiary" facts are proven to the requisite degree of proof beyond reasonable doubt, the "ultimate" or "elemental" facts can be inferred or presumed therefrom [Ulster v. Allen at 156-157]. However in the Petitioner's case, the Prosecution makes no attempt to prove "evidentiary" or "elemental", and neglects the best evidence that is easily available to establish all facts required conviction.

(A)  Conduct of Investors to Demonstrate Reliance:  In the transcript example provided in 3.1(B)(i) above, the Prosecutor presents to the jury that the false pretense was only orally represented by the Petitioner and the investor (Richardson) "never got anything in writing" (8RT1515).  Absent from this exchange, and from the entire trial, is any evidence of investor conduct that demonstrates any reliance in the alleged oral representation.

(i)   'Actions Speak Louder Than Words':  The Prosecution introduces Marlou De Luna, Senior Counsel with the CA Department of Business Oversight (DBO), so she can testify that these oral representations can be considered 'contracts'(7RT1382-1383); but the Prosecution offers no attempt to show investor reliance or performance in this verbal 'contract'. 1 Witken, Summary of Cal. Law (10th ed.) Contracts, Section 749, indicates that the actions of the investor before any controversy has arisen as to the effect of this contract, may be looked at in the determining the meaning of the verbal agreement.  "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words'".

Mr. Richardson is confronted by the Preliminary Hearing Judge about his actions before the controversy, saying "did you ever ask...how is this providing security to me if my name is nowhere in any of these,...loan document, promissory note, or deed of trust?";  to which Mr. Richardson replies "No" (2CT357).  Submitted by Request for Judicial Notice is industry-specific information relative to mortgage lending, which describes the document of indebtedness (i.e. promissory note) as the definitive document in private mortgage

ATTACHMENT 'A':  PAGE 38

ownership (see Exhibit 5: No.5A).  By contrast in the Petitioner's
case, with the False Pretense alleging these investors believing,
and relying on the premise they were the actual lender, not one has
come forward with evidence they held <u>any</u> promissory note.  Moreover,
the affiant of probable cause, FBI Special Agent Jessie Murray, when
testifying at trial says she doesn't recall seeing any promissory
notes, didn't ask for promissory notes, and doesn't recall "even
a mention" of promissory notes (9RT1713-1714).

     (ii)  Acts of Ownership to Prove Reliance:  CA Evid. Code
§628 'Property Ownership Acts' states a "person who exercises acts
of ownership over property is presumed to be the owner of it".  The
CA Evidence Code indicates that 'property' includes 'personal pro-
perty' (CEC§180), which includes 'evidences of debt' (CEC§185), which
would describe a privately held mortgage.  In spite of no investor
possessing any promissory notes, if there were specific factual sce-
narios demonstrating investors exercising acts of ownership over
these mortgages, one could conceivably presume they believed they
were the actual lender.  With many of these investors continuously
investing with the Petitioner in verbal contracts for a decade or
more (up to 13 years- see Genealogy of Investors at 11CT2346-2351),
in what amounts to over 100 investments involving millions of dollars
(see Accounting at 11CT2370-2401)-- all the while believing each
investment made them the "actual lender" or the vested beneficiary
of a specific mortgage-- surely there are plenty of examples showing
their acts of ownership over any such mortgage.  With evidentiary
proof of acts of ownership, per <u>Ulster v. Allen</u> [supra], the element
of reliance could be presumed therefrom.

The Petitioner references acts of ownership typical of an actual
lender in his affidavit found at 11CT2362-2363.  However Mr. Rich-
ardson, despite investing in private mortgages since the 1970's
(1RT126), and notwithstanding his testified belief of being the
"actual lender" in investment transactions with the Petitioner (8RT
1515), when asked about any acts of ownership relative to the False
Pretense counts, he is unable to provide any documentary evidence
to support the element of reliance (see 8RT1500-1504).  In fact,

not one alleged investor-victim has provided any evidence that de-
monstrates any act of ownership exercised for any mortgage at any
time during this 13 year investment period.  For transcript refer-
ences of this fact, please see Exhibit 4: No. 8.

(B)  Best Evidence Available to Prove Reliance:  The Prosecution's
theory of False Pretense as noted in 3.1(C) above, requires as an
elemental fact to be established beyond a reasonable doubt, the
investors' reliance in the verbally represented false pretense.
Under Ulster v. Allen, this 'ultimate/elemental' fact could be pre-
sumed by proving a 'basic' or 'evidentiary' fact beyond reasonable
doubt.  However as noted in 3.2(A), the Prosecution makes no attempt
to prove either 'evidentiary' or 'elemental'. But there is evidence
available demonstrable of these investors' 'actions that speak
louder than words'; and such is considered 'direct evidence' be-
cause by itself, without presumption or inference, it conclusively
establishes 'basic/evidentiary' and 'ultimate/elemental' facts. Thus
proving beyond reasonable doubt the guilt of a defendant, or as in
this case, the factual innocence of the Petitioner.

As theorized by the Prosecution, the false pretense relied upon by
investors is that they believed they were the vested beneficiaries
("actual lender") of each respective mortgage transaction.  Being
an 'actual' lender of record carries specific tax liabilities and
creates specific tax-reporting requirements (e.g. 11CT2402).  Tax-
reporting of income is required by law regardless of premise (e.g.
CPC428; Revenue and Taxation Code 19701 et seq), however the premise
of mortgage lending (i.e. the False Pretense) has a tax-reporting
fingerprint that is clearly distinguishable and undeniably ident-
ifiable.  Therefore with the element of False Pretense that purports
these investors investing with the belief of being actual lenders,
any tax record that demonstrates they tax-reported any of the mil-
lions of dollars actually received from the Petitioner at any time
over the 13 year investment period specifically as income equated
with a mortgage beneficiary, is inarguably the best evidence avail-
able.  This evidence can be as simple as a tax schedule that iden-
tifies any income consistent with the testified belief; and when

ATTACHMENT 'A':  PAGE 40

introduced, incontrovertibly establishes all facts-- those basic/
evidentiary facts of acts of ownership as well as the ultimate/
elemental facts of reliance.  It is purely and simply, hands down,
the best evidence that proves guilt beyond any reasonable doubt.
This evidence that would pre-empt the "long and complicated case"
as warned by the Prosecutor in his statements to the jury, and fast
track a guilty plea, was never introduced.  Not one investor pro-
vided any proof of tax-reporting for any investment for any year
investing with the Petitioner.  Up to 13 years investing, over one
hundred capital contributions and millions of dollars actually re-
ceived in return.  CA Evid. Code §412 states "if weaker and less
satisfactory evidence is offered when it was within the power of the
party to produce stronger and more satisfactory evidence, the evi-
dence offered should be viewed with distrust".  But as noted below,
in the Petitioner's case, the Prosecution offers no evidence to
establish these facts required for conviction, only presumptions;
and false presumptions at that.

3.3  The Prosecution's Exclusive Use of Presumptions as Evidentiary
     and Elemental Fact:  In the absence of any tax-reporting evi-
dence, the Prosecution to prove the ultimate facts of the Grand Theft
allegations, resorts to presumptions that would have been easily
proved or disproved by introduction of the best evidence available.

(A)  Prosecution's Presumption That All Disbursement Received by
     Investors Were "Interest", "Interest Payments", or "Interest
     Income":  These 'interest' representations are found throught-
out testimony whereby the Prosecutor and the alleged investor-victims
state under oath that the disbursements received on their investments
were "interest", "interest payments", "interest income", and reported
as such for tax purposes.

     (i)  Martin Almquist (Counts 1-6):  As accounted by Peti-
tioner, Mr. Almquist invested over a span of 10 years (see Genea-
logy at 11CT2346-2351), and received an estimated $6 Million on his
investments (see Accounting at 11CT2370-2401).  When testifying, Mr.
Almquist states he considered all disbursements received on his

ATTACHMENT 'A':  PAGE 41

investments as mortgage "interest" consistent with his understanding of the false pretense allegation (see 2RT346), and filed as "interest income" on his tax returns (see 2RT348).  Mr. Almquist continues to say that "every cent that I received from [Petitioner] went as interest income on my tax returns" (2RT357); and is on record saying that he only received interest and never received any payment of principal (3CT656).

(ii)  "Interest" Representations Found in Testimony:  The transcripts of the Petitioner's proceedings are replete with the Prosecution's exclusive use of "interest", "interest payments", and "interest income".  This encompasses all alleged investor-victims, Prosecutor Pierce, FBI Agent Murray, and unfortunately, Petitioner's trial counsel Jerry Schaffer.  For a non-exhaustive list of transcript references, please see Exhibit 4, No. 1.

(B)  Prosecution's Presumption of "Principal" and 'No Return of Principal':  The Prosecutor indicates throughout the trial that because all disbursements made by Petitioner to investors were "interest", they were therefore "irrelevant" in any reconciliation. (e.g. 1RT212-215).  Thus without accounting any monies received by these investors due to the characterized irrelevancy of these presumed "interest" payments, the investors consequently received no return of "principal".  As a result of this 'no return of principal', a theft in the original amount of the investment occurred (e.g. 1RT 214).

(C)  Prosecution's Presumption of Actual and Determinable Loss: By presuming all monies received by the investors were "interest", and therefore 'no return of principal', the 'loss' suffered by the investors is equal to the original amount of each investment.  Thus these presumed 'loss' amounts are represented as actual and determinable by the Prosecution as follows:

(i)  The Charged Theft Amounts of the Information: See 4CT 893-902, Counts 1-4,6,8,10-12,15-17,22-26.

(ii)  The Enhancement Allegations:  The Prosecution aggregates the presumed actual and determinable loss amounts of the

ATTACHMENT 'A':  PAGE 42

Information to charge the Petitioner with the enhancement allegations of: CPC12022.6(a)(4) "...loss exceeds $3,200,00", and; CPC186.11(a) (1)/(2) "...results in the loss...($500,000)". As agreed to by the Prosecutor and Trial Court, these loss amounts are unaffected by any disbursements received by the investors because such were "interest" and therefore not accountable aginst the enhanced loss amounts (see 1RT218).

(iii) Investor Testimony: For transcript reference of investor testimony as to 'no return of principal', and thus actual loss-- please see Exhibit 4, No.3 and No.4.

(D) Materiality of Presumptions: The signficance of these "interest", "interest payment", and 'no return of principal' representations is that without proof of tax-reporting, the Prosecution depends on these presumptions as 'basic' and 'evidentiary' facts for proof of the 'ultimate' and 'elemental' facts of false pretense, theft, and actual loss. This is openly expressed by the Prosecutor and the Trial Court where they agree that because all disbursements made by Petitioner were "interest", they are "completely irrelevant" (1RT217). They then surmise that without any return of principal, a loss equal to the amount of contributed capital was suffered, and by consequence a theft occurred (see 1RT217-218). The Due Process problem is that these presumptive terms of "interest" and "principal" are never proven, and are actually predicated upon the very theory of false pretense which is the ultimate fact to be established.

Because the false pretense alleges a represented premise of mortgage lending, 'interest' is defined within this context in an explicit and unequivocal manner-- i.e. 'interest paid' by a borrower, and 'interest income' in turn received by the lender (see 11CT2402, and Request for Judicial Notice at Exhibit 5, No. 2). Therefore to prove the elemental fact that investors relied on a belief they were lenders, the Prosecution presumes the basic/evidentiary fact that all disbursements received by these investors were not only interest, but "interest" specific to the false pretense of mortgage lending. As noted in Ulster v. Allen [supra], the Prosecution could

ATTACHMENT 'A': PAGE 43

conceivably presume the ultimate facts of reliance, theft, and loss
by proving the basic/evidentiary fact of an "interest" character-
ization specific to mortgage lending.  Instead the Prosecution
claims that proving "interest" is "irrelevant" (1RT213; 1RT217),
and employs nonsensical reasoning of proving the theory of theft
by false pretense, by basing it on presumptions of 'principal' and
'no return of principal', which is evidentiary dependent on an un-
proven, thus presumptuous, representation of "interest".

Here we see the best evidence, absolute and unequivocal, is the di-
rect evidence that establishes the <u>fact</u> of how these investors tax-
reported the millions of dollars received from the Petitioner.  A
veritable slam dunk to conviction.  Even though CEC§550(b) places
the burden of producing evidence upon the Prosecution to prove the
basic fact of an "interest" characterization specific to mortgage
lending, Prosecutor Pierce actually confirms on record that these
evidentiary  facts are presumptions when he states in chambers "I
don't know these people [investors] did not report income" (1RT194).
Although awkwardly worded, Mr. Pierce by claiming he doesn't know
<u>if</u> they tax-reported, precludes any ability to know specifically
<u>how</u> they tax-reported; thereby admitting that the entire "interest"
characterization specific to the false pretense is a presumption,
and by consequence, the ensuing daisy chain as well.

3.4  Improper Judicial Opinion that Adopts Presumptions Void of
     Established Fact:  On numerous occasions, the Trial Court voices
his opinion and disposition that disbursements received by the in-
vestors from the Petitioner were "interest", and as such not account-
able in determining loss (see Exhibit 4: No. 4)-- even going so far
as to claim it's not even a theory, it is "just basic math" (1RT218).
But because this particular opinion of "interest" is specific to
that of the false pretense's alleged belief of mortgage ownership
(i.e. the 'reliance' element to be proven)-- by adopting such a
disposition, the Trial Court enables the Prosecution to presume an
element of loss based on the presumption of the evidentiary fact
of a specific "interest" characterization.  Moreover, by allowing
the presumption that these disbursements were "interest" as

ATTACHMENT 'A':  PAGE 44

particularly characterized and specifically defined by mortgage
lending, the Trial Court endorsed the presumption of the alleged
false pretense and thereby advocated the guilt of the Petitioner.
The United States Supreme Court has indicated that such "disposition
or opinion that is somehow wrongful or inappropriate, either because
it is undeserved, or because it rests upon knowledge that the sub-
ject ought not to possess...constitutes a partiality and bias that
unduly influence[s] the trial process" [Liteky v. U.S., 510 US 540,
550 (1994)].

3.5  Trial Court's Improper Opinion Unduly Influences the Trial
     Process:  The California Supreme Court in People v. Mahoney
(1927) 201 Cal. 618, stated "judges are not permitted to comment
upon the evidence or its effect.  They cannot be too careful or
cautious lest they by word, look or inflection of the voice to bear
upon the jury an influence not compatible with an unbiased verdict
of the jury".  In the Petitioner's case, not only has the Trial
Court fabricated evidentiary fact out of the Prosecution's pre-
sumptions, but it has also removed the determination of such from
the jury's purview and eliminated the Prosecutor's burden of proof.

   (A)  Prosecution's Burden of Proof:  Under the Fifth Amendment
to the U.S. Constitution, the prosecution must prove every element
of a criminal charge beyond a reasonable doubt [Patterson v. New
York, 432 US 197, 210 (1977)].  Under the Sixth Amendment, that
determination must be made by the jury, not the judge [Apprendi v
New Jersey, 530 US 466, 476 (2000)].  When a trial court fails to
submit an issue of materiality to the jurors it may ease the pro-
secution's burden of proof and deprive a defendant of the right to
demand the jury find him guilty of every element of the charged
offenses [U.S. v. Gaudin, 515 US 506, 522-523 (1995)].  With a
trial court's defining reasonable doubt in a way that eases the
prosecution's burden of proof, such error is not "amenable to harm-
less error analysis" and "will always invalidate the conviction"
[Cage v. Louisiana, 498 US 39, 41 (1990)].

   (B)  Trial Court's Undue Influence on Burden of Proof:  By pro-
moting the disposition that characterizes disbursements received by

ATTACHMENT 'A':  PAGE 45

investors as "interest" consistent with a reliance on the alleged
false pretense, the Trial Court fashions elemental fact out of evi-
dentiary presumption and precludes any opportunity for the jury to
make any determination as to proof and materiality.  Absent the ob-
ligation to prove these basic/evidentiary and ultimate/elemental
facts, the Prosecution's burden is virtually eliminated along with
the Petitioner's right to due process of law.  With such constitu-
tional consequence and undue influence on jury determination and
fundamental fairness, the Trial Court's disposition is clearly
"wrongful" and "inappropriate"; even more prejudicial however, this
opinion as noted below, is shown to be just plain wrong.

3.6  Defining "Interest" Specific to the False Pretense:  To ade-
quately establish materiality and prejudicial impact resulting from
the Prosecution's exclusive use of presumptions as basic facts, it
is necessary to define "interest" within the evidentiary context of
the False Pretense and specific to the investment premise these in-
vestors elementally relied on in which to invest-- i.e. mortgage
lending as the beneficiary.  There are obviously many ways to report
income and certainly different ways income is tax-reported as in-
terest.  However in the False Pretense allegation, the Prosecution
charges that these investors relied on a specific premise of invest-
ment supposedly verbally represented by the Petitioner.  Therefore
the 'basic' fact of an "interest" definition to be proved, is that
which is specific to the precise premise that these investors ele-
mentally relied on to invest.

    (A)  Tax-Reporting as a Mortgage Beneficiary:  Attached hereto
and submitted herewith is a Request for Judicial Notice (see Exhibit
5), that includes facts and common sense propositions pertaining to
tax-reporting as an 'actual' lender.  These include the requirement
of a mortgage beneficiary (mortgagee) to notify the borrower (mort-
gagor) of 'Interest Paid' for each calender year (e.g. CA Civil Code
2954.2(a)).  This 'Interest Paid' statement given to the borrower,
in turn serves as the proof and source of the income to be tax-
reported as 'Interest Income' by the mortgage beneficiary.  What is
important to be judicially noticed within this context relied on by

ATTACHMENT 'A':  PAGE 46

the investors to invest, is that because this is a reciprocal arr-
angement, the 'Interest Paid' and 'Interest Income' are not mutually
exclusive, instead they are mutually corresponding.  Therefore the
failure to notify (or even identify) a borrower of 'Interest Paid'
precludes the practical possibility of a person purporting to be
the "actual lender" from tax-reporting income specifically as 'In-
terest Income' as required of an actual mortgage beneficiary.

(B)  Sworn Testimony of Investors:  Each investor when questioned
if they notified any borrower of any 'Interest Paid', replied under
oath that they never provided any notice whatsoever; no 'Interest
Paid' notification to any borrower of any mortgage at any time during
the 13 year investment period.  One hundred-plus investments and
millions of dollars actually received by investors allegedly as
"interest" consistent with the False Pretense.  These sworn state-
ments are found in testimony by Steiner (5RT984; 9RT1631); Almquist
(3CT635-636; 2RT346; 8RT1533); Pinault (9RT1627); Leever (4CT713;
9RT1655-1656); Bagley (8RT1561-1562); Duncan (8RT1556); Mathis (9RT
1642); O'Connell (6RT1234); Kentner (9RT1665); Infantino (9RT1661),
and; Falterman (9RT1615).  Indicative of these references is Mr.
Steiner and Mr. Almquist.  When asked if he provided any 'Interest
Paid' statements to any borrowers, Mr. Steiner replies "No".  When
asked why not, he responds "I wasn't required to" (5RT984).  Mr.
Almquist after receiving what the Petitioner estimates to be approx-
imately $6 Million dollars over a ten year span (see 3.3(A)(i) above),
and testifying that "every cent" he received went as "interest in-
come" on his tax returns (2RT357)-- when asked if he provided any
'Interest Paid' to any borrowers or to the Petitioner, replied no
that he had not (8RT1536).

(C)  "Interest" Presumption is a Tax-Reporting Impossibility:
As demonstrated by facts and common sense propositions, without the
'Interest Paid' notice to any borrowers, it is a practical imposs-
ibility for someone to tax-report 'Interest Income' specifically
as a mortgage lender.  There are obviously other ways that the in-
come can be reported  but this is not a question of if the income
was reported but how it was reported.  With the charge of Grand Theft

ATTACHMENT 'A':  PAGE 47

based on the allegation of False Pretense-- that being these investors relied on supposed verbal representations that they were vested mortgage beneficiaries-- all references under oath to "interest", "interest payment", "interest income" are all sworn statements material to basic/evidentiary characterizations used by the Prosecution to presume the ultimate/elemental facts of reliance, theft and loss.   Therefore not only has the Prosecution failed to prove these "interest" presumptions specific to the theory of False Pretense, but their representations and the testimony thereto are false as demonstrated by practical application of facts and propositions that are common knowledge to professionals working in the mortgage industry.

## 3.7  Conviction Obtained Through False Testimony

(A)  Perjury:  The California Penal Code states in pertinent part that every person who under oath states as true any material matter that they know to be false is guilty of perjury (CPC§118), irrespective if they knew or not the materiality of the false statement (CPC§123).  Every person who willfully procures another person to commit perjury is guilty of subornation of perjury (CPC§127).   In the Petitioner's case, not only is the practical impossibility of tax-reporting as required of a mortgage beneficiary established through the investors' own testimony, but their knowledge of the falsehoods contained in their evidentiary "interest" characterizations can also be determined by their own words.

(i)  Investors' Knowledge of False Statements:  Stated in testimony, these investors used CPA's, accounting firms, and licensed tax preparers for their tax preparation.  This is true for Richardson (3CT564);  Almquist (2RT376);  Leever (9RT1655); Mathis (9RT1643);  Steiner (5RT989);  Pinault (5RT1004, 9RT1624); Falterman (3RT558), and; O'Connell (6RT1185).  With the practical possibility of tax-reporting specifically as an actual lender precluded by the total absence of 'Interest Paid' notifications, these investors-- if they reported the income-- must have reported in some manner different than that of a vested mortgage beneficiary.  To do

ATTACHMENT 'A':  PAGE 48

based on the allegation of False Pretense-- that being these in-
vestors relied on supposed

so however, would require these investors to actively convey an investment premise to their tax professionals that is different than the premise purported by allegations   of false pretense.  Thus any notion that these investors believed they were actual lenders is betrayed by their actual impart of an investment understanding to these tax professionals that belies the charges.  Therefore, not only is the allegation of elemental reliance false, but the basic/ evidentiary presumption shown to be false by practical application is  knowingly false and thereby perjurious.  It must also be noted that during Prosecutor Pierce's closing remarks, he stated: "To be-lieve Mr. Tarbutton is to believe that each and every one of these victims...came in here and actually told a falsehood" (11RT2136). What is interesting about the Prosecutor's comments is that each alleged investor-victim did make materially false statements as noted above, and they did so with the Prosecution's knowledge.

　　　　(ii)  Prosecution Team's Knowledge of False Statements: The Prosecution Team consists of individuals specializing in the subject matter of mortgage lending.  This includes:  FBI Agent Jessie Murray (formally and informally trained in mortgage and real estate matters, see 2CT247);  OCDA's Scott Weitzman (Forensic Acct./ CPA, see 4RT824);  Marlou De Luna (Senior Counsel for the CA Dept. of Business Oversight- specializing in mortgage lending matters, see 7RT1366-1371 and 11CT2487-2488), and; members of the OCDA's Mortgage Fraud Unit- Peter Pierce, Dave Melnyk, Thomas Bees, Nat-alie Adams, Andy Terhorst, Lisa Diller and Summer Bakotich (see 11CT2477 and 4CT866).  The information contained in the facts and propositions set forth in 3.6(A) above, are those as described in CA Evidence Code §452(h) as being reasonably indisputable and as-certainable by reference to those learned in the subject matter (see "Comment- Assembly Committe on Judiciary", Subdivision (h)). The evidence contained in these judicially noticed facts and pro-positions of 3.6(A) above is common sense application of industry-specific information known to those working in that industry and should be known to those specializing in investigations specific to that industry.  Therefore the Prosecution Team's knowledge-- actual and/or constructive-- of the industry information that

ATTACHMENT 'A':  PAGE 49

illustrates the fallacy of the evidentiary "interest" presumption
is implied by their specialized and collective profession.  The state
court of <u>People v. Bamberg</u> (2009) 175 CA4th 618, when discussing
evidentiary matters, indicates that whether evidence is false depends
on  what it is intended to depict as genuine or true, and it can
turn upon what the evidence is offered to prove.  In the Peti-
tioner's case, the false representations of an industry-specific
"interest" characterization used to presume evidentiary facts, is
offered as proof of the elemental facts of reliance, theft and loss.
Thus with the procuring of witnesses to provide representations
and testimony that the Prosecution knows to be false, and considering
such serves as the evidentiary and elemental basis for conviction,
the Prosecution's use is knowing and willful.

(B)  Petitioner's Discovery Requests of Tax-Reporting:  As
noted in 3.2(B), the best evidence and simplest route to resolution,
guilt or innocence, is the incontrovertible proof of tax-reporting.
With verification of any tax records  this case would be over before
it started...or so it should have been.  Referencing 11CT2482-2483
is an affidavit prepared by the Petitioner regarding a face to face
interview with FBI Agent Jessie Murray on January 25, 2011.  The
Petitioner who was not subpoenaed to appear, agreed to the interview.
As noted in the affidavit, the Petitioner stressed three times that
tax-reporting is the truest indicator as to the understanding of
the investment premise, and requested Special Agent Murray's in-
vestigation of such.  Fast forward to March 7, 2014, Petitioner
through informal discovery request asks for disclosure of any tax-
reporting to substantiate the "interest" characterization and con-
sequently the basis for the allegations as a whole (see 11CT2475).
As noted in Petitioner's eventual CPC§1054.5 Discovery Motion filed
pro per prior to sentencing, the Prosecution failed to provide any-
thing that supports their presumption of a specific "interest" cha-
racterization (see 10CT2215-2218).  During trial, defense counsel
had argued in chambers regarding the "interest" characterizations
(e.g. 1RT194), but the Prosecutor calls it irrelevant (1RT198; 1RT
213; 1RT217) and the Trial Court calls it an "undue consumption of

time" (1RT202).  As previously noted, Prosecutor Pierce is on record
claiming "I don't know that they did not report the income" (1RT194).
However the truthfulness of this statement is betrayed by Mr.
Pierce's actual knowledge of fraudulent Victim's Compensation Fund
claims ('VCF') filed by since-disbarred attorney Patrick Lund and
at least five investors:  Richardson (1RT236);  Almquist (8RT1546);
Pinault (7RT1166);  Steiner (9RT1631), and; O'Connell (7RT1240).
In 11CT2295-2307, the Petitioner demonstrates that these 'VCF' claims
are fraudulent applications for payment from the state fund in an
estimated amount of $10 Million dollars.  Also demonstrated in 11CT
2302-2303 of that document, the Petitioner points out that these
investors state under penalty of perjury that the investment/trans-
actions that are the subjects of the claims for payment and the
Grand Theft charges, were not tax-reported.  Prosecutor Pierce as
noted in 8RT1331-1332, has knowledge of these 'VCF' claims; and
like the discovery request for the "interest" evidence, the Pro-
secution ignores the Petitioner's request for disclosure (11CT2475;
10CT2212-2215).  Therefore instead of the due process burden of
proving basic and evidentiary fact, the Prosecution who specializes
in industry-specific investigations, chooses to plead ignorance of
industry-specific facts, obscure this evidentiary fact by claims of
irrelevancy, suppress the simple and direct evidence that refutes
the charges, and prosecute the Petitioner using presumptions they
knew or should have known were false.

## 3.8  Prejudicial Impact of Trial Court's Improper Influence

   (A)  Trial Court's Opinion Prevents Fair Trial:  When the trial
court adopts a "favorable or unfavorable opinion that is somehow
wrongful [and] inappropriate" the question is the degree to which
the judge's opinion prevents the court from providing a fair trial
[Liteky, supra].  This is answered in the Petitioner's case by con-
sidering in Patterson v. New York [supra], the Supreme Court indi-
cated that there are "constitutional limits" beyond which the pro-
secution may not go in its use of presumptions.  Conjunctively, the
court may not simply "declare an individual guilty...of a crime"
nor may the prosecutor "create a presumption of the existence of all

ATTACHMENT 'A':  PAGE 51

facts essential to guilt". With the Petitioner, not only has the Trial Court by its inappropriate disposition declared the Petitioner guilty through advocacy of the false presumption of "interest", but in so doing, allowed the Prosecution to "create a presumption" of all evidentiary and elemental facts essential to guilt. Moreover, the opinion of the Trial Court is shown to be wrong in that it is a practical impossibility specific to the context of the alleged theory of the offenses. Therefore the prejudicial impact is fatal to the Petitioner and fundamental fairness when considering it permitted the Prosecution to obtain a conviction based entirely on false testimony.

Furthermore, the use of improper presumptions are not cured by general jury instructions on the presumption of innocence and the state's burden of proving every element [Francis v. Franklin, 471 US 319, 320 (1985)]; "no matter how often such corrective phrases are repeated" [united States v. Chiantese, 560 F.2d 1244, 1255 (4th Cir. 1977)]. Therefore the Trial Court does not alleviate the fatality of wrongful/inappropriate disposition by instructing the jury on the state's burden of proof.

   (B) Judicial Abuse of Discretion: Furthering the undue influence caused by the wrongful presumption of evidentiary fact is the Trial Court's protection of its improper opinion. This is seen in the Court's following decisions of: Hindering the introduction of tax-reporting evidence-- citing on numerous occasions such action as an "undue consumption of time" (see 1RT202; 1RT233; 2RT350; 7RT 1409-1413); Denying Petitioner's motion for appointment of expert to establish the false presumption (see 10CT2251-2254; for denial see 1CT204-205), and; denying Petitioner's Motion for New Trial based in part on grounds of judicial error resulting from improper disposition (10CT2168-2169). Insomuch that a judge must not be an advocate of any party [People v. Clark (1992) 3 CA4th 41, 43], he also has a duty to be impartial and to make sure a defendant is given a trial on the facts and not a trial "on the temper or whimsies of the judge who sits in his case" [People v. Blackburn (1982) 139 CA3d 761, 764-765]. Therefore, the Trial Court's improper

opinion and its irrational protection of such, deprived the Peti-
tioner of due process by alleviating the Prosecution's burden of
proof and allowing their use of false testimony to obtain the con-
viction.  Thus these actions and decisions of the Trial Court that
result in the violations of Petitioner's constitutional rights are
"erroneous under applicable legal standards [and] unsupported by
substantial evidence" thereby constituting an abuse of judicial dis-
cretion [People v. Jacobs (2007) 156 CA4th 728, 737].  The greatest
impact however is its effect in concealing the tax-reporting reality
that demonstrates the Petitioner's factual innocence.

   (C)  Factual Innocence:  The Trial Court's improper and incorrect
opinion along with the Prosecution's suppression conceals the tax-
reporting reality that no investor has shown any reliance on any
alleged false pretense; and if the best evidence of any tax records
would be introduced as discovery-requested by the Petitioner, such
would reveal the actions of these investors that refute the Grand
Theft charges.  Also refuted are the security fraud charges (Counts
27-37: CCC25401; see 4CT898-900) that are based on the same trans-
actions and the same premise of an orally communicated untrue state-
ment (also see CLAIM 5 below).  Also pragmatically proven by the
tax implications is the Petitioner's innocence of the forgery counts
(Counts 5,7,9,13,14,18-21; see 4CT894-897).  As described in greater
detail in CLAIM 7 (Posecutorial Misconduct), not only are the state-
ments of the Prosecutor false when he states the subject documents
are "actually recorded deeds of trust" (1RT52), but the element re-
quired to convict-- specific intent to defraud (1RT56)-- is also
refuted by the fact that these investors did not tax-report con-
sistent with a belief that these subject documents were actually
recorded deeds of trust.  As judicially noticed by the facts and
propositions of Exhibit 5, if believed to be true and correct copies
of actually recorded documents, the act of recording would give
public notice of the vesting; creating a virtual taxable event and
thus effectuate the same tax-reporting liability as set forth in
3.6(A) above.  California Penal Code §8 states "whenever...an in-
tent to defraud is required in order to constitute any offense, it
is sufficient if an intent appears to defraud".  Therefore without

any tax-reporting consistent with an appearance of being deceived, the investors by their 'actions that speak louder than words' demonstrate their actual awareness of the artificiality of the subject documents that, as thereby shown, were not intended to defraud.

3.9  This Claim Merits Federal Review and Remedy:  This Claim and the issues raised merit Federal Review pursuant to 28 U.S.C. 2254 as the facts and evidence presented are properly before the court. With the Petitioner's conviction and state custody a direct result of the violation of the U.S. Constitution, laws and Treaties of the U.S., proper remedy is warranted.

(A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of Orange County Superior Court, the Petitioner through pro per pleadings filed in Trial Court prior to sentencing, properly preserved the issues identifiable in CLAIM 3 above.  These 'objections' are found in the appellate record included as: Insufficiency of Evidence (CPC §1181 Motion at 10CT2040-2043); Prosecutorial Misconduct (CPC §1181 at 10CT2092-2103); 'IAC' (CPC §1181 at 10CT2132-2133); New Evidence (CPC §1181 at 10CT2152-2153; 11CT2402); Judicial Error (CPC §1181 at 10CT2168-2169); Motion for Appointment of Experts (10 CT2252-2253); Discovery Motion (CPC §1054.5 at 10CT2215-2218).  As noted in 3C of the Procedural History included in the PETITION OVERVIEW, all pro per motions and actions were denied by the Trial Court prior to sentencing; and in so doing offered no factual findings, applied no decisional law addressing the materiality or prejudiciality of the issues associated, nor compelled any evidence/testimony to resolve credible, disputed issues of fact.

(B)  Issues Exhausted in State Court:  As noted in the Procedural History included in the PETITION OVERVIEW, the Petitioner motioned the Appellate Court to set aside his direct appeal brief as filed by Appellate Counsel due to the omission of issues of greater significance.  After the Appellate Court disregarded this request/motion, the Petitioner filed a state Habeas Petition concurrent with his direct appeal in which the issues raised in CLAIM 3 were included as CLAIM III of that petition.  That state petition (No.G058686)

ATTACHMENT 'A':  PAGE 54

was denied on 6/04/2020.  Petitioner filed virtually the same pet-
ition in the California Supreme Court on 7/31/2020.  This state
petition (Case No. S263665) was denied on 2/20/2021.  Both denials
provided no factual findings, no explanation, no application of
decisional law (state or federal), no evidentiary action to resolve
any credible, disputed issues of fact, nor any indication that any
adjudication of any issue was considered or administered.

   (C)  Evidence and Authorities Presented to the State Court:  In
submitting these issues in state court, the Petitioner presented
such on the same facts and evidence referenced herein by attached
Exhibit, Declaration, and Request for Judicial Notice (Exhibit 5).
As to applicable federal law as established by U.S. Supreme Court
decision, the Petitioner offered such authorities that included:
Napue v. illinois, 360 US 764 (1959) [Use of Perjured Testimony];
In re Winship, 397 US 358 (1970) [Less Than Reasonable Doubt];
Apprendi v. New Jersey, 530 US 466 (2000) [ Apprendi Violation];
Brady v. Maryland, 378 US 83 (1963) [Discovery Violations]; Blakely
v. Washington, 542 US 296 (2004) ['Blakely' Violation].

   (D)  Review and Remedy:  In the PETITION OVERVIEW attached to
the Federal Habeas Form CV-69, the Petitioner demonstrates that this
CLAIM merits de novo review due to the fact that there is no state
ruling to review with AEDPA deference.  In this de novo review as
prayed by the Petitioner, he also requests Judicial Notice of the
evidence as presented in Exhibit No. 5 [Page 40 of ATTACHMENT 'D'].
In the Court's determination of issues as presented in this CLAIM,
the Petitioner prays for resolution of all disputed facts by refe-
rence to that which is judicially noticeable, and also that which
is obtainable by Evidentiary Hearing as incorporated by Exhibit
No. 20 [Page 127 of ATTACHMENT 'D'].  As to relief, Petitioner prays
for all just and proper including but not limited to reversal of
the conviction and dismissal of the charges due to the factual in-
nocence of the Petitioner as demonstrated herein.


                    ATTACHMENT 'A':  PAGE 55

# ATTACHMENT

# B

CONTENTS:

CLAIM 4

> CLAIM Summary                          Page  1
> Contents of CLAIM [Index]              Page  2
> Facts Supporting CLAIM                 Page  3

CLAIM 5

> CLAIM Summary                          Page 40
> Contents of CLAIM [Index]              Page 41
> Facts Supporting CLAIM                 Page 42

CLAIM 6

> CLAIM Summary                          Page 60
> Contents of CLAIM [Index]              Page 61
> Facts Supporting CLAIM                 Page 62

CLAIM 4:   OUTRAGEOUS GOVERNMENT CONDUCT [Forcible Transnational
           Abduction]

SUMMARY:   The Prosecution Team-- acting without authority and in
violation of Treaties in Force-- commissioned and compensated
Panamanian Officials to forcibly abduct the Petitioner outside
their collective territorial jurisdictions and convey him by force
and fraud without warrant, cause, or evidence of criminality.  The
conduct of the Prosecution Team-- and Panamanian Officials acting
under a false pretense of U.S. authority-- that conspires, carries
out, and conceals the Forcible Transnational Abduction of the Peti-
tioner denies him constitutional protections that include those of
the Fourth, Fifth, Sixth and Fourteenth Amendments.  Collectively,
the false accounts presented by the Prosecution Team, the Treaty
provisions violated, the illicit acts committed, the exculpatory
evidence withheld, the constitutional rights denied, and the per-
emptory norms of the international community derogated-- are
tantamount to outrageous governmental conduct that offends the uni-
versal sense of justice and therefore warrants dismissal of the
Petitioner's criminal case.

The prejudicial effect of this course of  misconduct is compounded
by the Trial Court's abuse of discretion that has failed to hold
the Prosecution accountable for such acts and has allowed them to
shelter from culpability.  These decisions of the Trial Court that
effectively deprived the Petitioner from fully litigating his ab-
duction are a derivative of an actual bias stemming from a dis-
qualifying conflict of interest or the improper appearance of such.

ATTACHMENT 'B':  PAGE 1

CONTENTS OF CLAIM 4:

4.1  Declaration of Events                              Pg.   3

4.2  Prosecution's False and Contradictory Accounts
     of Petitioner's Arrest                             Pg.   4

4.3  Forcible Transnational Abduction and the Trial
     Court's Jurisdiction                               Pg. 11

4.4  The Misconduct that Invalidates Jurisdiction       Pg. 17

4.5  Dismissal is Warranted Due to Violations of
     Constitutional and Statutory Rights                Pg. 22

4.6  Dismissal is Warranted in Order to Preserve
     Judicial Integrity                                 Pg. 25

4.7  Dismissal is Warranted to Deter Future Like
     Conduct                                            Pg. 30

4.8  Dismissal is Warranted Due to the Violations
     of Jus Cogens Norms                                Pg. 31

4.9  This Claim Merits Federal Review and Remedy        Pg. 36

ATTACHMENT 'B':  PAGE 2

<u>4.1  DECLARATION OF EVENTS:</u>  I, Thomas Franklin Tarbutton, declare under penalty of perjury the following statements as submitted, and verify as to the veracity of such as well as the accuracy of recounted event and experience.  If called upon to testify, I will do so competently and accordingly.

(A)  Manaus, Brazil to Panama City, Panama:  On or about the 9th of December, 2013, I flew via commercial airline from Manaus, Brazil to Panama City, Panama.  Traveling on a legal and valid U.S. passport (No.422079329), I cleared immigration and customs leaving Brazil and also when entering Panama, without complication or delay.

(B)  Exiting Panama on Legal Passport:  On or about the 14th of December, 2013, traveling by land on a legal and valid U.S. passport (No.422079329), I exited Panama after receiving an exit stamp in my passport by Panamanian Passport Control.  After leaving Panama and crossing in Costa Rica, I was handcuffed, arrested, taken into custody and physically/forcibly transported back into Panama.

(C)  No Explanation for my Arrest:  The arresting Panamanian Officials gave me no indication of an arrest warrant nor any legally justifiable basis for my arrest.  When I asked why I was being arrested, these officials explained:

        (i)  They did not know the grounds for my arrest;

        (ii) They were arresting me under the direction and authority of my government;

        (iii) They were unable to provide me with a copy of an arrest warrant;

        (iv)  The country of Panama had no problem with me and there was nothing illegal about my travel or conduct.

(D)  Movement After Arrest:  Over the next couple of days following my arrest, I was physically restrained and moved numerous times without explanation.  I spent nights either shackled to a steel bench outside a police station or on a concrete floor behind bars.

(E)  No Paperwork, No Legal Assistance, No Explanation:  While in

ATTACHMENT 'B':  PAGE 3

Panamanian custody, I was provided no legible paperwork, no information regarding charges, no notice of charges or even the existence of charges, no access to legal assistance, no opportunity to contact anyone for assistance, no evidence of criminality, no extradition demand, no order for deportation or/and paperwork for deportation.

(F)  Property and Documents Seized:  Upon being taken into custody, the Panamanian Officials seized my passport, money and belongings.

(G)  Panama City, Panama to Los Angeles (LAX):  On December 17, 2013, I was flown from Panama City, Panama to Los Angeles International Airport (LAX) accompanied by and still in-custody of Panamanian Officials.

(H)  Transfer of Custody:  Upon arriving at LAX, I was handed off by two Panamanian Officials to U.S. based officials/personnel that included FBI Special Agent Jessie Murray and Orange County District Attorney Investigator Dave Melnyk.  During this transfer, Ms. Murray had conversation with the Panamanian Officials regarding consideration and accommodations-- indicating to me these Panamanian Officials were being used/employed by FBI Agent Murray.

(I)  LAX to Orange County's IRC:  Following the transfer of custody, I was transported from LAX to Orange County's Intake/Release Center ('IRC') by Murray and Melnyk in a car driven by Murray. During this drive, Ms. Murray had a cell phone cconversation with OCDA's Peter Pierce.  In this call, Murray exclaimed to Pierce that "We got it right".  This indicated to me that Mr. Pierce (eventual prosecutor), Ms. Murray and Investigator Melnyk were at least three of the U.S. officials that according to the arresting Panamanian Officials had directed and authorized my arrest after I had legally exited Panama.

4.2  Prosecution's False and Contradictory Accounts of Petitioner's Arrest:  These Prosecution Team members of Pierce, Murray and Melnyk-- despite  their personal involvement and orchestration of the Petitioner's seizure and conveyance-- have individually entered

into record three contradictory versions of these events.  Moreover,
as described below, all three versions are knowingly and materially
false; and when reported with a representation of a lawful process
of arrest and rendition, actually conceal the illicit acts under-
taken to abduct and convey the Petitioner by means and method pro-
scribed by domestic and international norms.

   (A)  Prosecutor Pete Pierce:

      (i)  Material Representations of Arrest and Extradition:
In setting forth the procedural history of Petitioner's case, Mr.
Pierce states: "A Federal/International Arrest Warrant was issued
on the defendant on 6/13/13.  On 12/14/13, defendant was subsequently
arrested on that International Warrant by Panamanian Officials in
Panama.  He was subsequently extradited and transferred back to the
United States via LAX/Los Angeles on 12/14/13".  Mr. Pierce uses
this version in written briefs on 11/06/15 (4CT932) and 12/13/15
(5CT950).  These written statements confirm what Mr. Pierce had
verbally  entered into record during the Preliminary Hearing where
he said: "...it wasn't until he left presumably Brazil, where he
was, and was picked up on Federal Extradition Warrant in Panama late
last year" (4CT889).

These representations of Mr. Pierce continue into trial in conver-
sations with the Trial Court: "...I don't think there's any issue
or dispute, he was arrested on an International Warrant in Panama"
(4RT849);  "...actually was arrested in Panama pursuant to the Fed-
eral Warrant" (8RT1591), and;  "He was arrested and extradited from
Panama" (12RT2396).

The Prosecutor also conveys this version of lawful transnational
process to the jury by statements that purport the Petitioner was
"caught at the Panamanian/Costa Rica border" (11RT2201); by an
international arrest process that was enforced as a result of
"treaties...beyond our borders" (8RT1588).  Mr. Pierce also aff-
irms with FBI Agent Murray that "...you were contacted by another
law enforcement agency (Panamanian) that said that they had Mr.
Tarbutton in-custody" (8RT1588).

<center>ATTACHMENT 'B':  PAGE 5</center>

As a result of Mr. Pierce's constant representations, the Trial
Court in considering 'flight' and subsequent jury instructions,
adopts the like disposition as illustrated by examples found on re-
cord (see 1RT14-15), which also include statements such as "the fact
that he was extradited" (1RT19) and "when the day was done...he was
picked up on a warrant" (1RT17).

(ii)  Complete Absence of Evidence to Support:  Prosecutor
Pierce's version of a legal, warranted arrest and extradition is
betrayed by the complete absence of documentary evidence that is
supportive of an arrest conducted with regular process and lawful
authority.  There is no Panamanian arrest report; no extradition
order; no evidence in the minutes of Case No. 11CF2747 that indi-
cates the use of an international arrest warrant or even its exi-
stence (see 1CT016), and; no evidence of any lawful process what-
soever.  As to Pierce's continuous factual representation of extra-
dition; principles of international law recognize no right to
extradition apart from a treaty [Factor v. Laubenheimer, 290 US 276,
287 (1933)], and the legal right to demand an extradition and the
correlative duty to surrender to a demanding country exist only when
created by treaty [United States v. Rauscher, 119 US 407, 411
(1886)].  Therefore when Mr. Pierce states Petitioner was arrested
in Panama and extradited, he represents to the Court and jury such
actions were lawfully conducted under the pretense of U.S. authority
and pursuant to process prescribed by treaties in force.  Notwith-
standing the absence of any corroborative evidence, but Mr. Pierce's
specious accounting of events that conceals the illegality of the
conduct associated with what he calls Panamanian arrest and extra-
dition, is exposed by Ms. Murray's testimony (see 4.2(B) below) and
Mr. Melnyk's supplemental report (see 4.2(C) below), which fail to
suggest any indication of a lawful transnational process.

(B)  FBI Special Agent Jessie Murray:

(i)  Preliminary Hearing:  Ms. Murray's version of events
given during the Preliminary Hearing on 8/16/14 predate Mr. Pierce's
version and contradicts his account in totality.  During this
hearing, Ms. Murray testified that Petitioner was arrested, not in

ATTACHMENT 'B':  PAGE 6

——— on 12/17/13 (2CT348) on a Federal Warrant (2CT349-350).  When asked about a Panamanian arrest and extradition, Murray ignores such premise and instead stresses that Petitioner "was arrested at LAX" (2CT 349), but offers no explanation supportive of Pierce's lawful international arrest nor any documentary evidence or reference that demonstrates the legality of Petitioner's conveyance to LAX by Panamanian officials.

Panama on 12/14/13, but at Los Angeles International Airport on 12/17/13 (2CT348) on a Federal Warrant (2CT349-350).  When asked by Pierce about a Panamanian arrest and extradition, Murray ignores such premise and stresses that Petitioner "was arrested at LAX" (2CT349), but offers no explanation supportive of Pierce's lawful international arrest nor any documentary evidence or reference that demonstrates the legality of Petitioner's conveyance to LAX by Panamanian officials.

(ii)  Trial Testimony:  During trial, Ms. Murray testified as to her involvement in the federal complaint and the Arrest Warrant for Unlawful Flight, and agrees with Mr. Pierce that "because of treaties, it has implications beyond our borders" (8RT1588).

<u>Pierce continues</u>:  "Mr. Tarbutton was actually detained in Panama; is that right?"

<u>Murray</u>:  "Yes"

<u>Pierce</u>:  "And from there he was-- fair statement he was actually arrested in Panama pursuant to the Federal Warrant; is that right?"

<u>Murray</u>:  "He was deported from Panama"

<u>Pierce</u>:  "Deported?"

<u>Murray</u>:  "And arrested at LAX"

<u>Pierce</u>:  "So legally he was deported from Panama, and then were you actually one of the people who picked him up at LAX?"

<u>Murray</u>:  "Yes"                (8RT1591-1592)

(iii)  Fallacies of Murray's Version:  Ms. Murray's trial testimony now includes Petitioner's 'detaining' and 'deporting', a materially false version that has evolved from her Preliminary Hearing testimony.  Of note is the Prosecutor's testifying statement of "so <u>legally</u> he was deported", a statement in which he conveys to the jury a lawful process despite not being a testifying witness.  Regardless, Ms. Murray offers no <u>legal</u> explanation for Petitioner's 'detaining' and 'deporting', neither does she attempt to justify the seizure conducted by Panamanian officials after Petitioner had already exited Panama.  Also telling, is Ms. Murray's failure to provide any timing of the 'detaining' (events occurring

<div align="center">ATTACHMENT 'B':  PAGE 7</div>

outside Panama on 12/14/13) or details of what she refers to as deporting (events occuring from Panama on 12/17/13).

(a) Detaining:  Murray's characterization of the events occuring outside of, and inside of Panama on 12/14/13 through 12/17/13 as 'detaining' is contradicted by application of established law. The courts have indicated a 'seizure' occurs when law enforcement accosts an individual and restrains his freedom to walk away [Terry v. Ohio, 392 US 1 (1968)]; and specifically for Fourth Amendment purposes, a seizure is denoted by authoritative imposed restrictions of movement or an indication that a person is not free to go about his business [United States v. Lambert, 46 F.3d 1064 (10th Cir. 1995)].  The courts have also stated one category of seizure is an arrest which is "characterized by highly intrusive or lengthy search or detention" [U.S. v. Randall, 947 F.2d 1314, 1318 (7th Cir. 1991)]; and also the duration of detention serves as "the most important consideration in determining a restraint is a stop or a full-fledged arrest" [U.S. v. Edward, 103 F.3d 90, 93 (10th Cir. 1996)]. Furthermore "an arrest requires either physical force...or, where that is absent, a submission to the assertion of authority" [California v. Hodari, 497 US 621 (1991)].

Ms. Murray has testified as to her lead in the warrant and arrest process (see 8RT1585; 8RT1588), as well as her conversation with Panamanian Law Enforcement (8RT1588), and has given no indication that anyone other than the Prosecution Team was involved stateside. Thus what Murray under oath labels as 'detaining'-- that being the acts of Panamanian officials under authorization/instruction of U.S. officials, in joint operation against an unconstrained U.S. citizen after his entering and exiting Panama legally-- she does so with actual knowledge of the deceit contained in such a statement due to her own solicitation and participation in these events.  These events Murray identifies as 'detaining' include but are not limited to: an arrest of Petitioner using physical force by Panamanian officials-- acting under an assertion of U.S. authority-- conducted outside the territorial limits of both countries and without warrant, cause or evidence of criminality;  returning the Petitioner

ATTACHMENT 'B':  PAGE 8

by force and fraud back into Panama; subjecting the Petitioner to physical restraint and intrusive searches; the depriving Petitioner of access to counsel and courts; the constant movement of Petitioner into and within Panama over a three day period, and; the withholding of any legible notice or reasonable justification for the actions taken. Therefore according to the laws as clearly established by the courts, the characterization of these acts as 'detaining' is materially false.

(b) Legally Deported: Following an arrest by force and fraud, the Petitioner was conveyed to LAX from Panama City, Panama in-custody of Panamanian officials, who upon arrival received some consideration/accommodation from U.S. officials (i.e. FBI Agent Murray). Ms. Murray during trial calls this deportation, and Prosecutor Pierce conveys to the jury that it was <u>legally</u> conducted. Despite the illicit means employed to arrest the Petitioner, Murray's account of deporting, legal or otherwise, lacks any foundational documentation and any explained purpose supportive of such pretense. Neither Murray or Pierce offer into evidence any deportation order, actual reason for deportation or explanation for why Petitioner was not arrested in Central America on the supposed International Arrest Warrant. Moreover, Murray's version of events requires one to believe that Panama, after permitting the Petitioner to enter and exit the country, exceeded their territorial limits to apprehend the Petitioner outside their borders. Following this arrest, then bring him back into Panama without explanation, and after moving him across Panama, deport him from the country he had legally left 3 or 4 days prior.

(C) OCDA Investigator Dave Melnyk: In an attempt to review an arrest report, be it Panamanian or LAX, Petitioner has only found a 'Supplemental Report' prepared by OCDA Investigator Melnyk on 12/18/13 (see Exhibit 6). Mr. Melnyk's report states that Petitioner had been detained on a Federal Arrest Warrant; but he does not describe his actions as an actual warranted arrest due to his acknowledgement that Petitioner was already in custody of Panamanian officials. Melnyk's report does indicate a transfer of custody on

ATTACHMENT 'B': PAGE 9

12/17/13 "from" these foreign agents to Murray and himself, but neglects to report the date and methods used to arrest or 'detain' the Petitioner outside of Panamanian jurisdiction.

(i) Contradicting Pierce: By failing to corroborate Mr. Pierce's version of events, Melnyk's report contradicts the Prosecutor's continuous representations of a legal/warranted "arrest", lawful 'extradition', and a 12/14/13 extradition date.

(ii) Contradicting Murray: By acknowledging the Petitioner in custody of Panamanian officials, Melnyk's 'Supplemental Report' fails to qualify as an arrest report and therefore contradicts Murray's testified account of a "LAX" arrest. Also contradicted is Murray's version that the Federal/International Arrest Warrant was used for Petitioner's LAX arrest because Melnyk implies that it was used to 'detain' the Petitioner somewhere in Central America.

(iii) Melnyk's Material Misstatements and Omissions: Mr. Melnyk in his report fails to identify any date the Petitioner was taken into custody by Panamanian officials but by his describing it as detaining, erroneously implies it occurred on 12/17/13. However as set forth in 4.2(B)(iii)(a) above, to characterize Petitioner's arrest as 'detaining' is materially false; and thus Melnyk's implied arrest date of 12/17/13 is deceptive in that it not only hides the actual date of 12/14/13 but also, as set forth below, conceals the illicit acts committed and the parties complicit in the Petitioner's arrest and conveyance by force and fraud.

(D) Prosecution Team's Failure to Deny Illicit Acts: The reality of the Petitioner's arrest and conveyance by force and fraud is masked by the false representations provided by the members of the Prosecution Team. As described below in 4.4, this course of conduct is indicative of various illicit acts which the Petitioner also had raised in trial court prior to sentencing (e.g. 10CT2107-2111). Despite three contradictory and false accounts of Petitioner's arrest and conveyance-- and without any corroborative evidence supportive of a lawful process-- the Prosecutor has failed to deny the magnitude of their misconduct, instead stating that "no evidence was introduced at trial stemming from his arrest and extradition,

ATTACHMENT 'B': PAGE 10

so these allegations are irrelevant" (9CT1942; underline added).
As noted, the Prosecutor in this written brief is still reiterating
"arrest and extradition" and ignores the reasons Petitioner raised
these issues.  The relevancy of the illicit means used is not to
exclude evidence but rather to include examples of the Prosecution
Team's bad acts that impeach their competency and prosecution of
the Petitioner.  Furthermore, if/when called upon to defend their
actions that enlist Panamanian officials to abduct the Petitioner
outside of their collective jurisdictions, any attempt by the Pro-
secution Team to claim ex post facto, that the Petitioner's pass-
port was revoked is betrayed by no prior references as such in any
pleading or proceeding; no probative remarks in Murray's correspon-
dence with the Dept. of Homeland Security (see 11CT2524-2533); the
facts of Petitioner's travel into Panama on 12/09/13 and his exit
from Panama on 12/14/13 on a valid passport (see 4.1(A) and (B) a-
bove);  Law Enforcement's use of the passport to process Petitioner
into the U.S. on 12/17/13 (see 11CT2527; Exhibit 6), and; Mr. Pierce's
concern on 8/14/14 that Petitioner may use it if bail was reduced
(see 4CT889).

## 4.3  Forcible Transnational Abduction and the Trial Court's
Jurisdiction:  The means and method by which the Prosecution
Team used unauthorized force and fraud to arrest and convey the Peti-
tioner is tantamount to a Forcible Transnational Abduction.  This
course of conduct violates multi and bi-lateral treaties in force;
and with distinguishing aspects of the Petitioner's case, such mis-
conduct forfeits the Trial Court's jurisdiction over the person of
the Petitioner.

(A)  Ker-Frisbie Doctrine:  A court's power to bring a person to
trial upon criminal charges is typically not impaired by the forcible
abduction of a defendant into its jurisdiction.  This general rule,
referred to as the 'Ker-Frisbie' Doctrine [Ker v. Illinois, 119 US
436 (1886); Frisbie v. Collins, 342 US 519 (1952)] is subject to
exception when the conduct to abduct and convey violate applicable
treaties in force [United States v. Ceja, 543 Fed. Appx. 948 (11th
Cir. 2013)].

ATTACHMENT 'B':  PAGE 11

(B)  Petitioner's Case is Distinguishable from 'Ker':  In Ker v. Illinois, the Supreme Court based its ruling on the finding of fact that Ker's forcible abduction was perpetrated "without any pretense of authority under the treaty or from the Government of the United States" [Ker at 443].  In the Petitioner's case, the entire operation-- which would not have occurred without such orchstration-- was contrived, commissioned and carried out by state actors and/or foreign agents acting under the pretense of U.S. authority and instruction.  As stated by Panamanian officials to the Petitioner after his arrest-- and evident by his legal travel into and out of Panama on a legal passport-- the Panamanian Government had no issues with him and their actions were a direct result of a pretense of U.S. authority (see 4.1(C) above).  Moreover, as continuously represented by the Prosecutor's "arrest and extradition" claims (see 4.2(A) above), and conveyed to the jury during trial with his remarks about "treaties...beyond our borders" (8RT1588), the entire seizure and rendition of   Petitioner-- irrespective of the illegality of its operation-- was purported to be conducted pursuant to treaties to which the U.S. is a party.

(C)  Treaties in Force and the Conduct of the Prosecution Team in Violation Thereof:  To illustrate the treaty violations that result from the Prosecution Team's course of conduct, it is necessary to identify the treaties in force affected by their forcible transnational abduction of the Petitioner.  Also requested through judicial notice (see Exhibit 5), these treaties and the respective violations include but are not necessarily limited to:

(i)  Charter of the Organization of American States ('OAS')

(a)  Treaty Provisions:  This multi-lateral treaty recognizes an "international order [that] consists of respect for the sovereignty and independence of states, and the fulfillment of obligations derived from treaties and other sources on international law" (Art.3(b)). In describing the fulfillment of obligations, the 'OAS' addresses compliance with tenets such as "The territory of a state is inviolable; it may not be the object, even temporarily, of ... measures of force taken by another state; directly or indirectly,

on any grounds whatever" (Art. 21), and "no state...has the right
to intervene, directly or indirectly, for any reason whatever, in
the internal or external affairs of any other state" (Art. 19).

(b)  Violations of the 'OAS' Charter:  Apart from a pro-
cess authorized by a bi-lateral extradition treaty, the 'OAS' pre-
cludes U.S. authority and direct or  indirect action within the terri-
tory of another country irrespective of grounds.  The 'OAS' also
prohibits Panama from intervening in the affairs of the U.S. "on
any grounds whatever", and denies them authority for the forcible
action taken outside its own territory.  Therefore the pretense
of U.S. authority and instruction outside the United States' terri-
torial limitation, under which Panama was operating to forcibly ab-
duct the Petitioner, was in violation of Art. 21 of the 'OAS'; as
was Panama's intervening in the affairs of the U.S. (Art. 19).
Moreover, Panama's forcible abduction of Petitioner after he legally
left their territorial boundaries is in excess of their jurisdiction
and also violative of the 'OAS' (Art. 21), as is their forcible re-
turn of the Petitioner back into Panama and the subsequent conveyance
to Los Angeles 3 or 4 days later.  Because all of this was conducted
without warrant, cause, or evidence of criminality, these actions
are also in violation of the "obligations derived from treaties and
other sources of international law" (Art. 3(b)).  These "obligations"
or what is called 'Erga Omnes', are those as owed "towards the inter-
national community as a whole" (Petsche, Dr. Markus (2010) "Jus
Cogens as a Vision of the International Legal Order", Penn State
International Review: Vol. 29, No. 2; Art. 2. Page 250), and in-
clude the peremptory Jus Cogens norms as set forth in greater detail
in 4.8 below.

(ii)  United States-Panama Bilateral Extradition Treaty

(a)  Treaty Provisions:  This treaty (see copy at 8CT
1776-1782) between the two countries, who "being desirous to promote
the cause of justice", "mutually agree to deliver up persons...pro-
vided that this shall only be done upon such evidence of criminality
as, according to the laws of the place where the fugitive or person
so charged shall be found, would justify his...apprehension and

commitment for trial if the crime or offense had been there committed" (Art, I; underline added).  Along with this probable cause component is included provisions of: dual criminality (Art. II); authenticated copy of warrant and evidence upon which such warrant was issued (Art. III);  Statute of Limitations Bar (Art VII); Doctrine of Specialty (Art. VIII); expenses paid by demanding state (Art. IX), and; the stipulation indicated by President Roosevelt when signing that "the same and every article and clause thereof may be observed and fulfilled with good faith by the U.S. and the citizens thereof (Art. XII).

      (b)  Treaty Violations:  In <u>Sullivan v. Kidd</u>, 254 US 433, 442 (1921), the Supreme Court stated "The construction of treaties is judicial in its nature, and the courts when called upon to act should be careful to see that international engagements are faithfully kept and observed".  The construction of the US-Panama Treaty is clear in that it states that delivery "shall only be done" pursuant to the provisions set forth (Art. I).  However despite President Roosevelt's admonishment when signing, that all clauses be observed and fulfilled (Art. XII), the abduction and subsequent conveyance of Petitioner is conducted in stark contrast to the obligations set by the treaty.  To wit, there is no indication that any evidence of criminality was relied upon (Art. I), or the use of a warrant and that evidence upon such was issued (Art. III).  Also, in subsequent amendments to the charging document as demonstrated in CLAIM 1 and CLAIM 5, the Prosecution violated the dual criminality rule (Art. II) and the Doctrine of Specialty (Art. VIII)-- while neglecting to establish subject matter jurisdiction by means of tolling of Statute of Limitations (Art. VII; also see CLAIM 8.7). Apart from the expenses  apparently being paid by FBI's Murray (see 4.1(H) above) as set forth in Art. XI, the international obligations established through this treaty as well as those Jus Cogens norms owed to the international community as a whole (see 4.8 below) are completely and deliberately disregarded.

      (iii)  Charter of the United Nations

        (a)  Treaty Provisions:  This multi-lateral charter

obligates "all members" to "refrain...from the threat or use of force against the territorial integrity or political independence of any state" (Art. 2, Para. 4).

(1)   Threat to the Territorial Integrity (Art. 2, Para. 4):  Based on the fact that the Articles of the US-Panama Extradition Treaty are bi-lateral and as described in 4.3(C)(ii) above contain requirements for probable cause, warrant, evidence of criminality, etc.-- we must presume that such provisions are present in Panamanian due process of law.   Therefore Panama, while being territorially precluded from such acts as committed outside their borders, is also prohibited by their own due process to forcibly abduct and convey the Petitioner void of warrant, cause, and evidence of criminality.   Thus the authorization from U.S. officials instructing them to offend their own system of justice is corrupting of its integrity and subversive to its sovereignty; and thereby in violation of the U.N. Charter.

(2)   Violations of U.N. Resolutions:  The acts conducted by Panama and U.S. officials based on force and fraud are tantamount to offenses that include kidnapping as identifiable in CA. Penal Code §207(d) and federally in 18 U.S.C. §1201 (The Federal Kidnapping Act: applicable to "whoever knowingly...transports...any person who has been unlawfully seized, confined,...kidnapped, abducted").   That international kidnappings have been recognized as violations of the U.N. Charter and rules of International Law have been subject of U.N. resolutions (see U.N. Doc. 5/4349 (1960)), and are merely reiterations of long standing principle of International Law that abductions by one state of persons located within the territory of another state violates territorial limitations and sovereignties (see The Vicenti Affair, 1 Hackworth, Digest of International Law 624 (1920); The Cantu Case, 2 Hackworth 310 (1914); The Case of Blatt and Converse, 3 Hackworth 309 (1911)).

(iv)  International Convention on Civil and Political Rights

(a)  Convention Provisions:  The Ninth Circuit in <u>Kim Ho Ma v. Reno</u>, 208 F.3d 815 (9th Cir. 2000), stated "We recently

ATTACHMENT 'B':  PAGE 15

recognized that a "clear international prohibition exists against prolonged and arbitrary detention".  Furthermore Art. 9 of the [ICCPR], which the United States has ratified, see 138 Cong. Rec. S4781-84 (April 2 1992), provides that no one shall be subjected to arbitrary arrest and detention" [at 830].

    (b)   Violations of ICCPR:  The Petitioner in 4.2(B) (iii)(a) above, demonstrates the fallacy in FBI Agent Murray's description of Petitioner's arrest as 'detaining'.  Notwithstanding this material misstatement of the facts, but even when considering this deceptive label of 'detaining' within the context of the Petitioner's case, his 'detention' for a prolonged period absent warrant and process is arbitrary and thus in violation of Art. 9 of the ICCPR.

    (v)   Cumulative Effect of Violations:  It should be noticed here, judicially and pragmatically, that if the laws of an organization of nations and/or a foreign nation are indeterminable, the court may, as the ends of justice require, apply law of California and the United States consistent with the U.S. and California Constitutions (see Request for Judicial Notice, Exhibit 5).  As motioned in Exhibit 5, the Petitioner has formerly requested judicial notice of these laws as the ends of justice require.

Moreover, courts have indicated that when a defendant has been apprehended in a foreign country by foreign officials acting on behalf of U.S. officials, the laws of the jurisdiction in which the case is tried, apply [People v. Neustice (1972) 24 CA3d 178, 187].  Also, in Cook v. United States, 288 US 102 (1933), the Supreme Court when addressing a seizure in violation of a country's  territorial limits, indicates the inapplicability of Ker v. Illinois.  They note the objection  to the seizure is not that it was wrongful because it's made by one upon whom the government had not conferred authority to seize at the place where the seizure was made.  The objection to the seizure is that the government itself lacked the power to seize at that place since by their treaties and peremptory obligations, territorial limitations were imposed upon its authority.  Therefore the seizure of the Petitioner was carried out by Panamanian and U.S.

ATTACHMENT 'B':  PAGE 16

officials despite both lacking the authority and power to do so.
These actions of the Prosecution Team in co-opting the conduct of
Panamanian officials to forcibly abduct, transport and convey the
Petitioner in violation of these treaties in force, exempt the
Petitioner's case from the 'Ker-Frisbie' Doctrine [see Ford v. Un-
ited States, 273 US 593, 605-606 (1927)], and as a consequence
thereof, violate the Petitioner's right to due process of law [see
Breard v. Greene, 523 US 371 (1998)].

4.4  The Misconduct that Invalidates Jurisdiction:  The degree of
the government's misconduct in securing the Petitioner's presence
by force and fraud invalidates the Trial Court's jurisdiction over
the person of the Petitioner.

(A)  Ker-Frisbie Exception:  Another recognized exception to the
Ker-Frisbie Doctrine occurs when the govenment itself secures a de-
fendant's presence into the jurisdiction through use of conduct that
patently violates the principles of due process.  In this event,
the government may not take advantage of its own denial of a defen-
dant's constitutional rights and a court must divest itself of
jurisdiction over the person when it has been acquired through the
deliberate, unreasonable, and unnecessary invasion of the accused's
rights to fundamental fairness [United States v. Toscanino, 500 F.2d
267 (2nd Cir. 1974)].

(B)  Shocking Misconduct of the Prosecution Team:  Courts have
indicated that dismissal is mandated when the government's conduct
in obtaining a person's presence is so shocking and outrageous "as
to violate the universal sense of justice" [United States v.
Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991); U.S. v. Russell
411 US 423 (1973)].  In establishing the magnitude of misconduct
it is important to identify the scope of illicit acts undertaken to
commission, carry out and conceal the forcible transnational ab-
duction of the Petitioner.  Building on the treaty violations as
noted in 4.3 above, and when viewed in context of CA/U.S. law
[per People v. Neustice, supra], the Petitioner contends the conduct
of the state actors complicit in his abduction/conveyance is indi-
cative of offenses that may include but not be limited to:

ATTACHMENT 'B':  PAGE 17

(i)  Kidnapping:  Defined by CA Penal Code §207(d) as an abduction by force or fraud taking place out of the state of California and conveyance of that person within the limits of the state. Therefore, when Panamanian officials, acting on a fraudulent pretense of U.S. authority and without its own territorial authority to seize, to then take the Petitioner into custody by force after leaving Panama, transport him back into Panama and subsequently convey him to Los Angeles, California; such conduct is indicative of kidnapping as so defined.

(ii)  False Imprisonment:  Defined by CPC §236 as an unlawful violation of personal liberty.  Therefore, when Panamanian officials, lacking warrant, cause, and evidence of criminality-- and acting without territorial authorization and power to seize-- to then take Petitioner into custody by force and fraud, is an act identifiable as an illegal arrest [Henry v. United States, 361 US 98, 100-101 (1959)]; and as such, constitutes an unlawful violation of personal liberty (i.e. False Imprisonment).  It should be noted that the Supreme Court in Ker v. Illinois, acknowledged in the forcible abduction of Ker, a legitimate claim of false imprisonment by Ker against the abductor [see Ker at 443].

(iii)  Federal Kidnapping Act- 18 U.S.C. §1201:  Applies to "whoever knowingly transports" the person unlawfully seized, confined, kidnapped or abducted.  Therefore, when Panamanian and U.S. officials acting in violation of the international treaties to which they are a party, and thereby aware of the unlawfulness to seize, to then abduct and confine the Petitioner in the manner as herein described; to thereafter convey the Petitioner to 'LAX' following his forcible abduction and false imprisonment is indicative of a violation of the Federal Kidnapping Act 18 U.S.C. §1201.

(iv)  Solicitation in the Commission of the Illicit Act: When FBI Agent Murray testifies that Petitioner was arrested on 12/17/2013 on an International Arrest Warrant (see 4.2(B)(i) above), she effectively conceals the facts of his abduction on 12/14/2013. Considering the Petitioner was traveling legally-- having entered and exited Panama on a valid U.S. passport-- there is no reason for

for Panama to take Petitioner by force after letting him leave, and
then forcibly return him back into Panama.   Therefore it is clear
and convincing that Panama's actions, as indicated to Petitioner
at the time of his seizure (see 4.1(C) above), were a direct result
of U.S. instruction-- for without it, the abduction would not have
occurred.   However, these actions as described above are consistent
with those that constitute kidnapping; and thus this solicitation
by U.S. officials for Panamanian officials to commit such acts is
correspondent to conduct proscribed in CPC§653f(a).   It is important
to note that there has been no identification of any other persons,
nor is there reason to believe the initiating involvement of any
other persons, than those of the Prosecution Team of Murray, Pierce
and Melnyk; with Murray testifying as to contact with foreign law
enforcement (8RT1588).   The Petitioner in attempts to access evi-
dence of corroborating circumstances as per CPC§653f(a), has re-
quested discovery of the daily logs for the arresting officers (11
CT2481) and relevant information regarding the principals involved
(10CT2225-2232).   The Petitioner has moved for discovery sanctions
due to the Prosecution's refusal to disclose this evidence (10CT2225-
2234), and has also moved for all arrest reports, warrants, extra-
dition/deportation orders to be moved into evidence (10CT2247).
All motions were denied by the Trial Court (see 1CT203-205).

(v)   Arrest Without Regular Process or Lawful Authority:
Defined by CPC§146 as a public officer acting under the pretense or
color of authority, to arrest or detain a person against his will
while doing so without regular process or lawful authority.   This
description is consistent with the conduct of Panamanian and U.S.
officials acting without lawful authority due to territorial re-
strictions and arresting the Petitioner without regular process.

(vi)   Conspiracy to Commit:   Defined by CPC§182 to occur
when two or more persons conspire to commit any act injurious to
public morals, or to pervert/obstruct justice or the due admin-
stration of the laws.   Thus the overt act of the forcible trans-
national abduction, the violations of the multilateral and bilateral
treaties, the defiance of statutory law and the disdain for its due

ATTACHMENT 'B':   PAGE 19

administration is demonstrable of conduct consistent with a con-
spiracy to commit such offenses.  With its commission evident in
Ms. Murray's 12/17/13 cell phone conversation with Mr. Pierce in
which she proclaimed "We got it right" (see 4.1(I) above), the
conspiracy that connects the Prosecution Team with the foreign of-
ficials with whom Murray had been in contact, was contrived to sub-
vert due process and therefore purposed to pervert justice.  Further-
more, the full magnitude of the conspiracy can only be measured when
viewed in conjunction with the factual innocence component of
CLAIM 3.8(C), whereby the evidence that refutes all charges was
known to the Prosecution Team.  Consequently, with knowledge of the
information that is the fatal flaw in the allegations, the Pro-
secution was aware of the false charges; and thus the forcible ab-
duction and conveyance employed as the method to procure the Peti-
tioner to be falsely prosecuted is shocking to     the universal
sense of justice and warrants the dismissal of the charges.

      (vii)  Misrepresentations, Concealment, Fraudulent Conduct:
Described by CPC§131 as anyone "who knowingly and willfully fal-
sifies, misrepresents or conceals a material fact or makes any ma-
terially false, fictitious, misleading or fraudulent statement or
representation".  Thus the material mish-mash of the Prosecution
Team's version of events as set forth in 4.2 above, that mislead
and conceal the forcible transnational abduction of the Petitioner
is conduct consistent with a violation of §131 of the CA Penal Code.

      (viii)  Miscellaneous:  The Petitioner in pre-sentencing
pleadings has raised these 'bad acts' as well as others that include
false report, false evidence, false affidavit.  For reference,
please see 11CT2317-2326.

   (C)  Shocking and Outrageous Conduct That Offends a Universal
         Sense of Justice:  Recognized by the Ninth Circuit in United
States v. Valot, 625 F.2d 308 (9th Cir. 1980), is the Ker-Frisbie
exception as created by the federal court of United States v. Tosca-
nino, 500 F.2d 267 (2nd Cir. 1974).  In Toscanino  the court indi-
cated that the principle of due process requires acceptable stand-
ards of conduct, and that convictions cannot be brought about by

ATTACHMENT 'B':  PAGE 20

**outrageous** methods that offend a sense of justice.  Toscanino argued that the government violated these standards of conduct and a sense of justice because "at no time during [the] seizure of Toscanino did it ever attempt to accomplish its goal through any lawful channels whatever.  From start to finish the government un- lawfully, willingly and deliberately embarked upon a brazenly cri- minal scheme violating the law of three separate countries".  In response, the court indicated: "The concept of due process...now protects the accused against pretrial illegality by denying the fruits of its exploitation of any deliberate and unnecessary un- lawfulness on its part...and when an accused is kidnapped and for- cibly brought within the jurisdiction; the court's acquisition of power over his person represents the fruits of the government's ex- ploitation of its own misconduct...[and] we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been [so] acquired".

(i)  Petitioner's Case is Distinctly Similar to <u>Toscanino</u>: The indications of the <u>Toscanino</u> court apply to the Petitioner's case because like <u>Toscanino</u>, the government/Prosecution in com- missioning the abduction of the Petitioner never "attempt[ed] to accomplish its goal through any lawful channels whatever".  Instead they "unlawfully, willfully and deliberately embarked upon a ... criminal scheme", violating statutory/ federal/ foreign law, inter- national treaties, and as contended in 4.8 below, the peremptory norms of the international community.

Included in this brazen and shocking conduct is the Prosecution's concealing of these outrageous acts due to what the Prosecutor de- scribes as the irrelevancy of the Petitioner's allegations (see 4.2 (D) above).  The concealment of this misconduct also carries an appearance of an improper judicial bias, where as described in 4.6 below, the Trial Court refuses to provide specifically-requested information relevant to the question of actual bias through his extrajudicial affiliation with those perpetrating such outrageous acts.

(ii)  The Differences are Non-Distinguishing:  It should be

**ATTACHMENT 'B':  PAGE 21**

noted that in <u>Toscanino</u>, the defendant alleged physical mistreat-
ment, but the **court** as quoted above, identifies "when an accused
is kidnapped and forcibly brought within the jurisdiction" as the
misconduct and the "court's acquisition of power over the person"
as the exploited fruit thereof.  Therefore even though Toscanino's
degree of physical mistreatment is greater than that of the Peti-
tioner, it is **the** forcible abduction and conveyance of the Petitioner
as indicated by the <u>Toscanino</u> court that requires the Trial Court's
divesture of jurisdiction over the person of the Petitioner.

## 4.5  Dismissal is Warranted Due to Violations of Constitutional
    and Statutory Rights:  Courts may dismiss an action under
their inherent supervisory powers "to implement a remedy for the
violation of a recognized statutory or constitutional right"
[<u>United States v. Matta-Ballesteros</u>, 71 F.3d 754, 763 (9th Cir.
1995)].  Therefore, the Petitioner contends that dismissal is
warranted due to an investigatory and prosecutorial process that
has violated his substantive statutory and constitutional rights.
These include but are not necessarily limited to:

(A)  Fourth Amendment Rights:  The forcible abduction and con-
veyance of the Petitioner void of warrant, cause and evidence of
criminality is considered an illegal arrest and violates his right
against unreasonable search and seizure [<u>Henry  v. United States</u>,
supra].  As noted in his CPC§1538.5 Motion in Trial Court (see 1OCT
2242-2247), the Petitioner claimed a reasonable expectation of pri-
vacy due to the constitutional rights accorded him as a U.S. citizen
traveling on a valid U.S. passport, as well as the individual pro-
tections provided by the U.N. and 'OAS' Charters.  Despite this
motion being presented to the Trial Court, the court refused to
receive any evidence on any issue of fact necessary to determine
the motion (per CPC§1538.5(c)(1)); and as a result, has deprived
Petitioner a meaningful opportunity to fully litigate this matter.

Also relevant to Fourth Amendment rights is the concealing of the
unqualified determination of probable cause as prepared by FBI Agent
Murray prior to her instigating the abduction and conveyance of the
Petitioner.  As asserted in Petitioner's CPC§1181 Motion (see 1OCT

2046-2061), Agent Murray was unqualified to act as affiant due to
her absence of knowledge and sufficient training relative to the
subject matter.  Therefore the investigatory process that was con-
ducted with a reckless disregard for the factual truth was obscured
by Murrays's subsequent commissioning of a forcible abduction that
by its method, precluded any opportunity for the Petitioner to con-
temporaneously contest through a Writ of Habeas Corpus.

(B)  Sixth Amendment Rights:  The Petitioner was deprived his
right to fair notice by the abduction conducted by Panamanian off-
icials without legal justification or explanation.  Furthermore, the
Petitioner is entitled to access to counsel by the Sixth Amendment
as well as "adequate provisions...to have due leagl aid in order to
secure [his] rights" ('OAS' Art. 45(i)).  Thus the process co-
ordinated by the Prosecution Team has deprived the Petitioner of
such rights [Reid v. Covert, 354 US 1, 5-6 (1957)].  Also evident
in the Prosecution's contradictory versions of arrest (see 4.2
above), is the continued concealment of the 'bad acts' employed
to forcibly bring the Petitioner into the court's jurisdiction.
With FBI Agent Murray testifying at trial, the Petitioner is consti-
tutionally entitled to confront and impeach her credibility; and to
do so, introduce evidence of the illicit acts (see CA Evid. Code
§1101(b)) to commission and carry out the forcible transnational
abduction of the Petitioner.  Whereas the Prosecutor has claimed
the allegation of abduction/conveyance are irrelevant because "no
evidence was introduced at trial stemming from his arrest and ex-
tradition" (9CT1942), he fails to account for the suppressed evi-
dence that would have demonstrated Murray's intentional disregard
for proper process.  Thus the prosecutorial methods used that cover
up misconduct violates the confrontation clause of the Sixth Amend-
ment.

(C)  Right to Due Process of Law:  The Petitioner contends that
no evidence has been presented by the Prosecution that is demon-
strable of a legal arrest and lawful conveyance.  The Prosecution
has produced no arrest report, no warrant that was used in the so-
called arrest, no extradition order nor any deportation order.  In

ATTACHMENT 'B':  PAGE 23

addition to the complete lack of documentary evidence supportive of
proper procedure, the Prosecution's abduction, conveyance and cover-
up effectuates violations of Petitioner's right to due process that
includes:

(i)   Discovery Violations:   Despite his explicit discovery
requests (see 11CT2479-2481) and the Prosecution's constitutional
obligation to disclose [Brady v. Maryland, 373 US 83 (1963)], the
Petitioner has been deprived of the evidence of the 'bad acts' (see
4.4(B) above) that impeach the competency of the investigatory and
the integrity of prosecutorial process and personnel.   By failing to
disclose the relevant materials and information as noticed in the
CPC§1054.5 Sanctions Motion filed by Petitioner in Trial Court (see
10CT2225-2234), the concealment continues to violate Petitioner's
right of due process discovery [Imbler v. Pachtman, 424 US 409, 427
fn. 25 (1976)].

(ii)   Statute of Limitations:   The method employed by the
Prosecution to abduct and convey have skirted the procedural bar
imposed by the statute of limitations as contained in Article VII
of the US-Panama Extradition Treaty (see 11CT2468).   As contended
in CLAIM 7.7(B) below, the Prosecution has failed the due process
obligation to demonstrate subject matter jurisdiction resulting
from a potential bar of statute of limitations [People v. Zamora
(1976) 18 C3d 538].   Therefore the arrest and rendition void of this
regular process has deprived the Petitioner of procedural due pro-
cess as a result of a prosecution that is barred by statute of li-
mitations.

(iii)   Doctrine of Specialty:   This doctrine found in Article
VIII of the US-Panama Treaty (see 11CT2468-2469), and articulated
by the Supreme Court in United States v. Rauscher, 119 US 407 (1886),
was violated by the design and process used to arrest and prosecute
the Petitioner.   The doctrine and its violations are set forth in
greater detail in CLAIM 5.2- 5.3 below.   Based on the contentions
as therein raised, the Prosecution by failing to address and abide
by the constitutionally-enforced principle is conduct that violates
Petitioner's right to due process of the law.

(iv)   Rights of Reasonable Access to the Courts and Writ
of Habeas Corpus:  The First Amendment guarantees the
Petitioner the right of access to the courts, which is a very imp-
ortant right, since it theoretically protects all other rights [Mc-
Carthy v. Madigan, 503 US 140, 153].  Also the Fifth Amendment's
due process clause protects the Petitioner from arbitrary depri-
vation of life, liberty or property [Kaoru Yamataya v. Fisher, 189
US 86 (1901)] and CA Penal Code §1473 provides him the state-created
right to inquire into the cause of his imprisonment or restraint.
Therefore the actions of the Prosecution Team to abduct, restrain
and confine in the manner that precludes any ability to exercise
these protections as entitled through constitutional and statutory
right, have violated those privileges accorded all criminal defen-
dants.

(v)   Fourteenth Amendment Right to Equal Treatment:  As
raised in CLAIM 7 as an indicator of Prosecutorial Misconduct, the
Petitioner has requested from the Governor and Attorney General of
California for the rational basis underlying the State's actions to
abduct the Petitioner while traveling legally when compared to the
different treatment of the State that provides sanctuary from dep-
ortation to those traveling illegally.  The Supreme Court has held
that an individual who claims he has been treated differently from
others similarly situated, intentionally and without rational basis,
states an equal Protection claim as a 'class of one' [Village of
Willowbrook v. Olech, 528 US 562, 564-565 (2000)].  The Petitioner
as evidenced by the examples as attached as Exhibit 8, has requested
for the rational basis behind this disparate treatment.  As of today's
date and despite four attempts, he has received no response from
any party whatsoever.  Thus without an explained rational basis,
the different treatment given the Petitioner as compared to the pro-
tection provided those who **may** be similarly situated, is a distinct
violation of the Petitioner's right to Equal Treatment due to his
standing as a class of one.

4.6 Dismissal is Warranted in Order to Preserve Judicial Integrity

ATTACHMENT 'B':  PAGE 25

Review courts may dismiss an action under their inherent super-
visory powers when required "to preserve judicial integrity by en-
suring that a conviction rests on appropriate considerations validly
before a jury" [United States v. Matta-Ballesteros, supra; underline
added].

(A) Appropriate Considerations:  Under CA Evid. Code §780, the
jury may consider (and the defendant may inquire about) "any matter
that has any tendency in reason to prove or disprove" a witness's
testimony.  Consequently requested disclosure of impeachment mate-
rials is correspondingly broad.  It includes felony 'acts', misde-
meanor 'acts', and non-criminal 'acts' of dishonesty or moral tur-
pitude that could reflect on credibility [People v. Wheeler (1992)
4 CA4th 284].  As noted in 4.5(C)(i) above, the Prosecution sup-
pressed all evidence pursuant to Petitioner's arrest and effectively
concealed the 'bad acts' associated with his abduction and con-
veyance.  The materiality of the suppressed evidence is relative to
FBI Agent Murray's involvement in the investigation and subsequent
prosecution.  The Petitioner has asserted and still maintains that
Murray was not competent in the subject matter and, as a result, her
probable cause reports were prepared with reckless disregard for
the truth (e.g. see 10CT2062-2074).  At trial, defense counsel half-
heartedly attempted to impeach her credibility, culminating with
his closing remarks that "she is clueless" (11RT2141).  However,
in rebutting her incompetence, Prosecutor Pierce simply states "I'm
not sure why it was considered that she did such a bad job- because
she didn't believe...Mr. Tarbutton's [B.S.] defense?" (11RT2200);
a defense, that Mr. Pierce had previously remarked has "zero doc-
umentation" (11RT2136).  Murray's competency and credibility though,
is viewed in a different light if evidence had been introduced for
jury's appropriate consideration that demonstrates her orchestrating
a forcible transnational abduction that offends international trea-
ties, constitutional due process and a universal sense of justice.
Therefore without the introduction of this evidence that is appro-
priate for jury consideration, the integrity of the verdict and the
judicial process that is responsible, has been compromised.

ATTACHMENT 'B':  PAGE 26

(B)  Judicial Integrity:  "To perform its high function in the best way, justice must satisfy the appearance of justice" [Rodriguez v. Copenhaver, 823 F.3d 1238, 1243 (9th Cir. 2016)].  However in the Petitioner's case, the decisions of the Trial Court that compound the Prosecution's discovery violations fall well short of any appearance of impartiality.  This pattern of a series of abuses of discretion have sustained the prejudicial impact on the Petitioner's rights denoted in 4.5 above, and as a result, denigrated the integrity of the judicial process.  These abuses include the examples of:

(i)  Petitioner's Attempts to Compel Disclosure:  The Petitioner made several attempts available through the judicial process to compel disclosure and move into evidence the details of his abduction and conveyance:

(a)  Discovery Request for details of Arrest (11CT2479-2481);

(b)  CPC §1054.4 Motion for Sanctions as a result of the Prosecution's failure to comply with discovery (10CT2225-2234);

(c)  CPC §1538.5 Search and Seizure Motion filed to compel production of all evidence of arrest including warrants, affidavits, reports, extradition orders, deportation orders, communications, daily logs, etc. (10CT2242-2247);

(d)  CPC §1181 Motion to litigate the illegal restraint of the Petitioner due to the abduction and conveyance (10CT2062-2074);

(e)  Motion for Appointment of Experts to introduce testimony of the unlawfulness of the means and methods used to arrest and convey (10CT2251-2254);

(f)  CPC §1185 Motion to arrest judgment due to jurisdictional defects resulting from the forcible abduction (10CT2196-2200);

(g)  CPC §1181 Motion due to prosecutorial misconduct arising from the arrest process (10CT2075-2125);

(h)  CPC §1181 Motion due to 'IAC' resulting from the

failure of counsel to investigate and litigate the arrest process (10CT2126-2148).

(ii) Decisions of the Trial Court:  Despite the numerous attempts and motions to discover and litigate the issues associated with the Petitioner's arrest, the Trial Court denied every motion without compelling any introduction of evidence (see 1CT204-205). Instead of the appearance of justice, the Trial Court's decisions maintained the violations of the Petitioner's constitutional and statutory rights.

(iii)  Trial Court's Apparent Conflict of Interest:  The Trial Court, Judge Jensen, is on record as to non-disqualifying social acquaintance with FBI Agent Jessie Murray and her husband, Mike Murray; as well as his conversations with Mike Murray about his goal and desire in "running for judge" (1RT08).  However, due to the magnitude of misconduct perpetrated by the Prosecution Team-- which includes Jessie Murray-- the Petitioner specifically requested Judge Jensen to disclose whether or not he used his prestige of his own judicial office to assist Mike Murray in his candidacy for judgeship.  This request is found in Petitioner's CCP §170.3 Challenge for Cause filed 10/02/2017 (10CT2010-2012).  Pursuant to the CA Code of Judicial Ethics, Judge Jensen is within his privilege to use the prestige of judicial office (see Canon 2B(2)(d)/(e)); however this Code also requires disclosure of such actions, if any statement or endorsement would influence Judge Jensen to reach a particular result or rule in a particular way (see Canon 3E(3)(a)). This influence could be prejudicial to the Petitioner in his motions that would require Judge Jensen's rulings on matters carrying grave implications/ consquences for the wife, Jessie Murray, of the man, Mike Murray, to whom Judge Jensen may have pledged his prestige of judicial office in order to assist in Murray's own judgeship.  According to the Code of Judicial Ethics, this obligation to disclose is required "even if the Judge believes there is no actual basis for disqualification" (Canon 3E(2)(a); CCP170.1).

In response to Petitioner's request, Judge Jensen answered and at the same time, struck the Challenge for Cause (12CT2579-2587).  The

ATTACHMENT 'B':  PAGE 28

Judge in his answer/striking, reiterated his non-disqualifying
social acquaintance with both Murrays but refused to answer the
question of a conflict of interest that in the mind of the Peti-
tioner would influence his rulings in order to protect the repu-
tations of not only the Murrays, but also his own judicial prestige
if used to elect Mike Murray.  If Judge Jensen did assist Mike
Murray, his refusal to disclose not only establishes an actual bias
and a conflict of interest-- but also a jurisdictional issue as
raised in CLAIM 8, due to the pre-existing disqualifying interest
(see CA Code of Judicial Ethics Canon 3E(1); and advisory comments).

However, irrespective of whether Judge Jensen did or did not assist
Mike Murray, by refusing to answer what is a simple, straight for-
ward and reasonable question, he creates an appearance of impro-
priety that is clearly within his power to dispel.  This appearance
of an improper partiality is corrupting to the perceived integrity
of the judicial process [Liljeberg v. Health Services Corp., 468 US
847, 867-868 (1988)], and itself a violation of the CA Code of Ju-
dicial Ethics (Canon 2).  A code, which as stated in its preamble,
is designed to ensure the integrity and impartiality of the jud-
iciary.

Furthermore, by denying the Petitioner all efforts to discover the
evidence relative to his abduction/conveyance, the Trial Court pre-
cluded its appropriate consideration by the jury.  Because this evi-
dence is relevant to the credibility of Jessie Murray's testimony,
it is admissable (CEC §351); and due to the statutes that require
judicial action to ensure its introduction (CPC §1044; CPC §1054;
CPC §1538.5(c)(1)), the performance of the Trial Court-- especially
considering **an appearance of a disqualifying** interest and his refusal
to disclose-- is injurious to the integrity of the judicial process
and requires dismissal of the current action.

     (iv)  Evidentiary Hearing Required to Preserve Integrity:
It must also be noted that the Petitioner filed a 42 U.S.C. §1983
action seeking only declaratory relief as a result of the Trial
Court's refusal to provide the requested information that is rele-
vant to the question of judicial bias.  This federal action was

ATTACHMENT 'B':  PAGE 29

dismissed by the Central District of California (Case No. 8:20-
cv-01801-FMO-AS) and the Ninth Circuit (Case No. 20-56165). As a
result, the Petitioner has exhausted all practical means to dis-
cover the information relevant to the question of an actual bias.
Therefore due to the **corrosive effect** that the Trial Court's refusal
to disclose has  on the integrity of the judicial process, the Pe-
titioner has attached hereto as Exhibit 20, a request for an evi-
dentiary hearing that includes the interrogatories of the Trial
Court to compel the information requested.

4.7  Dismissal is Warranted to Deter Future Like Conduct:  The
Courts have indicated that dismissal to deter future misconduct is
available to review courts under their inherent supervisory powers
[United States v. Matta-Ballesteros, supra].

(A)  Predicates to Dismissal:  Courts have recognized predicates
to be established prior to exercising the remedy of dismissal [Un-
ited States v. Simpson, 927 F.2d 1088, 1090-1091 (9th Cir. 1991].

(i)  Predicate of Prejudice:  "The defendant must demon-
strate prejudice before the court may exercise its supervisory
powers to dismiss" [United States v. Struckman, 611 F.3d 560 (9th
Cir. 2010)].  Referencing 4.5 above, the Petitioner has established
and demonstrated prejudice due to the bad acts of the Prosecution
Team that have violated his substantive constitutional and statutory
rights.

(ii)  Predicate of Prior Conduct:  "A finding that the go-
vernment has broken the law in the past is a necessary predicate to
dismissal" [United States v. Simpson, supra].  Referencing the Peti-
tioner's CPC §1054.5 Discovery Motion (see 10CT2205-2237), based on
specific factual scenarios of misconduct exhibited by the Prosecution
Team, the Petitioner moved for disclosure of information that would
be probative of prior misconduct (see 10CT2225-2231).  However as
noted in 4.6(B) above, the Trial Court-- despite Petitioner's com-
pliance with the pre-conditions of CPC §1054.5(b)-- neglected to
"make any order necessary to enforce the provisions" that ensure
discovery of prior misconduct.  Therefore any failure to establish

ATTACHMENT 'B':  PAGE 30

the predicate of prior misconduct is a direct result of the Trial
Court's appearance of bias that has deprived the Petitioner appro-
priate consideration of such relevant materials and information.

   (B)  Dismissal as Remedy:  In United States v. Toscanino [supra],
the court did not indicate prior conduct as a prerequisite, instead
stating "in an effort to deter [government] misconduct, the term
[Due Process] has been extended to bar the government from realizing
directly the fruits of its own deliberate and unnecessary lawlessness
in bringing the accused to trial".  When "trials...are the outgrowth
or fruit of the government's illegality...they debase the processes
of justice" and "the [court's] supervisory power is not limited to
admission or exclusion of evidence, but may be exercised in any
manner necessary to remedy abuses of...process".  Therefore in the
Petitioner's case, with the outrageousness of the misconduct exhi-
bited, dismissal of the action is warranted.

4.8  Dismissal is Warranted Due to the Violations of Jus Cogens Norms:
The Petitioner maintains that dismissal is warranted due to the con-
duct of the Prosecution Team that has violated the Jus Cogens norms
recognized and accepted by the international community.

   (A)  Jus Cogens Norms:

      (i)  Legal Concept Binding on All Nations:  The legal concept
of Jus Cogens norms designates peremptory norms from which no der-
ogation is permitted by way of particular agreements.  "These per-
emptory norms are derived from values taken to be fundamental by
the international community and are binding on all nations" [United
States v. Struckman, supra].

      (ii)  Vienna Convention and International Law Commission:
The principle values of Jus Cogens norms and their existence are
memorialized through the 1969 and 1986 Vienna Convention on the Law
of Treaties, wherein tenets were established that prohibit treaty
provisions that are incompatible with Jus Cogens norms [Article 53
and 64].  The same is also true for unilateral declarations, fol-
lowing the guiding doctrine adopted by the International Law Com-
mission ('ILC') in 2006 [Principle 8].  According to the Articles

ATTACHMENT 'B':  PAGE 31

of Responsibility finalized by the 'ILC' in 2001 and 2011, nations as well as international organizations shall cooperate to bring to an end any breach of Jus Cogens, and shall not recognize as lawful, a situation created by such a breach, nor render aid or assistance in maintaining such a situation [Article 41/2001; Article 42/2011]. Moreover, if nation states or international organizations are to violate Jus Cogens norms, they cannot invoke any circumstance that justifies the wrongfulness of their conduct [Article 26].

(iii)  Identifying a Jus Cogens Norm:  Article 53 of the Vienna Convention identifies Jus Cogens as a "norm [that] is accepted and recognized by the international committee of states". Thus to qualify a peremptory norm as Jus Cogens, it must be determinable as one that is accepted/recognized by international organizations. This process of identification has been evident in international situations and decisions [e.g. Nicaragua v. U.S., 1968 I.C.J. 14 (june 27)].

(B)  Violations of Jus Cogens Norms in Petitioner's Case:

(i)  Identifiable Violations:  As noted in 4.8(A)(iii), to illustrate the misconduct of the Prosecution Team and Panama constituted violations of Jus Cogens, the Petitioner needs to demonstrate breaches of peremptory norms, that to qualify as Jus Cogens pursuant to Article 53 of the Vienna Convention, are fundamental values accepted and recognized by the international community.

(a)  Charter of the Organization of American States ('OAS'):  Referenced in 4.3(C)(i) above, this multinational treaty recognizes and accepts that within the framework of democratic institutions, exists "a system of individual liberty and social justice based on respect for the essential rights of man" [Preamble; underline added].  This treaty is based on principles that "reaffirm" and "proclaim the fundamental rights of the individual" [Article 3(1)], as well as adherence to an "international order consist[ing]...of the faithful fulfillment of obligations derived from treaties and other sources of international law" [Article 3(b)].

ATTACHMENT 'B':  PAGE 32

(b)  Fundamental Rights of the Individual as Jus Cogens
Norms:  To equate the values of "individual liberty"
and "fundamental rights of the individual" proclaimed in the 'OAS'
with those peremptory norms of the Jus Cogens' construct, it is
helpful to note the post- Vienna Convention impact on its practical
application.  The legal principle that the concept of Jus Cogens
essentially aims to protect individual rights has progressively
found acceptance among scholars, resulting in academic and inter-
national law materials focused on specific individual rights.  As
noted in "Jus Cogens as a Vision of the International Legal Order"
[Petsche, supra], "The recognition of individual rights as funda-
mental values of the international legal system and the resulting
idea of the existence of a hierarchy of international law norms in-
escapably lead to the necessity of providing heightened protection
of those rights" [Petsche at Page 270].  The means of providing this
heightened protection is through a 'Jus Cogens Vision' that has
"facilitated acceptance of individual rights as fundamental values
of the international legal order and helped improve the judicial
protection of such values" [Petsche at Page 238].

(ii)  Personal Liberty and Fundamental Rights:  By promoting
"individual liberty" and proclaiming "fundamental rights of the in-
dividual", the 'OAS' demonstrates its recognition and acceptance
of these legal principles, thus designating such as peremptory norms
within the international community.  Therefore pursuant to the stan-
dard established by Article 53 of the Vienna Convention, such norms
are identifiable as Jus Cogens.  Consequently, violations of the
legal principles of personal liberty and essential rights of the
individual are violations of the Jus Cogens norms.

(a)  Violation of Petitioner's Personal Liberty:  As
noted in 4.4(B)(ii) above, CPC §236 defines an unlawful violation of
personal liberty as false imprisonment.  To define "unlawful vio-
lation", we need only to refer to Ker v. Illinois [supra] wherein
the Supreme Court indicated that Ker, the subject of "forcible ab-
duction" and "transfer by...force and fraud" [Ker at 444], has a
legitimate claim of "false imprisonment" against the abducting party

ATTACHMENT 'B':  PAGE 33

[Ker at 445].   Therefore the Prosecution Team's forcible abduction
and transfer by force and fraud of the Petitioner-- conducted with
the cooperation of Panamanian officials-- according to Ker, is pro-
bative of 'false imprisonment'; aka unlawful violation of personal
liberty, which is a recognized and accepted Jus Cogens norm.

        (b)   Violations of Petitioner's Right to Counsel and
               Access to Courts:   Of relative importance is the
deprivation of fundamental rights accorded the Petitioner by the
U.S. Constitution.   This includes the rights to counsel and the
right of meaningful access to the courts.   As asserted in 4.5(C)
above, these peremptory rights recognized domestically were denied
the Petitioner by Panamanian and U.S. officials.   However, these
norms are also internationally recognized and accepted as noticed
in the 'OAS' dedication, along with application to principles that
include a protected liberty interest [Article 45(a)], as well as
"adequate provisions for all persons to have due legal aid in order
to secure their rights" [Article 45(i)].   Therefore when the Pro-
secution Team and Panamanian officials deprived the Petitioner ac-
cess to counsel, Habeas Corpus filing, extradition/deportation
hearing-- they denied him the essential rights that are accepted/
recognized internationally and thereby constituting violations of
Jus Cogens norms.

   (C)  Jus Cogens Norms and Treaties in Force:   Also relevant to
Jus Cogens is its relation to treaties in force and interpretive
application of their provisions.

     (i)   Juridicial Orders Incompatible with Jus Cogens Norms:
In an influential publication authored in 1937 by Alfred Von Verdoss
[Alfred von Verdoss, Forbidden Treaties in International Law, 31
Am.J.Int'l L. 571 (1937)], he argues that "no juridicial order can
admit treaties...which are obviously in contradiction to the ethics"
of the subjected communities.   This concept of an ethical standard
for interpretation is also indicated in other decisions that find
that treaties or specific provisions contained therein, are void/
invalid when such allow for violations of Jus Cogens norms [see
Case of the S.S. Wimbledon (U.K.,Fr.,It.,&Japan v. Ger.), 1923

P.C.I.J. (Series A) No. 1].

     (ii)  Treaty Interpretations Incompatible With Jus Cogens
          Norms:  In <u>United States v. Alvarez-Machain</u>, 504 US
655, 662 (1992), the Supreme Court indicated that when an inter-
national transfer occurs by means other than extradition, the act
could constitute a violation of the extradition treaty, if that
treaty makes extradition the exclusive means to effect the transfer.
The Petitioner, as stated in 4.3(C)(ii) above, contends the US-
Panama Extradition Treaty does indicate the provisions of the treaty
as the exclusive method for conveyance.  That assertion notwith-
standing, but the Petitioner offers in arguendo, that a court's in-
terpretation of this treaty that differs, and thereby determines
his forcible transnational abduction is an acceptable alternative
to lawful extradition because the treaty does not explicitly forbid
it; is a juridicial decision that finds the treaty provisions in-
compatible with Jus Cogens norms.  Furthermore, the Petitioner argues
that such a juridicial order that permits peremptory norms violations
due to a treaty's failure to expressly prohibit them, is an order
that admits a treaty to actually allow illicit acts.  Moreover, not
only would a court's interpretation contradict the ethics of the re-
spective communities, but itself be incompatible with Jus Cogens
norms by violating the Articles of Responsibility of the 'ILC'.
These Articles, Article 41 (2001) and Article 42 (2011) stipulate
international cooperation to bring to an end any serious breach of
Jus Cogens and also, prohibit recognizing as lawful a situation cre-
ated by such a breach, or render aid/assistance in maintaining.

Therefore any court's decision that would effectively permit the
Petitioner's forcible abduction and conveyance due to the extra-
dition treaty's failure to particularly prohibit is a declaration
that colors a breach of peremptory norms as lawful thereby rendering
assistance in maintaining the violations of the fundamental values
accepted and recognized by the international community.

It is also of important significance to note how  such a juridicial
decision would impact other treaties in force.  Insomuch that the
Supreme Court has stated "Legislative silence is not sufficient to

abrogate a treaty" [TWA, Inc. v. Franklin Mint Corp., 466 US 243,
252 (1984)], thus any court's decision that excuses the bad acts
of the **Prosecution Team** due to  the US-**Panama Treaty**'s lack of un-
ambiguous language that forbids it, is a juridicial order that
essentially abrogates the non-derogable peremptory norms of the
multi-lateral treaty established through the Vienna Convention on
the Law of Treaties.  Such an order will be contrary to what the
Ninth Circuit has indicated to be clearly established law [Swino-
mish Indian Tribal Cmty. v. BNSF RY. Co., 951 F.3d 1142 (9th Cir.
2020)].

Lastly, the Petitioner contends, that any juridicial order or non-
order that fails to dismiss the current action, effectively maintains
the breach and thereby rationalizes the wrongfulness of the ab-
duction/conveyance.  Any such action or inaction will offend the
'ILC' Articles of Responsibility [Article 41/2001; Article 42/2011;
Article 50/2001; Article 53/2011] as well as Article 26 of the Vi-
enna Convention.  The reality of a juridicial decision that exempts
a forcible transnational abduction from the provisions of a treaty
is one that incentivizes transnational illegal conduct, permits de-
liberate deprivation of the rights of individuals, and contradicts
the ethical and legal obligations owed to the international community
as a whole.

   (D)  Jus Cogens are Justiciable in our Courts:  Jus Cogens norms
are a subset of customary international law which is defined as the
"general and consistent practice of states followed...from a sense
of legal obligation" [Siderman de Blake v. Republic of Argentina,
965 F.2d 679, 714 (9th Cir. 1992)]; and as indicated in Struckman
[supra], possible of "providing a basis for dismissal under a court's
supervisory powers because, like statutory and conventional law,
they are justiciable in our courts".

4.9  This Claim Merits Federal Review and Remedy:  This Claim and
the issues raised merit Federal Review pursuant to 28 U.S.C. 2254
as the facts and evidence presented are properly before the court.
With the Petitioner's conviction and state custody a direct result

of the violation of the Constitution, Laws, and Treaties of the
United States, proper remedy is warranted.

(A)   Issues Preserved in Trial Court:   In Case No. 11CF2747 of
Orange County Superior Court, the Petitioner through pro per plea-
dings filed in Trial Court prior to sentencing, properly preserved
the issues identifiable in CLAIM 4 above.   These 'objections' are
found in the appellate record included as: Search and Seizure Vio-
lations (CPC §1538.5 Motion at 10CT2242-2247); Discovery Request
for Arrest Details (11CT2479-2481); Discovery Motion (CPC §1054.5
at 10CT2225-2234);   Illegal Restraint (CPC §1181 at 10CT2062-2075);
Arrest of Judgment (CPC §1185 at 10CT2196-2200); Prosecutorial Mis-
conduct (CPC §1181 at 10CT2075-2125);   'IAC' (CPC §1181 at 10CT2126-
2148); Petitioner's Declaration of Arrest (10CT2472-2473);   Decla-
ration of No Formal Extradition (10CT2474);   Petitioner's Addenda
of 'Bad Acts' of the investigatory and prosecutorial process (10CT
2317-2331).   As noted in 3C of the Procedural History included in
the PETITION OVERVIEW, all pro per motions and actions were denied
by the Trial Court prior to sentencing; and in so doing offered no
factual findings, applied no decisional law (state or federal) ad-
dressing the materiality or prejudiciality of the issues associated,
nor compelled any evidence/testimony to resolve credible, disputed
issues of fact.

(B)   Issues Exhausted in State Court:   As noted in the Procedural
History included in the PETITION OVERVIEW, the Petitioner motioned
the Appellate Court to set aside his direct appeal brief as filed
by Appellate Counsel due to the omission of issues of greater sign-
ificance.   After the Appellate Court disregarded this request/motion,
the Petitioner filed a State Habeas Petition concurrent with his
direct appeal in which the issues raised in CLAIM 4 were included
as CLAIM IV of that petition.   That state petition (No.G058686) was
denied on 6/04/2020.   Petitioner filed virtually the same petition
in the California Supreme Court on 7/31/2020.   This state petition
(Case No. S263665) was denied on 2/20/2021.   Both state denials
provided no factual findings, no explanation, no application of
decisional law (state or federal), no evidentiary action to resolve

ATTACHMENT 'B':   PAGE 37

any credible, **disputed** issues of fact, nor gave any indication
whatsoever that any adjudication of any issue was considered or
administered.

(C) Evidence and Authorities Presented in State Court:  In sub-
mitting these issues in state court, the Petitioner presented such
on the same facts and evidence referenced herein by attached Exhibit,
Declaration, and Request for Judicial Notice (Exhibit 5).  As to
applicable federal law as established by U.S. Supreme Court decision,
the Petitioner offered such authorities that included: Mapp v. Ohio,
367 US 643 (1961) [Illegal Search and Seizure]; Terry v. Ohio, 392
US 1 (1968) [Illegal Detention]; U.S. v. Russell, 411 US 423 (1973)
[Outrageous Government Conduct]; Breard v. Greene, 523 US 371 (1998)
[Treaty Violations]; Reid v. Covert, 364 US 1 (1957) [Fourth Amend-
ment Rights Apply internationally]; Arizona v. Fulminante, 499 US
279 (1991) [Judicial Bias]; Brady v. Maryland, 373 US 83 (1963)
[Discovery Violations].

(D) **Review and Remedy:  In the PETITION OVERVIEW** attached to
**the** Federal Habeas Form CV-69, the Petitioner demonstrates that this
CLAIM merits de novo review due to the fact that there is no **state**
ruling to review with AEDPA deference.  In this de novo review as
**prayed by the Petitioner,** he also requests Judicial Notice of the
evidence as presented in Exhibit No. 5 [**Page 40 of ATTACHMENT 'D'**].
In the Court's determination of issues as presented in this CLAIM,
the Petitioner prays for resolution of all disputed facts by refe-
rence to that which is judicially noticeable, and also that which
is obtainable by Evidentiary Hearing as incorporated by Exhibit
No. 20 [**Page 127 of ATTACHMENT 'D'**].  The Petitioner contends **that**
an evidentiary hearing is **especially** critical to judicial process
due to the fact that despite Petitioner's best efforts to introduce
evidence of a legal arrest and lawful conveyance, nothing has been
produced by the Prosecution, nor has anything been compelled by
the Trial Court.  As raised herein, absent any documentary proof
of legal/lawful process, the means and method used by the Prosecution
Team is tantamount to outrageous conduct that is offensive to the
integrity of the criminal proceedings.  Moreover, as demonstrated

ATTACHMENT 'B':  PAGE 38

above in 4.6 (Page 25), the Trial Court failed to provide the Petitioner a meaningful opportunity to fully litigate his arrest and conveyance; and therefore, the Fourth Amendment implications are cognizable in Federal Habeas review [Stone v. Powell, 428 US 465, 481-482 (1976)].

As to relief, Petitioner prays for all just and proper including but not limited to reversal of the conviction and dismissal of the action for the purposes as stated above in 4.3 through 4.8.

ATTACHMENT 'B':  PAGE 39

CLAIM 5:   CUMULATIVE ERRORS OF THE PROSECUTION THAT VIOLATE
           PROCEDURAL DUE PROCESS, INTERNATIONAL TREATY, AND
           FUNDAMENTAL FAIRNESS

SUMMARY: Following the initial Felony Complaint, the Prosecution
added additional charges on three separate occasions.  However when
doing so, they amend the allegations-- actually and constructively--
by methods that are void of fair procedure and in violation of in-
ternational treaty.  One example of this is the Prosecution adding
charges, that pursuant to the particulars of the Petitioner's arrest,
are precluded by the 'Doctrine of Specialty'.  This rule that pro-
hibits the trying and/or punishing of additional charges at the time
and in the manner executed by the Prosecution, is clearly established
through U.S. Supreme Court decision and international treaty.

Another example of these errors of due process is the Prosecution
adding security fraud charges that are based on the same trans-
actional acts alleged in the original complaint as grant theft, but
when brought to trial alongside the original counts, they are done
so alleging elements that are inconsistent and factually irrecon-
cilable with those concurrently alleged in the original grand theft
offenses.  To mask the contradicting theories from the jury's pur-
view, the Prosecution introduces improper expert testimony that is
elementally-oxymoronic, which is then followed by their material
alteration of the respective 'security fraud' jury instruction by
eliminating operative terminology and guidance as provided by U.S.
Supreme Court decisions, that would have highlighted the contra-
dictions in the divergent theories.

Also included in these actually added offenses is the allegation
of an overall scheme to defraud, but despite the course of business
that is the elemental subject of this count predating the charge
and predicate security fraud offenses by up to ten years, the Pro-
secution-- with actual and constructive knowledge of salient facts
exhibited by the victims-- fails to establish subject matter jur-
isdiction due to the bar of statute of limitations.

ATTACHMENT 'B':  PAGE 40

All of this is aided by a judicial abuse of discretion that allows the Prosecution to freely amend these allegations in clear violation of established federal law as determined by U.S. Supreme Court decision, international treaty, **and constitutional due process.**

CONTENTS OF CLAIM 5:

5.1  Procedural Facts                                           Pg. 42

5.2  The Charges Added in the Amended Felony Complaint
     and the Information Violate the 'Doctrine of
     Specialty'                                                 Pg. 43

5.3  The Constructively Amended Grand Theft Counts
     Violate the 'Doctrine of Specialty'                        Pg. 44

5.4  The Prosecution's Intentional and Bad Faith Use
     of Inconsistent and Irreconcilable Factual Theories        Pg. 45

5.5  The Prosecution Materially Alters the Supreme
     Court's 'Howey Test' for the Security Fraud Jury
     Instruction                                                Pg. 50

5.6  The Prosecution Adds a Charge Based on a Transaction
     Dismissed at the Preliminary Hearing                       Pg. 52

5.7  The Cumulative Due Process Errors Relative to
     Added Count 38 Deprived Petitioner of a Fair Trial         Pg. 53

5.8  Judicial Abuse of Discretion                               Pg. 56

5.9  This Claim Merits Federal Review and Remedy                Pg. 56

5.1  PROCEDURAL FACTS:  The following procedural facts are set forth in chronological order:

(A)  Felony Complaint Warrant:  Filed on 10/21/2011 against the Petitioner as Case No. 11CF2747 (Orange Co. Superior Ct.), charging Counts 1-29 (see 1CT001-008).

(B)  Extradition:  On 12/17/2013, Petitioner was 'extradited' from the country of Panama to Los Angeles.  Irrespective of the illegal/unlawful means and method used to facilitate (see CLAIM 4), the  12/17/2013 date of conveyance is indisputable (see Exhibit 6); as are the continuous representations of "extradition" made by Prosecutor Pierce and the Trial Court's adoption of such (see CLAIM 4.2(A)(i)).

(C)  Felony Complaint Warrant- Amendment 1:  On 08/06/2014, the Prosecution filed an amended complaint.  This complaint includes the Counts 1-29 from the original filed 10/21/2011 (see 5.1(A) above) and adds Counts 30-34 (see 2CT228-240).

(D)  Preliminary Hearing:  From 08/06/2014 to 08/14/2014, a Preliminary Hearing was held for Counts 1-34 as charged in the amended Felony Complaint.  The Counts 4,23,24,25, and 30 were dismissed and the Petitioner was not held to answer for those transactions.  The Petitioner was held to answer on the remaining counts (see 4CT887).

(E)  Information Filed:  On 08/21/2014, the Prosecution filed the Information (see 4CT893-902).  This charging document. includes the counts for which the Petitioner was held to answer and, as indicated by Prosecutor Pierce in written briefs (e.g.5CT951), adds Counts 27-38.

(F)  Constructive Amendment:  As set forth in CLAIM 1, the Prosecutor on 01/14/2016 constructively amended the allegations after the close of evidence by adding an alternative theory of embezzlement based on distinctly different acts.

(G)  Trial by Jury:  The Petitioner after standing trial on all 38 counts, was found guilty by the jury on all 38 counts on 1/20/2016 (1CT158-179), and eventually sentenced by the Trial Court for

ATTACHMENT 'B':  PAGE 42

all 38 counts and 47 enhancements to 34 years, 4 months in state prison (1CT209-226).

## 5.2   THE CHARGES ADDED IN THE AMENDED FELONY COMPLAINT AND THE INFORMATION VIOLATE THE 'DOCTRINE OF SPECIALTY':

(A)  Doctrine of Specialty:  In United States v. Rauscher, 119 US 407 (1886), the Supreme Court set forth what has become known as the Doctrine of Specialty which "clothe[s]" the Petitioner "with the right to exemption from trial for any offense" other than those used to extradite.  This exemption even applies to any charges based on the "same evidence and identical acts" alleged in pre-extradition counts.  This principle that precludes post-extradition charges is also found in Article VIII of the U.S.-Panama Bilateral Extradition Treaty which states "no person surrendered...shall...be triable or be punished for any crime or offense committed prior to his extra-dition, other than that for what he was delivered up" (see 11CT2468-2469).  Inosmuch that the Supremacy Clause of the U.S. Constitution includes "treaties made", and mandates that "all judges [to] be bound thereby" (Art. VI, Cl.2), thus the Doctrine of Specialty as articulated in Supreme Court decision and international treaty precludes the Trial Court's trying and punishing for all counts and enhancements that were added by the Prosecution following the Petitioner's extradition date of 12/17/2013 (see 5.1(B) above).  This includes the counts added in the amended complaint on 08/06/2014 (5.1(C)), and those added in the filing of the Information on 08/21/2014 (5.1(E)).  Referencing the Information found at 4CT893-902, the offending counts are:

(i)  Count No. 25:  Added as Count No. 31 on 8/06/2014 (2CT233), and charged as Count No. 25 in the Information on 8/21/2014 (4CT897);

(ii)  Count No. 26:  Added as Count No. 33 on 8/06/2014 (2CT233), and charged in the Information on 8/21/2014 as Count No. 26 (4CT897);

(iii)  Counts 27 through 38:  All of these counts were added and charged in the Information on 8/21/2014 (4CT898-900).

ATTACHMENT 'B':  PAGE 43

(B)  Violations of the Doctrine of Specialty and Due Process:
The Due Process Clause bars certain arbitrary, wrongful govern-
ment actions and prohibits deprivation of liberty without fair pro-
cedure [Daniels v. Williams, 474 US 327, 331 (1986)].  In the Peti-
tioner's case, the trying of Counts 25,26,27-38 and the consecutive
punishment for these counts-- at the time and manner as noted in
5.1(G) above-- is prohibited by the Doctrine of Specialty.  There-
fore with a conviction based on charges and proceedings that are in
violation of an international treaty and contrary to the Rauscher
Supreme Court, the Petitioner was deprived due process by the wrong-
ful actions of the Prosecution to prosecute, and the Trial Court's
decisions to allow then punish void of fair procedure [Breard v.
Greene, 523 US 371 (1998)].

It must also be noted that these actions to add charges contrary
to clearly established federal law, follow the Prosecution's for-
cible transnational abduction of the Petitioner as outlined in
CLAIM 4 that forfeit the Trial Court's jurisdiction over the person
of the Petitioner.  As stated in United States v. Toscanino, 500
F.2d 267 (2nd Cir. 1974), "the government should be denied the
right to exploit its own illegal conduct".  Thus, not only do these
added counts violate the constitutionally-enforced doctrine but they
are also representative of the Prosecution's continued abuse of pro-
cess, pretense and legal authority.

## 5.3  THE CONSTRUCTIVELY AMENDED GRAND THEFT COUNTS VIOLATE THE DOCTRINE OF SPECIALTY:

(A)  Grand Theft Counts and Charges:  As set forth in CLAIM 1,
the Prosecution after the close of evidence at trial, added an al-
ternative theory for conviction for the Grand Theft counts identified
in the Information as Counts 1-4,6,8,10-12,15-17,22-26 (see 4CT893-
902).  As demonstrated in CLAIM 1, this new theory of embezzlement
which relies on different acts, different property and an indeter-
minable time frame, constituted different allegations than those
of the Grand Theft counts prosecuted under the theory of false pre-
tense (see 1.4 and 1.5 above).

ATTACHMENT 'B':  PAGE 44

(B)   Constructive Amendment Causes a Violation of The Doctrine
      of Specialty:  As noted in 1.5(B), the adding of the em-
bezzlement theory effectuated a constructive amendment to the of-
fenses alleged in the accusatory pleading.  But because these dis-
tinctly different offenses are not charged until after the close
of evidence on 1/14/2016 (see 11RT2107-2111), they were added after
the 12/17/2013 extradition date (see 5.1(B) above).  Therefore
according to the Doctrine of Specialty (also referenced herein as
'DOS'), the prosecution and punishment of these constructively
amended offenses are prohibited at that time and manner.

Notwithstanding the prejudicial effect of the embezzlement theory
being added after the close of evidence, but by the Prosecution's
improper/wrongful use of these separate allegations as an alter-
native basis for conviction for the Grand Theft counts charged
prior to extradition, they duplicitly pair 'DOS'-precluded post
extradition offenses with those that were charged pre-extradition.
The actual effect of this constructive amendment and the duplici-
tous counts which pair pre and post, is that it contaminates the
original 10/12/2011 offenses (see 5.1(A) above) with the taint
of 'DOS' preclusion due to their commingling with the 01/14/2016
constructively amended allegations (5.1(F)).  Any chance to ex-
tricate the pre from the post is eliminated by the Trial Court's
non-unanimity instruction (CALCRIM No. 1861; 11RT2243-2244); and
the decision not to request the jury to return special findings
(5CT1148).  Thus leaving unresolvable doubt which theory, and
therefore what allegation, the jury found the Petitioner guilty:
the pre-extradition offenses, or those prohibited by the Doctrine
of Specialty.  Consequently, without any practical possibility of
excising the infection of 'DOS' preclusion, the conviction of the
Grand Theft counts 1-4,6,8,10-12,15-17, and 22-26 should be vacated.

5.4  THE PROSECUTION'S INTENTIONAL AND BAD FAITH USE OF INCONSISTENT
     AND IRRECONCILABLE FACTUAL THEORIES:  As noted in 5.1(E) above,
the Prosecution following the Preliminary Hearing, added new
charges as Counts 27-38 filed in the Information.  These new charges
include CCC25401 which allege an Oral Communication of an Untrue

Statement in the sale of a security (see Counts 27-37;4CT893-902). While these 'security' allegations are based on the same trans- actions as the Grand Theft charges, the elements required for conviction are in contradiction to those concurrently alleged of- fenses.

(A) Security Fraud vs. Grand Theft: The Petitioner's appellate attorney in the 'AOB' for his direct appeal (No. G055717, 4th App. Dist.), argues in Contention III ('E' and 'F') that the Security Fraud Counts 27-33,35,36 and the corresponding Grand Theft Counts 1-4,6,8,10-12,15-17,22-26, are essentially the same acts committed during the same course of conduct with the same intent (see 'AOB', Pages 141-146). However upon closer scrutiny, the charging of the Security Fraud Counts 27-37 (CCC25401) based on the same acts as the Grand Theft Counts (CPC §487(a)) is more dubious than just multiplicitous.

When the Prosecution added these Sceurity Fraud Counts, the Peti- tioner was reminded of a saying of his grandmother: "poultry is just another name for chicken". This seemed to describe the sameness for the Grand Theft  charges based on a theory of a verbal repres- entation of a false pretense, and the Security Fraud charges based on an oral communication of an untrue statement.  When the oppor- tunity arose, the Petitioner spoke with Trial Counsel about this apparent sameness but counsel basically advised not to worry be- cause CPC §654 will preclude multiple punishment.  The assertion of not guilty aside, the Petitioner took little consolation in any statutory protection.

(B)  The Elemental Definition of 'Security' and the Expert
        Witness Introduced to Establish:  During trial, the Pro- secution introduced an expert witness, Marlou De Luna- who is the Senior Counsel with the California Department of Business Over- sight (see 7RT1366). Ms. De Luna's role on the Prosecution Team is described in the "Direct Examination" document found on record at 11CT2487-2494.  According to her testimony, Ms. De Luna fami- liarized herself with the criminal prosecution of the Petitioner (7RT1383).  This entailed reviewing the transcripts of the

ATTACHMENT 'B':  PAGE 46

Preliminary Hearing, the details of the charging documents (7RT 1383), and the 'DBO' file of Petitioner's company while it was a licensee (7RT1391). As prefaced by    Prosecutor Pierce during his opening remarks (1RT52-58) and summed up in his closing arguments (11RT2114-2115), Ms. De Luna's testimony was to provide expert opinion on qualifying these investment transactions as 'securities' (7RT1388), and to establish that a 'security' could result from an oral communication (7RT1381).

      (i)   The Supreme Courts' Decisions Used to Define a
         'Security':  To charge the Petitioner with securities fraud, the Prosecution must establish beyond a reasonable doubt that oral investment contracts between the Petitioner and the alleged investor-victims qualify as "securities" (see 5CT1100). Ms. De Luna explains that to do so requires the application established by the Supreme Court decision in S.E.C. v. W.J. Howey Co., 328 US 293 (1946). Under this 'Howey Test', a security exists where:

      (a)   There is an investment of money;

      (b)   There is a reasonable expectation of profits, and;

      (c)   This profit comes solely, or at least primarily, from the entrepreneurial managerial efforts of others-- the investor is basically passive (11CT2491).

      (ii)   Further Guidance Provided by The Supreme Court: To aid the trier of fact, the Supreme Court decision in S.E.C. v. Joiner Leasing Co., 320 US 344 (1943) has also been applied. This states "in determining whether investors are relying on the managerial skill of others for their profits, courts consider the "economic realities" of the transaction in light of all facts and circumstances. These include...oral representations made...at the time of the investment...and the background and experience of investors. If circumstances indicate investors cannot practically exercise control, the court will find an investment contract" (11CT2491).

(C)  The Elementally-Oxymoronic Expert Testimony of Ms. De Luna: What is troubling about the added Securities Fraud Counts 27-37 relative to the Grand Theft Counts that are based on the same

investment transactions, are the contradictory elements alleged in the respective offenses.  As detailed in CLAIM 3.1(B), the Prosecution charges in the Grand Theft counts, that the Petitioner allegedly verbally represented the false pretense of an investment transaction in which all investors believed they were actual mortgage lenders (e.g. 8RT1515).  In their elemental reliance on this pretense, the investors testified as to a belief they had ultimate control as a vested beneficiary over the investments through the right of foreclosure on a non-performing loan (e.g. 2RT278).

Ms. De Luna is on record as to reading the transcrpits of the Preliminary Hearing (11CT2493)--in which the Prosecutor clearly defines the theory of False Pretense (e.g. 2CT444-445)-- and testifies that she has looked at the alleged representations made by Petitioner to the investors (7RT1404).  However following her investigation, Ms. De Luna testifies as an expert, that the investment transactions for which the Petitioner has already been charged with Grand Theft due to his alleged verbal  representations of a false investment pretense that offered investors ultimate control, are the same oral 'investment contracts' through which the Petitioner promoted by using 'oral communications of an untrue statement' (see 5CT1099), a premise of investment--  that in order to qualify as a security per the 'Howey Test'-- offered the investors no control over their investments.  Therefore not only is the expert testimony of Ms. De Luna elementally-oxymoronic, but it is clear and obvious that the same investment transaction cannot constitute an offense based on a verbal representation of ultimate control while also being charged as a securities fraud offense that alleges an oral communication of no control (7RT1388).

Equally disturbing, especially considering Ms. De Luna's position as senior counsel with the CA 'DBO' specializing in mortgage matters (see 11CT2487-2488), is her testimony in light of investor testimony as to no contact with any borrowers of any mortgages (see 11CT2446-2447), as well as their failure to provide any documentary evidence demonstrating possession of any promissory note signed by any of the borrowers (see Exhibit 4, No.13).  Despite all investors lacking

ATTACHMENT 'B':  PAGE 48

the definitive document of a mortgage that establishes the terms
of repayment and the default of which is required to foreclose
(see 11CT2365-2366), Ms. De Luna, to confirm the investors' re-
liance element of the Grand Theft charges, renders competent ex-
pert testimony that a promissory note can be an oral agreement;
but follows this with a head-scratching statement that it is
possible for an investor to have an oral promissory note with some-
one [borrower] with whom they've never spoken (see 7RT1397).

    (D)   Divergent and Irreconcilable Factual Theories Violate
        Due Process:  The California Appeals Court of In re Sakarias
(2005) 35 CA4th 140, indicated that a defendant is deprived due pro-
cess when the prosecution uses divergent, inconsistent, and irrecon-
cilable factual theories.  A prosecution's intentional and bad faith
use is fundamentally unfair, for it creates the potential for and,
where prejudicial, actually achieves a false conviction or increased
punishment on a false factual basis [also see Nguyen v. Lindsey,
232 F.3d 1240-1241 (9th Cir. 2000)].

In the Petitioner's case, the intentionality and bad faith is overtly
displayed through the Prosecution's employ of Ms. De Luna's testimony
where she offers expert opinion of a factual co-existence of verbal
representations and oral communications that contradict, and in-
vestor reliance on spoken agreements with those to whom they've
never spoken.  Following this, Prosecutor Pierce during his closing
argument, explains to the jury the 'reliance' element of the Grand
Theft's verbal representation offering a false pretense of ultimate
control (11RT2110).  Shortly thereafter, Prosecutor Pierce when de-
scribing the security fraud counts based on the same transactional
acts, represents to the jury that the orally communicated invest-
ment contract of no control [i.e. 'Security' per De Luna at 7RT
1388] was "relied on" by investors in their investing (11RT2116).

Furthermore, when referring to these securities fraud charges, Mr.
Pierce states "There does not have to be a loss" (3RT387).  Thus
these offenses based on the same transactions as those of the Grand
Theft charges, which as raised in CLAIM 3 rely on a false presumption
to establish the element of loss, are being prosecuted on a theory

of no determinable loss.  Therefore, by adding these Security
Fraud charges identified as Counts 27-37 which are elementally di-
vergent and factually irreconcilable with the Grand Theft counts,
the Prosecution deprived the Petitioner of due process by creating
the false conviction and increased punishment resulting from the
guilty verdict on contradicting scenarios.

5.5  THE PROSECUTION MATERIALLY ALTERS THE SUPREME COURT'S 'HOWEY
     TEST' FOR THE SECURITY FRAUD JURY INSTRUCTION:  Compounding
the prejudice of the irreconcilable factual theories of Security
Fraud vs. Grand Theft (see 5.4 above), the Prosecution in submitting
the 'security' definition for jury determination, materially alters
the 'Howey Test' [S.E.C. v. W.J. Howey, supra] as established by
the Supreme Court and in so doing, significantly eases their burden
of proof.

   (A)  Altering the 'Howey Test':  Prosecutor Pierce during his
closing arguments, reiterated Ms. De Luna's expert testimony re-
garding the 'Howey Test' and the format required to elementally
define the oral investment contracts as 'securities' (11RT2116).
However when doing so, Mr. Pierce materially changes the steps re-
quired to establish a 'security'.  As stated in 5.4(B)(i) above,
and found on record at 11CT2497, under what is known as the 'Howey
Test', "a security exists where...there is a reasonable expectation
of profits".  Mr. Pierce's version though, eliminates the operative
word "reasonable" thereby lowering the burden of proof required to
establish a 'security', to the point where one exists whenever there
is any expectation of profit be it reasonable or not.  Mr. Pierce's
relaxed version of the 'Howey Test' is found in the verbal instr-
uctions to the jury (11RT2252), Mr. Pierce's overhead visual display
(see 6CT1256; Exhibit 4), and the actual jury instruction given to
the jury (see 5CT1100).

   (B)  Materiality of the Alteration:  To illustrate the relevance
of "reasonable" in the investors' expectations, please consider
Linda Mathis's testimony (Count No. 34).  When asked about her ex-
pectations in the event of a borrower default and foreclosure action,
Ms. Mathis states "I expected either to receive payment [from the

ATTACHMENT 'B':  PAGE 50

Petitioner], or...be bought out of the loan [by Petitioner]" (9RT 1648-1649). Also consider Mr. Almquist's testimony, whereby he claims he would not have invested if he wasn't the vested beneficiary of the respective mortgages (2RT279; 2RT298), acknowledges that he received all disbursements from the Petitioner regardless of borrower defaults (see 3CT632-634). Thus these investors, who according to the False Pretense theory believed themselves to be the actual lender of each respective mortgage (see CLAIM 3.1(B)), to then expect and actually receive disbursements from the Petitioner irrespective of borrower defaults, foreclosure and the economic realities of that period of time (2007-2010), is indicative of an unreasonable expectation of profit and thereby disqualifying these investment transactions as 'securities' pursuant to the 'Howey Test' as provided by the Supreme Court. Therefore the Prosecution's alteration that eliminates "reasonable" from the jury's determination, reduces the burden of proof to a level where unrealistic expectations and the failure of the Petitioner to do the impossible become criminal.

    (C)  Further Alterations to the Jury Instructions:  In addition to dropping "reasonable" from the 'Howey Test', the actual jury instruction given the jurors [Special Jury Instruction No. 2, see 5CT1100], eliminates altogether the passive investor requirement as provided by the Supreme Court in S.E.C. v. Joiner [supra] and removes all determination guidance that instructs the jury to consider "economic realities" in light of all facts and circumstances (see 5.4(B)(ii) above). Therefore, by altering the instruction and removing guidance provided by the Joiner Supreme Court, the Prosecution eliminates the conditional requirement of 'no control' that contradicts the 'ultimate control' element of the Grand Theft by False Pretense theory. The intentionality of these material changes to language of Supreme Courts' decisions, is demonstrated by the fact that this relaxed version of the 'Howey Test' relieves the Prosecution from proving irreconcilable and diametric theories of 'no control' (security fraud) versus the 'ultimate control' reliance of the false pretense (grand theft). Whereas to be found

ATTACHMENT 'B':  PAGE 51

guilty of Securities Fraud as instructed the jury (see 5CT1099),
it is necessary to define the investments as securities (see 5CT
1100; 11CT2492). Thus these material changes to the jury instructions
that essentially eliminate elemental determinations as established
by Supreme Courts' decisions, remove  the Prosecution's burden of
proof and therefore merit reversal of the Petitioner's conviction
[U.S. v. Gaudin, 515 US 522 (1995)].

## 5.6  THE PROSECUTION ADDS A CHARGE BASED ON A TRANSACTION DISMISSED
##      AT THE PRELIMINARY HEARING:

(A)  Count No. 34:  On 08/14/2014, Count No. 30 was dismissed
by the Preliminary Hearing Judge Makino, not due to any statute of
limitation but because he found no sufficient cause (see 4CT887).
However one week later on 8/21/2014, the Prosecution filed the In-
formation, and as noted in 5.1(E) above, adds Counts 27-38.  In
these added counts is Count 34 which refers to the same victim,
Linda Mathis (see Information at 4CT899), and the same investment
transactions as the previously dismissed Count No. 30 (see 3RT569).
The 'Doctrine of Specialty' notwithstanding (see 5.2(A) above), in
California CPC §739 permits the Prosecution to charge a defendant
with either the offense named in the order of commitment or an of-
fense shown by the evidence.  However also in California, a charge
cannot be added unless a holding order was issued on the same trans-
action from which the newly added charge arose [People v. Dominguez
(2008) 166 CA4th 855, 866].  Therefore the adding of Count 34 based
on a transaction that was previously dismissed subjected the Peti-
tioner to double jeopardy and violated his Fifth Amendment right to
due process.

(B)  Statute of Limitation and Subject Matter Jurisdiction:  In
California any judgment acquired without subject matter jurisdiction
is void [Taliaferro v. County of Contra Costa (1960) 182 CA2d 587].
To avoid such a bar to prosecution, an accusatory pleading must al-
lege facts that demonstrate the statute of limitation has not ex-
pired [In re Demillo (1975) 14 C3d 586, 597].  In the Petitioner's
case, the Prosecution to establish subject matter jurisdiction over
the newly added Count 34 as filed in the Information, alleges that

regardless of the 8/25/2006 transaction date, discovery occurred
at a later date (see 4CT901; 11RT2132); and therefore the 'SOL' is
tolled pursuant to CPC §801.5.803 and People v. Zamora (1976) 18
C3d 538. Aside from this re-arguing the charge dismissed at the
Preliminary Hearing, the relevancy of the Prosecution's acknowledge-
ment of a jurisdictional bar is best explained in 5.7 below with
their neglect to establish subject matter jurisdiction over the
course of business allegation added as Count 38.

(C) The Prosecution Submits Altered Documentary Evidence to
Argue 'Tolling': As alleged in the Prosecution's tolling
explanation found in the Information at 4CT901, Linda Mathis did
not discover that Petitioner had not funded loans on the specified
real property until 2010. To support this claim during trial, the
Prosecutor introduces into evidence as People's Exhibit 61 (see at-
tached Exhibit 18), a transaction history for the property in
question that shows no mortgage secured by the Petitioner. However
this history that is obtained from a Title Insurance Company has
been materially altered by removing an entire page of recorded trans-
actions; one of which is a mortgage funded by the Petitioner secured
against the subject property. When comparing the People's Exhibit
No. 61 (attached hereto as Exhibit 18) to a full unaltered trans-
action history as supplied by the Petitioner (see 11CT2343), it
demonstrates that not only is Count 34 added despite being dismissed
at the Preliminary Hearing, but the Prosecution's tolling argument
as found in the Information is based on a materially false claim
supported by materially altered documentary evidence.

5.7 THE CUMULATIVE DUE PROCESS ERRORS RELATIVE TO ADDED COUNT 38
DEPRIVED PETITIONER OF A FAIR TRIAL: Subject matter juris-
diction is the authority to adjudicate and decide a case. Even if
a court has jurisdiction over the parties, it cannot enter a binding
judgment if it lacks jurisdiction over the subject matter [e.g. In
re Demillo, supra]. In the Petitioner's case, when the Prosecution
added Count 38 after the Preliminary Hearing, it violated principles
of Double Jeopardy, Statute of Limitations, and Due Process, that
when viewed cumulatively, deprived the Petitioner of a fair trial

[see Estelle v. McGuire, 502 US 62 (1991)].  Moreover, these series
of state errors demonstrate the Trial Court's lack of subject matter
jurisdiction over certain offenses and the voidability of the judg-
ment as acquired.

(A)  Double Jeopardy:  The U.S. Supreme Court has indicated if
the offense is a course of conduct, the trial court should treat as
one offense all violations that arise from that singleness of
thought, purpose or action [U.S. v. Universal C.I.T. Credit Corp.,
344 US 218 (1952)].  In the Petitioner's case, when the Prosecution
added Counts 27-38 (see 5.1(E) above), they charged 11 counts (27-
37) of orally communicating an untrue statement in the sale of a
security (CCC25401; 5CT1099) and one count (Count 38) of engaging
in a course of conduct that uses these alleged untrue oral commun-
ications as a scheme specifically intended to deceive (CCC25541;
5CT1104).  Therefore, the charging of Count 38, that according to
Prosecutor Pierce represents the "overall accusation of operating
a scheme to fraudulently sell securities" (11RT2108), subjects the
Petitioner to multiple punishments and double jeopardy when tried
in conjunction with the individual allegations of a fraudulently
sold security.

(B)  Precluded Subject Matter Due to Statute of Limitations:  As
noted above in 5.6(B), statute of limitations present a juris-
dictional issue which requires an accusatory pleading to allege
facts showing that the prosecution is not barred [In re Demillo,
supra].  If a prosecution was not commenced within the period of
time provided by the appropriate 'SOL', and the statute has not been
tolled, then the court lacks subject matter jurisdiction and the
criminal proceedings must be terminated [People v. Zamora, supra].

In the Petitioner's case, the Prosecution-- as shown in 5.6(B)
above-- acknowledges the bar resulting from the lack of juris-
diction by pleading the 'tolling' of Count 34.  However, when adding
Count 38, the Prosecutor alleges that the Petitioner's "entire op-
eration was a fraudulent scheme" (11RT2115).  This "entire operation"
though, as indicated in the charged elements of the offense is a
"course of business" (5CT1104), and actually predates the timing of

of the predicate offenses of Counts 27-37 by as much as ten years as in the case of Wlliam Steiner (Count 29). Mr. Steiner, who started investing with the Petitioner in 1998, is directly or in-directly responsible for introducing all of the alleged investor-victims to the Petitioner except Richardson (see Genealogy at 11CT 2346-2354). But when questioned by FBI Agent Murray in 2010, Mr. Steiner demonstrates an actual knowledge of the facts that would eventually serve as the basis for the charges against the Petitioner. Mr. Steiner's discovery of these facts "over the years" (11CT2518) establishes a due process requirement for the Prosecution to allege facts showing why this action is not barred by the statute of limit-ations. Furthermore, with most alleged investor-victims investing in this "entire operation" that was supposedly "a fraudulent scheme" years before the offense dates of Counts 27-37, the Prosecution's allegation of a fraudulent course of business as charged in Count 38-- absent a showing that the 'SOL' has somehow been tolled for up to ten years-- fails to establish subject matter jurisdiction and thus requires reversal of the judgment and termination of the criminal matter.

(C) Violation of Due Process Due to Arbitrary Denial of a State Created Right: The California Constitution provides the Petitioner as a substantive element of his liberty the right to be free from arbitrary adjudication [People v. Ramirez (1979) 25 C3d 260], especially when there is a statutory benefit or interest at stake [Ryan v. CIF San Diego Section (2001) 94 CA4th 1048, 1071]. The Petitioner to assert this right addressed the inequitable ap-plication of the 'SOL' standards in his CPC §1185 Arrest of Judg-ment. This action filed in Trial Court prior to sentencing set forth the actual and constructive knowledge of the investors that expires the 'SOL' and forfeits the Trial Court's jurisdiction over the subject matter of Count 38 (see 10CT2198-2199). The Trial Court however, after gaining subject matter jurisdiction over Count 34 due to the Prosecution's improper use of statutory and decisional tolling (see 5.6(B)), then neglects the same standards that would benefit the Petitioner if applied to Count 38 and denies the motion to arrest judgment. This arbitrary adjudication that chooses when

ATTACHMENT 'B': PAGE 55

to apply and when to forsake, deprives the Petitioner this state
created right typical of criminal defendants and thus violates his
constitutional protection of fair and due process [Hicks v. Oklahoma,
447 US 343 (1980)].

5.8  JUDICIAL ABUSE OF DISCRETION:  Before the trial court agrees
to give a jury instruction, it must find legally sufficient evidence
in the record to support the findings or inference that each in-
struction permits.  A failure to make such a preliminary finding is
error [People v. Hannon (1977) 19 C3d 597].  A trial court must also
refrain from instructing on principles of law concerning issues ir-
relevant and unsupported because it may confuse the jury or relieve
it from making findings on those relevant [People v. Satchel (1971)
6 C3d 28, 33].  Accordingly, it is the contention of the Petitioner
that his Trail Court erred by not only allowing the Prosecution to
add the charges that are precluded by due process of law (see 5.2,
5.3, 5.4, 5.6, 5.7 above), but also erred in instructing the jury
on those issues that are irrelevant due to their constitutional in-
eligibility and/or lacked the fantastical evidence that supports
contradictory theories.  Furthermore, when the Trial Court did in-
struct the jury on Counts 27-37, it instructed them with the ma-
terially altered 'Howey Test' as outlined in 5.5 above, thus re-
lieving the Prosecution from its burden of proof beyond a reasonable
doubt (see Trial Court instructing at 11RT2252).  Moreover as noted
these issues were raised by the Petitioner in Trial Court prior to
his sentencing.  All motions were denied by the Trial Court (see
1CT204-205).  As a result, the Trial Court's actions that subjected
the Petitioner to prohibited charges, irreconcilable and divergent
theories, and procedurally barred prosecution is indicative of
a pattern of prejudicial abuse of discretion.

5.9  THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY:  This Claim and
the issues raised merit Federal Review pursuant to 28 U.S.C. 2254
as the facts and evidence presented are properly before the Court.
With the Petitioner's conviction and state custody a direct result
of the violation of the Constitution, Laws, and Treaties of the
United States, proper remedy is warranted.

ATTACHMENT 'B':  PAGE 56

(A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of
Orange County Superior Court, the Petitioner through pro per plea-
dings filed in Trial Court prior to sentencing, properly preserved
the issues identifiable in CLAIM 5 above.  These 'objections' are
found in the appellate record included as:  Extradition Treaty Vio-
lations (CPC §1538.5 Motion at 10CT2245-2247; CPC §1185 Motion at
10CT2196-2197; CPC §1181 Motion at 10CT2068-2074);  'Count 34' (CPC
§1181 at 10CT2116; CPC §1185 at 10CT2199);  Doctrine of Specialty
(CPC §1181 at 10CT2167-2168; CPC §1185 at 10CT2199); Alternative
Basis for Conviction (CPC §1181 at 10CT2167; CPC §1185 at 10CT2197);
Conflicting Theories (CPC §1181 at 10CT2117-2118; CPC §1185 at 10CT
2197-2198);  'Howey Test' Alteration (CPC §1181 at 10CT2117-2119);
Altered Jury Instructions (CPC §1181 at 10CT2169-2170); Statute of
Limitation and Jurisdiction Defects (CPC §1185 at 10CT2198-2199).
As noted in 3C of the Procedural History included in the PETITION
OVERVIEW, all pro per motions and actions were denied by the Trial
Court prior to sentencing; and in so doing offered no factual fin-
dings, applied no decisional law addressing the materiality or pre-
judiciality of the issues associated, nor compelled any evidence/
testimony to resolve credible, disputed issues of fact.

(B)  Issues Exhausted in State Court:  As noted in the Procedural
History included in the PETITION OVERVIEW, the Petitioner motioned
the Appellate Court to set aside his direct appeal brief as filed
by Appellate Counsel due to the omission of issues of greater sign-
ificance.  After the Appellate Court disregarded this request/motion,
the Petitioner filed a State Habeas Petition concurrent with his
direct appeal in which the issues raised in CLAIM 5 were included
as CLAIM V of that petition.  That state petition (No.G058686) was
denied on 6/04/2020.  Petitioner filed virtually the same petition
in the California Supreme Court on 7/31/2020.  This state petition
(Case No. S263665) was denied on 2/20/2021.  Both state denials
provided no factual findings, no explanation, no application of
decisional law (state or federal), no evidentiary action to resolve
any credible, disputed issues of fact, nor gave any indication
whatsoever that any adjudication of any issue was considered or
administered.

ATTACHMENT 'B':  PAGE 57

(C)  Evidence and Authorities Presented in State Court:  In submitting these issues in state court, the Petitioner presented such on the same facts and evidence referenced herein by attached Exhibit, Declaration, and Request for Judicial Notice (Exhibit 5).  As to applicable federal law as established by U.S. Supreme Court decision, the Petitioner offered such authorities that included: Breard v. Greene, 523 US 371 (1998) [Treaty Violations]; Osborne v. Ohio, 495 US 103 (1990) [Defective Jury Instructions]; Brown v. Ohio, 432 US 161 (1977) [Multiple Punishments]; United States v. Rauscher, 119 US 407 (1886) [Doctrine of Specialty]; Strickland v. Washington, 466 US 688 (1984) ['IAC'].

(D)  Review and Remedy:  In the PETITION OVERVIEW attached to the Federal Habeas Form CV-69, the Petitioner demonstrates that this CLAIM merits de novo review due to the fact that there is no state ruling to review with AEDPA deference.  In this de novo review as prayed by  the Petitioner, he also requests Judicial Notice of the evidence as presented in Exhibit No. 5 [Page 40 of ATTACHMENT 'D']. In the Court's determination of issues as presented in this CLAIM, the Petitioner prays for resolution of all disputed facts by reference to that which is judicially noticeable, and also that which is obtainable by Evidentiary Hearing as incorporated by Exhibit No. 20 [Page 127 of ATTACHMENT 'D'].  As to relief, Petitioner prays for all just and proper including but not limited to reversal of the conviction and dismissal of the charges due to the arguments and authorities as presented above.

THIS PAGE IS LEFT INTENTIONALLY BLANK

**CLAIM 6:   FALSE EVIDENCE USED TO CONVICT**

<u>SUMMARY:</u>  False Evidence was offered against the Petitioner at
trial by the Prosecutor, the Prosecution's Expert Witnesses , and
through the perjured testimony of the alleged investor-victims.
Examples of this false evidence that was material to guilt and
punishment include:  The Prosecution's knowing use  of a false
presumption as evidentiary fact;  the Prosecutor's willful mis-
representation of documentary evidence;  the Prosecution's pre-
paration and introduction of false documentary evidence and its
improper expert opinion used to support;  the Prosecution's use
of an industry-expert opinion and testimony that provides state-
ments known to be not true;  the Prosecutor's promotion of a false
representation of 'flight' that is improperly used to  convey con-
duct associated with guilt, and;  the Prosecution's introduction
of perjured testimony suborned from its witnesses.

## CONTENTS OF CLAIM 6:

6.1  Petitioner's Conviction Obtained by Use of False
     Evidence                                                  Pg. 62

6.2  False Material Evidence of a Specific Interest
     Characterization was Offered Against the Petitioner
     at Trial                                                  Pg. 62

6.3  False Evidence was Offered Against the Petitioner
     at Trial Through the Prosecutor's Intentionally
     Untrue Representations of "Actual" Recorded Deeds         Pg. 64

6.4  False Evidence was Offered at Trial Against the
     Petitioner Through the Testimony and Documentary
     Evidence Presented by OCDA Forensic Accountant
     Scott Weitzman                                            Pg. 66

6.5  False Evidence was Offered Against the Petitioner
     at Trial Through the Expert Testimony of Prosecution
     Team Member Marlou De Luna                                Pg. 70

6.6  False Evidence was Offered Against the Petitioner
     at Trial Through Prosecution Witness Testimony of
     'No Investing Unless Secured'                             Pg. 72

6.7  False Evidence was Offered Against the Petitioner
     at Trial Through the Prosecutor's Improper
     Presumption of 'Flight'                                   Pg. 75

6.8  False Evidence was Offered Against the Petitioner
     at Trial Through Altered/False Documentary Evidence
     and Material Misrepresentations Provided by the
     Prosecution                                               Pg. 78

6.9  This Claim Merits Federal Review and Remedy               Pg. 81

6.1  PETITIONER"S CONVICTION OBTAINED BY USE OF FALSE EVIDENCE:  In
Miller v. Pate, 386 US 1 (1967), the Supreme Court found the pro-
secution's use of evidence known to be false in obtaining a con-
viction violated the defendant's due process right to a fair trial.
In the Petitioner's case, he submitted a false evidence claim in his
state Habeas Petition based  on the established federal law as
determined by the Miller v. Pate Court.  In re-presenting these
issues for federal review, the Petitioner is again offering specific
factual scenarios to demonstrate by a preponderance of the evidence,
that 'false' evidence-- substantially material or probative in de-
termination of guilt or punishment-- was introduced against him at
trial.  To show that the examples of false evidence were substan-
tially material or probative to issues of guilt or punishment, the
Petitioner demonstrates the significance of each instance, and the
reasonable probability of their respective affect on the outcome
of his criminal proceedings.  For purpose and context of this
claim, 'false' is being defined according to Merriam-Webster Dic-
tionary 7th ed. as 'not genuine' or 'intentionally untrue' [also
see In re Miles (Case No. G046534, 4th Appellate Dist. 1/19/2017)].

6.2  FALSE MATERIAL EVIDENCE OF A SPECIFIC INTEREST CHARACTERIZATION
    WAS OFFERED AGAINST THE PETITIONER AT TRIAL:

   (A)  Offered at Trial on the Issue of Guilt:  As raised in CLAIM
3 above, the Prosecution offered at trial the presumption of an
'interest' characterization to support presumptions  of 'no return
of principal', 'actual and determinable loss', and 'reliance' of
the investors on the alleged false pretense verbally represented
by the Petitioner (see 3.3 above).  However because the precise pre-
mise supposedly relied on by these investors-- private mortgage
lending-- the characterization of 'interest' must be specifically
applied to that as paid by a borrower ('interest paid'), and that
as received by a lender ('interest income').  Furthermore, as indi-
cated by industry-specific information, this specific 'interest'
characterization is precluded by all investors failing to notify
any borrower or entity of any 'interest paid' for any amount at
any time over a 13 year investment period (see 3.6 above).

ATTACHMENT 'B':  PAGE 62

Therefore this representation by the Prosecution of a specific
'interest' characterization that is offered at trial as genuine
and consistent with the required element of 'reliance', is false.
The Prosecution's use of this false evidence is pervasive through-
out the proceeding (see Transcript References at Exhibit 4, No.1),
and as demonstrated in CLAIM 3, improperly used as the evidentiary
fact to presume the elemental facts required for conviction.  Il-
lustrated by the Prosecution's use in testimonial evidence of 'no
return of principal' (see Exhibit 4, No. 2), tax reporting (Ex-
hibit 4, No. 11), and forged documents intended to deceive (Ex-
hibit 4, No. 12), the evidence as presented to convey an 'interest'
characterization probative of guilt is intentionally untrue.  To
fully grasp the significance of this false evidence is to recognize
the fatal flaw in the Prosecution's case.  As raised by the Peti-
tioner in trial court, it demonstrates the insufficiency of the evi-
dence (10CT2040-2043), the unqualified determination of probable
cause (10CT2048-2060), and the prosecutorial misconduct that in-
fected the entire trial process (10CT2092-2096).  Removal of this
'false' evidence leaves the Prosecution with no evidence to support
loss, reliance, theft or deceit.  Simply stated, this 'false' evi-
dence establishes and finds guilt, where in its absence none exists.

   (B)  Offered at Trial on Issue of Punishment:  As indicated on
Page 9 of the Information (4CT901), the Prosecution charges the Peti-
tioner with punishment enhancements of CPC §12022.6(a)(4) and CPC
§186.11(a)(1)/(2) which allege actual and determinable loss amounts
($3.2M and $500K respectively).  As indicated by the Trial Court's
sentencing of the Petitioner with these enhancements increasing
the punishment (see 1CT209-226), the 'false' evidence of the specific
'interest' presumption was used by the Trial Court to determine loss.
Even though the Trial Court stayed all but two counts of the en-
hancements, the Petitioner was actually sentenced to 47 counts of
enhancements-- 38 counts of CPC §12022.6 and 9 counts of CPC 186.11
(see Amended Felony Abstract; Clerk's Supplemental Transcripts 006-
009).  The prejudiciality in the Trial Court's use of this false
evidence is carried over to the Petitioner's Non-Violent Parole
Consideration which cites aggravated loss due to the 47 enhancements.

ATTACHMENT 'B':  PAGE 63

## 6.3   FALSE EVIDENCE WAS OFFERED AGAINST PETITIONER AT TRIAL
### THROUGH THE PROSECUTOR'S INTENTIONALLY UNTRUE REPRESENTATIONS
### OF "ACTUAL" RECORDED DEEDS

(A)  Offered at Trial by Prosecutor Pierce:  Mr. Pierce during
his opening statement to the jury as support for the charges of
Grand Theft, Forgery and Securities Fraud, says "We have plenty of
documentation", and irrespective of witness testimony, "the docu-
ments don't lie" (1RT50).  Expounding on this, the Prosecutor tells
the jurors that he will introduce into evidence probative of the
Petitioner's intent to deceive and defraud, examples of "forgery
of a specific document, and those documents...those are <u>actually</u>
recorded deeds of trust" (1RT52).  Prosecutor Pierce goes on to
punctuate this representation by stating "in each one of these cases
...they were all recorded deeds-- recorded deeds of trust" (1RT56),
and he further reiterates this to the jury through statements such
as that to alleged investor-victim George Kentner, "you invested...
based on the fact you were given...recorded deeds of trust" (see
4RT796).  The due process problem with Mr. Pierce's representations
is that they are all false statements; not one of these documents
that are the subject of his eventual introduction were ever <u>actually</u>
recorded neither are they copies of <u>actual</u> recorded deeds.

During trial, Mr Pierce does introduce copies of the documents he
had already stated were actually recorded deeds, but fails to pro-
duce any original or proof from title records to authenticate the
"actual" recording of any original.  An example of this is People's
Exhibit 11  (see Request for Judicial Notice at Exhibit 5) intro-
duced by the Prosecutor to the jury after his statements that such
was actually recorded.  This neglect of authorization is inten-
tional given the Prosecution Team's inclusion of a title records
expert, Summer Bakotich (see 4CT867).

Therefore when the Prosecutor does introduce documents that pur-
suant to his prefaced statements "are actually recorded deeds of
trust" (1RT52), he offers into record false evidence by its use
as proof of Petitioner <u>actually</u> recording doctored deeds.

(B)  Materiality of False Evidence:  The materiality of the false

ATTACHMENT 'B':  PAGE 64

statements of the Prosecutor in conjunction with his introduction
of the documents that are purposely represented to be demonstrative
of "actually recorded deeds of trust", is best determined by con-
sidering what the false evidence is offered to prove [People v.
Bamberg (2009) 175 CA4th 618, 627].  As Mr. Pierce states, these
documents-- that don't lie and speak for themselves (1RT50)--
represent a "key component of the overall scheme- the overall in-
vestment mortgage fraud scheme that Mr. Tarbutton perpetrated ag-
ainst the investment victims, the documents themselves" (1RT51).
During his closing arguments, Mr. Pierce again indicated "these doc-
uments...[were] part of his con.  That was part of his con to get
them to invest" (11RT2201).  And in giving the case to the jury,
they were allowed to consider these documents-- that pursuant to
Mr. Pierce's representations were actually recorded deeds-- as a
false writing or token to prove the false pretense theory of the
grand theft charges (see 11RT2240-2241).

These documents in question however were never "actually recorded",
and as stated by Petitioner at trial were only given to investor
Almquist and two others at their insistence and for purposes un-
known (9RT1786-1791).  These investors' knowledge of the fact that
they were not "actually recorded" is easily demonstrated by the same
investors' failure to comply with the tax-reporting requirements
that would exist from an 'actual' recording (see CLAIM 3.8(C) and
Request for Judicial Notice at Exhibit 5).  Moreover, because these
documents also relate to the CPC §470(d) forgery charges (Counts 5,
7,9,12,13,18-21), they elementally require an "intent to defraud";
which according to CPC §8 "it is sufficient if an intent appears
to defraud".  Thus the Prosecutor's false statement of "actually
recorded deeds" along with the subject documents alleged to be
doctored and recorded, that are introduced as a false token demon-
strable of an intent to deceive-- are all representations that are
predicated on the false "interest" characterization of CLAIM 3 (see
6.2 above).  As demonstrated in 3.6(B) above, Mr. Almquist's
failure to notify any borrower, including the one named in the al-
leged "actually recorded deed", precludes any practical possibility
of his tax-reporting consistent with a belief in this document's

ATTACHMENT 'B':  PAGE 65

'actual' recording. Therefore the tax-reporting reality that as demonstrated in CLAIM 3 illustrates the fallacies of their "interest" characterization, also demonstrates that the investors did not tax-report conformable with the appearance of being deceived and thereby indicating they were not defrauded.

Furthermore, the false evidence introduced in the form of documents represented to be "actually recorded" (or copies of actually recorded), that are used by the Prosecution as a false token of the Grand Theft charges, as well as the subject matter of the Forgery allegations and the "key component of the overall investment scheme" charged in Count 38 as CCC §25541-- was material and if not introduced, leaves a documentary void in the case against the Petitioner.

## 6.4   FALSE EVIDENCE WAS OFFERED AT TRIAL AGAINST THE PETITIONER THROUGH THE TESTIMONY AND DOCUMENTARY EVIDENCE PRESENTED BY OCDA FORENSIC ACCOUNTANT SCOTT WEITZMAN

(A)  Testimony and Documentary Evidence Offered:  During trial, the Prosecution introduced testimony, "going to all counts", of Senior Forensic Accountant and CPA for the OCDA, Scott Weitzman (4RT814-815). Mr. Weitzman, who testifies as to 500 hours of analysis (4RT825), claims he has "reviewed all of the documentation, the so-called discovery that [is] part of [the] prosecution" (4RT 828). In his analysis, Mr. Weitzman is on record as to reviewing all of the Petitioner's bank records subpoenaed by the FBI and OCDA (4RT824), and has specifically scrutinized all bank accounts, including all items, all deposits, all canceled checks, all sources of income coming into Petitioner's accounts (4CT846). He also indicates he was asked to review these financial records and in particular anything pertaining to the the transactions with the investors (4RT821). Mr. Weitzman states under oath that based on his forensic review, he prepared spreadsheets in which he identified all such financial transactions (4RT830). In reference to these forensically accurate spreadsheets [found as People's Exhibits 76-87 (see Request for Judicial Notice)], Mr. Weitzman explains "for each [bank] account, I have noted when there is a transaction involving one of the investors, then I noted that in green" (6RT1261).

ATTACHMENT 'B':  PAGE 66

In response to Prosecutor Pierce's question about line items on his
spreadsheets that are not color-coded and unidentified, Mr. Weitz-
man testifies that each such item does not involve or relate to one
of the alleged investor-victims (6RT1262).  To emphasize the fo-
rensic accuracy of these spreadsheets and his expert opinions, Mr.
Weitzman is steadfast in his sowrn statements that all transactions
involving the investors are identified (6RT1269; 7RT1354; 8RT1463).

(B)  The **False** Evidence Offered by Mr. Weitzman:  Referencing
11CT2387-2400 are just a few examples of disbursements made by Pe-
titioner to investors that are left unidentified on Mr. Weitzman's
spreadsheets, despite his sworn testimony as to denoting all such
transactions.  This small sample provided include 12 disbursements
made directly to alleged investor-victims totaling approximately
$20,000, only represent one month's omissions from Weitzman's spread-
sheets and are typical of what he has left out of his accounting.
Aside from these examples, attached as Exhibit 8 is a declaration
of the Petitioner whereby he swears under penalty of perjury, ac-
tual knowledge of disbursements made to investors by check,
cashier's check or wire that are left unidentified on Mr. Weitz-
man's spreadsheets along with payments made by the Petitioner to
service the company asset base; including those assets to which
the investors testified they believed they were the actual lenders.
These items omitted from identification by Mr. Weitzman, despite
his forensic review of all such items, are found in virtually every
month from 2007 to mid-2010.

Another glaring example is provided by the Petitioner at 11CT2400
which shows a wire transfer of $55,890.26 to alleged investor-victim
O'Connell that is not identified on Weitzman's spreadsheets.  Also
of note is Mr. Weitzman in his 500 hour analysis (4RT829), restricts
his review to bank records of 2008-2010 despite investments and al-
leged offenses predating this time frame (e.g. Count 6,7,27,32,34,
38; see Information at 4CT893-900).  Even with this abridged sel-
ection of bank records and omission from those of items relative
to the charged offenses, Mr. Weitzman pares down his forensic ac-
counting by deleting the year 2008 completely from relevant bank

accounts [see People's Exhibits 76-87].  Thus not only did Mr.
Weitzman deliberately omit disbursements to, or involving investors,
he also eliminates a virtual year of exculpatory bank activity from
the scope of his prepared documentary evidence.  All of this follows
the Petitioner's discovery request for their accounting to show all
financial transactions that represent payment and consideration pro-
vided the investors (see 11CT2475-2481), and Mr. Weitzman's testi-
mony that his spreadsheets do so (e.g. 6RT1264-1265).

(C)  Materiality of the False Evidence

(i)  Grand Theft Counts:  When Prosecutor Pierce tells the
court and jury that Mr. Weitzman's review and testimony goes to all
counts (4RT814), he indicates that the forensic analysis establishes
the elements of actual and determinable loss of the Grand Theft
charges.  However as noted in CLAIM 3 above, all loss is predicated
on the false presumption of a specific "interest" characterization.
That contention aside, an actual and accurate forensic accounting,
if conducted, would negate the allegation of loss by showing that
most investors profited from their investments with the Petitioner.
Found at 11CT2370-2401 is an accounting prepared by the Petitioner
from the small sample size of bank accounts used by Mr. Weiztman;
that demonstrates the facts of investors receiving consideration
exceeding their capital contributions.  This shows that Mr. Weitz-
man's spreadsheets that omit disbursments and his testimony to the
contrary, conceal not only the facts that disprove loss but also
those that are probative of  actual innocence.  As explained below,
Mr. Weitzman, exemplified by his professional capacity as Forensic
Accountant and CPA for the OCDA (4RT815), is acutely and actually
aware of the falsities used by the Prosecution to convict the
Petitioner.

(ii)  The 'Overall Scheme' Allegation of Count 38:  In ad-
dition to the false prepared documentary evidence that purposely
fails to identify material transactions relevant to the Grand Theft
charges, Mr. Weitzman bases his expert optinion, used to convict
the Petitioner of the 'Ponzi' allegation of Count 38, on a pre-
sumption he knows to be false.  In Mr. Weitzman's testimony-- which

per Pierce is applicable to all counts (4RT814)-- he states that he
is "familiar with the charged allegations" (4RT822), has reviewed
all discovery (4RT828), and is informed about the entire case and
the involved investment transactions (6RT1260). He has also in-
dicated that in his analysis, he looked for evidence specific to an
investment pretense that would serve as a basis for the 'Ponzi'
allegation (6RT1269; 7RT1359-1360). However in light of Weitzman's
profession as a Forensic Accountant and CPA-- the very credentials
relied upon by the Prosecution for his expert opinion-- such ex-
pertise qualifies him as the most competent and capable of the
OCDA to identify the true investment premise understood by investors,
as revealed by the industry-related tax reporting realities and re-
quirements as set forth in CLAIM 3.6. In fact in testimony, Weitz-
man intimates he is actually aware of the reciprocal relationship
between borrower and lender's tax-reporting responsibilities (see
8RT1458-1459). Therefore when Mr. Weitzman provides his expert op-
inion that is based on his findings of predicate acts of Grand Theft,
he does so with the actual knowledge of a tax-reporting reality
that disproves the alleged false pretense that is elemental to such
offenses.

Thus Mr. Weitzman's testimony and expert opinion of an overall in-
vestment scheme ('Ponzi' of Count 38), that relies on allegations
of a specific investment pretense, that as demonstrated in CLAIM 3
is false-- and actually known to be false by Weitzman-- is improper,
unqualified, and willfully misrepresentative of material facts.

        (iii)  Deliberately Deceptive Expert Opinion:  Mr. Weitz-
man's testimony whereby he finds evidence of 'Ponzi' (8RT1423), that
he has already testified implies a determinable loss (7RT1355; 7RT
1360), is shown to be deceitful when he subsequently testifies he
has no idea if any of these alleged investor-victims lost or made
money in their investments with the Petitioner (see 8RT1461-1462).
This demonstrates that Weitzman's expert opinion of the 'Ponzi'
Count 38-- the overall scheme of predicate acts reliant on a false
pretense that is precluded by practical application of his pro-
fession's principles-- is further repudiated by a false presumption
of loss that the Prosecution has failed to establish as an elemental

fact.  Moreover, when considering the Prosecution's theory of
theft by False Pretense is refuted by the tax-reporting realities
that are the subject of Weitzman's expertise (see CLAIM 3.6), and the
intentionally untrue presumption of actual/determinable loss is con-
cealed through the disinformation conveyed through the false doc-
umentary evidence of his spreadsheets, thus the false evidence
offered against the Petitioner at trial through Weitzman's expert
opinion defies due process by his knowing use of false presumptions
as the bases therefor.  Such 'evidence' introduced by Weitzman is
improper, unreliable and inadmissable [see CEC §801(b); CEC §804;
Estelle v. McGuire, 502 US 62 (1991)].

    (D)  Probability of Affecting the Outcome:  California Evidence
Code §607 states "When a presumption affecting the burden of proof op-
erates  in a criminal action to establish presumptively any fact
that is essential to the defendant's guilt, the presumption operates
only if the facts that give rise to the presumption have been found
or otherwise established beyond a reasonable doubt and, in such case,
the defendant need only raise a reasonable doubt as to the existence
of the presumed fact".  Therefore, without the false evidence offered
through the testimony of Scott Weitzman used by the Prosecution to
establish facts giving rise to presumptions essential to guilt and
punishment, there is reasonable doubt as to the existence of such
facts  (i.e. 'loss', 'reliance', 'Ponzi').  Most importantly though,
with accurate and honest forensic accounting that as set forth in
Petitioner's submission found at 11CT2370-2401, establishes the
fatal flaws in the Prosecution's presumptions, factual innocence
of the Petitioner would be presented to the jury.


6.5  FALSE EVIDENCE WAS OFFERED AGAINST THE PETITIONER AT TRIAL
     THROUGH THE EXPERT TESTIMONY OF PROSECUTION TEAM MEMBER MARLOU
     DE LUNA

    (A)  Offered at Trial:  In trying the Petitioner on the se-
curities fraud counts of 27-37 (CCC §25401; see 4CT898-900), an
element that the Prosecution must prove beyond a reasonable doubt,
is that the oral investment contracts between investor and Petitioner,
per Prosecutor Pierce, "are, in fact...securities as defined by the

law of the state of California.  That's where our expert witness
frome the Department of Business Oversight comies in" (1RT57-58).
This expert is Senior Counsel of the 'DBO', Marlou De Luna (see
7RT1366) and, as noted in CLAIM 5.4(B), she testifies: one of the
first thing she does is request any and all files (7RT1392); she
claims to have reviewed the 'DBO' file (7RT1391); she has re-
viewed the Preliminary Hearing transcripts, the charging documents,
and is familiar with what is being criminally prosecuted (7RT1383),
and; she has focused on the representations allegedly made by the
Petitioner to investors (7RT1404).  As an expert, Ms. De Luna
testifies that an investment contract can be oral (7RT1381), and
the elemental determination of such as a 'security' relies on the
U.S. Supreme Court decision in <u>S.E.C. v. W.J. Howey Co.</u>, 328 US 293
(1946) and <u>S.E.C. v. Joiner Leasing Co.</u>, 320 US 344 (1943).  Ms.
De Luna testifies that a key requirement of this 'Howey Test' is
the passivity of the investor (7RT1377), and unable to exercise con-
trol over their investment (7RT1376).  During closing arguments,
the Prosecutor reiterates this expert testimony stating that the
investor under this 'security' definition is completely dependant
on the Petitioner, and that the investors "relied on that" under-
standing (11RT2115-2116).

However this 'reliance' on an investment premise whereby the in-
vestors cannot exercise control is in direct conflict with the con-
currently alleged theft by false pretense charges that offered
ultimate control.  Despite this contrareity, Ms. De Luna chooses
to offer expert opinion that these investment contracts that are
the basis for the grand theft charges founded on verbal represen-
tations of false pretense and reliance on ultimate control, are
somehow the same transactions wherein the Petitioner orally com-
municated an investment contract-- that to elementally qualify as
a 'security' per '<u>Howey</u>'-- required investor passive participation
and offered them the "relied" upon premise of no control.  As raised
in CLAIM 5.4, not only is Ms. De Luna's expert testimony elementally-
oxymoronic, but it is clear and obvious that one transaction cannot
denote an offense rooted in pretense and reliance of ultimate con-
trol while at the same time meet the elemental definition of another

ATTACHMENT 'B':  PAGE 71

offense requiring reliance on a premise of no control.  Despite
this common sense conclusion, Ms. De Luna's area of expertise
and specialty as provided in 11CT2488, makes her overtly qualified
to point out the obvious contradiction in these charges.  Therefore
Ms. De Luna's testimonial evidence  that her professional capacity
dictates she must know not to be true, is thereby unqualified and
thus known by her to be false (CPC §125).

   (B)  Materiality of False Evidence:  Ms. De Luna's testimony
that conceals material information of contradiction in the con-
currently charged offenses, and therefore willfully/knowingly mis-
leads the jury in an expert opinion that obscures irreconcilable
theories, is used by the Prosecution to elementally define the in-
vestments as 'securities' (see 11RT2115)-- a requisite determination
for Counts 27-38 (see 11RT2252).  Thus, eliminating the false evi-
dence conveyed through Ms. De Luna's testimony removes the required
'security' definition that is the foundation for the respective
offenses.

## 6.6  FALSE EVIDENCE WAS OFFERED AGAINST THE PETITIONER AT TRIAL
### THROUGH PROSECUTION WITNESS TESTIMONY OF 'NO INVESTING UNLESS SECURED'

   (A)  Offered at Trial:  As noted in CLAIM 3.1, the Prosecution
as to the form of Grand Theft for Counts 1-4,6,8,10-12,15-17,22-26,
alleges a theory of a verbal representation of a false pretense.
This theory is elementally dependent on reliance (5CT1144; 11RT2241),
and a resulting belief that each investor was the "actual lender"
(8RT1513).  To demonstrate this reliance on a material representation,
the Prosecutor elicits from each investor testimony that they would
not have invested unless they were secured as the lender.

   (i) Prosecution Witness testimony:  An example of this testi-
mony is found in Mr. Almquist's representations where he states "the
way I understood it was that the trust deed was assigned to myself
...and that was my security; that if they [borrowers] didn't perform
on the loan, that I [personally] could then go back and take [fore-
closure] action against the property" (2RT278).  Mr. Almquist when

ATTACHMENT 'B':  PAGE 72

asked by Prosecutor Pierce if he would have invested if this were
not the premise, answers "no" relative to all  charged counts (2RT
298-299). These representations of 'no investing unless secured'
are seen in all instances of investors' testimony (see Exhibit 4,
No. 7 for transcript references).

      (ii)  The Facts that Disprove the Testimony of the Investors:
This testimonial evidence provided by each investor, stating they
would not have invested unless they were secured as the actual
lender is betrayed by the fact that no investor has produced any
documentary evidence showing they possessed or displayed ownership
of the definitive document of private mortgage ownership; the pro-
missory note.  Mr. Almquist after testifying to a belief he could
foreclose on a property due to a borrower's non-performance, when
asked if he had any promissory notes, replies "My guess is no"
(2RT367).  This void of promissory notes held by the investors is
repeated by all investors as indicated through transcript references
found in Exhibit 4, No.13.

As stated in Petitioner's affidavit provided to the Trial Court
attached to his pre-sentencing pleadings (11CT2365-2366), inherent
in an agreement by and between a borrower and an 'actual' lender
is the contract that defines the debt and the terms/conditions for
its repayment.  This document of indebtedness (promissory note or
loan agreement), once executed and lending consummated, serves as
the borrower's promise to repay pursuant to the terms as agreed
therein.  Therefore, it is this loan agreement between borrower and
lender that provides not only the definition of its terms for re-
payment but also explains a default resulting from the breach of
those terms and the consequences of a borrower's failure to per-
form.  Thus the Prosecution's failure to introduce any documentary
evidence demonstrating investors' possession/ownership of any pro-
missory note, not only precludes the investors' ability to declare
a default on terms/conditions for which they have no actual know-
ledge, but also renders any action of foreclosure-- based on an
unknown default relating to a loan agreement they're not a party
to-- a pragmatic  impossibility.

(iii)   The Actions of the Investors that Disprove Their
Testimony:  When Mr. Almquist testifies about the
security of foreclosing as a result of a borrower not paying on a
loan, he lacks not only the documentary evidence demonstrable of
his ownership of the loan, but also is without actual knowledge of
the terms of its repayment.  Absent the knowledge of those terms,
he doesn't know what constitutes a default of such terms and is
without standing to declare a default on those terms and foreclose.
Moreover, despite Mr. Almquist's sixty-plus investments with the
Petitioner (2RT256), conducted over an eleven year period (see 11CT
2346-2347), there is no evidence of any promissory note or any
foreclosure action taken by Mr. Almquist or any other alleged
investor-victim.

(iv)  Prosecution Team's Knowledge of the False Evidence:
As set forth in CLAIM 3.7(A)(ii), the Prosecution Team consists of
specialists well versed in the industry of mortgage lending.  In-
cluded in these is the Prosecution Team expert in mortgage law, Mar-
lou De Luna, Senior Counsel for the California Dept. of Business
Oversight (see 11CT2488 for credentials).  However instead of in-
dicating the obvious common sense conclusion as aforedescribed,
Ms. De Luna opts for the fantastical by justifying the absence of
any documents of indebtedness with the proposition that investors
could have an oral promissory note with the borrowers to whom they
have never spoken (see 7RT1397).

These material misrepresentations aside, the prosecution witnesses
on occasion perjure themselves as to possession of promissory notes.
An example of this is Mr. Steiner (Count 11, 29), when he says "I
know there were copies of all the notes, I submitted copies of all
the notes" (5RT988).  However, FBI Agent Jessie Murray in her Prop
115 testimony during the Preliminary Hearing is unaware of any in-
vestor held promissory notes (2CT363; 2CT370); and in her interviews,
which included Steiner (see 11CT2518), stated no investor even
"referenced promissory notes" (2CT392).  Thus with Mr. Steiner's
seventy-plus investments with the Petitioner (9RT1631), over a
thirteen year period (see 11CT2346), there is no documentary evi-
dence of any promissory note held by Mr. Steiner or any other

alleged investor-victim.

(B)  Materiality of False Evidence:  During trial, FBI Agent Murray testifies that she doesn't recall seeing any promissory notes, didn't ask about promissory notes, and doesn't recall "even a mention" of promissory notes (9RT1713-1714).  With this absence of any document of indebtedness or proof of assignment of such wherein any investor is named, or even an example of an investor requesting the definitive document of mortgage ownership, the Prosecution's representations that their witnesses intended to foreclose on non-performing loans are false.  Furthermore, the fact of each investor failing to hold/own the document that defines non-performance constitutes a premise that precludes the practical ability for non-judicial foreclosure; and without foreclosure, there is no recovery, no collateral, and thus no security.  Therefore the investment pretense that the Prosecution claims was verbally represented by the Petitioner, actually offered the investors no security.  With this knowledge displayed by no investor requesting or possessing promissory notes, their testimony that they would not have invested unless secured-- used by the Prosecution to prove reliance-- is materially false.

## 6.7  FALSE EVIDENCE WAS OFFERED AGAINST THE PETITIONER AT TRIAL THROUGH THE PROSECUTOR'S IMPROPER PRESUMPTION OF 'FLIGHT'

(A)  Offered at Trial:  As set forth in CLAIM 4, the Prosecutor's representations of a legal Panamanian arrest and extradition are false.  The Prosecutor promotes this false and specious pretense to the point where it is accepted by the Trial Court (see 1RT14; 1RT15; 1RT17; 1RT19).  This deceptive version is offered into evidence at trial where Prosecutor Pierce questions FBI Agent Murray "but because of statutory, because of treaties, it [International Arrest Warrant] has implications beyond our borders; fair statement?"; to which Ms. Murray agrees (9RT1588).  Mr. Pierce follows this exchange with the conclusion that Ms. Murray as a result, was contacted by Panamanian Law Enforcement  informing her that they had the Petitioner "in custody" (9RT1588).  However, as indicated in CLAIM 4.1 through 4.5, these representations of lawful process

to arrest and extradite are refuted by the actual events of ab-
duction and conveyance by force and fraud.

(B) Materiality of False Evidence: Notwithstanding the out-
rageous conduct of the Prosecution to commission, carry-out and con-
**ceal,** but the materiality of the Prosecutor's promotion of law-
ful process is also felt prejudicially in a false presumption of
'flight' that is presented to the jury for consideration of Peti-
tioner's conduct associated with guilt (see CALCRIM No. 372 Jury
Instruction at 5CT1085).

(i) Defining 'Flight': The statutory definition of CPC
§1127c states "flight of a person immediately after the commission
of a crime, or after he is accused of a crime that has been com-
mitted".

(ii) Petitioner's Travels After the Alleged Commission:
As stated by the Petitioner in affidavits filed in Trial Court (e.g.
10CT2182-2183), by using the border crossing information requested
by the Prosecution (see 11CT2524-2533) and the dates of the alleged
commission of the offenses found in the Information (4CT893-902)--
the traveling of the Petitioner as an unconstrained citizen to
Brazil on or about 02/14/2011, constitutes a border crossing 5½
years after allegedly committing the oldest charge (Count 34), and
8 months after allegedly committing the most recent (Count 20).
In relation to all charges, the Petitioner's travel to Brazil on
02/14/2011 constitutes a border crossing on the average of 21 months
after alleged commission. Insomuch that CPC §1127c unequivocally
defines flight as "immediately" after commission, any characterizing
of Petitioner's travel as 'flight' is incongruous with this sta-
tutory definition.

(iii) Petitioner's Travel from Brazil to U.S.: When Peti-
tioner traveled back to the United States on or about 06/20/2011
(see 11CT2527), the time elapsed between border crossing and the
dates of the offenses grows longer. This return from Brazil occurs
nearly 5 months after Petitioner's face to face with FBI's Murray
(see 11CT2482-2483), and is conduct incompatible with the concept
of 'flight'. Upon his 06/20/2011 return to California, Petitioner

ATTACHMENT 'B': PAGE 76

appeared at a related civil hearing with investors and their attorney, Patrick Lund in order to work on a realistic resolve of grievances.

(iv)  Petitioner's Travel Back to Brazil:  On 08/17/2011, the Petitioner subsequently traveled back to Brazil (11CT2527), a date that is nearly 2 months prior to the filing of the original felony complaint on 10/12/2011 (1CT001-008), almost 7 months after meeting with the FBI, and an average of 27 months after the dates of the alleged commission.  Whereas the second alternative for a 'flight' designation per CPC §1127c is after accusal (filing of charges), thus the Petitioner's traveling to/from/to Brazil years after alleged commission and months prior to filing of the original complaint cannot be construed as 'flight'.

(v)  Prosecutor's Material Misstatements:  The Prosecution, as exemplified by Prosecutor Pierce's statements of procedural history, purposely misstates the acts of the Petitioner by indicating that he "at some point prior to filing or soon after the filing and the issuance of a felony warrant...fled the U.S. and relocated to Brazil" (see 5CT950).  These statements of Mr. Pierce are knowingly deceitful due to the fact they are issued after receiving the 'TECS' border crossing info as provided by the 'DHS' at the Prosecution's request in July of 2014 (see 11CT2524-2533).  Also, in arguing the admissability of the CALCRIM No. 372 Flight Jury Instruction (5CT 1085), Mr. Pierce tells the Trial Court that FBI Agent Murray called the Petitioner, and he left after that call (6RT1112).  Absent from this version is that Petitioner met with Murray after that call, traveled to Brazil about a month after that meeting, returned from Brazil, met with investors and Attorney Lund, and then eventually left for Brazil approximately 7 months after that call.

(vi)  The Materiality of the False Characterization of 'Flight':  The jury was given the CALCRIM No. 372 "flight" instruction (see at 5CT1085) based on not only the Prosecutor's false characterization of 'flight' that is contradicted by CPC §1127c, but also as a result of Mr. Pierce's deceitful statements of procedural fact.  Therefore the false evidence embedded

in a fallacious proposition of **'flight'**, offered the jurors the ability to  consider such inaccurate pretense as possible conduct of the Petitioner associated with guilt.  Further prejudice to Petitioner's constitutional rights due to the intentionally untrue characterization of 'flight', is raised by the Petitioner in trial court prior to sentencing as a result of its use in the unreasonable bail determination and the Eighth Amendment violations associated therewith (see 10CT2180-2184).

## 6.8  FALSE EVIDENCE WAS OFFERED AGAINST THE PETITIONER AT TRIAL THROUGH ALTERED/FALSE DOCUMENTARY EVIDENCE AND MATERIAL MIS-REPRESENTATIONS PROVIDED BY THE PROSECUTION

(A)  Altered/False Documentary Evidence:  As noted by Petitioner in CLAIM 5.6, despite no holding order for the 'Mathis' transaction, the Prosecution adds it as Count 34 as a securities fraud offense (Information at 4CT899).  In arguing the tolling of statute of limitations as a result of the August 25, 2006 date of the alleged offense, the Prosecution claims that Petitioner had not "fund[ed] a second mortgage" against a certain property in question (see Information at 4CT901).  During trial to support such allegations, the Prosecutor introduces as People's Exhibit No. 61 (attached hereto as Exhibit 18), a title company transaction history for this property.  However, this document has been altered by deleting pages that show the Petitioner did fund a mortgage secured by this property.  This is demonstrated by the full history showing a mortgage secured July 9, 2006 in favor of Villa Capital (see 11CT2343).  The materiality of the altered/false document of People's Exhibit No. 61 relative  to  the new  charge and claim that Petitioner had not funded a loan is that it conceals the reality of events that directly disprove their allegations.

(B)  False Evidence was Offered Against Petitioner at Trial Through the Testimony of FBI Agent Jessie Murray:  On January 25, 2011, following a phone call from Jessie Murray, the Petitioner met face-to-face with Special Agent Murray.  Ms. Murray's '302' report is included at 11CT2508-2510, and Petitioner's affidavit of this interview is located at 11CT2482-2483.  However during

trial, Ms. Murray swears that the Petitioner during this interview, said he was keeping corporate funds as reimbursement for operating costs (8RT1582-1583). Not only is this statement missing from her '302' report and Petitioner's affidavit, but it also contradicts Murray's Preliminary Hearing testimony where she states Petitioner's claim of turning over all assets and incomes to the investors' attorney Patrick Lund (2CT402)-- a scenario she also details in her '302' report (11CT2509). The materiality of this false statement is best understood when viewed in context of the alternative theory of embezzlement added by the Prosecutor after the close of evidence (see CLAIM 1.3). This constructively amended allegation carries an element of fraudulent use or misappropriation that could be construed from a statement FBI Agent Murray is now falsely attributing to the Petitioner. Therefore this false evidence that represents a potential admission of guilt for an allegation of misappropriation of funds may have been used by jurors to convict on the alternative basis of the grand theft counts. As noted in CLAIM 1.5(C), the certainty of its use, or non-use in the jury's verdict is indeterminable due to no unanimity instruction or special findings.

   (C)  False Evidence was Offered Against the Petitioner at Trial
          Through the Testimony of Prosecution Witness Martin Almquist:
Notwithstanding the Prosecution's reliance on a false presumption of "interest" to determine loss (see CLAIM 3.3), but its witnesses have also entered into evidence, their false testimony of determining loss by more conventional means. An example of this is found in Martin Almquist's testimony where he indicates his loss was established by an FBI 'audit' (2RT360-361). This testimonial evidence is shown to be false by FBI Agent's testimony where she states on record regarding Almquist, "I did not have...in my file supporting documentation to support loss" (9RT1699), and she reiterates that Mr. Almquist did not provide her-- verbally or through documentation-- any accounting of payments/disbursements received from the Petitioner (9RT1703). Insomuch that all loss amounts represented by investors are shown to be false by accurate accounting as demonstrated by Petitioner in 11CT2370-2401, any attempt by the Prosecution and its witnesses to claim loss is established by the

ATTACHMENT 'B':  PAGE 79

OCDA's forensic review, is thwarted by OCDA Forensic Accountant, Scott Weitzman's testimony who, according to his testimony, is unaware if any investor lost or made money (8RT1462).  Therefore the respective testimony of actual loss is shown to be false, and thus prejudicial to the Petitioner due to the jury's consideration of these statements as elemental aspects of grand theft and also the determinable loss amounts relative to enhancement charges of CPC §12022.6(a)(4) and CPC §186.11 (see Information at 4CT901).

(D)  False Evidence was Offered Against the Petitioner at Trial
      through Prosecution Witness Testimony of 'Tax Deferred':
The Prosecution and some of its witnesses attempt to justify not reporting some of the income received from Petitioner due to it being 'tax deferred'.  An example of this is found in Mr. Steiner's testimony:

      <u>Defense Counsel:</u>  "Regarding the ...payments from [Petitioner], did  you report all that income on your income tax?"

      <u>Mr. Steiner:</u>  "I didn't"

      <u>Defense Counsel:</u>  "Why is that sir?"

      <u>Mr. Steiner:</u>  "It was tax deferred"        (9RT1631)

However  as judicially noticed in Exhibit 5, in such a transaction, it is the <u>taxation</u> of the income that is deferred, the <u>reporting</u> of the income is not deferred.  Other instances of these false statements are found in Almquist's testimony (2RT376-377);  Bagley's (8RT1560), and; Pinault's (9RT1624-1625).  The materiality of these false statements is found in Petitioner's assertion as to tax-reporting of income being the truest indicator of actual investor understanding (see CLAIM 3.2(B)).  A contention continuously made by Petitioner starting with his FBI interview (11CT2508-2510) and his pre-trial discovery requests (11CT2476).  Thus the false evidence provided by investor testimony that pretends an acceptable explanation for investors not tax-reporting, conceals the affirmative defense of actual investor awareness.

6.9  <u>THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY</u>:  This Claim and
the issues raised merit Federal Review pursuant to 28 U.S.C. 2254
as the facts and evidence presented are properly before the Court.
With the Petitioner's conviction and state custody a direct result
of the violation of the Constitution, Laws, and Treaties of the
United States, proper remedy is warranted.

(A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of
Orange County Superior Court, the Petitioner through pro per plea-
dings filed in Trial Court prior to sentencing, properly preserved
the issues identifiable in CLAIM 6 above.  These 'objections' are
found in the appellate record included as:  "Interest" Mischaracter-
ization (CPC §1181 Motion at 10CT2097-2098); "Actually Recorded
Deed" Misrepresentations (9CT1946-1954);  Improper Expert Opinion
of Scott Weitzman (10CT2095; 10CT2112; 10CT2120);  Improper Expert
Opinion of Marlou De Luna (10CT2117-2119);  'No Investing Unless
Secured' Misstatement (10CT2100); Improper 'Flight' Designation (10
CT2124); 'Mathis' False Evidence (10CT2116); FBI Agent Murray's
Unqualified Statements (10CT2048-2060);  Misrepresentations of Ac-
tual Loss (11CT2295-2301; 11CT2370-2401);  Tax-Reporting Impro-
prieties/Irregularities (11CT2301-2303).  As noted in 3C of the
Procedural History included in the PETITION OVERVIEW, all pro per
motions and actions were denied by the Trial Court prior to sen-
tencing; and in so doing offered no factual findings, applied no
decisional law addressing the materiality or prejudiciality of the
issues associated, nor compelled any evidence/testimony to resolve
credible, disputed issues of fact.

(B)  Issues Exhausted in State Court:  As noted in the Procedural
History included in the PETITION OVERVIEW, the Petitioner motioned
the Appellate Court to set aside his direct appeal brief as filed
by Appellate Counsel due to the omission of issues of greater sign-
ificance.  After the Appellate Court disregarded this request/motion,
the Petitioner filed a State Habeas Petition concurrent with his
direct appeal in which the issues raised in CLAIM 6 were included
as CLAIM VI of that petition.  That state petition (No.G058686) was
denied on 6/04/2020.  Petitioner filed virtually the same petition

in the California Supreme Court on 7/31/2020.  This state petition
(Case No. S263665) was denied on 2/20/2021.  Both state denials
provided no factual findings, no explanation, no application of
decisional law (state or federal), no evidentiary action to resolve
any credible, disputed issues of fact, nor gave any indication what-
soever that any adjudication of any issue was considered or admini-
stered.

   (C)  Evidence and Authorities Presented in State Court:  In sub-
mitting these issues in state court, the Petitioner presented such
on the same facts and evidence referenced herein by attached Exhibit,
Declaration, and Request for Judicial Notice (Exhibit 5).  As to
applicable federal law as extablished by U.S. Supreme Court decision,
the Petitioner offered such authorities that included:  Miller v.
Pate, 386 US 1 (1967) [False Evidence Used to Convict]; Berger v.
U.S., 295 US 78 (1935) [Prosecutorial Misrepresentation]; Napue v.
Illinois, 360 US 264 (1959) [Prosecutor's Use of Perjured Testi-
mony]; Strickland v. Washington, 466 US 668 (1984) ['IAC'].

   (D)  Review and Remedy:  In the PETITION OVERVIEW attached to
the Federal Habeas Form CV-69, the Petitioner demonstrates that this
CLAIM merits de novo review due to the fact that there is no state
ruling to review with AEDPA deference.  In this de novo review as
prayed by the Petitioner, he also requests Judicial Notice of the
evidence as presented in Exhibit No. 5 [Page 40 of ATTACHMENT 'D'].
In the Court's determination of issues as presented in this CLAIM,
the Petitioner prays for resolution of all disputed facts by refe-
rence to that which is judicially noticeable, and also that which
is obtainable by Evidentiary Hearing as incorporated by Exhibit
No. 20 [Page 127 of ATTACHMENT 'D'].  As to relief, Petitioner prays
for all just and proper including but not limited to reversal of
the conviction and dismissal of the charges based on the arguments
and the authorities as presented above.

# ATTACHMENT C

CONTENTS:

CLAIM 7
> CLAIM Summary                        Page  1
> Contents of CLAIM [Index]            Page  2
> Facts Supporting CLAIM               Page  3

CLAIM 8
> CLAIM Summary                        Page 44
> Contents of CLAIM [Index]            Page 45
> Facts Supporting CLAIM               Page 46

CLAIM 9
> CLAIM Summary                        Page 70
> Contents of CLAIM [Index]            Page 72
> Facts Supporting CLAIM               Page 73

## CLAIM 7:  PROSECUTORIAL MISCONDUCT

<u>SUMMARY:</u>  The Petitioner's conviction was obtained as a result of prosecutorial misconduct which so infected the integrity of the proceedings that the cumulative injurious effect denied the Petitioner his rights of fundamental fairness and due process.  These improper methods employed by the Prosecution Team from investigation through post-conviction include their complicity in the issues raised in the concurrent claims of:  CLAIM 1- The Prosecution's use of a constructive amendment to the allegations after the close of evidence; CLAIM 3-  The Prosecution's use of a presumption known to be false as the evidentiary fact for all charges;  CLAIM 4-  The outrageous conduct of the Prosecution Team to commission, carry out, and conceal the forcible transnational abduction of the Petitioner from the country of Panama;  CLAIM 5-  The Prosecution's adding of charges in violation of international treaty and due process, and; CLAIM 6-  The Prosecution's deliberate use of false evidence to obtain the conviction.

Compounding the prejudice of these acts, the Prosecution has also engaged in misconduct that includes:  The suppression of relevant materials and information that was explicitly discovery-requested by the Petitioner;  The Prosecution's adoption and protection of an unqualified and incompetent determination of probable cause; The Prosecution's employ and exploitation of a selective and arbitrary prosecution that protects their defective investigation and harbors their witnesses from culpability for their illicit acts; The Prosecution's intentional and in bad faith failure to preserve exculpatory evidence;  The Prosecutor's improper communication with members of the jury;  The Prosecutor's deliberate misstatements of material fact during trial, and; The Prosecution's deceptive tactics not only in determining an excessive bail amount but also in calculating maximum punishment.

CONTENTS OF CLAIM 7:

7.1   Standards in Identifying Prosecutorial Misconduct      Pg.   3

7.2   CLAIMS 1 and 3 Through 6 Include Components of
      Prosecutorial Misconduct Infecting the
      Integrity of the Proceedings                           Pg.   3

7.3   Discovery Violations of the Prosecution Team           Pg.   6

7.4   Unqualified Determination of Probable Cause            Pg.  13

7.5   The Selective Prosecution of the Petitioner            Pg.  19

7.6   The Prosecution's Failure to Preserve Evidence         Pg.  23

7.7   The Prosecution's Improper and Deceptive
      Methods                                                Pg.  28

7.8   The Pattern of Misconduct of the Prosecution           Pg.  39

7.9   This Claim Merits Federal Review and Remedy            Pg.  41

7.1  STANDARDS IN IDENTIFYING PROSECUTORIAL MISCONDUCT:  Pro-
secutorial Misconduct has been recognized to include "improper
methods calculated to produce a wrongful conviction" [Berger v.
United States, 295 US 78, 88 (1935)], and actionable when such im-
proprieties "so infect the trial with unfairness as to make the
resulting conviction a denial of due process" [Darden v. Wainwright,
477 US 168, 181 (1986)].  Furthermore, upon Habeas review, relief
should be granted if these defects caused by the misconduct "had
substantial and injurious effect or influence in determining the
jury's verdict" or otherwise "infect[ed] the integrity of the pro-
ceedings" [Brecht v. Abrahamson, 507 US 619, 637-638 (1993)].

7.2  CLAIMS 1 AND 3 THROUGH 6 INCLUDE COMPONENTS OF PROSECUTORIAL
     MISCONDUCT INFECTING THE INTEGRITY OF THE PROCEEDINGS

   (A)  CLAIM 1:  As noted in Petitioner's CLAIM 1, the Prosecution
after the close of evidence added the additional theory of embezzle-
ment as an alternative basis for conviction on the Grand Theft
charges (see CLAIM 1.3).  Because this new theory relates to di-
fferent acts, different property and an indeterminable time frame,
its addition constitutes a constructive amendment to the allegations;
and along with the variance and duplicity in the charging as a re-
sult, violates Petitioner's constitutional rights of fair notice
and due process (see 1.5- 1.6 above).

Courts have recognized defects in due process when the prosecution's
misconduct is deliberate [e.g. Oregon v. Kennedy, 456 US 667, 676
(1982)]; and in the Petitioner's case, this intentionality is demon-
strated by the subpoena for bank records signed by the Prosecutor
pre-dating the Preliminary Hearing (see 11CT2556-2557).  This sub-
poena discovered by the Petitioner post-conviction (pre-sentencing),
is signed March 20, 2014 by Prosecutor Pierce declaring  under
penalty of perjury that the records being sought directly from the
bank are being done so under the theory of embezzlement.  This
theory that was used by Pierce to access the Petitioner's bank re-
cords is absent from any charging document, written briefs, pre-
liminary hearing, opening remarks and direct trial testimony.  It
is not until after the close of evidence that Prosecutor Pierce

alleges the theory used by subpoena to gather evidence.  Thus the intentional acts of the Prosecution to give Petitioner notice of one theory while gathering evidence based on another theory and separate allegations, subjected him to a trial by ambush.  With a jury verdict determined on deliberately disguised and duplicitous offenses, such tactics used by the Prosecution to obtain, are indicative of improper methods that have infected the integrity of the Petitioner's criminal proceedings.

(B)  CLAIM 3:  As noted in CLAIM 3, the Prosecution uses a presumption of a specific "interest" characterization as the basic and evidentiary fact underpinning all charges.  Aside from ignoring its due process obligation to prove such beyond reasonable doubt, the Prosecution employs this improper method even though they know this representation of "interest"-- particular and specific to their theory of the offenses-- is false.  Considering the Petitioner's explicit requests made through the discovery process (see 11CT2475), and FBI interview (see 11CT2482-2483), for the disclosure of the definitive documentary evidence of tax-reporting in order to substantiate their presumptions, the Prosecution's use of this false evidence is knowing and deliberate (see CLAIM 3.7(A)(ii) and CLAIM 6.2).

Courts have recognized prosecutorial misconduct in circumstances of suppressed exculpatory evidence [Brady v. Maryland, 373 US 83 (1963)]; also when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony [Giglio v. United States, 405 US 150 (1972)]; as well as when the prosecution knowingly uses the perjured testimony to obtain a conviction [Napue v. Illinois, 360 US 264 (1959)].  Therefore, as it is in the present case with the prosecutorial misconduct that conceals the best evidence available that is probative of Petitioner's factual innocence despite Petitioner's repeated requests for disclosure, such course of conduct is fatally prejudicial to fundamental fairness and due process.

(C)  CLAIM 4:  As noted in CLAIM 4, the Prosecution Team's methods to commission, carry out, and conceal the forcible abduction

ATTACHMENT 'C':  PAGE 4

and conveyance of the Petitioner from the country of Panama are in violation of statutory law, federal law, Petitioner's fundamental rights, and international treaty obligations (see CLAIM 4.3 to 4.5). As such this course of action is demonstrable of outrageous government conduct that offends due process and equal protection [U.S. v. Russell, 411 US 423 (1973)].  The pattern of concealing these illicit acts from jury consideration at trial, despite Petitioner's discovery requests for information relative to these events, deprived the Petitioner of constitutional rights including those of the Sixth Amendment's confrontation clause.

(D)  CLAIM 5:  As noted therein, the Prosecution violated Petitioner's right to due process when adding allegations after the original complaint.  In doing so, the Prosecution offends the 'Doctrine of Specialty' that is articulated by international treaty and decisions of the U.S. Supreme Court [United States v. Rauscher, 119 US 407 (1886)].  Furthermore, in adding Counts 27-38, the Prosecution argues a pretense irreconcilable with the alleged theory of the original offenses; and to obscure the elementally-oxymoronic testimony of their expert, materially alters the jury instruction that is used to then convict the Petitioner of those added charges. Thus the improper methods not only subject the Petitioner to trial and punishment for offenses prohibited by the timing and manner of their charging, but also unduly influences a jury decision by eliminating the burden of proof on the inconsistent and divergent factual theories of the original offenses of Grand Theft versus the added offenses of securities fraud.  These defects of due process, knowingly and willfully employed by the Prosecution, constitute misconduct that infected the integrity of the judicial proceedings.

(E)  CLAIM 6:  As noted therein, the Prosecution bases their entire prosecution of Petitioner on evidence and testimony they know-- or should know-- to be false.  Considering the explicit requests of Petitioner for discovery/disclosure of the relevant materials and information that demonstrate the fatal flaws in the charges (see 7.3 below), the Prosecution's deliberate and constant

ATTACHMENT 'C':  PAGE 5

use to obtain and maintain the actual   conviction is the essence
of "improper methods calculated to produce a wrongful conviction"
[Berger v. United States, supra].

7.3  DISCOVERY VIOLATIONS OF THE PROSECUTION TEAM:  The Petitioner
through discovery requests made to the Prosecution, has explicitly
requested and identified the relevant materials and information
that demonstrate the fatal flaws in the allegations and his actual
innocence of the charges.  The explicit requests, made in accordance
with statutory provisions and constitutional mandates, are found
on record at 11CT2475-2483.  The Petitioner's CPC §1054.5 Motion
for Sanctions due to the Prosecution's failure to comply is found
at 10CT2204-2237.  The relevant materials and information requested/
identified by the Petitioner, and suppressed by the Prosecution,
include but are not limited to:

(A)  Claims Submitted by the Investors to the Victims Compensation
     Fund (hereafter 'VCF'):  Identified in discovery request
dated March 7, 2014 (11CT2475), Petitioner asked for disclosure of
claims for payment submitted by the alleged investor-victims and
their since-disbarred attorney, Patrick Lund, to the Secretary of
State's Victim Compensation Fund ('VCF').  Originated prior to the
filing of criminal charges, these applications for payment-- as
demonstrated by Petitioner in his CPC §1181 Motion, Addendum 'A'
(see 11CT2295-2316)-- are fraudulent claims of 'actual out of pocket
loss' totaling an estimated $10,000,000.  Signed by investors under
penalty of perjury, these applications for payment for an aggregated
amount of approximately $10M, are submitted to the 'VCF' based on
false claims of loss, whereby no consideration or accounting is
given to any disbursement whatsoever made by Petitioner to these
respective investors (see 11CT2295-2301).

Despite monthly disbursements made by Petitioner to these investors,
in some cases over an 11-13 year period (see Accounting at 11CT2370-
2401), FBI Agent Jessie Murray in her initiating investigation,
adopts and applies this same deliberate neglect of any accounting,
as demonstrated by her prepared and noticeably false spreadsheet
that alleges actual and determinable loss (see 11CT2484).  This

documentary evidence prepared by FBI Agent Murray, and used by her to determine probable cause (see 8RT1563-1565), calculates loss by excluding all disbursements and consideration provided by Petitioner to investors.  This link that neglects any accounting as seen in the investors filing fraudulent 'VCF' claims for approximately $10M and the origination of criminal charges being filed against the Petitioner is also apparent  in Agent Murray's use of the investors' attorney, Patrick Lund, to assist in her investigation (see 7.4 below).  Lund's involvement is critical to Murray's investigation as confirmed by alleged investor-victim O'Connel's testimony whereby she states the information provided the FBI was the same that was used in their filing of the 'VCF' claims (7RT1240).

(i)  Materiality of the Fraudulent 'VCF' Claims:  The relevance of these 'VCF' claims is fully realized by the Prosecution's eventual use of a false characterization of "interest" that allows them to eliminate all disbursements and consideration provided by Petitioner to investors (see CLAIM 3.3 above).  This improper method perpetuated by the Prosecution to obtain the conviction is merely an extension of the same pretense employed by Attorney Lund and investors to file fraudulent applications for payment in an estimated amount of $10M.

(ii)  Content of the 'VCF' Claims:  In addition to false claims of 'actual out of pocket loss', these 'VCF' claims as set forth by Petitioner in 11CT2295-2316 also contain:

(a)  False Statements signed under penalty of perjury that each respective investor did not assign the stipulated judgment given them by the Petitioner;

(b)  False Statements as to the actual premise of the investment transaction as demonstrated by the reality of tax reporting (see 11CT2303-2306; CLAIM 3.6);

(c)  Candid Sworn Statements as to 'no tax reporting of investment transactions', that as set forth in 11CT2302-2303 contradict investor trial testimony, as well as demonstrating the false "interest" presumption of the Prosecution and its theory of

**ATTACHMENT 'C':  PAGE 7**

theft that is shown to be false by the reality of tax-reporting
(see CLAIM 3).

(iii) Prosecution's Failure to Disclose:  In spite of
Petitioner's explicit request for discovery of all 'VCF' claims,
the Prosecution has failed to provide any compensation related
claims.  This suppression is even more suspect when considering
Patrick Lund's eventual disbarment and the OCDA's criminal in-
vestigation of his conduct relative to these activities (see 7.5
below).  It is important to note that three 'VCF' claims were
introduced at trial by defense counsel, Jerry Schaffer (see 11CT
2534, Defense Exhibits A,C,D), however these documents were pro-
cured by Petitioner's former counsel, Karren Kenney (11CT2535-
2536).  The two most egregious claims, filed by Mr. Steiner and
Mr. Almquist, estimated at a combined false claim amount of about
$8M (see 11CT2298-2300), have never been disclosed.  As indicated
by Petitioner in his CPC §1181 Motion at 10CT2089-2092-- and in
his CPC §1054.5 Motion for Sanctions at 10CT2214-2215-- not only
are legitimate claims discoverable due to the potential economic
bias, but these fraudulent claims that impeach witness testimony
and reveal motive for prosecution are paramount to confrontation
and a fair trial.

(B)  Tax-Reporting to Establish "Interest" Characterization:
As noted in discovery request dated Macrh 7, 2014 (11CT2475), the
Petitioner identifies and requests the direct evidence of tax-
reporting.  Whereas the Prosecution bases all allegations on an evi-
dentiary presumption that disbursements received by investors from
Petitioner were 'interest income' as typical and required of mort-
gage beneficiaries/lenders (see CLAIM 3.3),  this informal discovery
request simply asks for disclosure of tax-reporting to establish
the evidentiary facts that are the veritable foundation of their
case.  As described in Petitioner's CPC §1181 Motion at 10CT2092--
and in his CPC §1054.5 Motion at 10CT2215-2218-- the Prosecution's
failure to disclose the most relevant and material evidence avail-
able, subjected the Petitioner to a trial based entirely on test-
imonial evidence known to be perjurious by the Prosecution Team

ATTACHMENT 'C':  PAGE 8

(also see CLAIM 6.2).

(C) Proper Accounting:  In the discovery request dated March 7, 2014 (11CT2475), the Petitioner requested proper accounting to show all disbursments and consideration provided by Petitioner to, and on behalf of the alleged investor-victims.  As demonstrated in CLAIM 6.4 above-- and argued by Petitioner in his CPC §1181 Motion (10CT2084-2086) and CPC §1054.4 Motion (10CT2218-2222)-- the OCDA in response to this request, not only fails to disclose the relevant materials and information as identified, but their forensic accountant Scott Weitzman, swears to the accuracy of his prepared spreadsheets that deliberately neglect full and proper accounting.

To adequately comprehend the prejudicial effect of suppressing proper accounting and its role in the criminal proceedings, notice must be taken of the origins of this artifice that omits any and all consideration of disbursement provided by the Petitioner.  As described by Petitioner in Trial Court pleadings (e.g. 'Fraudulent Claims' at 11CT2295-2307) and mentioned in 7.3(B) above, since-disbarred Attorney Lund and at least five of the alleged investor-victims relied on the suppression of all accounting in order to file fraudulent 'VCF' claims in their applying for payment in an amount estimated to be $10M.  These deceitful tactics were aided by the incompetence of FBI Agent Murray, who during this same period of time-- and based on the same documentation Lund/Investors used for their 'VCF' claims (see 7RT1240)-- prepared her own spread-sheet of loss (11CT2484), which then served as her foundation in preparing probable cause reports (8RT1490).

FBI Agent Murray's implausible probable cause in turn leads to the OCDA's embrace of such pretense and its eventual charging the Petitioner with allegations of actual and determinable loss that neglect any accounting or consideration of any disbursement whatsoever; which can only be accomplished by the Prosecutor's portrayal of the false "interest" presumption of CLAIM 3.  Therefore the Prosecution's continuation of the process of determining loss by the suppress and disregard of the evidence that refutes it, is conduct that has infected the whole of the judicial process that leads to conviction.

ATTACHMENT 'C':  PAGE 9

(D)  Proper Accounting of Transferred Assets:  Specifically id-
entified in discovery request dated April 3, 2014 (see 11CT2478),
and included as exculpatory evidence in discovery request dated
September 22, 2014 (see 11CT2479-2481), Petitioner requested the
Prosecution to acknowledge and incorporate into their accounting
all consideration and transferred assets provided the investors.
These assets include but are not limited to real property, prop-
erty entitlements, mortgage contracts, rental contracts, cash on
hand, and derivative income.  As demonstrated by the Petitioner in
11CT2370-2401, when these assets are included into a forensic ac-
counting they not only disprove 'loss', but also further illustrate
the conspiracy to defraud embodied into 'VCF' applications.

The transfer of all assets and stipulated judgments provided by the
Petitioner to investors and attorney Lund are noted in FBI Agent
Murray's '302' report (see 11CT2509), however as explained by the
Petitioner in 11CT2301-2302, these same investors and Lund-- as
'VCF' claimants-- swear under penalty of perjury that they did not
assign the stipulated judgments received from Petitioner (see 7.3
(A)(ii) above).  These sworn statements are proven false when con-
sidering investors assigned these judgments to an entity, Resto-
ration Holdings, LLC (hereafter RH,LLC) in exchange for a propor-
tional share in 'RH,LLC' (see 11CT2540-2548).  This LLC managed
and fund-controlled by attorney Lund was used to receive the assets
transferred by the Petitioner; and in light of Petitioner's actions
to do so at the instruction of Lund and Investors, their subsequent
use of the RH,LLC vehicle to disguise consideration and derivative
income from the purview of the 'VCF' is evident in their sworn
statements as to no assignment of any judgment that obscures con-
sideration actually provided.

Thus the failure of the Prosecution to account for, and disclose
through their forensic analysis, the evidence of transferred assets
that negates loss and impeaches the credibility of investors and
the prosecutorial process-- especially considering Petitioner's ex-
plicit request-- is deliberate suppression and concealing of the
bad acts associated with the filing of the fraudulent 'VCF' claims

ATTACHMENT 'C':  PAGE 10

(see 11CT2294-2307).  Of further evidentiary importance, as de-
scribed in Petitioner's Trombetta-Youngblood Motion (11CT2256-
2275)  and argued in 7.6 below, is the Prosecution's failure to pre-
serve the evidence of these assets and consideration by neglecting
the provisions of the charged CPC §186.11 enhancement, that ul-
timately led to Patrick Lund's secreting away the asset base and
his misappropriation of the funds derivative therefrom.

(E)  Disclosure of 'Bad Acts':  As noted in the Informal Dis-
covery Request  dated September 22, 2014 (see 11CT2479-2481), the
Petitioner requested disclosure of "any and all possibly exculpatory
evidence, i.e. anything that may have a tendency to exculpate the
defendant, impeach any witness or evidence" (underline added).
Therefore evidence that a person committed a crime, civil wrong,
or other act when relevant to prove some fact (CEC §1101(b)), as
well as felony acts, misdemeanor acts, and non-criminal acts of dis-
honesty or moral turpitude that impeach evidence and credibility
constitutes exculpatory evidence and thus is discoverable [People
v. Wheeler (1992) 4 C4th 284].

(i)  Identifiable 'Bad Acts' Associated with the Prosecution:
As set forth in Petitioner's CPC §1181 Motion, he details conduct
of the Prosecution team and its witnesses that is indicative of
discoverable 'bad acts' (see 11CT2294-2331; 10CT2107-2114).  These
include the fraudulent claims (CPC §72) filed by alleged investor-
victims; the abduction and conveyance by force and fraud conducted
by the Prosecution Team (18 U.S.C. §1201), and; the perjured testi-
mony used to obtain and maintain the false and malicious action
(CPC §182).

(ii)  Prosecution's Knowledge of the 'Bad Acts':  Included
in the suppression-- as articulated by Petitioner in his CPC §1054.5
Motion (10CT2225-2231) and his CPC §1181 Motion (10CT2054-2057)--
is the reality of the Prosecution's knowledge, tacit approval, and
concealing of the illicit activities of attorney Lund.  Mr. Lund,
the since-disbarred attorney for the alleged investor-victims was
instrumental in assisting FBI Agent Murray in her investigation by
"providing me with, sharing info with me" (9RT1724), and on several

ATTACHMENT 'C':  PAGE 11

occasions Lund "would provide me with documentation" (2CT356).
During this same period of time, and using the same "info" and
"documentation" being provided to Agent Murray, Lund and his clients
were filing fraudulent claims to the 'VCF' for approximately $10M
(see 7.3(A) above).  Also concurrent with this assistance in the
investigation/prosecution of the Petitioner, Lund was misappro-
priating funds and dissipating assets transferred to RH,LLC for
the benefit of the investors (see 11CT2538; 11CT2478).  As a result
of Lund's role in assisting the Prosecution in its duties of in-
vestigation, he is identifiable as a person that misconduct of whom
is discoverable (see CPC §1054.5(a)).  Irrespective of this mandate,
the Prosecution's neglect of disclosure is indefensible considering
Lund's disbarment (2CT403), and OCDA's criminal investigation of
his conduct as it relates specifically to the Petitioner (2CT404).

   (iii)  Prosecution's Failure to Disclose and Resulting
          Prejudice:  All of the 'bad acts' identified by the
Petitioner are ignored by the Prosecution or deemed irrelevant (see
11CT2286).  Thus the Prosecution's suppression of all acts of mis-
conduct as illustrated in the specific factual scenarios described
in 11CT2294-2331, along with the neglect to disclose possible other
materials and information corroborative of such misconduct (see 11CT
2227-2231), has prejudiced the Petitioner by concealing evidence
that impeaches not only the culpable but also the methods used to
obtain the conviction.  This pattern and practice identifiable as
prosecutorial misconduct qualifies to such an egregious degree as
to merit dismissal of the Petitioner's case on due process grounds
[Darden v. Wainwright, supra].

   (F)  "All Communications Between Any Expert and Prosecution":
This information as requested in Petitioner's September 22, 2014
discovery request (11CT2480) is relevant to the false testimony of
OCDA Forensic Accountant, Scott Weitzman (see CLAIM 6.4), and 'DBO'
Senior Counsel Marlou De Luna (see CLAIM 6.5).  Thus the failure
of the Prosecution to provide the communications that would have
served as a prelude to the perjury presented through their experts
resulted in a trial by ambush style of proceedings, that despite

ATTACHMENT 'C':  PAGE 12

the explicit request made by the Petitioner for the pertinent dia-
logue that should have alerted the defense.

   (G)  Arrest Reports and Daily Activity Logs for Arresting
       Officers:  This information requested in Petitioner's dis-
covery request dated September 22, 2014 (11CT2480-2481), is rele-
vant to those involved in his forcible transnational abduction (see
CLAIM 4.3) and disclosure of such would be corroborative of the
many illicit acts associated therewith (CLAIM 4.4).  Thus this re-
quest to identify those involved and denote that activity probative
of the 'bad acts' that include kidnapping (see 4.4(B)(i)), False
Imprisonment (4.4(B)(ii), and solicitation to commit (4.4(B)(iv))--
and the Prosecution's subsequent failure to disclose-- has concealed
evidence favorable to the Petitioner and harbored those complicit.

   (H)  Any and All Exculpatory Evidence:  Requested through the
September 22, 2014 correspondence (11CT2481), this evidence only
reiterates what is constitutionally required even if the request
was not made [People v. Rutherford (1975) 14 C3d 399, 406].  How-
ever when considering the Prosecution's entire case against the
Petitioner rests and relies on a presumptive characterization of
"interest" (see CLAIM 3.3), this discovery request simply asks the
Prosecution for the industry-specific information that impeaches
all allegations.  With subsequent investor testimony that precludes
the practical possibility of this "interest" presumption actually
being true, the Prosecution by suppressing the information relative
to the industry of their specialty, "put[s] the whole case in such
a different light as to undermine confidence in the [eventual] ver-
dict" [Kyles v. Whitley, 514 US 419, 434 (1995)].

7.4  UNQUALIFIED DETERMINATION OF PROBABLE CAUSE:  The improper
methods calculated to produce a wrongful conviction was originated
in the FBI investigation conducted by Special Agent Jessie Murray
and her subsequent drafting of a probable cause determination (see
8RT1565).  As set forth in Petitioner's CPC §1181 Motion (10CT2046-
2061), Agent Murray acting without proper reason, caution and pru-
dence, lacked sufficient training and knowledge and therefore was
unqualified to determine probable cause.  This is demonstrated by

the facts that Agent Murray was investigating despite only two (2) formal hours of training in the applicable subject matter (see 8RT 1593; 9RT1717), possessing no mortgage industry experience (2CT350), and not knowing how the Petitioner's company worked (2CT361).  Her absence of prudence is exhibited by her admitting she "did not consult with [FBI] financial analysts" (2CT442), opting instead to collaborate with Attorney Lund, who at the same time was preparing and filing fraudulent 'VCF' claims that applied for payment in an estimated amount of $10,000,000 (see 7.3(A) above).  Her method to find probable cause is conducted with a reckless disregard for the truth as demonstrated by her failure to objectively investigate.

(A)  Failing to Objectively Investigate:  Probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts, and the investigation required to determine the existence of such, is based on the interrelationships between the <u>quality and reliability of the information</u> as assessed through an objective, as opposed to a subjective, analysis of those facts [see <u>Illinois v. Gates</u>, 462 US 213, 239 (1983); underline added].

(i)  Agent Murray's Lack of Knowledge and Training:  Examining transcripts of Murray's testimony (Preliminary Hearing and Trial), it is clear and obvious that the FBI Agent lacked sufficient training and knowledge to identify the probabilities within the factual contexts of Petitioner's case, and failed to objectively analyze the reliability of the information conveyed to her by the attorney Lund and investors.  In Petitioner's CPC §1181 Motion (1OCT 2024-2045), he outlines the insufficiency of the evidence as it relates to industry-specific information that belies any reasonable belief in the investors' feigned reliance on an alleged false pretense.  With this theory of theft by false pretense originating in fraudulent 'VCF' claims (see 7.3(A) above), Agent Murray's adoption of such as the basis for an existence of probable cause (2CT417-418), demonstrates her inability or unwillingness to consider the facts that would give the prudent investigator pause.

(ii)  Agent Murray's Lack of Objectivity:  One fact, if/when

ATTACHMENT 'C':  PAGE 14

considered within the context of the alleged false pretense (i.e. Investors believing to be actual lenders- see CLAIM 3.1), is the importance of the promissory note and its interrelationship with the complete and collective inability of the investors to produce any document of indebtedness or proof that they hold/own any such document.  Instead of objectively questioning the absence of the definitive document in an allegation that depends on it, Agent Murray responds that she doesn't recall seeing any promissory notes, didn't ask for promissory notes, nor remember "even a mention" of promissory notes (9RT1713-1714).  This 'doesn't know; doesn't recall; didn't ask' method of Murray's objective investigation is repeated for virtually every evidentiary fact that would make up a reasonable investigation; including but not limited to: Mutually Executed Contracts (10CT2048-2049);  Original Documentation (e.g. Deed of Trust, Assignment; 10CT2049-2050);  Industry-Specific Documentation (e.g. Title Policy, Insurance Policy; 10CT2051-2052); Investor Behavior (i.e. Acts of Ownership; 10CT2052-2054);  Proof of Actual Loss (10CT2055), and; Tax Reporting consistent with alleged reliance (10CT2055).  All of these evidentiary facts that would substantiate, or as in this case disprove the allegations are disregarded by Murray due to her not knowing, not recalling or not asking.

(B)  Failing to Demonstrate that the Information Received is Reasonably Reliable:  To provide meaningful protection for an individual from capricious arrest and prosecution, probable cause must be based on information that was reasonably trustworthy at the time it was obtained and at the time of arrest [Beck v. Ohio, 379 US 89, 91 (1964); underline added].

(i) Agent Murray and Attorney Patrick Lund:  Agent Murray's reckless disregard for due process is undeniable in her **collaboration with Patrick Lund**; "I spoke to him.  I interviewed him, and he would provide me with documentation" (2CT356).  Murray's candid use of "would" is in the past-progressive verb tense, indicating Lund's providing her with information was a regular and coordinated activity.  This verbiage also corroborates subsequent testimony

ATTACHMENT 'C':  PAGE 15

whereby Murray states "I spoke to him on several occasions through-
out this investigation...he was providing me with, sharing info
with me" (9RT1724).  This "sharing info" reflects Agent Murray's
actual knowledge of Lund's activities and the  tacit cooperation
between Murray's investigation and Lund/Investors' filing of the
'VCF' claims.  This arrangement is noticeable when Murray is asked
if she ever questioned Lund regarding the assets transferred to
him (Restoration Holdings, LLC; RH,LLC) by the Petitioner; to which
she replies "That didn't seem like something that was relevant to
me at that point in time" (2CT257).  However "that point in time"
per Beck v. Ohio [supra] should have included "at the time of ar-
rest".

        (ii)  Murray's Failure to Question Reliability of Lund:
With Agent Murray's role in the abduction and conveyance of the
Petitioner  (see CLAIM 4.2-4.3), which coincided with Lund being
disbarred, her nonchalance as to relevance of his activities is
also illustrative of her reckless disregard for due process.
Choosing intentional ignorance or inexcusable neglect, Agent Mur-
ray when asked if she's aware Lund had been disbarred answers non-
responsively (2CT403).  Furthermore, there is testimony from alleged
investor-victim-- and Lund client (and Murray interviewee [2CT331])--
Robert Pinault, that Lund leveraged the fraudulent 'VCF' claims to
borrow money (see 4CT816-818).  However, Agent Murray seems ob-
livious to the actions, motives and intentions of Lund and investors
relative to and dependent upon a criminal prosecution of the Peti-
tioner.  When Agent Murray is asked if she was familiar with Rest-
oration Holdings, LLC-- the vehicle used by Lund and investors to
shield transferred assets from 'VCF' scrutiny-- she indicates she's
unaware and appears unconcerned (see 2CT358).  For perhaps the most
compelling example of testimony which magnifies the requirement to
establish the trustworthiness of the source, and Murray's deliberate
disregard to do so, reference the Preliminary Hearing transcripts
of 2CT402-407.  Highlighting the particular passage of 2CT404, Agent
Murray is being questioned about the State Bar action taken against
Lund due to conduct relating to Petitioner's case:
        Defense Counsel: "So then you're now aware that the Orange

County DA's office has an open [criminal] investigation for that conduct; correct?"

> Murray:  "I didn't know there was an open investigation".

Agent Murray's answer appears disingenuous when considering she learned of Lund's disbarment from an investigator, Thomas Bees, with the OCDA's Major Fraud Unit (2CT404).  Either Murray is being dishonest in her answer, or she is unable to make the connection between this information coming from a criminal investigator and the existence of a criminal investigation.  Either possible explanation is disturbing for due process purposes.

(C)  Agent Murray's Lack of Sufficient Training and Experience: The standard required to determine probable cause is that of "a reasonable, cautious, and prudent peace officer and must be judged in light of [their] training and experience" [Bailey v. United States, 380 F.2d 305, 308-309 (D.C. Cir. 1967)].  With an objective investigation applying industry-specific information and knowledge (as proposed by Petitioner in 10CT2024-2045, and herein as CLAIM 3), "it would be entirely unreasonable for an officer to believe" that probable cause existed because a "reasonable and well trained officer would have known that [their] affidavit failed to establish probable cause and that [they] should not have applied for a warrant" [People v. Camarella (1991) 54 C3d 592, 605].

(i)  FBI Murray's Unreasonable Methods:  When Agent Murray determined probable cause by her 'doesn't know; doesn't recall; didn't ask' method of objective analysis, she demonstrated her insufficient knowledge and training by failing to identify the factual mosaic and context specific to the Petitioner's case.  Whereas the court should tolerate a degree of ambiguity "where law enforcement agents have done the best that could reasonably be expected...[and] have acquired all the descriptive facts" [United States v. Young, 745 F.2d 733, 759 (2nd Cir. 1984)], this reviewing court, as prayed for by Petitioner, should take issue with Agent Murray's neglect to consider any common sense application essential to establishing a probable cause as it relates distinctively to the case's circumstances.  Furthermore, Agent Murray in her own words admits her

**ATTACHMENT 'C':  PAGE 17**

training had "very little" to do with real estate and mortgage
matters; consisting of only two hours (8RT1593-1594).  Therefore
the ignorance exemplified through her testimony regarding industry-
specific material matters, while not acceptable, is understandable.
Examples that illustrate her lack of experience include but are not
limited to:

(a)  Murray: "I don't have a knowledge as to...how
[Petitioner's] company would work" (2CT361);

(b)  Murray on loan servicing:  "I don't know your
definition" (2CT368);

(c)  Murray on the significance of 'interest' character-
ization within the context of the allegations:  "I think it means
different things to different people" (2CT370);

(d)  Murray is unaware of the significance of assignment
of the beneficiary position of a trust deed (see 2CT391);

(e)  Murray, on the industry-specific, and potentially
fatal, need of a junior lien holder to service senior liens in the
event of default:  "I don't understand your question" (2CT364);

(f)  Murray on the importance of promissory notes in the
investigation:  Doesn't recall seeing any, asking for any, or "even
a mention" of any (9RT1713-1714);

(g)  Murray not understanding the basic components of
a mortgage:  "I'm not up to speed in mortgage law, even though I
have a mortgage myself, so I don't know about the requirements of
the promissory note" (9RT1724);

(h)  Murray not understanding if foreclosure can occur
without owning/holding the debt [promissory note] (9RT1716-1717);

(i)  Murray on tax-reporting requirements:  "I am not
knowledgable" (9RT1694);

(j)  Murray on FBI help:  "I didn't consult" (2CT442);

(k)  Murray on industry terminology:  Admits "I might
not have the correct terminology" (2CT442); and errs gramatically

when referring to "principals" of mortgage payments (2CT395);

(1) <u>Murray</u> and unqualified statements such as:  "I know he [Steiner] received interest payments" (2CT367); a statement she cannot possibly know to be true because she follows this with the reality that she didn't ask/ doesn't know about Steiner's tax no-tification and tax-reporting of the income received from Petitioner (see 2CT369).

(ii)  Due Process Requires a Knowledgeable and Objective Finding of Probable Cause:  Even though CPC §872 pro-vides that probable cause may be based on sworn testimony of a law enforcement officer possessing five years of experience or completion of a certified training course, the intent of such statutory qual-ification is to ensure a knowledgeable and objective determination. Because these statutes, per CPC §4, "are to be construed according to the fair import of their terms with a view to effect its objects and to promote justice"-- the object in this case being due process and Fourth Amendment protection.  Therefore the drafting and dec-laration of probable cause  prepared by Agent Murray, acting with unabashed lack of knowledge and objective investigation, is un-qualified and thus offensive to Petitioner's constitutional pro-tections.  As stated by the U.S. Supreme Court, "The history of the use, and not infrequently abuse of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would leave law abiding citizens at the mercy of the officer's whim or caprice" [<u>Yick Wo v. Hopkins</u>, 118 US 356 (1886)].

<u>7.5  THE SELECTIVE PROSECUTION OF THE PETITIONER</u>:  Prosecutors may not engage in selective prosecution, which denies equal protection of the laws [<u>Wayte v. United States</u>, 470 US 598, 608 (1985)], or conduct/maintain a prosecution in an arbitrary or discriminatory manner [<u>Yick Wo v. Hopkins</u>, supra].  The Petitioner contends that the methods employed during investigation, prosecution and punish-ment were a result of a corrupted and selective process conducted by the OCDA in an intentionally arbitrary manner; which also in-cludes components of discriminatory effect.

(A)  'VCF' Claims and the Conspiracy to Defraud:  As raised in 7.3(A) above-- and contended by Petitioner in trial court (11CT2294-2307)-- the 'VCF' claims prepared and filed by attorney Lund and alleged investor-victims are fraudulent applications and overt acts of a collective conspiracy intended to defraud in an estimated amount of $10,000,000.  The Prosecution Team, specializing in mortgage related crimes (see CLAIM 3.7(A)(ii)), possesses actual knowledge of the 'VCF' applications; and with its industry-specific expertise, possesses knowledge of the criminality contained therein. This actual knowledge is demonstrated by Petitioner providing notice of these claims through discovery requests (11CT2476);  the Prosecution's employ of Forensic Accountant, Scott Weitzman, who testifies as to reviewing all bank records and disbursments provided the investors (4CT846-847; 4CT853-854; 4RT828), and;  the OCDA's criminal investigation of Patrick Lund for misconduct specific to the Petitioner's case (2CT404).  Regardless of this actual knowledge, the Prosecution as noted in 7.3(A) above failed to disclose any compensation related claims to the Petitioner.  Thus their active suppression of this evidence that is favorable to the Petitioner, effectuated a collective immunity to the investor-witnesses by harboring the same from exposure and possible prosecution based on these impeaching, illicit acts.  Therefore the concealing of evidence that incriminates investors and exculpates the Petitioner, was transacted with a discriminatory intent to maintain the subject proceeding v. the Petitioner.  The resultant discriminatory effect is a trial that was conducted using prosecution witnesses testifying exempt from evidence of such acts and immune from the criminal consequences thereof.

(B)  Grand Theft Prosecution and Equal Treatment:  The Orange County District Attorney's Office has charged individuals with Grand Theft when they have collected rents from real property without making any mortgage payments (e.g. see OC Register, 7/13/2014: "Terrill Meisinger" Fraud Charges- Local Section, Page 11).  During Petitioner's Preliminary Hearing, Prosecution Witness  Robert Pinault testified that as a member of Restoration Holdings, LLC, they collected rents on properties transferred to them by Petitioner

ATTACHMENT 'C':  PAGE 20

without making any mortgage payments (4CT821-822).

Lost or diregarded by the Prosecution, is the fact Pinault has already filed a 'VCF' claim swearing that he had not assigned the stipulated judgment given him by the Petitioner; a statement shown to be perjurious by his membership in RH,LLC which is gained only by assigning this stipulated judgment (see 7.3(A)(ii) above).  These rents collected by Lund and investors in the name of RH,LLC is seen in the example of a RH,LLC "Collections Reconciliation" statement as provided by the Petitioner in 11CT2539.  Thus the Prosecution is not only aware of the perjury contained in the 'VCF' statement of 'no assignment of a judgment', but it is also actually aware of the income realized through these collected rents that is possibly being concealed from the purview of the 'VCF'.  Moreover, with knowledge of Lund and investors collecting rents without making any mortgage payments, the Prosecution chooses to ignore such conduct that is criminally charged in similar circumstances.  By failing to bring charges against Lund and investors for these acts deprived the Petitioner his right to confront those testifying against him with evidence that impeaches their credibility.

Instead of holding Lund and investors to the same level of accountability, the Prosecution introduced into evidence a prior conviction of Petitioner from 1998 where he pleaded guilty to grand theft when he collected rents on property while not making the mortgage payments.  Similarly situated as Lund and investors, but different and unjustifiably disparate treatment from the OCDA (see 12CT2845-2862).  In fact, in Petitioner's prior conviction, he was attempting to negotiate 'short sales' with the subject mortgage holders and gave the renters full notice and a discounted rental amount as a result of the uncertainty associated.  With Lund and investors there is no such mitigating circumstances.

(C)  Misdemeanor Complaint Case No. 12CM00583:  Referenced as 11CT2549-2555 is a misdemeanor complaint filed against the Petitioner on January 18, 2012 as Case No. 12CM00583.  This complaint filed against the Petitioner as an individual for failure to obtain a business tax certificate pertains to a property that had been

owned by Villa Capital, Inc.  This property, as stated by Petitioner
to Prosecution Team member Jessie Murray in the FBI interview con-
ducted a year earlier (January 25, 2011), was transferred to Lund
and Investors' RH,LLC by Petitioner in 2010.  This is acknowledged
by Agent Murray during Preliminary Hearing, as is the fact that she
gave transferred asset information to the OCDA (2CT401-402).  Also
of note is the corporate listing (public record) for Villa Capital,
Inc. that shows eventual Prosecution Witness, Debra Duncan as the
officer of record.  Thus when Shawn Horning as the affiant signs
the misdemeanor complaint under penalty of perjury as noted in 11CT
2552, stating . she was "assigned to investigate allegations that
Thomas Franklin Tarbutton did violate the Orange Municipal Code"
and that "a misdemeanor was committed by defendant"; she acted with
intentional ignorance to the facts revealed through a common public
information search showing Debra Duncan as the officer of record.

Also of importance to this contention is who "assigned" Shawn
Horning to investigate and who made such "allegations".  If these
allegations and assignment were made on behalf of the OCDA-- as is
the Petitioner's belief-- the District Attorney did so with actual
knowledge that the subject property was deeded to Patrick Lund and
investors c/o Restoration Holdings, LLC approximately a year and
a half earlier.  Referencing the 'Collections Reconciliation' for
RH,LLC identified at 11CT2539, it shows a 1/23/2012 rents received
for this subject property ('Park Lane') in the same week the mis-
demeanor complaint was being filed against the Petitioner.  Thus
when affiant Shawn Horning declares under penalty of perjury that
he/she "contacted witnesses and obtained statements that support
filing of this complaint"; such actions, if conducted, would have
corroborated the aforedescribed facts of Lund/investors collecting
rents on the property in question.

With Horning intentionally ignoring these facts, or by committing
perjury by not contacting witnesses or obtaining pertinent state-
ments, it is the belief of the Petitioner that Case no. 12CM00583
was filed at the behest of the OCDA.  With the "allegations" and
'assignment' being initiated by the OCDA, they did so with the

ATTACHMENT 'C':  PAGE 22

actual knowledge of the facts that demonstrate the falsity in the charge. The discriminatory design and effect is seen by considering that equal and due administration of the laws should have resulted in the same charges being filed not against the Petitioner, but against Lund, Investors and/or Debra Duncan; and thus impeachable and discoverable 'bad acts' of those testifying against the Petitioner at trial (CEC §780, CEC §1101(b)). Furthermore, with the OCDA's actively harboring those culpable of the acts falsely attributed to the Petitioner, such action is defined as accessories after the fact by CPC §32, if the offense was a felony instead of a misdemeanor. However, when considering the concealment also secreted grand theft due to Lund/investors collecting rents on the subject property while not making the mortgage payments (see 7.5(B) above), the OCDA's knowledge of this in conjunction with their conduct to selectively and falsely accuse the Petitioner, is indicative of concealing and conspiring.

(D) Discriminatory Treatment as a Class of One: Attached as Exhibit 9 are copies of letters sent to the Governor and Attorney General for the state of California. The subject of these letters is to request the rational justification for the unequal treatment of Petitioner as it relates to his abduction/conveyance as described in CLAIM 4 above. As stated in 4.5(C)(v), the actions of state actors to abduct and convey the Petitioner by force and fraud while traveling legally, as compared to the state's disparate treatment of providing sanctuary to those traveling illegally, violates Petitioner's Fourteenth Amendment right to equal protection as a 'class of one'. Despite four attempts for a rational basis for such disparity, the Petitioner has never received any justification from the Governor or the Attorney General's office.

7.6  THE PROSECUTION'S FAILURE TO PRESERVE EVIDENCE: As noted in Petitioner's Trombetta-Youngblood Motion (10CT2256-2275), following his transfer of all corporate assets to Restoration Holdings, LLC (RH, LLC; Lund-Managed/Investor-Owned), Attorney Lund-- as described by Investor Steiner in a document entitled CA State Bar Complaint (see 11CT2538)-- failed to distribute these assets or monies

ATTACHMENT 'C':  PAGE 23

derivative therefrom; leading to his misappropriating those funds for his own purposes.  In addition to being disbarred (2CT402), Lund was criminally investigated by the OCDA for conduct related to the transferred assets (2CT404).  All of Lund's actions occurred while assisting FBI Agent Murray in her probable cause determination (see 7.4 above) and during the criminal prosecution of the OCDA against the Petitioner (2CT405).  Lund was able to conduct his misappropriation of the transferred asset base despite Petitioner's explicit information relative to Lund and assets provided to the FBI on Jan. 25, 2011 (11CT2482-2483), and regardless of his April 3, 2014 explicit discovery request given the OCDA relating specifically to Lund and the transferred assets (11CT2478).

   (A)  'Trombetta' Materiality [California v. Trombetta, 467 US
        479 (1984)]:  The offenses charged against the Petitioner include Grand Theft and include certain enhancements that allege actual and determinable loss (see Information at 4CT893-902).  Thus the evidence of consideration provided to investors-- implicit in the transfer of assets-- is accountable and mitigative against any allegation of loss, and therefore exculpatory.  The 'Trombetta' requirement of the irreplaceability of such evidence, is unique and noticeable in the Petitioner's case due to the management required to maintain the asset base transferred to Lund and Investors.  As intimated by Petitioner in his statements to Agent Murray on 1/25/2011 (see 2CT402-403), the evidence of consideration provided to RH, LLC can be lost or significantly reduced in value by mismanagement or misappropriation.

   (B)  'Youngblood' Bad Faith [Arizona v. Youngblood, 488 US 51
        (1988):  In the original complaint filed 10/12/2011 (1CT001-008) and included throughout the proceedings, the Prosecution charged Petitioner with enhancements, one of which was CPC §186.11. This statutory enhancement provides for protection and preservation of "any asset or property that has been transferred by [defendant] to a third party" [CPC 186.11(d)(1)].  Thusly, "to prevent dissipation or secreting of assets or property", the Prosecution can "file a petition...seeking a temporary restraining order, preliminary

ATTACHMENT 'C':  PAGE 24

injunction, the appointment of a receiver, or any other protective relief [e.g. Lis Pendens] necessary to preserve the property or assets" [CPC §186.11(d)(2)].   The purpose of these statutory provisions is to ensure that any property transferred is "maintained and preserved" [CPC §186.11(e)(2)], and to "prevent any asset... from perishing, spoiling, going to waste, or otherwise being significantly reduced in value" [CPC §186.11(f)(9)].   Therefore with the due process requirement to preserve material/exculpatory evidence [Trombetta, supra; Youngblood, supra], along with the Prosecution's actual knowledge of the evidence in question and its materiality and irreplaceability (7.6(A)), their decision to neglect the statutory provisions of the charged enhancement that calls for protection of transferred assets, leads to and allows Attorney Lund's dissipation of value and secreting away of the consideration provided the investors.   This loss of evidence or its de facto destruction is demonstrated by the jury's finding of loss commensurate with the enhancement threshold, without any accounting or consideration provided by Petitioner through the transfer of assets. While at the same time conducting a criminal investigation of Lund (2CT404), the Prosecution's decisions not to protect these assets defy not only the enhancement protections but also common sense. With the actual knowledge of these assets dating back to Petitioner's 1/25/2011 FBI interview, and reinforced through their criminal investigation of Lund and Petitioner's discovery requests (e.g. 11CT 2478), the Prosecution was encountered with multiple opportunities to fulfill the constitutional obligation  to preserve and protect these evidentiary assets through the statutory provisions uniquely designed to do just that.  With every opportunity to do so, the Prosecution's decisions not to, demonstrate the 'Youngblood' intentionality required to establish bad faith.

   (C)  'Trombetta-Youngblood' Improper Motivation and Constitutional Materiality:

      (i)  Improper Motivation:  The improper motivation requirement is best demonstrated by necessary steps to preserve and protect the subject transferred assets as detailed in CPC §186.11.

ATTACHMENT 'C':  PAGE 25

As written, this statute provides protective measures "based upon the sworn declaration of a peace officer with personal knowledge of the criminal investigation that establishes probable cause" of the aggravated white-collar crime [CPC §186.11(f)(1)]. In the Petitioner's case, this individual would have been FBI Agent Jessie Murray, as the affiant in the probable cause finding (8RT1565; 8RT 1596-1597). However for Agent Murray to do so, she would have impugned her own investigation and the integrity of her probable cause by moving to protect these assets from Attorney Lund, on whom she relied for her investigation (see 7.4 above). Also, by moving to protect this evidence of consideration provided by the Petitioner to investors, it would have demonstrated her own false evidence of loss as portrayed through her spreadsheet wherein she failed to acknowledge any payment whatsoever (see 11CT2484).

This pattern whereby the Prosecution was more interested in salvaging the integrity of its case instead of protecting the evidence in the case, is also seen in their intentional neglect of the Petitioner's discovery request of April 3, 2014 that specifically deals with Lund and the assets (11CT2478). If the evidence implicit in the transfer of assets would have been disclosed as militated by due process, proof of consideration provided would not only have impeached the probable cause finding but would also illustrate their false representations of actual and determinable loss (see 11CT2404-2405). Furthermore any acknowledgement of payment would expose the fraudulent 'VCF' claims filed by Lund and investors that swear to loss without considering anything received from the Petitioner (see 11CT2294-2307).

The improper motivation that effectuates suppression of evidence by failing to preserve/protect it, also conceals the discriminatory intent whereby the OCDA acted with selective prejudice and bias in choosing to shelter the character of FBI Murray's unqualified and incompetent investigation (7.4 above). The basis for this bias is found in Agent Murray's relationship with the OCDA. Agent Jessie Murray is married to Mike Murray who at the time was a prosecutor with the OCDA (1RT8), and has since gone on to become an

ATTACHMENT 'C': PAGE 26

Orange County Superior Court judge.  Therefore the conduct of the Prosecution that sought to preserve and protect the network of relationships and sensitivities amongst co-workers instead of the exculpatory evidence in the Petitioner's case, was also conceivably motivated by the knowledge of Mike Murray's judicial candidacy. Irrespective of Mr. Murray's pending judgeship, the Prosecution even with an ongoing criminal investigation of Lund took no action that would expose and impeach an incompetent investigation, demonstrate the unqualified determination of probable cause, and illustrate the reckless disregard exhibited by the wife of a superior court judge for the county in which they practice.

(ii)  Constitutional Materiality:  The prejudice and corresponding constitutional materiality due to the Prosecution's failure to protect this evidence pervades virtually every aspect of the Petitioner's case:

(a)  Fourth Amendment- Probable Cause:  The loss of this evidence deprives the Petitioner of that which impugns the affiant of probable cause and impeaches the false representation of actual loss used to establish;

(b)  Sixth Amendment- Right of Confrontation:  The loss of this evidence deprives the Petitioner of proof of consideration provided to those testifying against him at **trial** that claim otherwise;

(c)  Sixth Amendment- Assistance of Counsel:  The loss of this evidence of payment that would challenge the Prosecution's allegations and enhancements of actual and determinable loss, deprived the Petitioner of the adversarial testing of their theory and as such, the denial of effective assistance of counsel;

(d)  Fourteenth Amendment- Due Process:  With the loss of this evidence occurring during the investigation and prosecution of the Petitioner, the failure to protect this information removed it from the purview of the jury and precluded its use in an elemental determination of loss relative to the alleged enhancements.

7.7   THE PROSECUTION'S IMPROPER AND DECEPTIVE METHODS:   As in-
dicated in People v. Strickland (1974) 11 C3d 945, 955, a Pro-
secutor's employ of improper tactics to influence judicial pro-
ceedings is misconduct.  It is the contention of the Petitioner
that the Prosecution Team's continuing course of conduct from in-
vestigation through trial has utilized such methods to such a degree
as to infect the integrity of the trial process.  These impro-
prieties include but are not limited to:

(A)  Improperly Influencing the Jurors:  CPC §95 specifically
prohibits corrupt attempts to influence jurors.  Examples of these
deceptive tactics are:  Improper Communication (CPC §95(a); includes
nonverbal conduct [see CEC §225]);  Improperly Exhibiting Objects
(CPC §95(b));  Improper Persuasion and Entreaty (CPC §95(c)), and;
Improperly Appealing to a Passion or Prejudice of Jurors [People
v. Criscione (1981) 125 CA3d 275, 292].

Raised by Petitioner  in his CPC §1181 Motion, the Prosecutor is
guilty of misconduct before the jury by appealing to a passion/
prejudice that is commonly shared by certain members of the jury,
one or more of the alleged investor-victims, and the Prosecutor
himself (10CT2106).  Prosecutor Pierce, a veteran of the armed
services, learned through voir dire that at least two of the jurors
selected are retired from the U.S. Marine Corps.  Also within the
knowledge gained through investigation is the fact that alleged
investor-victim George Kentner is as well a retired Marine Corps
veteran.  During trial, and in full view of the jurors, Mr. Pierce
and Mr. Kentner both wore service 'pins' which displayed the cama-
raderie jointly shared with the respective jurors.  In so doing,
Prosecutor Pierce improperly communicated an appeal to a passion
of these jurors and effectively propagated a prejudice for the
fellow veteran.  Mr. Pierce follows these non-verbal communications
with an oral plea during his closing arguments when he singles out
Mr. Kentner, referring to him as "poor Mr. Kentner...a retired guy"
(11RT2208).  No other investor-victim is given such a sympathetic
overture from Mr. Pierce.

California's CCP §225(b)(1)(C) defines actual bias as "the existence

ATTACHMENT 'C':  PAGE 28

of a state of mind on the part of the juror in reference to the case or to any of the parties which will prevent the jury from acting with entire impartiality, and without prejudice to the substantial rights of any party". While 'actual bias' is used as a determinant in jury selection, the operative phrase of "the existence of a state of mind" would have been inconsequential during voir dire because jurors were not aware of the shared passion. It was not until Prosecutor Pierce's improper attempts to communicate the bias did the "state of mind" turn prejudicial to the substantial rights of an impartial jury.

It should be noted that neither Pierce nor Kentner have denied wearing these pins after this was raised by Petitioner (10CT2106). The Petitioner has in his possession an affidavit signed by a third party, swearing to a conversation with Kentner wherein he admits without conditions as to wearing the service 'pin' during his trial testimony. Thus these covert communications designed to improperly influence jurors by appealing to a partiality and passion, are corrupting to an unbiased verdict and therfore presumptively prejudicial [Remmer v. United States, 347 US 227, 229 (1954)].

(B) Improper Conduct that Obstructs Due Administration of the Laws and Equal Treatment under the Law- Statute of Limitations: As raised by Petitioner in his CPC §1181 Motion (10CT2122-2123), the Prosecution Team participated in various scenarios that required proper and due administration of the laws as it relates to subject matter jurisdiction. In California this structural requirement for Fourteenth Amendment compliance is administered through the principles of statute of limitation as set forth in CPC §801.5/§803 and the decisional standards of People v Zamora (1976) 18 C3d 538. Insomuch that the Prosecution is obligated to constitutional due process and the rudimentary demands of fair procedure, their conduct as shown by the following examples relative to the forthright implementation of establishing subject matter jurisdiction through 'SOL' procedure, is opposed to the fundamental aspects of fairness.

(i) Count No. 34 'Mathis': As denoted by Petitioner in

ATTACHMENT 'C': PAGE 29

CLAIM 5.6, the Prosecution improperly added Count 34 after the subject transactions were dismissed at Preliminary Hearing, and despite the Doctrine of Specialty that precluded its charging at that time and manner.  Irrespective of the false documentary evidence used to introduce this count, what is relevant to this argument is the Prosecution's explicit use of CPC §801.5/§803 and People v. Zamora to establish subject matter jurisdiction and charge the Petitioner with this count (see 4CT901).  Thus to circumvent procedural due process and double jeopardy that should preclude the adding of this charge, the Prosecution argues 'SOL' procedure that is inapplicable to Count 34.  Conversely, when proper application of this 'SOL' procedure (§801.5/§803; Zamora) would forfeit subject matter jurisdiction, the Prosecution deliberately ignores the due administration of such laws as demonstated by the following examples.

(ii)  Alleged Investor-Victims' Dates of Discovery:  As noted in 7.7(B)(i) above, the Prosecution cites People v. Zamora as grounds to toll the 'SOL' on Count 34.  In Zamora, the court indicated that the prosecution to establish subject matter jurisdiction and to avoid the bar of 'SOL', must allege (1) the date on which the offense was discovered;  (2) how and by whom the offense was discovered;  (3) the lack of knowledge, both actual and constructive, before the date of discovery, and;  (4) the reason the offense was not discovered earlier.  Despite using Zamora for Count 34, the Prosecution in the Petitioner's case forsakes this structural requirement in most all other instances.

(a)  Investors' Knowledge of the Facts:

(1)  Investor Steiner:  Referencing FBI Agent Murray's '302' report for her interview with Investor William Steiner located at 11CT2518-2519-- that was used by Murray for her probable cause investigation (8RT1490)-- Agent Murray reports that "over the years, Steiner discovered" the facts that later served as the basis for the criminal charges filed against the Petitioner. The ambiguity of this statement considered in context of Steiner's investment period of 13 years (1998-2010; see 11CT2581), and the genealogy of investors introduced by Steiner to Petitioner during

ATTACHMENT 'C':  PAGE 30

this period (see 11CT2346-2351), Steiner's 'discovery' conveys an
actual knowledge of Steiner, and a constructive knowledge of those
introduced, that predates the timing of the alleged offenses.  This
actual and constructive knowledge along with establishing a date
of discovery spotlight the subject matter requirements of Zamora
and §801.5/§803 that the Prosecution is choosing to ignore.

      (2)  Investor Leever:  Demonstrative of actual
knowledge that predates the allegations is testimony from alleged
investor-victims that indicate not only their awareness of the facts,
but also their decisions to continue investing with the Petitioner.
One such investor is Jack Leever (Counts 22,23,33), who was intro-
duced to Petitioner by Steiner (3CT664).  The Grand Theft al-
legations of Count 22 (September 2009) and Count 23 (April 2010)
are charged on the theory of false pretense that are predicated on
Mr. Leever's expectation of actual mortgage assignment (11RT2133).
However, Mr. Leever when asked by Prosecutor Pierce about his in-
vestments with the Petitioner dating back to 2004 stating "He [Peti-
tioner] did not provide you with an assignment in your name, cor-
rect?", responds "No" (3CT683).  In fact, Mr. Leever follows this
up with the same response to his investments made in 2005 (3CT687),
2006 (3CT687-688), and 2009 (3CT689).  Therefore when Mr. Leever 'dis-
covered' as far back as 2004 the facts now serving as the basis for
the Prosecution's false pretense theory filed in 2011 (1CT005), his
actual knowledge is established and per Zamora, the 'SOL' has run.
Furthermore, Mr. Leever's decisions to re-invest multiple times and
introduce his sister-in-law Linda Mathis (Count 34) in 2006 (4RT572),
is conduct that should judicially estop his contradictory testimony
and preclude the allegations altogether [New Hampshire v. Maine, 532
US 742, 751 (2001); CEC §623].

      (b)  The Prosecution Improperly Ignores Equal Application:
Other instances of actual or constructive knowledge is found in the
testimonies of Mathis, Richardson, Almquist, Bagley, Pinault and
Steiner (see Exhibit 4, No.5).  Despite the actual and constructive
knowledge that would forfeit subject matter jurisdiction and pro-
cedurally bar most charges pursuant to due process, Zamora, and CPC

ATTACHMENT 'C':  PAGE 31

§'s 801.5 and 803, the Prosecution ignores such equal application
and adds Count 38 that as asserted in CLAIM 5.7(B) involves the
Petitioner's course of business conducted with investor awareness
that predates the predicate offenses by up to ten years in certain
investment scenarios.

(iii)  Trial Court's erroneous 'SOL' Decisions on Investor
'VCF' Claims:  Raised by Petitioner in his CPC §1181
Motion (10CT2163-2166) and included as a jurisdictional defect in
CLAIM 8 below, the Trial Court erred in its Statute of Limitation
determination relative to the subject matter for which he lacked
jurisdiction; i.e. the 'VCF' claims filed by Lund and investors.

(a)  Trial Court's Decision to Expire 'SOL' on the
'VCF' Claims:  The Trial Court when considering
the bad acts embodied in the 'VCF' claims filed by Lund and the re-
spective investors ('Bad Acts', see 11CT2294-2307), noted that the
applications for payment were signed in 2010; and decides "in light
of the fact this is now 2016, it would appear that the ['SOL'] would
run on any type of exposure for perjury" (5RT1095).  The Trial
Court's decision was made after inquiries with the Prosecutor (5RT
1095-1096), and appointments of counsel for the respective investors
"who had...lengthy discussion[s] with [Prosecutor] Pierce" (5RT
1016).

(b)  Trial Court's Decision to Expire the 'SOL' is in
Error:  The impropriety of ex parte communications
and jurisdictional defects aside (see CLAIM 8.2), but the issues
relative to this contention is the collective failure of the Trial
Court and the Prosecution to apply the same CPC §801.5/§803 and
Zamora guidelines used by the Prosecution to add Count 34 (see 5.6
above).  For subject matter jurisdictional purposes, CPC §803(c)
states "A limitation of time prescribed in this chapter does not
commence to run until discovery of an offense described in the di-
vision" (underline added).  These offenses "described" include CPC
§72 Fraudulent Claims;  CPC §118 Perjury;  CPC §134 Preparing False
Evidence (CPC §803(c)(1)), and; An Offense where a material element
of which is fraud (e.g. CPC §182(a)(4)).  Signed in December of 2010,

ATTACHMENT 'C':  PAGE 32

these 'VCF' claims and their application to the Secretary of State
run in lockstep with the FBI ivestigation opened by Agent Murray in
September of 2010 (8RT1489), and the subsequent prosecution of the
Petitioner.  Thus a date of "discovery" that would provide a 'SOL'
bar for these fraudulent claims could only have occurred during the
same time period as the investigation and prosecution of the Peti-
tioner.  Due to the impeach-worthy aspect of illicit acts committed
by investors in conspiring with attorney Lund with an intent to de-
fraud the state of California for an approximated amount of $10M
through  false claims of loss, these 'VCF' applications certainly
qualify as discoverable in this case where claimants are testifying
against the Petitioner.  Hence the Petitioner's discovery request
Of 3/07/2014 for the OCDA to disclose all claims (11CT2475).

   (c)  Prejudiciality of Trial Court's Error and the
      Prosecution's Complicity in its Application:  The
Trial Court's erratic and erroneous decision that neglects the same
'SOL' standards used by the Prosecution to improperly add Count 34,
absolves the investors from all sin implicit within the 'VCF' claims
and obscures the impeachable bad acts from jury consideration.  Of
equal significance in the decision to run 'SOL' without proper pro-
cedure is that it conceals the Prosecution's actual knowledge of
these fraudulent claims and their harboring of their investor-
witnesses from the possible criminal consequences associated there-
with.  Moreover, the Trial Court's failure to identify the date of
"discovery" was aided by the Prosecution's  intentional neglect to
correctly note the same legal principles already employed in the
accusatory pleading (4CT893-902).  Along with the failing to comply
with Petitioner's discovery request for disclosure of all 'VCF'
claims (see 10CT2212-2215), the Prosecution's complicity in the
erroneous decision of the Trial Court improperly protected the in-
vestors from confrontation and secreted their suppression of re-
levant materials that would impeach the methods used to prosecute
the Petitioner.

   (iv)  Immunity Agreement of Shellaver Canasa:  During trial,
the Prosecution introduced testimony from a former employee of the

ATTACHMENT 'C':  PAGE 33

Petitioner, Shellaver Canasa.  As reiterated by Prosecutor Pierce during closing arguments, she "had to testify with a grant of immunity, because of what she had done...at the behest of Mr. Tarbutton" (11RT2135).

(a)  'SOL' on Canasa's Criminal Liability:  According to FBI Agent Murray, she opened the case against the Petitioner on September 17, 2010 (8RT1489), an investigation that included her interview of Ms. Canasa in 2010 (7RT1284).  Therefore a 'SOL' for any criminal wrongdoing would have commenced per People v. Zamora [supra], upon the actual or constructive knowledge resulting from the 2010 date of discovery.  Furthermore, pursuant to CPC §801.5 "Prosecution for any offense described in subdivision (c) of Section 803 shall be commenced within four years after discovery of the commission of the offense".  Thus the five-plus years between the 2010 date and Ms. Canasa's 2016 trial testimony is sufficient for expiring the 'SOL' on Grand Theft, Forgery, Perjury, and Corporation Code violations (see CPC §803(c)(1)/(2)/(3)).

(b)  The Prejudiciality of Prosecution's Unequal Application of 'SOL' Procedure:  When the Prosecutor implied criminal liability by indicating Ms. Canasa "had to testify with a grant immunity", he did so while neglecting the due administration of the same laws he used, though inapplicably, in the re-charging of the 'Mathis' transaction dismissed at the Preliminary Hearing (see CLAIM 5.6).  This speciously represented requirement of an immunity agreement-- itself potentially illicit due to its intent to affect Ms. Canasa's testimony (see CPC §133; §137; 11CT2331)-- improperly influenced the jury by inferring a guilt that was associated and attributable to the Petitioner; and thereby presumptively prejudicial to his constitutional rights of due process and fair **trial** [Remmer v. United States, supra].

(v)  'SOL' and Extradition Treaty Violations:  As stated in the U.S.- Panama Bilateral Extradition Treaty, Article VII (see 11CT 2468), and noted in CLAIM 4.5(C)(ii), "Extradition shall not be granted, in pursuance of the provisions of the Treaty if legal proceedings...[have] become barred by limitation".  Notwithstanding

ATTACHMENT 'C':  PAGE 34

the illegality of the Petitioner's forcible transnational abduction (CLAIM 4.3), but also subverted by the methods employed is the due process requirement to establish jurisdiction over the subject matter by pleading 'SOL' tolling that as set forth in 7.7(B)(ii) above, has been ignored by the Prosecution.  Proper administration and equal application of subject matter jurisdiction as established through 'SOL' procedures, if conducted, would have precluded lawful extradition pursuant to Article VII of the extradition treaty.  Thus when Prosecutor Pierce continuously represents a regular process of lawful extradition conducted under legal authority (see CLAIM 4.2), he not only conceals the illicit acts employed, but also hides the designed defect that avoided the procedural bar of 'SOL' that should have prohibited actual extradition.

      (vi)  The Alternative Theory of Embezzlement and the Prosecution's Neglect of 'SOL' Procedure:  As stated in CLAIM 1.6(C)(iv), in adding the alternative theory of embezzlement after the close of evidence, the Prosecution relied on the analysis and testimony of OCDA's Forensic Accountant, Scott Weitzman.  However Mr. Weitzman in his testimony, not only failed to identify the timing of the alleged offenses but was also unable to draw a date of demarcation between legitimate business practices of the Petitioner and his supposed fraudulent (8RT1449-1450).  With investor transactions dating back to 1998 (see 11CT2346-2351), the Prosecution's neglect to determine the most rudimentary aspects of date of commission and date of discovery appear intended to sidestep the structural requirements of subject matter jurisdiction established through proper 'SOL' procedure.

  (C)  The Prosecutor Engages in Third Party Representation:  As raised by Petitioner in his CPC §1181 Motion (10CT2103-2105), third-party representation is seen in context of the Prosecutor's conduct relative to the 'VCF' claims, its claimants (alleged investor-victims), and soon-to-be-disbarred Patrick Lund.  These 'VCF' applications for payment in an approximate amount of $10,000,000 are fraudulent as demonstrated by the Petitioner in his CPC §1181 affidavit (112294-2307).  The Trial Court despite its erroneous 'SOL'

décision noted in 7.7(B)(iii) above, did acknowledge illegalities contained with the 'VCF' claims (5RT1095-1096). The Prosecution, never objected to any underlying offense used by the Trial Court for its 'SOL' determination (5RT1096), neither did it dispute or rebut the Petitioner's assertions of the 'bad acts' of the 'VCF' claims as raised at 11CT2278-2288. Instead, Prosecutor Pierce by shifting blame to attorney Lund, looks to defend his witnesses from culpability and by so doing, improperly engages in third party representation.

(i)   Prosecutor Pierce and Prosecution Witness Karen O'Connell: An example of the Prosecutor's improper representation is found in Karen O'Connell's testimony. After testifying that she provided Lund with the information that was used for the 'VCF' application (6RT1240), Mr. Pierce redirects the attention to Lund as the culpable party by stating "It is your testimony that...as far as the details of the ['VCF' application], were prepared by your attorney at the time, Mr. Lund; is that right?". To which O'Connell replies "Yes" (6RT1248). Mr. Pierce follows this exchange with a punctuation of the 2010 signing date in order to reinforce the erroneous 'SOL' decision of the Trial Court, "so you signed it in 2010; is that right?"; with Ms. O'Connell obviously saying "yes".

(ii)   The Prosecution is Actually Aware of the 'VCF' Claims: Ignored by the Prosecutor's punctuation of the 12/29/2010 signing date of the 'VCF' claims, is that they occur 3 months into the investigation started by FBI Agent Murray (8RT 1489), and as of June 2014, investor 'VCF' claims were still pending with the Secretary of State (see 11CT2535-2536). The Petitioner as early as 1/25/2011-- less than one month from their signing date-- notified Agent Murray of the need to look at Lund, the investors' 'VCF' claims, the monies received by the investors from the Petitioner, and their tax-reporting in order to identify the fraudulence in their allegations (see 11CT2482-2483). A notification that was reiterated by Petitioner in his discovery request of 3/07/2014 (11CT2475), that identifies the same exact items required to not only demonstrate the fraud of the 'VCF' claims but also the

ATTACHMENT 'C':  PAGE 36

false criminal charges levied against the Petitioner.

(iii)  The Prejudiciality of the Prosecution's Third
          Party Representation:  California Courts have in-
dicated that a prosecutor may not engage in criminal defense [e.g.
People v. Rhodes (1974) 12C3d 180, 186]; neither do they represent
victims and witnesses as individuals, nor may they function as
their attorney [Bullen v. Superior Court (1988) 204 CA3d 22, 25].
Moreover, there is no privilege that allows the prosecution to
suppress evidence of a crime [People v. Meredith (1981) 29 C3d 527],
and concealment of such may be a crime as well as basis for attorney
discipline [Price v. State Bar (1982) 30 C3d 682].  Therefore when
the Prosecution fails to disclose the 'VCF' claims as requested/re-
quired, they are concealing evidence of certain criminalities (e.g.
CPC §72 Fraudulent Claims) that involve the Prosecution's witnesses.
The Prosecutor's redirecting of their testimony to essentially ac-
cuse attorney Lund of all wrongdoing, as well as reiterating the
erroneous 'SOL' finding of the Trial Court by accentuating the
signing date of the 'VCF' claims, is conduct meant not only to pro-
tect their witnesses from legal liability-- thus third party repre-
sentation-- but also to disguise the tacit participation of the OCDA
due to a prosecution of the Petitioner that parrots the same false
particulars of the fraudulent claims.

(D)  The Prosecutor's Improper Comments Regarding Credibility
       of Petitioner and His Defense:

(i)  The Petitioner's 'BS' Defense:  In closing arguments
to the jury, Prosecutor Pierce labels Petitioner's testimony and
his defense as 'BS'. Mr. Pierce in an attempt to cutely sidestep
the impropriety of such statements goes on to explain that 'BS'
actually stands for 'Baloney Sandwich' (11RT2199-2200).  These
statements are followed by the Prosecutor's vouching for FBI Agent
Murray's credibility by saying "I'm not sure why it was considered
that she did such a bad job because she didn't believe...Mr. Tar-
button's ['BS'] defense and somehow go ahead and get tax returns
of the victims" (11RT2200).  These remarks are accompanied by the
Prosecutor's criticism of the Petitioner's lack of evidence, saying

"he has virtually no documentation, he has zero documentation to support any of what his version of events" (11RT2136), and calls "the defendant's testimony with virtually no documentary evidence" (11RT2205). As a result, Mr. Pierce says that Petitioner's testimony lacks credibility (see 11RT2137), and is unreasonable (see 11RT 2209). Whereas it is misconduct for a prosecutor to make improper remarks about a defendant's credibility [People v. Perez (1962) 58 C2d 229, 245], it is also improper to make potentially unfair comments regarding his defense [Hein v. Sullivan, 601 F.3d 897, 913 (9th Cir. 2010)]. In this situation, not only is Pierce's claim of "zero documentation" a result of his non-compliance with the discovery requests of the Petitioner (see 7.3 above), but he also touts his own expertise to the jurors.

(ii) The Prosecutor's Self-Promotion Made to the Jurors: Prosecutor Pierce's denigrating comments about the Petitioner are contrasted by his remarks about his own stature and expertise. A few examples of this is seen in his informing the jury that the alleged crimes committed by the Petitioner are "classic examples" of theft by false pretense (11RT2110), and "classic examples" of embezzlement (11RT2111); and he would know due to his "personal experience" in evaluating evidence (11RT2117). The courts have indicated it to be improper for a prosecutor to express opinions about matters requiring personal experience or expert knowledge [United States v. Wright, 625 F.3d 583, 610-611 (9th Cir. 2010)], as well as make comments intended to enhance his "stature in the eyes of the jury" [United States v. Warshak, 631 F.3d 266, 283 (6th Cir. 2010)].

(iii) The Prejudiciality of the Prosecutor's Comments: The impropriety of Prosecutor Pierce's comments are magnified when considering the Petitioner's lack of evidence is a direct result of the Prosecution's suppression of all evidence explicitly requested by the Petitioner (7.3 above) that not only corroborates the Petitioner's so-called 'BS' defense but also demonstrates the actual 'BS' in the Prosecutor's "classic examples". Furthermore, with the industry-specific information that negates all charges-- as demonstrated in CLAIM 3.6 and CLAIM 6.2-- within the collective

ATTACHMENT 'C': PAGE 38

knowledge of Prosecutor Pierce's fraud unit that specializes in the respective industry, his disparaging comments about the Petitioner and his defense are knowingly false.

(E)  The Prosecutor's Material Misstatements of Fact:  The Prosecution's case against the Petitioner included an allegation and corresponding jury instruction for criminal negligence (5CT 1099).  The Prosecutor throughout trial makes material misstatement of facts that are attempted to convey conduct of Petitioner's supposed criminal negligence.  An example of this is found in Mr. Pierce's questioning Prosecution witness, Debra Duncan, regarding a corporate asset located on Grande Vista in Laguna Niguel, CA. Mr. Pierce and Ms. Duncan tell the jury that the Petitioner "let it foreclose" (6RT1140), which represents to the jury a loss of this asset resulting from the  negligence of the Petitioner.  Not only is the statement false but it is knowingly so.  Consider that Petitioner, as corroborated by FBI Agent Murray in her '302' report (11CT2508-2510), transferred all assets to Restoration Holdings, LLC-- an Investor-owned/Lund-managed entity-- in 2010.  Also, as noted in a document entitled 'Collections Reconciliation' from this RH, LLC entity (see 11CT2539), Lund and investors were collecting rents on this exact property nearly two years after Petitioner had transferred title to them.  Therefore if the property was eventually lost to foreclosure, it had to have occurred while Lund and investors were collecting rents and not servicing the debt (i.e. making mortgage payments); conduct that as noted in 7.5(B) above, chargeable per the OCDA in other like instances as Grand Theft.  Regardless of the selective prosecution for this offense, the Prosecutor's deliberate misstatement of fact unduly conveys a criminal negligence example to the jury that is elemental to the allegations and therefore deemed misconduct [Berger v. United States, supra].

7.8  THE PATTERN OF MISCONDUCT OF THE PROSECUTION: The Prosecution Team has engaged in a practice and pattern of misconduct that pervades the entire judicial process and infected the integrity of the Petitioner's criminal proceedings.  These methods of the Prosecution

Team, taken in context of the proceedings as a whole, have denied the Petitioner his most basic rights of fundamental fairness. Along with the prejudicial acts as presented in 7.2 through 7.7 above that demonstrate misconduct from investigation through trial, the Prosecution has committed other acts that are built upon these improprieties. These other acts include but are not limited to:

(A) Excessive Bail: As raised by Petitioner in his CPC §1181 Motion (1OCT2180-2184), the Prosecution Team despite actual knowledge that disproves 'loss' (see CLAIM 3.6-3.7) and 'flight' (see CLAIM 6.7), uses false characterizations of risk in order to set Petitioner's bail at $2,000,000 (1CT008). This bail determination is inconsistent with statutory standards set forth in CPC §815 and §1375; and therefore violate Petitioner's Eighth Amendment protections against excessive bail. The prejudicial effect of the excessive bail is apparent in the Petitioner's case-- that due to its subject matter typically results in a protracted pre-trial process-- by depriving him of due process of law occurring from the duration of pre-trial detention, that ceased serving as a regulatory function and became punitive [United States v. Melendez-Carrion, 479 US 978 (1986)].

(B) Excessive Sentencing: As noted in the Prosecutor's sentencing Brief filed 12/15/2016, Mr. Pierce requests the "maximum possible State Prison Term of 36 Years and 4 Months" (6CT1275-1276). However in doing so, Mr. Pierce uses the "aggravated term on the base Count [Count 38]". This Count 38 that is precluded by the 'Doctrine of Specialty' (see CLAIM 5.2), is also barred procedurally by statute of limitations (claim 5.7), while at the same time depending on multiplicitous predicate charges that are elementally irreconcilable with the concurrently alleged counts of Grand Theft (CLAIM 5.4 and 5.7). In spite of the Petitioner calling notice to this impropriety in a Challenge for Cause filed 11/30/2017 (12CT2833-2833), the prejudiciality of the Prosecutor's improper means to maximize punishment is seen in the Trial Court's use of Mr. Pierce's recommendation of Count 38 as the base term to sentence the Petitioner to 34 Years and 4 Months in State Prison.

ATTACHMENT 'C': PAGE 40

**7.9  THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY:** This Claim and the issues raised merit Federal Review pursuant to 28 U.S.C. 2254 as the facts and evidence presented are properly before the **Court.** With the Petitioner's conviction and state custody a direct result of the violation of the Constitution, Laws, and Treaties of the United States, proper remedy is warranted.

(A)  Issues Preserved in Trial Court:  In Case no. 11CF2747 of Orange County Superior Court, the Petitioner through pro per pleadings filed in Trial Court prior to sentencing, properly preserved the issues identifiable in CLAIM 7 above.  These 'objections' are found in the appellate record as:  Prosecutorial Misconduct and alternative theory added for conviction (CPC §1181 Motion at 10CT 2123-2124);  False Presumption of "Interest" (CPC §1181 at 10CT2094-2098); Forcible Transnational Abduction (CPC §1181 at 10CT2110-2112); 'Doctrine of Specialty' (CPC §1185 at 10CT2199);  False Evidence (CPC §1181 at 10CT2094-2107); Discovery Violations (CPC §1054.5 at 10CT2205-2237); Unqualified Determination of Probable Cause (CPC §1181 at 10CT2046-2061); Selective Prosecution (CPC §1181 at 10CT 2114-2116);  Failure to Preserve Evidence (Trombetta-Youngblood Motion at 10CT2258-11CT2275); Deceptive Methods (CPC §1181 at 10CT 2116-2122);  Excessive Bail (CPC §1181 at 10CT2180-2184); Excessive Sentencing (CCP 170.3 at 12CT2833-2835; Filed after sentencing).  As noted  in  3C of the Procedural History included in the PETITION OVERVIEW, all pro per motions and actions were denied by the Trial Court prior to sentencing; and in so doing offered no factual findings, applied no decisional law addressing the materiality or prejudiciality of the issues associated, nor compelled any evidence/ testimony to resolve credible, disputed issues of fact.  The exception to this is the CCP §170.3 filed after sentencing (12CT2833-2835).  This challenge was struck by the Trial Court but obviously after sentencing.

(B)  Issues Exhausted in State Court:  As noted in the Procedural History included in the PETITION OVERVIEW, the Petitioner motioned the Appellate Court to set aside his direct appeal brief as filed by Appellate Counsel due to the omission of issues of greater

**ATTACHMENT 'C':  PAGE 41**

significance.  After the Appellate Court disregarded this request/ motion, the Petitioner filed a State Habeas Petition concurrent with his direct appeal in which the issues raised in CLAIM 7 above were included as CLAIM VII of that petition.  That state petition (No. G058686) was denied on 6/04/2020.  Petitioner filed virtually the same petition in the California Supreme Court on 7/31/2020.  This state petition (Case No.S263665) was denied on 2/20/2021.  Both state denials provided no factual finding, no explanation, no app- lication of decisional law (state or federal), no evidentiary action to resolve any credible, disputed issues of fact, nor gave any in- dication whatsoever that any adjudication of any issue was con- sidered or administered.

(C)  Evidence and Authorities Presented in State Court:  In sub- mitting these issues in state court, the Petitioner presented such on the same facts and evidence referenced herein by attached Exhibit, Declaration, and Request for Judicial Notice (Exhibit 5).  As to applicable federal law as established by U.S. Supreme Court decision, the Petitioner offered such authorities that included:  Darden v. Wainwright, 477 US 168 (1986), Parker v. Matthews, 132 S.Ct. 2148 (2012) [Prosecutorial Misconduct That Violates Due Process]; Berger v. U.S., 295 US 78 (1935) [Misstatements of Material Fact]; Remmer v. U.S., 347 US 227 (1954) [Improper Influences on Jury]; Brady v. Maryland, 373 US 83 (1963) [Discovery Violations]; California v. Trombetta, 467 US 479 (1984), Arizona v. Youngblood, 488 US 51 (1988) [Bad Faith Failure to Preserve Evidence]; Miller v. Pate, 386 US 1 (1967) [False Evidence Used to Convict]; U.S. v. Russell, 411 US 423 (1973) [Outrageous Government Conduct]; Terry v. Ohio, 392 US 1 (1968) [Illegal Detention Unsupported by Probable Cause]; Yick Wo v. Hopkins, 118 US 356 (1886) [Selective Enforcement of the Law].

(D)  Review and Remedy:  In the PETITION OVERVIEW attached to the Federal Habeas Form CV-69, the Petitioner demonstrates that this CLAIM merits de novo review due to the fact that there is no state ruling to review with AEDPA deference.  In this de novo review as prayed for by the Petitioner, he also requests Judicial Notice of the evidence as presented in Exhibit No.5 [Page 40 of ATTACHMENT 'D'].

ATTACHMENT 'C':  PAGE 42

In the Court's determination of issues presented in this CLAIM, the Petitioner prays for resolution of all disputed facts by reference to that which is judicially noticeable, and also that which is obtainable by Evidentiary Hearing as incorporated by Exhibit No. 20 [Page 127 of ATTACHMENT 'D']. Regarding the Petitioner's best efforts in presenting fully developed factual CLAIMS, notice should be taken of his Federal 1983 action filed against officials at the CA State Bar. This action was filed in the Central District as Case No. 2:20-cv-10932-FMO-AS seeking coercive judgment compelling disclosure of evidence within the possession of the State Bar that is corroborative of the CLAIM of Prosecutorial Misconduct as herein raised. That action was dismissed by the District Court and subsequently appealed by the Petitioner in the Ninth Circuit as Case No. 21-55039.

As to relief, Petitioner prays for all just and proper including but not limited to reversal of the conviction and dismissal of the charges based on the arguments and authorities as presented above.

<u>Transmittal Summary</u>:  Petition for Writ of Habeas Corpus

<u>To:</u>          California Supreme Court
               350 McAllister Street
               San Francisco, CA. 94102

<u>From:</u>        Thomas Tarbutton  CDCR#BE8274  Petitioner in pro se
               Folsom State Prison   Housing # 1-B1-09
               P.O. Box 715071
               Represa, CA. 95671

<u>Contents are stacked in the following order:</u>
1.)    Judicial Council Form HC-001: Page  1
2.)    Petition Overview:  Page: 8. Includes the following:
       Introduction:  Page: 2ⱽ
       Brief Summaries for each CLAIM:   Page:  ℭ — 16
       Procedural History:  Page:  16 -18
       Compliance with State Procedural Standards:  Page: 18
       Index of Petition: Page:  21
3.)    Statement of Facts:   Index Page: 23
4.)    Verification:  Page:  186
5.)    Exhibits:  Index Page:  131
6.)    Supplemental Request:  Request for Judicial Notice – Page:  101
7.)    Supplemental Request:  Request for Evidentiary Hearing – Page: 209
8.)    Supporting Case Law References:  Index Page:  210
9.)    Proof of Service: Page:  last two pages

<u>Petition was served on the following:</u>
1.)    Warden Rick Hill of Folsom State Prison
2.)    Office of the Attorney General
3.)    Orange County District Attorney
4.)    Orange County Superior Court
5.)    Appellate Counsel – Valerie G. Waas
6.)    Trial Counsel – Jerry Schaffer
7.)    Appellate Project:  Appellate Defenders Inc.

CLAIM 8:   THE TRIAL COURT HAS ACTED WITHOUT FUNDAMENTAL JURISDICTION

SUMMARY:   The Trial Court has acted without fundamental jurisdiction
over the person of the Petitioner and certain subject matter of the
proceedings.   In addition, the Trial Court's abuses of discretion,
identifiable by actions conducted in excess of its authority, are
of sufficient magnitude as to constitute jurisdictional defects that
warrant reversal of the judgment rendered.   Examples of these actions
taken in excess of jurisdiction as defined by constitutional, sta-
tutory, and decisional standards, include:   The Trial Court's de
facto grant of immunity to the alleged investor-victims through its
erroneous decision to expire statute of limitations for overt acts
that are components of a separate criminal investigation;   the Trial
Court's improper predisposition that advocates the Prosecution's
presumption of a false evidentiary characterization that is ele-
mental to all charged offenses;   the Trial Court's passive per-
mission that enabled the Prosecutor to improperly and constructively
amend the allegations after the close of evidence;   the Trial Court's
failure to provide the Petitioner a full and fair opportunity to
litigate his forcible transnational abduction that is so outrageous
its conduct and exploitation should cause the Trial Court's divesture
of its jurisdiction;   the Trial Court's trying and punishing of the
Petitioner for offenses that pursuant to U.S. Supreme Court decision
he is not triable or punishable;   the Trial Court's scheduling and
controlling of the criminal proceedings in a manner that denied the
Petitioner a fair trial, and;   the Trial Court's failure to disclose
information relevant to the question of judicial bias and neglect
of the due process duty of recusal.

## CONTENTS OF CLAIM 8

8.1   Jurisdiction of the Trial Court Pursuant to
      Supreme Court Decision and State-Created Rights        Pg. 46

8.2   The Trial Court Through Error of Sufficient
      Magnitude has Acted in Excess of Its Jurisdiction-
      'VCF' Claims and its Statute of Limitation
      Decision                                                Pg. 46

8.3   The Trial Court Through Error of Sufficient
      Magnitude has Acted in Excess of Its Jurisdiction
      by an Improper Disposition that Presumes an
      "Interest" Characterization as an Evidentiary Fact    Pg. 52

8.4   The Trial Court Exceeded Its Authority by Acting
      Without Fundamental Jurisdiction over the Subject
      Matter that was Constructively Amended after the
      Close of Evidence                                      Pg. 53

8.5   The Trial Court Exceeded Its Authority by Acting
      Without Fundamental Jurisdiction over the Person
      of the Petitioner due to the Forcible Transnational
      Abduction Conducted by the Prosecution Team            Pg. 55

8.6   The Trial Court Exceeded Its Authority by Acting
      Without Fundamental Jurisdiction over the Subject
      Matter that is Precluded by the Doctrine of
      Specialty                                              Pg. 56

8.7   The Trial Court in Violation of Constitutional
      Provisions, Statutory Obligations, and Rules
      Developed by the Courts, has Acted in Excess of
      Its Jurisdiction Relative to the Fair Trial
      Guarantee                                              Pg. 57

8.8   The Trial Court has Acted in Excess of Its
      Authority due to the Appearance of a Disqualifying
      Interest...                                            Pg. 63

8.9   This Claim Merits Federal Review and Remedy            Pg. 66

8.1  JURISDICTION OF THE TRIAL COURT PURSUANT TO SUPREME COURT
     DECISION AND STATE-CREATED RIGHTS:  The Supreme Court's de-
cision in Pennoyer v. Neff, 95 US 714 (1877), as eventually applied
to the Fourteenth Amendment's requirement of due process, guarantees
the Petitioner that his rights can be adjudicated only by a court
that has proper jurisdiction.  In California, the Petitioner is ac-
corded a state-created right applicable to all criminal defendants
that he may be discharged from custody "when the jurisdiction of
the [committing] court...has been exceeded" (CPC §1487(1)).  This
can occur when a criminal defendant is confined by a judgment of a
court that lacked fundamental jurisdiction, and as such, the judg-
ment is void due to the court acting without power over the subject
matter or the person of the defendant [People v. Superior Court
(Marks) (1991) 1 C4th 56, 66].  However within the context of a
Habeas petition, "the term 'jurisdiction' is not limited to its
fundamental meaning, and in such proceedings judicial acts may be
restrained or annulled if determined to be in excess of the court's
power as defined by constitutional provision, statute, or rules
developed by courts" [In re Zerbe (1964) 60 C2d 666, 668].  More-
over, this concept of fundamental jurisdictional error also "en-
compasses any error of sufficient magnitude that the trial court
may be said to have acted in excess of **jurisdiction**" [In re Sands
(1977) 18 C3d 851, 856-857].  Furthermore, because jurisdictional
defects are structural errors requiring reversal, they are not sub-
ject to harmless error review [Arizona v. Fulminante, 499 US 279,
309-310 (1991)]; and therefore such claim is not forfeited or
waived and may be brought at **any** time [U.S. v. Cotton, 535 US 625,
630 (2002)].

8.2  THE TRIAL COURT THROUGH ERROR OF SUFFICIENT MAGNITUDE HAS
     ACTED IN EXCESS OF ITS JURISDICTION- 'VCF' CLAIMS AND ITS
     STATUTE OF LIMITATION DECISION

(A)  Fraudulent 'VCF' Claims of Attorney Patrick Lund and the
     Alleged Investor-Victims:  An aspect of the Petitioner's
defense was the assertion of an affirmative defense that, in addition
to factual innocence demonstrated through the direct evidence of

**ATTACHMENT 'C':  PAGE 46**

tax-reporting (see CLAIM 3), the charges brought against him stem
from a conspiracy to defraud the state of California initiated by
Attorney Patrick Lund and his clients (alleged  investor-victims)
through the 'VCF' claims.  The scope of misconduct in these app-
lications for payment in an estimated amount of $10,000,000 is out-
lined by Petitioner in 11CT2294-2307; and include perjury, false
evidence, and the overt acts of a conspiracy intended to defraud.
Despite the Prosecution's suppression of these 'VCF' claims by
neglecting Petitioner's discovery request (see CLAIM 7.3(A)),
coupled with the 'IAC' of trial counsel not to investigate or
prepare (see CLAIM 9.2 below), the Petitioner through no assistance
of either, was able to introduce three out of a possible six 'VCF'
claims (see Defense Exhibits A,C,D).

   (B)  Materiality of the 'VCF' Claims in Context of Petitioner's
        Case:  The relevance of these applications for payment from
the 'VCF' is best determined when considering the role they played
in the criminal prosecution of the Petitioner.

       (i)  Actions of Attorney Lund and Investors:  The 'VCF'
claims of actual loss represent what alleged investor-victim Jesse
Bagley denotes as the intention behind the actions of Lund and
other investors, saying "the end game was to try to get funds from
the VCF fund" (4CT765).  This "end game" of what turns out to be
fraudulent claims originated in 2010 with investors meeting with
Lund in May of that year (3CT497), while still receiving disburse-
ments from the Petitioner (see 5RT986).  The meetings with Lund
was followed by a meeting between investors and Petitioner in July
of 2010 (see 2RT308), with civil suits filed by Lund very shortly
thereafter (see 9RT971-972).  In an effort to resolve grievances,
Petitioner assigned all assets to RH, LLC with stipulated judgments
(see 11CT2538), however in spite of these good faith efforts of the
Petitioner, these same investors and Lund contacted the FBI, and
Special Agent Jessie Murray opened her investigation in September
of 2010 (see 8RT1489).

       (ii)  FBI Agent Murray's Incompetent Investigation:  During
Agent Murray's investigation started in Sept 2010, Patrick Lund and

investors were preparing the applications for payment that were sub-
mitted to the 'VCF' based on false claims of loss (see 11CT2295-2301);
which then served as the information/documentation provided to FBI
Agent Murray for her investigation (see 6RT1240). The collaboration
between Murray and Lund, who according to Murray "was providing me
with, sharing info with me" (9RT1724), is apparent in the FBI Agent's
spreadsheet that alleges actual loss without considering any dis-
bursements received by the alleged victims from Petitioner over a
period of time that spans up to 13 years (11CT2484). Despite true
accounting that shows many investors receiving consideration far
exceeding their capital contributions (see 11CT2370-2404), Agent
Murray used the same false claims of loss submitted as fraudulent
'VCF' applications as the basis for her probable cause finding for
the Petitioner (8RT1565). With the FBI passing on federal charges,
Agent Murray provided her findings to the OCDA (8RT1584), which
eventually resulted in the original state complaint filed against
the Petitioner on October 12, 2011 (8RT1855).

    (iii)   The Symbiotic Relationship Between the 'VCF' Claims
and the Criminal Prosecution of the Petitioner:  With
Lund and Investors receiving stipulated judgments and all assets
from the Petitioner, there is no reason to pursue criminal action
immediately thereafter except for the support such prosecution pro-
vides in the approval of their 'VCF' claims (see Defense Exhibits
A,C,D for examples of filed claims). In fact this "end game" of
Lund and investors is designed to maximize payment from the 'VCF'
by not only alleging loss by disregarding all disbursements re-
ceived, but also shielding from the purview of the Secretary of
State all assets and incomes transferred by Petitioner to the
Lund/Investor entity of Restoration Holdings, LLC. This is decep-
tively attempted by sworn statement contained in the 'VCF' claims
whereby claimants declare that they have not assigned any judg-
ment provided them by Petitioner. As noted in 11CT2301-2302 and
demonstrated through the operating agreement for RH, LLC found
at 11CT2547, these investors did assign their judgments to this
LLC. Consequently, no consideration provided the transfer of assets
or derivative incomes are accounted for in their 'VCF' claims of

ATTACHMENT 'C':  PAGE 48

actual out-of-pocket loss. This formula of stipulated judgment from Petitioner plus criminal prosecution of Petitioner, as predicates to a 'VCF' application is seen in Jesse Bagley's testimony. When asked "was the purpose of retaining Lund [and the] stipulated judgment issue, to obtain payment through the 'VCF' claim?", Bagley eventually responds "I believe that was the idea" (4CT766). This concept designed to maximize compensation claims is also intimated by Bagley when alluding to transferring his claim amount to his father-in-law, William Steiner, so it could be included in Mr. Steiner's fraudulent claim; which is then followed by his own intentions "I went about trying to get a separate judgment earlier this year so I can file my own 'VCF' claim with that judgment" (4CT766-767).

(C) Decisions of the Trial Court Relating to the 'VCF' Claims: As noted, the importance of these fraudulent 'VCF' claims in the Petitioner's defense is demonstrated by the reciprocal relationship existing between approval of such claims relying on the criminal prosecution of the Petitioner, and the criminal prosecution depending on the same false elements of loss and specious pretense of theft. Notwithstanding the Prosecution's discovery violations (see CLAIM 7.3(A)), and 'IAC' of Trial Counsel (see CLAIM 9.5 below), the Petitioner as identified by defense exhibits A,C,D,- was able to introduce three of the 'VCF' claims into evidence. With the two most damnable claims still outstanding (Almquist and Steiner), the Trial Court considered the introduction of any claims and their effect on the trial. The Trial Court then decides that after "inquiring with [Prosecutor] Pierce that the [VCF Claim]... was signed under penalty of perjury in [December] of 2010...[and] not[ing] that the statute of limitations for perjury is three years-- in light of the fact this is now 2016, it would appear that the ['SOL'] would run on any type of exposure for any type of perjury" (5RT1095-1096).

To confirm his decision, the Trial Court appoints Nancy Le from the alternate Public Defender's Office for Prosecution Witness, Robert Pinault (5RT1095), and private attorney, Kenny Reed for Prosecution

ATTACHMENT 'C':  PAGE 49

Witness, Karen O'Connell (6RT1179).  Both Le, who Trial Court has
known for over twenty years (5RT1098), and Reed, who was handpicked
by the Trial Court (6RT1178), was brought "up to speed" by the Trial
Court, Judge Jensen, as to the issue of 'SOL' through ex parte com-
munications (see 5RT1095 and 6RT1178).  This leads to Le and Reed,
on behalf of their clients, adopting and accepting Judge Jensen's
gratuitous and erroneous, de facto grant of immunity from prosecution
for these fraudulent claims.  When Ms. Le tells the Trial Court, "We
don't see any issues along these lines" (6RT1179), she is obviously
content in the collusion that keeps her new client from culpability
and complicity in the false claim filed by the investor in cooper-
ation with attorney Lund.  The fact that attorney Patrick Lund was
being criminally investigated by Prosecutor Pierce for conduct that
encompasses the "end game" of these 'VCF' claims (see CLAIM 7.3(A)),
doesn't appear important to Judge Jensen or Prosecutor Pierce.  This
collusion aside, the decision of Judge Jensen to expire "any type
of exposure" due to running of 'SOL' is in error when applying the
same rules of statute (CPC §801.5/§803) and court [Zamora, supra],
that he allows the Prosecution to use-- though improperly done--
to add a charge based on transactions dismissed at the Preliminary
Hearing (see CLAIM 5.6).  According to CPC §803(c), "a limitation
of time prescribed in this chapter does not commence to run until
the discovery of an offense described in this subdivision".  This
"subdivision" explicitly describes offenses that are identifiable
in these 'VCF' claims:  CPC §72 [Fraudulent Claims];  CPC §118 [Per-
jury];  CPC §134 [Preparing False Evidence], and; offenses where a
material element of which is fraud (i.e. CPC §182(a)(2)/(4)).  Thus
to run 'SOL' on these offenses, they must have been discovered, and
per Zamora, this would be determined by the date of discovery, how,
and by whom.  Therefore the Trial Court's erroneous decision to wipe
clean all elements of criminality from the slate of these investors
after their submission to the 'VCF' for applications based on false
claims of loss, not only cloaks these 'bad acts' from jury consider-
ation, but also improperly conceals the Prosecution's actual know-
ledge of such illicit activity and obscures the harboring of their
witnesses from the possible prosecutorial consequences associated.

ATTACHMENT 'C':  PAGE 50

(D)  The Sufficient Magnitude of the Trial Court's Error:  To demonstrate the magnitude of Judge Jensen's error, it is helpful to contrast this decision with the other 'SOL' issues raised by the Petitioner in CLAIM 7.7(B).  Of particular note is the "Immunity Agreement of Shellaver Canasa" (7.7(B)(iv)), where according to the Prosecution, Ms. Canasa "had to testify with a grant of immunity" (11RT2135).  However if this same standard of culpability were applied to the respective investors, and their testimony was being provided under a recognized grant of immunity which implies criminal liability, the jurors would be put on notice as to the 'bad acts' implicit within the 'VCF' claims and therefore used in determining their credibility (see CEC §780; §1101(b)).  Also available for jury consideration would be the corrupt motive and economic bias of the 'VCF' claims and its connection with FBI Agent Murray's unqualified determination of probable cause (CLAIM 7.4), its nexus with the selective prosecutorial practice of the OCDA (CLAIM 7.5), and the Prosecution's use of the same false particulars in order to obtain the conviction (CLAIM 7.2(E)).

However the most damaging aspect of the 'VCF' claims and what is shrouded by this judicial decision/disposition, is the only part of the 'VCF' application that is not perjurious.  This is found in the application's question that asks if the transaction, from which the claim of loss arose, was reported on the claimant's tax returns.  (Reference defense exhibit A,C or D, No._7__).  In all instances of Investors filing these 'VCF' claims, all answered "No", they did not tax-report the transactions associated with the loss they are now claiming (see 11CT2302-2303).  These candid answers of no actual tax-reporting disprove the "interest" characterization presumed by the Prosecution as the evidentiary fact foundational to allegations charged in the present case  (see CLAIM 3), and demonstrates the fatal flaw in the prosecution of the Petitioner.  Furthermore, the disparity in all judicial decisions without justification, that favor the Prosecution in all erroneous 'SOL' application is indicative of a pattern of judicial bias that has deprived the Petitioner of due process, fair trial and equal treatment.

These indications of a prejudicial bias is also seen in the ex parte communications used by the Trial Court in bringing appointed attorneys Le and Reed "up to speed" on the 'SOL' issues and his decision on how to handle such (see 5RT1095; 6RT1178).  As noted in 8.8 below, not only  is this type  of ex parte communication prohibited by the California Code of Judicial Ethics, but it is also part and parcel of an overall partiality that was prejudicial to the integrity of the Petitioner's proceedings.  Therefore the actions of the Trial Court that improperly convey an immunity to investors from prosecution for fraudulent claims-- a matter that is subject to criminal investigation and subject matter for which the judge lacks fundamental jurisdiction-- is of sufficient magnitude that constitutes conduct in excess of its jurisdiction.

8.3  THE TRIAL COURT THROUGH ERROR OF SUFFICIENT MAGNITUDE HAS ACTED IN EXCESS OF ITS JURISDICTION BY AN IMPROPER DISPOSITION THAT PRESUMES AN "INTEREST" CHARACTERIZATION AS AN EVIDENTIARY FACT

(A)  Decisions of the Trial Court:  Included in CLAIM 3.4-3.5, and raised in trial court through Petitioner's CPC §1181 Motion at 10CT2168-2169, is Judge Jensen's improper disposition and opinion that allows the Prosecution to presume an "interest" characterization-- specific to the theory of False Pretense-- as the evidentiary fact that is foundational to all charges.  To protect its opinion, the Trial Court determines that introduction of expert testimony that would establish the error in this presumption, is an undue consumption of time (1RT202; 1RT223).  The Trial Court also decides that the method by which the income received by the alleged investor-victims is tax-reported is irrelevant (1RT213), and any effort to prove differently is also an undue consumption of time (2RT350).

(B)  Materiality of Trial Court's Decisions:  As noted in CLAIM 3.6, this characterization of "interest" that is particular to mortgage lending is shown to be false by practical application of industry-specific information.  Thus by adopting this disposition, Judge Jensen relieved the Prosecution's burden to prove beyond a

reasonable doubt the evidentiary fact relied upon to presume the elemental facts of 'reliance', 'loss', and 'theft'.

(C)  The Error is of Sufficient Magnitude:  Referencing CLAIM 3.8(A), when a trial court adopts a "favorable or unfavorable opinion that is somehow wrongful or inappropriate, the question is the degree to which the judge's opinion prevents the judge from providing a fair trial" [Liteky v. United States, 510 US 540 (1994)]. In the Petitioner's case, the Trial Court's disposition, and its protection of such, advocated the Prosecution's theory of theft without the establishment of factual findings; and as a consequence thereof, "create[d] a presumption of the existence of all the facts essential to guilt" [Patterson v. New York, 432 US 197 (1977)]. Furthermore, common sense and practical application of industry-specific information when applied, demonstrate the fallacy of the presumption, thus the decisions of the Trial Court-- including its actions clouding  'VCF' claims that swear to no tax reporting (see 8.2(D) above)-- permit the Petitioner to be convicted on the basis of perjured testimony and allegations known by the Prosecution Team to be false (CLAIM 3.7).  Therefore these errors that deprive the Petitioner of the ascertainment of actual innocence are of such sufficient magnitude as to constitute acts of the Trial Court in excess of its jurisdiction.

8.4  THE TRIAL COURT EXCEEDED ITS AUTHORITY BY ACTING WITHOUT
     FUNDAMENTAL JURISDICTION OVER THE SUBJECT MATTER THAT WAS
     CONSTRUCTIVELY AMENDED AFTER THE CLOSE OF EVIDENCE

(A)  Actions of the Trial Court in Excess of Its Authority: Fourteenth Amendment procedural due process as reiterated through Article 1, Section 14 of the California Constitution provides that "felonies shall be prosecuted as provided by law, either by indictment or...by information".  This is further empasized by CPC §737 which clarifies "all felonies shall be prosecuted" as such with the exceptions of guilty and nolo contendere pleas (also see CPC §682).  As detailed in CLAIM 1 above, the Prosecution added the additional theory of embezzlement after the close of evidence as an alternative basis for conviction on the Grand Theft by False

Pretense offenses (CLAIM 1.3). However because this theory of em-
bezzlement involves different acts, different property and an in-
determinable timeframe, these allegations are distinguishable from
the offenses already charged in the Information (see CLAIM 1.4).
The Prosecutor's addition is considered an impermissable constru-
tive amendment to the accusatory pleading resulting in a prejudicial
duplicity in the Grand Theft counts (CLAIM 1.5). Dogpile the U.S.
Supreme Court's Doctrine of Specialty on top of this (see CLAIM
5.3), and we see that despite these allegations not being 'pro-
secuted by indictment or information', the subject matter is also
precluded by due process, international obligations and fundamental
fairness.

In People v. Dominguez (2008) 166 CA4th 858, the state appellate
court reversed a conviction where the trial court granted the pro-
secution's motion to add an alternative basis for conviction after
the close of evidence even though the jury was instructed on un-
animity. Contrast Dominguez with the Petitioner's case where the
Trial Court allowed the alternative basis to be added after the
close of evidence without a motion (11RT2107), and without a un-
animity instruction or special findings (11RT2243-2244; 5CT1148).
In order to do so, the Trial Court materially misstates procedural
facts and misinstructs the jurors that "the defendant has been pro-
secuted for theft under two theories" (see CLAIM 1.8).

(B)  Lack of Fundamental Jurisdiction Over the Subject Matter
       and in Excess of Authority:  In allowing and enabling the
Prosecution to constructively amend the allegations after the close
of evidence, the Trial Court permitted a conviction of Petitioner
for felonies not prosecuted by Indictment or Information, and thus
subject matter for which the Trial Court lacked fundamental juris-
diction.  Therefore when the Trial Court malinformed the jurors on
procedural fact and misinstructed them without unanimity and special
findings, it acted in excess of its authority by allowing jury
consideration on subject matter that was precluded by procedural
due process.

ATTACHMENT 'C':  PAGE 54

8.5  THE TRIAL COURT EXCEEDED ITS AUTHORITY BY ACTING WITHOUT
     FUNDAMENTAL JURISDICTION OVER THE PERSON OF THE PETITIONER
     DUE TO THE FORCIBLE TRANSNATIONAL ABDUCTION CONDUCTED BY
     THE PROSECUTION TEAM

   (A)  Outrageous and Shocking Conduct That Forfeits Jurisdiction:
As denoted in CLAIM 4.3, and raised in trial court through motions
filed by the Petitioner (CPC §1181: 10CT2107-2114;  CPC §1185: 10CT
2196-2197;  CPC §1538.5: 10CT2242-2247), the outrageous conduct of
the Prosecution Team to commission, carry-out, and conceal the for-
cible transnational abduction of the Petitioner has violated due
process to such an egregious and shocking degree, it requires the
"court to divest itself of jurisdiction over the person of the de-
fendant" [United States v. Toscanino, 500 F.2d 267 (2nd Cir. 1974)].
Therefore as a result of the Prosecution Team's deliberate, un-
necessary, and unreasonable invasion of the Petitioner's constitu-
tional rights as identified in CLAIM 4.5, the Trial Court's ac-
quisition of jurisdiction represents the fruits of the government's
exploitation of its illegal conduct, and "the government should,
as a matter of fundamental fairness, be required to return him to
his status quo ante" [Toscanino].

   (B)  Trial Court's Actions in Excess of Authority as Defined by
        Constitutional Provision, Statute, or Rules Developed by
        the Courts:  The Petitioner is accorded the protection of
the Fourth Amendment and such applies to U.S. Government conduct
while he is traveling abroad [Reid v. Covert, 354 US 1, 5-6 (1957)].
The Petitioner is also entitled to a full and fair opportunity to
litigate violations of these Fourth Amendmment rights [Stone v.
Powell, 428 US 465 (1976)]; and to protect and provide the Peti-
tioner these federal constitutional rights, the state statute of
CPC §1538.5(c)(1) requires "the judge [to] receive evidence on any
issue of fact necessary to determine the motion".  However in  the
Petitioner's case, despite the constitutional, statutory and de-
cisional provisions that ensure the full and fair opportunity to
litigate the abduction and conveyance of the Petitioner that should
cause the Trial Court's divesture of jurisdiction, Judge Jensen fails

ATTACHMENT 'C':  PAGE 55

the statutory requirement to receive <u>any</u> evidence on <u>any</u> issue of fact related to Petitioner's arrest and rendition.  By neglecting the Petitioner's motion to move into evidence any and all arrest warrants, arrest reports, extradition or deportation orders, the Trial Court's actions are in direct contrast with what should constitute proper adjudication, and as a result, deprived the Petitioner any opportunity to litigate these actions and thereby denied him his constitutional rights associated.  Therefore with these provisions in place that should eventuate the return of the Petitioner to his "status quo ante", Judge Jensen as the Trial Court acts in excess of jurisdiction due to decisions that are contrary to clearly established federal law and statutory procedure.

8.6  THE TRIAL COURT EXCEEDED ITS AUTHORITY BY ACTING WITHOUT FUNDAMENTAL JURISDICTION OVER SUBJECT MATTER THAT IS PRE-CLUDED BY THE DOCTRINE OF SPECIALTY

(A)  Subject Matter Precluded by Doctrine of Specialty:  As contended in CLAIM 5.2/5.3, and raised in trial court by Petitioner's CPC §1181 Motion (10CT2167-2168) and CPC §1185 Motion (10CT2199), the charges added by the Prosecution after the 'extradition' date of 12/17/2013 are precluded by the Doctrine of Specialty [<u>United States v. Rauscher</u>, 119 US 407 (1886)] and Article VIII of the U.S.-Panama Bilateral Extradition Treaty (see 11CT2466-2470).  This 'Doctrine' which according to <u>Rauscher</u>, "clothes" the Petitioner with the rights that, as described in Article VIII of the treaty, he shall not "be triable or tried or be punished for any crime or offense committed prior to extradition, other than that for which he was delivered up, until he shall have had an opportunity of returning to the country from which he was surrendered".  Notwithstanding the forcible transnational abduction that requires the Trial Court's divesture of jurisdiction over the person of the Petitioner (see 8.5 above), but the Prosecution after the commission of such illicit acts, adds counts 25 to 38 through formal amendments on 8/06/2014 and 8/21/2014 (see CLAIM 5.1(C)/(E)), and constructively amends Counts 1-4,6,8,10-12,15-17,22-26 on 1/14/2016 with duplicitously charged allegations of embezzlement that are added

to the existing false pretense offenses (CLAIM 1.5).   Therefore
the Prosecution's adding charges after the 12/17/2013 date subjects
the Petitioner to offenses for which he is not "triable".   Thus
the Trial Court lacked the fundamental jurisdiction over the subject
matter represented by Counts 1-4,6,8,10-12,15-17,22-38.

   (B)   Trial Court's Actions in Excess of Authority and Contrary
         to Clearly Established Federal Law and Procedure:   Article
VI, Clause 2 of the U.S. Constitution articulates that treaties made
under the authority of the United States are recognized and in-
cluded in the Supreme Law of the Land, and all the judges in every
state shall be bound thereby.   Therefore, following the Prosecution
adding subject matter that is precluded by the <u>Rauscher</u> Supreme
Court decision and international treaty (Art. VIII, see 11CT2468-
2469), the Trial Court acted in excess of its authority by 'trying'
the Petitioner on offenses for which he was not "triable".   Further-
more, following its actions in excess of authority by adjudicating
subject matter void of fundamental jurisdiction, the Trial Court
'punishes' the Petitioner for offenses not "triable" or 'punishable'.
In fact after the Petitioner raises the Doctrine of Specialty prior
to sentencing along with the jurisdictional defects associated
therewith (e.g. 10CT2199), the Trial Court uses a precluded offense,
Count 38, as the primary offense-- and its aggravated base term--
to sentence the Petitioner to 34 Years and 4 Months.   In so doing,
the Trial Court to virtually maximize punishment for offenses the
Petitioner is not triable or punishable, calcuates the sentence
by imposing consecutive terms on the precluded offenses (see 1CT
208-226).   Thus the decisions of the Trial Court that are contrary
to constitutional provision and federally established law-- along
with his taking action over subject matter that is exempt from his
jurisdictional authority-- is conduct that exceeds the Trial Court's
power and voids the judgment so acquired.

8.7   <u>THE TRIAL COURT IN VIOLATION OF CONSTITUTIONAL PROVISIONS,</u>
      <u>STATUTORY OBLIGATIONS, AND RULES DEVELOPED BY THE COURTS,</u>
      <u>HAS ACTED IN EXCESS OF ITS JURISDICTION RELATIVE TO THE</u>
      <u>FAIR TRIAL GUARANTEE</u>

(A)  Trial Court's Responsibility for the Essential Rights of the Accused:  The U.S. Supreme Court in Glasser v. United States, 315 US 60, 71 (1942), stated "upon the Trial Judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused".  This constitutional obligation of fair procedure is reiterated through state statute of CPC §1050(A) which entitles a defendant to an "expeditious disposition".  To ensure due and equitable process in this expeditious diposition, the trial judge has the responsibility of providing an accused with the "full right to be heard and shall consider only the evidence presented or facts that may be properly judicially noticed" [Code of Judicial Ethics: Canon 3B(7)].  In its management of criminal proceeding with the designed purpose of effective ascertainment of the truth, the trial court has the duty to limit argument and evidence to relevant and material matters (CPC §1044).  To guarantee this process occurs expeditiously, the trial court may make any order necessary to require constitutionally-mandated pretrial discovery; which itself is designed to save the court time in trial and to avoid unnecessary delays (CPC §1054).  Furthermore, the trial judge shall provide a defendant with a meaningful opportunity to have their matter fairly adjudicated in accordance with constitutional, statutory and decisional law [Code of Judicial Ethics: Canon 3B(8)]; and this includes the due process right to an impartial judge and ultimately a fair trial [Arizona v. Fulminante, supra].

(B)  The Trial Court's Actions Inconsistent with Effective Ascertainment and Expeditious Disposition:

(i)  Petitioner's Trial Schedule:  In the Petitioner's case, the trial proceedings were protracted over a period of time that encompassed three holidays: Christmas, New Year's, Martin Luther King; and two informal holidays: Christmas Eve, and New Year's Eve. This resulted in a trial that started on December 10, 2015 and lasted until January 20, 2016; 41 calender days from start to finish. The Trial Court, with another trial slotted to start immediately after the Petitioner's (see 7RT1409)-- and the duty of implementing a timeframe most advantageous to the effective ascertainment of

truth in the Petitioner's matters-- deemed this segmented schedule as appropriate for such purposes.  However as set forth below, the design of this schedule subjected the Petitioner to a prejudicial imbalance by exposing jurors to a virtual month-long presentation of the Prosecution's case.  By the time the Prosecution rested, with another trial waiting on deck, the allotted time remaining restricted the Petitioner to two actual days and truncated the presentation of a proper defense.

      (ii)   The Actions Inconsistent with the Role of the Trial Court:  The calender month provided the Prosecution by the disproportionate trial schedule was devoted to allegations that due process precludes through: the Doctrine of Specialty (see CLAIM 5.2-5.3); multiplicitous charging and statute of limitations (CLAIM 5.7; CLAIM 7.2(D)); elementally-opposed theories (CLAIM 5.4), and; double jeopardy (CLAIM 5.6).   Thus these charges that were argued by the Prosecution during this month-long presentation are not relevant, and the time provided by the Trial Court to such immaterial matters is not effective.  In spite of this, the Trial Court assumed facts not in evidence relative to  Petitioner's arrest (e.g. 1RT16-19); Petitioner's so-called 'flight' (CLAIM 6.7), and presumed evidentiary facts improperly used by the Prosecution to establish elemental aspects of the irrelevant issues (CLAIM 3.8).  Also during this time, when the defense attempts to adversarially challenge the Prosecution by introducing evidence/argument that would demonstrate the fallacy in the Prosecution's presumption of all evidentiary fact-- a disposition improperly adopted by the Trial Court-- Judge Jensen call this most material of issues, "irrelevant" (1RT219), and an "undue consumption of time" (1RT203; 2RT 350).

This decision of the Trial Court and its dismissal of the defense's attempts to demonstrate the falseness of the basic facts being presumed, is a byproduct of the Prosecution's failure to provide pretrial discovery (see CLAIM 7.3); which according to CPC §1054 is designed to save consumption of time during trial.  But when the Petitioner asks the Trial Court through a CPC §1054.5 Motion to

ATTACHMENT 'C':  PAGE 59

make any order necessary to enforce the provisions of due process
discovery (see 1OCT2205-2237), as well as a Motion for Appointment
of Expert that would establish judicially noticeable facts/propo-
sitions that demonstrate the impropriety of presumption and alle-
gation (see 1OCT2251-2254), Judge Jensen denies the Petitioner's
requests (see 1CT204-205) and deprives him of the effective ascer-
tainment of truth demonstrable through such evidence.  Moreover,
when the Petitioner requests the full and fair opportunity to liti-
gate his illicit abduction/conveyance through an evidentiary hearing
that should have established the outrageous conduct of the Pro-
secution Team in its transnational transgressions (1OCT2242-2247),
Judge Jensen failed to receive any evidence as required by statute
(CPC §1538.5) and equal treatment.  In denying the Petitioner's
Motion relative to his arrest and rendition (see 1CT204-205), the
Trial Court not only excluded evidence that impeaches the prosecu-
torial process but in so doing, also deprived him of the right to
fair adjudication in accordance with the law.

When the Petitioner finally does take the stand a calender month
after the trial began, he does so with a defense that is contrary
to the Trial Court's espoused disposition and absent any corro-
borative expert testimony/opinion.  Undeterred, the Petitioner
makes every attempt to plead his defense but the Trial Court cuts
off his testimony approximately 51 times by expressing that the
Petitioner's answers are narrative and essentially too long for
the time remaining scheduled for the trial.

    (C)  Prejudicial Impact of the Trial Court's Actions:  It is the
Petitioner's contention that his right to an expeditious disposition
is accorded him through constitutional provisions guaranteeing due
process of law (e.g. CA. Const. Art. 1, Sec. 15; U.S. Const. XIV
Amendment).  Therefore the test of prejudice resulting from a de-
lay or deterring of an expeditious disposition must be weighed a-
gainst any justification for the delay [Scherling v. Superior Court
(1978) 22 C3d 493, 505 n.9].  In the Petitioner's case, the pre-
judice of the trial scheduling is evident in the jurors' response
to the length of the trial, and Judge Jensen's efforts and decisions

ATTACHMENT 'C':  PAGE 60

to hustle it along.  In addition to the decisions of the Trial
Court as noted in 8.7(B)(ii) above, the following are examples that
illustrate the effects of the trial schedule:

     (i)  Impact on Jurors:  Jurors have voiced their skepticism
over the length of the trial and their attentability to the matters
involved.  This is seen in trial transcripts at 7RT1406-1409, 11RT
2104, 11RT2168-2172, as well as before the start of the testimony
at 1RT103-109.  An example of this potential lack of mindfulness
is voiced by Judge Jensen at 7RT1364: "The fact is I have a jury
that is telling me they have concerns about their ability to stay
with this case for a period that is much longer than was estimated.
Okay.  And that's for a variety of reasons".

     (ii)  Impact on Introduction of Relevant Evidence and
             Argument:  As previously noted, Judge Jensen used
CEC §352(a) "undue consumption of time" multiple times for ex-
clusionary tactics against the defense.  Despite the Prosecution's
case that lasted practically a month compared to the Petitioner's
two days, the Trial Court never uses CEC §352 for any of the Pro-
secution's arguments/evidence that as noted above in 8.7(B)(ii),
pertain to allegations that are precluded by due process. Examples
of the Court's use against the defense are denoted at 1RT202, 1RT
223, 2RT350, and 7RT1409-1413.

     (iii)  Impact on Petitioner's Testimony:  Found in trial
transcripts from 9RT1733 to 11RT2095, the Trial Court interrupted
Petitioner's trial testimony 51 times in its attempts to hurry
along the trial proceedings.

     (iv)  Impact on Closing Statements:  Judge Jensen, as noted
at 8RT1551-1552, voices a restriction as to length of closing state-
ments fearing a mistrial based on the length of the trial.

   (D)  The Trial Court's Actions in Excess of Jurisdiction

     (i)  Trial Mismanagement:  As noted by Judge Jensen on
January 12, 2016, the "People have rested" (9RT1728); 33 days from
the start of the trial and 28 days from the Prosecution's first wit-
ness.  The next day, January 13, 2016-- which is the first full day

of the defense presenting their case-- the Judge remarks:  "The
court is going to note that it is incumbent upon trial judge to
manage trials effectively.  Judges need to be proactive from the
start in both assessing what a reasonable trial estimate is, trial
management is an ongoing responsibility of the trial judge, re-
gardless of the case's complexity, the number of witnesses called,
or whether specific time limits have been imposed.  Therefore this
court, pursuant to Evidence Code Section 765, is now going to be
imposing time restrictions on counsel's exam of their witnesses...
because I have jurors that are sending me notes that they are con-
cerned about their ability to continue to move on with this case in
light of all the delays, and the disorganization of both counsel
and their inability to present a precise organized case" (10RT1897-
1898).

(ii)  Ineffective Methods for Ascertainment of Truth:  After
an objection by defense counsel, Judge Jensen indicates he will hold
off on exercising CEC §765 (10RT1899), but his actions related to
the Petitioner's testimony prove otherwise.  Despite his acknow-
ledgement of trial counsel's deficient performance due to an
"inability to present a precise organized case", Judge Jensen, either
sua sponte or in response to the Prosecutor's objections, interrupts
Petitioner's attempts to present a precise organized case 51 times.
In a case which revolves around the premise of investment allegedly
verbally represented by the defendant, and despite the designed pur-
pose of trial to come upon the truth through evidence and testi-
mony, the Petitioner is repeatedly thwarted by the Trial Court when
trying to explain the investment understanding presented to all in-
vestors.  When the defense counsel asks the Petitioner, "Can you
tell us about the premise of investment that you presented to Mr.
Steiner and Mr. Almquist?", Judge Jensen agrees with the Prosecutor
that to answer will be narrative and does not allow the Petitioner
to answer the question (9RT1740).

(iii)  Defective Process:  The decisions of the Trial Court
to set the trial schedule as noted (8.7(B)(i)), and take the
actions as described (8.7(B)(ii)), has prejudicially impacted jurors,

proper introduction of evidence/argument, Petitioner's testimony, and closing arguments (8.7(C)).  Thus with such prejudice effectuated by a 'round-hole, square-peg' trial schedule, there is no justification for a criminal process that fosters juror angst and compromises a defendant's evidence, argument and testimony.  Moreover, the Trial Court's conduct that is contrary to constitutional and statutory enforcement of the fair trial guarantee, in conjunction with its curious efforts to hustle it along, have sacrificed efficacy and by consequence betrays the spirit of effective ascertainment of the truth and the expeditious disposition thereof.

## 8.8   THE TRIAL COURT HAS ACTED IN EXCESS OF ITS AUTHORITY DUE TO THE APPEARANCE OF A DISQUALIFYING INTEREST, THE REFUSAL TO PROVIDE INFORMATION RELEVANT TO THE QUESTION OF SUCH AND NEGLECTING THE DUE PROCESS REQUIREMENT OF SELF-RECUSAL

(A)  California's Code of Judicial Ethics:  In compliance with the Code of Judicial Ethics (herefater 'CJE'), a trial court shall disclose on the record all information that is reasonably relevant to the question of disqualification under CCP §170.1-- even if the judge believes there is no actual basis for disqualification (CJE: Canon 3E(2)(a)).  Furthermore, a judge _is_ disqualified if that judge has made any statements that a person aware of the facts might reasonably believe commits the judge to reach a particular result or rule in a particular way in a proceeding (CJE: Canon 3E(3)(a)).

(B)  The Petitioner's Defense to the Criminal Charges Against Him:  The Petitioner has challenged the Prosecution's case against him in matters that include: the insufficiency of the evidence (10CT2024-2045); an unqualified determination of probable cause (10CT2046-2061); the illegal restraint due to process of his arrest and conveyance (10CT2062-2074); the prosecutorial misconduct (10CT2075-2125); issues of subject matter jurisdiction and statute of limitations (10CT2194-2200); excessive bail (10CT2180-2184), and; a forcible transnational abduction (10CT2242-2247).  A common denominator in these contentions of the Petitioner is the incompetence of the affiant of probable cause (8RT1586), and the instigator of

the forcible transnational abduction (8RT1588), FBI Special Agent
Jessie Murray.

(C) The Connection Between the Trial Court and FBI Agent Murray:
The Trial Court, Judge Jensen, is on record as to a non-disqualifying
social acquaintance with FBI Agent Murray and her husband, Michael
Murray of Orange County District Attorney's Office (1RT8). Judge
Jensen is also on record as to conversations with Michael Murray
regarding his candidacy for judgeship (1RT8).

(D) The Information Reasonably Relevant to the Question of an
        Actual Judicial Bias: Because of the Petitioner's reasons
to question Jessie Murray's conduct and competency as demonstrated
in his pleadings filed in Trial Court and reiterated herein as
CLAIM 4 and CLAIM 7, Petitioner requested Judge Jensen to disclose
information that he believes would reasonably influence and possibly
commit Judge Jensen to a predictable ruling on Petitioner's motions.

In particular, Petitioner filed a Challenge for Cause pursuant to
California's CCP §170.3 (see 12CT2657-2663) whereby he requests
Judge Jensen to disclose whether he used his judicial prestige or
assisted in any way with Michael Murray's running for judge. Inso-
much that Judge Jensen is within his discretion to lend his prestige
of judicial office (CJE: Canon 2B(2)(d)), he is also under obligation
to disclose such if the Petitioner could reasonably believe it would
influence the Judge to a ruling on Petitioner's motions that pertain
to significant and possibly incriminating matters involving the wife
of the man he may be helping to run for judge (CJE: Canon 3E(3)(a);
Canon 3E(2)(a)).

To provide proper perspective, consideration must be given to the
scope of Petitioner's motions, that as also claimed within this
Habeas petition, implicate FBI Agent Murray in a subjective investi-
gation conducted in association with the filing of fraudulent 'VCF'
claims (CLAIM 7.3(A)); her collaboration with Attorney Patrick
Lund who was being disbarred and criminally investigated (7.4 above);
her incompetence in the subject matter of the allegations (7.4-7.6)
and; her involvement in the abduction and conveyance of the Peti-
tioner in violation of federal, statutory and international norms

(CLAIM 4).  Thus the significance of fully litigating these matters and a proper ruling in favor of the Petitioner on such issues, pose a serious and adverse effect on the credibility of not only FBI Agent Murray, but also her husband and Judge Jensen himself if pledging his judicial prestige.  Therefore it is a reasonable request and an actionable disqualifying interest that should be disclosed.

    (E)  Judge Jensen's Answer/Striking of the Petitioner's Request for Information Relevant to the Question of Judicial Bias: Instead of disclosing the requested information relevant to the question of an actual bias, Judge Jensen chooses not to answer the challenge and decides to strike the Peitioner's request (12CT2691-2693).  If Judge Jensen did not lend his judicial prestige or assist Michael Murray in his candidacy, there is no logical reason for the Trial Court to strike the challenge.  Thus the practical conclusion of an objective observer would determine with relative certainty that Judge Jensen did assist with Michael Murray's judgeship.  Regardless of final determination, Judge Jensen's striking of an issue that is directly connected to his ability to impartially conduct the Petitioner's criminal proceedings with a view to its effective ascertainment of truth, creates an appearance of impropriety that is clearly within the Trial Court's power to dispel.  Even more important though is the presumable existence of this extrajudicial disqualifying interest; and because it predates the Trial Court's proceedings, disqualifies Judge Jensen from taking any action in the Petitioner's matters (see CJE: Canon 3E(i) Advisory Committee Commentary).  Therefore as a result of this appearance of an existing disqualifying interest, the Trial Court loses jurisdiction over the person of the Petitioner [People v. Whitfield (1986) 183 CA3d 299, 303; CCP §170.1], and his orders/judgments are void [Giometti v. Etienne (1934) 219 C 687, 688-689; CCP §170.4(c)(1)].

    (F)  Due Process Requires the Trial Court's Recusal:  The Petitioner's right to a fair trial is constitutionally guaranteed by the U.S. and CA Constitutions; and this inalienable right includes the right to be tried by an impartial judge [Arizona v. Fulminante, supra].  To ensure this right, a judge "shall disqualify himself

in any proceeding in which his impartiality might reasonably be questioned" (28 U.S.C.A. 455(a)).  Thus following the actions of the Master Calender Court as raised in CLAIM 2 that deprived the Petitioner of his state-created right typically available to all criminal defendants that allows him to peremptory disqualify Judge Jensen, the Trial Court in its solicitude for the essential rights of the accused, should have sua sponte considered recusal.  In the case of Liljeberg v. Health Services Corp., 468 US 847 (1988), the Supreme Court indicated that the statutory standards for recusal are intended to promote public confidence in the impartiality of judicial process, and a judge when confronted with circumstances in which his impartiality could reasonably be doubted, should disqualify himself.  In the Petitioner's case, aside from the Challenges for Cause filed in an attempt to obtain information relevant to the question of actual bias, the Petitioner also requested Judge Jensen's consideration of recusal resulting from the pattern of a prejudicial partiality that overwhelmingly favored the Prosecution (see 10CT2173-2174).  Insomuch that there  is no indication that Judge Jensen at any time considered any of these scenarios as circumstances in which his impartiality could be reasonably be questioned, demonstrates his failure to conduct such proceedings with the solicitude for the essential rights of the Petitioner in violation of due process of law.

8.9  THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY:  This Claim and the issues raised merit Federal Review pursuant to 28 U.S.C. 2254 as the facts and evidence presented are properly before the Court. With the Petitioner's conviction and state custody a direct result of the violation of the Constitution, Laws, and Treaties of the United States, proper remedy is warranted.

(A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of Orange County Superior Court, the Petitioner through pro per pleadings filed in Trial Court prior to sentencing, properly preserved the issues identifiable in CLAIM 8 above.  These 'objections' are found in the appellate record as:  Improper Disposition of Trial Court (CPC §1181 Motion at 10CT2168-2169);  'VCF' Ruling and 'SOL'

ATTACHMENT 'C':  PAGE 66

Errors (CPC §1181 at 10CT2163-2166);  Alternative Basis for Con-
viction (CPC §1181 at 10CT2167;  Forcible Transnational Abduction
(CPC §1185 at 10CT2196-2197);  Doctrine of Specialty (CPC §1181 at
10CT2167-2168);  Trial Mismanagment (CPC §1181 at 10CT2162-2163);
Disqualifying Interests (CCP §170.3 at 12CT2657-2663; CPC §1181 at
10CT2173-2174).  As noted in 3C of the Procedural History included
in the **PETITION OVERVIEW**, all pro per motions and actions were
denied by the Trial Court prior to sentencing; and in so doing of-
fered no factual findings, applied no decisional law addressing the
materiality or prejudiciality of the issues associated, nor compelled
any evidence/testimony to resolve credible, disputed issues of fact.

   (B)  Issues Exhausted in State Court:  As noted in the Procedural
History included in the **PETITION OVERVIEW**, the Petitioner motioned
the Appellate Court to set aside his direct appeal brief as filed
by Appellate Counsel due to the omission of issues of greater sign-
ificance.  After the Appellate Court disregarded this request/motion,
the Petitioner filed a State Habeas Petition concurrent with his
direct appeal in which the issues raised in CLAIM 8 above were in-
cluded as CLAIM VIII of that petition.  That state petition (No.
G058686) was denied on 6/04/2020.  Petitioner filed virtually the
same petition in the California Supreme Court on 7/31/2020.  This
state petition (Case No. S263665) was denied on 2/20/2021.  Both
state denials provided no factual findings, no explanation, no ap-
plication of decisional law (state or federal), no evidentiary
action to resolve any credible, disputed issues of fact, nor gave
any indication whatsoever that any adjudication of any issue was
considered or administered.

   (C)  Evidence and Authorities Presented in State Court:  In sub-
mitting these issues in state court, the Petitioner presented such
on the same facts and evidence referenced herein by attached Exhibit,
Declaration, and Request for Judicial Notice (Exhibit 5).  As to
applicable federal law as established by U.S. Supreme Court decision,
the Petitioner offered such authorities that included:  <u>Arizona v.
Fulminante</u>, 499 US 279 (1991) [Improper Judicial Bias]; <u>Liljeberg v.
Health Services Acquisition Corp.</u>, 486 US 847 (1988) [Failure to

**ATTACHMENT 'C':  PAGE 67**

Disclose Information Relevant to the Question of Judicial Bias];
Caperton v. A.T. Massey Coal Co., 556 US 868 (2009) [Due Process
Requiring Recusal/Disqualification].

   (D)  Review and Remedy:  In the PETITION OVERVIEW attached to
the Federal Habeas Form CV-69, the Petitioner demonstrates that this
CLAIM merits de novo review due to the fact that there is no state
ruling to review with AEDPA deference.  In this de novo review as
prayed for by the Petitioner, he also requests Judicial Notice of
the evidence as presented in Exhibit No.5 [Page 40 of ATTACHMENT 'D'].

In the Court's determination of issues presented in this CLAIM,
the Petitioner prays for resolution of all disputed facts by refe-
rence to that which is judicially noticeable, and also that which
is obtainable by Evidentiary Hearing as incorporated by Exhibit
No. 20 [Page 127 of ATTACHMENT 'D'].

Regarding Petitioner's best efforts in presenting fully developed
factual CLAIMS, notice should be taken of his efforts to discover
information that is relevant to the question of actual bias of the
Trial Court.  As raised by Petitioner in CLAIM 2, he was deprived
of the state-created right to peremptory challenge the Trial Court
by the conduct of the Master Calender Court.  After Petitioner's
Trial Counsel failed to file any timely motion to enforce this
right to an impartial judge, Petitioner  in pro per, filed Three
(3)  Challenges for Cause pursuant to CA CCP §170.3 as means to
discover the information specifically requested of the Trial Court.
After all three challenges were struck by the Trial Court, Petitioner
filed Writs of Mandate with the Appellate Division.  After three
dismissals of these Writs, Petitioner filed for an evidentiary
hearing in his state Habeas Petition filed in Appellate Court, as
well as motioned for evidentiary hearing in the state Supreme Court
on Habeas relief.  As noted, these state Habeas Petitions were de-
nied without any factual findings.  In addition to these efforts
for disclosure of the specific information that Petitioner has id-
entified as relevant to the question of judicial bias, he has filed
a Federal 1983 action against the Trial Court seeking only decla-
ratory relief as a result of Judge Jensen refusing to provide the

requested information.  This Federal action was filed in the Central District as Case No. 8:20-cv-0189-FMO-AS and dismissed by the Court; and was appealed to the Ninth Circuit as Case No. 20-56165.  The Ninth Circuit dismissed the action, and like the dismissal in the District Court, provided no factual finding relative to the question of actual bias.

As to relief, Petitioner prays for all just and proper including but not limited to reversal of the conviction based on the arguments and authorities as presented above.

## CLAIM 9:   THE INEFFECTIVE ASSISTANCE OF COUNSEL

<u>SUMMARY</u>:   The Petitioner herein claims that Trial Counsel acting
on his behalf committed errors so serious or omitted actions of such
importance that he was not functioning as counsel guaranteed the
Petitioner by the Sixth Amendment to the United States Constitution.
The Petitioner contends that this deficient performance of Trial
Counsel has prejudiced his defense by depriving him of effective
assistance of counsel, due process, and a fair trial.   The pre-
judiciality of Trial Counsel's deficient performance is demon-
strated by Counsel's failure to prepare and investigate, thereby
subjecting Petitioner to a trial in which Counsel introduces ab-
solutely zero evidence that is derivative of any pre-trial pre-
paration.   Also deficient was Trial Counsel's failure to file, or
failure to timely file, the appropriate motions that were essential
to Petitioner's defense.   The failure to file motions, include:
the failure to file a discovery motion that would compel disclosure
of exculpatory evidence explicitly requested by the Petitioner that
was being suppressed by the Prosecution;  the failure to file a
motion that would fully and fairly litigate the Petitioner's for-
cible transnational abduction from the country of Panama as com-
missioned by the Prosecution Team;  the failure to file a motion
for sanctions/dismissal based on the Prosecution's failure to pre-
serve evidence due to its improper motives to protect the incom-
petence of its investigation;  the failure to file for disqualifi-
cation of the Trial Judge due to the errors of the Master Calender
Court, and;  the failure to file a motion for appointment of experts
that would testify as to industry-specific information that demon-
strates the actual innocence of the Petitioner.

The abject failure of Trial Counsel to introduce any evidence and
expert testimony resulted in an unchallenged prosecutorial process
that **ran** amok with the false presumptions of the Prosecutor being
adopted by the Trial Court as evidentiary fact, elementally-
oxymoronic testimony being offered as expert opinion, and the
industry-specific information that is probative of factual innocence

being suppressed and ignored.

Along with failure to subject the Prosecution's fallacious all-
gations to any meaningful or adversarial testing, the Trial Counsel
neglected to advocate the affirmative defense of the Petitioner
that demonstrates and explains the actual investment premise that
is consistent with the behavior, and thus the understanding, of
the alleged investor-victims.  This awareness of these investors
demonstrated by their actions would be contrasted by the psycho-
genic origins of the criminal prosecution of the Petitioner that
is founded and identical in theory with fraudulent compensation
claims filed by these investors and Attorney Patrick Lund who was
relied upon for the Prosecution Team's investigation.

Also deficient and prejudicial is Trial Counsel's failure to be
competent and diligent by neglecting to object to the decisions
of the Trial Court that include the erratic and erroneous appli-
cation by the Trial Court of statute of limitation principles re-
quired to establish fundamental jurisdiction, the Trial Court's
wrongful advocacy of the Prosecution's theories used to obtain a
finding of guilt, and the Trial Court's improper and material
alteration of U.S. Supreme Court decisions used in instructing
the jury on elemental definitions.

Trial Counsel's deficiencies are also evident in his failure to
hold the Prosecution Team accountable for illicit acts committed,
improper communications with jurors, material misstatements of
facts, and their use of false evidence to obtain the conviction.
Trial Counsel's complete failure to object to the pervasive pro-
secutorial misconduct is a by-product of his conflict of interest
that seeks to protect his own self-interests and those within his
social circle rather than provide Petitioner with effective re-
presentation.

In addition to ineffective assistance of Trial Counsel is that of
Appellate Counsel, that despite Petitioner's preservation and sub-
sequent insistence of these issues-- including 'IAC' of Trial
Counsel-- to be raised on direct appeal, not one is argued in the
Appellant's Opening Brief of Appeal No. G055717.

ATTACHMENT 'C': PAGE 71

CONTENTS OF CLAIM 9:

9.1 The Constitutional Right to Effective Assistance
    of Counsel that is Clearly Established Federal Law
    as Determined by United States Supreme Court
    Decisions                                              Pg. 73

9.2 Trial Counsel's Failure to Prepare and Investigate
    was Deficient and Prejudicial to the Petitioner        Pg. 73

9.3 Trial Counsel's Failure to File Motions, and
    Timely File Motions was Deficient Performance and
    Prejudicial to the Petitioner's Defense                Pg. 83

9.4 Trial Counsel's Performance is Deficient and
    Prejudicial when Failing to Subject the Prosecution's
    Case to any Meaningful Adversarial Testing             Pg. 88

9.5 The Failure of Trial Counsel to Advocate the
    Petitioner's Affirmative Defense was Deficient
    and Prejudicial                                        Pg. 93

9.6 Trial Counsel Failed to Act in a Manner Expected
    of a Reasonably Competent Attorney Acting as a
    Diligent Advocate                                      Pg. 97

9.7 Trial Counsel Possessed a Conflict of Interest
    that Deprived Petitioner of Effective Assistance
    of Counsel                                             Pg.100

9.8 Appellate Counsel's Failure to Raise Significant
    and Obvious Issues on Direct Appeal was Deficient
    Performance and Prejudicial to the Petitioner's
    Right to Effective Counsel                             Pg.101

9.9 This Claim Merits Federal Review and Remedy            Pg.103

9.1   THE CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

THAT IS CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY

UNITED STATES SUPREME COURT DECISIONS:   The Sixth Amendment
to the U.S. Constitution guarantees the Petitioner the right to
effective assistance of counsel in his criminal prosecution [Yar-
borough v. Gentry, 540 US 1, 5 (2002)].   To determine his counsel
to be ineffective, the Petitioner must show that (1) counsel's per-
formance fell below an objective standard of reasonableness, and
(2) counsel's deficient performance prejudiced the Petitioner re-
sulting in an unreliable or fundamentally unfair outcome in his
criminal proceedings [Strickland v. Washington, 466 US 668 (1984)].
In deciding performance and prejudice, a reviewing court must con-
sider the totality of the circumstances, and has found certain
scenarios to be deficient and fundamentally unfair in instances
that include: when trial counsel has failed to properly prepare and
investigate [Wiggens v. Smith, 539 US 510 (2003)];   when trial coun-
sel has failed to file or timely file motions [Kimmelman v. Morri-
son, 477 US 365 (1986)];   when trial counsel has failed to be com-
petent and diligent [Knowles v. Mirzayance, 556 US 111 (2009)];
when trail counsel has failed to subject the prosecution's case to
meaningful adversarial testing [United States v. Cronic, 466 US 648
(1984)];   when trial counsel has failed to advocate defendant's
affirmative defense [Strickland v. Washington, supra];   when trial
counsel had a conflict of interest which materially compromised the
defense [Mickens v. Taylor, 535 US 162 (2002)], and;   when appellate
counsel failed to raise meritorious issues on direct appeal [Smith
v. Robbins, 528 US 259 (2000)].   The Petitioner in his judicial
proceedings as raised below, has suffered ineffective assistance
of counsel as determined by these decisions of the U.S. Supreme
Court.

9.2   TRIAL COUNSEL'S FAILURE TO PREPARE AND INVESTIGATE WAS

DEFICIENT AND PREJUDICIAL TO THE PETITIONER

(A)   Trial Counsel's Failure to Prepare:   In Couch v. Booker,
632 F3d 241, 247 (6th Cir. 2011), the court found trial counsel in-
effective when he failed to track down readily available, and likely

ATTACHMENT 'C':   PAGE 73

useful evidence that defendant had asked counsel to obtain.  Attached as Exhibit 10, is an affidavit that was prepared and filed by the Petitioner in trial court as an addendum to his CPC §1181 Motion. This declaration submitted under penalty of perjury provides a non-exhaustive list of correspondences sent to defense counsel in which Petitioner listed with relative specificity the evidence required for the proper and effective defense of the allegations. This affidavit provides dates of twenty-two (22) letters mailed by Petitioner prior to trial, and seven (7) letters mailed after the start of trial.  In these letters, the Petitioner requested counsel's preparation and production of readily available and useful evidence that included but necessarily limited to:

(i)  Proper Accounting:  In his communications with Trial Counsel, the Petitioner stressed the absolute necessity for proper accounting to be prepared.  This included accounting of all disbursements made by Petitioner to the alleged investor-victims;  accounting of all assets transferred by Petitioner to investors and their attorney Patrick Lund;  accounting of all income derivative of these transferred assets, and;  accounting of Petitioner's costs, expenses, and advances to service the corporate asset base.  Despite the charges of Grand Theft by False Pretense and statutory enhancements that allege actual and determinable loss (see Information at 4CT893-902), the Trial Counsel failed to provide any accounting of anything whatsoever.  The prejudice of the Trial Counsel's failure to do so is demonstrated by Petitioner's accounting affidavit attached to his CPC §1181 Motion (see 11CT2370-2401), that shows alleged investor-victims profiting from their investments with the Petitioner.  An example of this is Larry Richardson (Counts 8,9,10,28), who invested $682,000 with the Petitioner; and in return, received what Petitioner estimates to be $2,072,000.  In spite of this, Mr. Richardson along with his Attorney Patrick Lund, filed an application for payment from the 'VCF' resulting from what he claims is an actual out-of-pocket loss of over $700,000.

(ii)  'VCF' Claims:  In his communications with Trial Counsel, Petitioner stressed the need to procure all compensation claims,

especially those submitted to the 'VCF' by investors and attorney
Lund.  Three 'VCF' claims were introduced by Trial Counsel, Jerry
Schaffer, at trial as Defense Exhibits A,C,D; however these three
claims were procured by prior counsel Karren Kenney leading up to
the Preliminary Hearing (see 11CT2535-2536).  The two claims still
outstanding-- and the two most flagrantly fraudulent-- are those
of Mr. Steiner and Mr. Almquist, which were never secured by Trial
Counsel Schaffer and never introduced.  The  two 'VCF' claims com-
bined, are estimated by the Petitioner to be approximately $8 Million
in false claims of loss submitted for payment from the 'VCF'.  With
these two investors receiving disbursements from the Petitioner
over an 11-13 year period (see 11CT2346-2351), the Petitioner est-
imates their collective disposition to be 'in the black' by an est-
imated $3.76M to $5.08M (11CT2370-2377).  Therefore their fraudulent
applications to the 'VCF' seeking payment in an amount up to $8M
on top of the consideration already received is an economic bias
that is important in jury consideration of credibility. Unfortu-
nately, there is no indication that Trial Counsel Schaffer made _any_
attempt whatsoever to procure these claims despite Petitioner's ex-
plicit requests and the materiality of the evidence implicit within.
Therefore the failure of Trial Counsel to prepare and obtain the
evidence that was readily available is deficient and prejudicial.

     (iii)  Expert Testimony Regarding Tax-Reporting:  As noted
in CLAIM 3, all charged offenses share in the Prosecution's pre-
sumption of a specific "interest" characterization that is evi-
dentiary to the pretense of private mortgage lending.  Because the
requisite tax-reporting of such premise is easily identifiable and
virtually irrefutable, the Petitioner repeatedly asked Trial Counsel
Schaffer to prepare expert testimony to provide the details and the
eventualities that each and every investor did not tax-report with
any belief or elemental reliance on the alleged False Pretense.
The Petitioner was aware of this artifice of presuming loss by mis-
characterizing payment received by his exposure to the fraudulent
'VCF' claims which employed the same deceitful tactic (see CLAIM
8.2(B)(iii)).  Therefore when Petitioner continuously exclaimed the
urgency to secure expert testimony that will demonstrate his actual

innocence as well as expose   the fallacy of the allegations, he was also seeking the introduction of testimony that illustrate their origins in the conspiracy intended to defraud the 'VCF'.   In spite of the exculpatory impact that this expert opinion and testimony would provide, Trial Counsel Schaffer failed to prepare and neglected  to introduce any expert testimony.

      (iv)   Expert Testimony Regarding Industry-Specific Information:  The Petitioner requested Trial Counsel Jerry Schaffer to prepare expert testimony of industry-specific information that would provide an understanding to the jury as to the irrationalities of the allegations.

      (a)   The Document of Indebtedness (Promissory Note): An example of the materiality of this testimonial evidence is seen in the Prosecution's Theft by False Pretense theory whereby all investors invested with the alleged belief they were actual lenders with the ultimate control of foreclosure on non-performing loans. This theory, the element of reliance, and the testimony of investors' belief is introduced by the Prosecutor as demonstrated by the Petitioner in CLAIM 3.1.  Because this theory of false pretense was exclusively used by the Prosecution starting with the Preliminary Hearing through the close of evidence at trial (see CLAIM 1.2), Petitioner was informed of the charges that he recognized as the aftermath of the 'VCF' claims (see 11CT2303-2306).  However because no investor was able to provide proof that they held or owned any promissory note for any mortgage, the Petitioner asked Trial Counsel Schaffer to prepare expert testimony regarding the promissory note being the definitive document of indebtedness.  This contrast with investor testimony and the inconceivability for someone such as Investor Almquist-- investing with Petitioner for approximately 11 years (11CT2346-2351) with sixty-plus investments (1RT 256)-- to believe he was the lender when he never possessed or owned any loan agreement with any borrower or the Petitioner (see 3CT360), would be conveyed to the jurors as implausible through the expert testimony requested of Trial Counsel.

      (b)   Foreclosure Requirements:  Also to be presented to

ATTACHMENT 'C':  PAGE 76

jurors through industry-specific expert testimony, are the require-
ments for foreclosure process initiated by a default declared by the
note holder upon a breach of the terms as stated in the document of
indebtedness.  This testimony would demonstrate to the jury that
the belief of an investor such as Mr. Almquist, that he could fore-
close based upon a breach of the terms of which he is unaware, con-
tained within an agreement to which he is not a party, is irrecon-
cilable with common sense and incompatible with his sophistication
(see 3CT598).

      (c)  Property Title Records:  This expert testimony
would also establish through title company records, the actions of
the Petitioner foreclosing on non-performing loans; while at the
same time-- and in same transactions investors believed themselves
to be that actual lender-- all investors such as Mr. Almquist con-
tinued to receive disbursements from the Petitioner.  These facts
and expert testimony swearing as to the authenticity of the title
records that illustrate investors receiving disbursements irres-
pective of any borrower's performance (e.g. 3CT632), would convey
to the jury an investment understanding contrary to the Ad Hoc
theory devised by Lund and Investors for the purpose of 'VCF' ap-
plication, and adopted by the OCDA in its criminal prosecution of
the Petitioner.

      (d)  Actions, Obligations, and Liabilities Typical of
            An Actual Lender:  To explain to the jury the
actions, obligations and liabilities typical of a mortgage bene-
ficiary-- especially a junior lien holder which the Prosecution's
False Pretense theory purports (e.g. 1RT256-259)-- the Petitioner
requested of Trial Counsel Schaffer to have expert testimony also
provide details of the vital responsibilities of a vested bene-
ficiary of a second mortgage.  These  obligations that are crucial
to protecting the investment, and the potentially fatal consequences
in failing to do so, include title and hazard insurance policies
that guard against the loss of investment;  the necessity to service
senior debt in the event of default;  the 'interest paid' notific-
ation given borrowers for tax purposes, and;  loan servicing and

ATTACHMENT 'C':  PAGE 77

licensing requirements for revolving lines of credit.  With in-
vestors such as Mr. Almquist's testifying as early as the Prelim-
inary Hearing that he never took any action or assumed any lia-
bility of a mortgage beneficiary (3CT636-638)-- which includes his
admitted failure to notify any borrower of any 'interest paid'
(3CT635)-- this expert testimony requested by the Petitioner would
demonstrate to the jurors that no alleged investor-victim ever ex-
hibited any acts of ownership over any mortgage transaction.  Thus
these industry-specific facts would provide the jurors with the
contrariety between  investors'  words and their actions.  How-
ever despite the Petitioner articulating and identifying the evi-
dence readily available through industry-specific knowledge and
testimony, Trial Counsel fails to prepare and provide any expert
opinions whatsoever.

   (B)  Trial Counsel's Failure to Investigate:  In addition to
Trial Counsel's failure to prepare any of the evidence requested
by the Petitioner, Mr. Schaffer also failed to investigate the
conspicuous matters that are critical of the prosecutorial process
employed by the Prosecution Team.  In United States v. Mason, 481
Fed. Appx. 815, 819 (4th Cir. 2012), the reviewing court found
trial counsel ineffective for failing to investigate evidence that
would have impeached the government's case against the defendant.
In the Petitioner's case, there are multiple conspicuous issues that
are overtly favorable to an effective defense and should have re-
sulted in Trial Counsel's investigation.

      (i)  Actions of Attorney Patrick Lund and Their Nexus
            with the Prosecution's Case Against the Petitioner:
As noted in CLAIM 7.4(B) and CLAIM 8.2, the FBI investigation of
the Petitioner was kick-started with the help of attorney Patrick
Lund who was assisting Special Agent Murray by feeding her infor-
mation and documentation.  The "end game" of Mr. Lund and his clients
as it was described by Prosecution Witness Bagley (4CT765), was to
get money from the 'VCF' by submitting claims of actual loss that
were incumbent upon the criminal prosecution of the Petitioner.
Thus these fraudulent 'VCF' claims-- submitted by Lund and certain

ATTACHMENT 'C':  PAGE 78

alleged investor victims in December of 2010-- run in parallel with the FBI investigation and the OCDA's subsequent prosecution of the Petitioner.

    (a)  Additional Activities of Patrick Lund During the Period of Petitioner's Investigation and Prosecution:  At the same time as Lund was assisting in the investigation and prosecution of the Petitioner, in addition to the 'VCF' fraudulent claims being submitted for payment, the attorney was also engaged in a course of misconduct that included:

    (1)  Patrick Lund in 2011 to 2012, was misappropriating trust funds related to another client (see Exhibit 11);

    (2)  Patrick Lund in 2010-2014, is being accused by the alleged investor victims in the Petitioner's case of misappropriation of assets and funds relative to the transferred assets received from Petitioner (e.g. 11CT2537-2538);

    (3)  Patrick Lund during the period between 2010 and 2014, is leveraging the fraudulent 'VCF' claims to borrow money (see 5CT818);

    (4)  Patrick Lund on October 16th of 2014 is being disbarred by the California State Bar (see Exhibit 11);

    (5)  Patrick Lund in 2014 is being criminally investigated by the OCDA for conduct related to the Petitioner's case (see 5CT817);

    (6)  Patrick Lund at some time between 2015 and 2017, is being formally charged by Prosecutor Pierce for an act committed in Spring of 2013 related to another client (see Exhibit 11);

    (7)  Patrick Lund at some point after the Petitioner's trial, is eventually convicted for criminal conduct connected with one or more of these incidents (see Exhibit 11).

    (b)  Trial Counsel Schaffer's Failure to Investigate: With Patrick Lund and investors filing fraudulent 'VCF' claims concurrent with the investigation and prosecution of the Petitioner,

prudent defense counsel would investigate this attorney who had
fraudulent financial interest in the prosecution of the Petitioner,
and was instrumental in its probable cause finding (see 7.4 above)--
especially when this attorney is disbarred and criminally investi-
gated prior to the start of the Petitioner's trial.  In the corre-
spondences with Trial Counsel, Petitioner requested Mr. Schaffer
to provide all 'VCF' claims as noted in 9.2(A)(ii) above, but he
also through these efforts urged Mr. Schaffer to look into Lund's
activities due to the attorney's collaboration with FBI Agent Mur-
ray (2CT356).  Following up his lack of any effort whatsoever to
procure any 'VCF' claims, Trial Counsel Schaffer fails completely
to conduct any investigation on attorney Lund, that prior to his
disbarment and criminal prosecution, was coordinating the criminal
action against the Petitioner for the "end game" of the fraudulent
'VCF' applications.

     (ii)  Petitioner's Forcible Transnational Abduction:  As
noted in CLAIM 4, the means and method employed by the Prosecution
Team to commission, carry-out, and conceal the abduction/conveyance
of the Petitioner (4.3 above), deprived him of constitutional and
statutory rights (4.4 to 4.5).  In the Petitioner's communications
with defense counsel, he stressed the need to investigate what the
Prosecutor continuously calls an arrest on an international warrant
and subsequent extradition (e.g 4CT932; 5CT950).  As stated by the
Petitioner in declarations eventually filed in trial court (11CT
2472-2473), there was no legal arrest or lawful extradition as cor-
roborated by the absence of appropriate arrest reports, notice of
international warrants or proof of extradition orders.  During the
Preliminary Hearing, FBI Agent Murray who testifies as to her in-
volvement in this process, further obscures the illegality of its
conduct by contradicting the Prosecutor's version of events (see
CLAIM 4.2).  Therefore with plausible reasons to doubt the veracity
of the Prosecution Team's various and contradictory reports, the
due process requirement of effective counsel would necessitate an
investigation into the actualities of arrest and conveyance of the
Petitioner.  This obligation and the materiality of the evidence
to be introduced as a result, is also obvious to competent counsel

when considering these actions that betray peremptory norms of pro-
cedure and process are being orchestrated by FBI Agent Murray (2CT
348-350), who prepared the probable cause for Petitioner's pro-
secution (2CT320), based on information and documentation provided
her by Patrick Lund (2CT356). Despite every reason to investigate
the specious pretense of Petitioner's arrest/conveyance and no
reason not to; Trial Counsel Schaffer chooses the latter. But be-
cause this investigation was requested of Schaffer by Petitioner,
his choice not to investigate, is deliberate, deficient and pre-
judicial. Moreover, as raised in 9.7 below, Mr. Schaffer's de-
cisions on protecting members of the Prosecution Team from ex-
posure of impeachable acts is motivated by the conflict of interest
that sacrificed the Petitioner's right to effective representation.

(iii) Cognitive Psychology: The Petitioner is aware of
studies conducted by cognitive psychologists that show when new con-
textual information is presented, especially when coming from auth-
oritative sources and perceived as beneficial for the person to
whom its being presented, it can change the way that that person's
memory recalls specific events. The Petitioner felt that this
power of suggestion concept could help explain the complete dis-
connect between these investors investing for over a decade with
absolutely no actions or documentation vital to being an actual
mortgage lender (see CLAIM 3.1(B)), and the dramatic shift to a
supposed reliance/belief that they were actual lenders all along;
that is now the newfound theft by false pretense theory. Because
this ad hoc theory is the premise of the 'VCF' claims devised by
then-attorney Patrick Lund and adopted by FBI Agent Murray as
grounds for probable cause, these authoritative individuals pos-
sessing FBI and licensed attorney credentials are seen by investor
as experts or professionals in investigation; and their suggestions
that the investors are victims of criminal conduct is much more
palatable that a reality of personal responsibility. To help the
jury understand the effect of the new contextual premise intro-
duced by Lund and subsequently embraced by the FBI and OCDA, the
Petitioner asked Trial Counsel Schaffer to investigate this avenue
of an affirmative defense. Unfortunately Mr. Schaffer did nothing

ATTACHMENT 'C': PAGE 81

and offers the jury no explanation as to the contradiction existing between the investors' trial testimony and their actions that demonstrate an altogether different understanding as to the premise of investment.

(C)  The Prejudice of Trial Counsel's Failure to Prepare and Investigate:  In stark contrast to the requisite evidence and expert testimony explicitly articulated by the Petitioner face to face and through at least twenty-two pre-trial correspondences (see Exhibit 10), Trial Counsel Schaffer introduced absolutely no documentary evidence and no expert testimony as a result of any attempt whatsoever to prepare and investigate.  In fact of the nine items introduced as defense exhibits (see 11CT2534), not one of these is a product of any due diligence exercised by Mr. Schaffer.

(i)  Defense Exhibits Introduced at Trial:  Referencing the defense exhibit list (11CT2534), it is obvious that the documents produced were not a result of Mr. Schaffer's representation:

(a)  Exhibits A,C,D, are 'VCF' Claims procured by prior defense counsel who represented Petitioner at the Preliminary Hearing (see 11CT2535-2536);

(b)  Exhibit B is a copy of an assignment signed by attorney Patrick Lund.  This document was brought into the court room during trial by the Prosecutor attached to another document that was eventually introduced by the Prosecution.  The Petitioner recognized the neglected document as an instrument showing Lund's sale of the subject asset and asked Trial Counsel Schaffer to introduce it as a defense exhibit;

(c)  Exhibit E,F,G, are copies of Petitioner's bank account statements that were produced not by Schaffer but by Prosecution subpoena (11CT2556-2561);

(d)  Exhibits H,I, are documents that were either prepared by the Prosecution Team or produced as a result of their investigation.

(ii)  Failure of Trial Counsel to Introduce any Evidence or Expert Testimony is Presumptively Prejudicial:

ATTACHMENT 'C':  PAGE 82

When trial counsel fails to prepare or conduct an adequate invest-
igation, "that fact would have no effect on the deficient prong of
Strickland [test] because counsel has already demonstrated ineffect-
iveness by failing to thoroughly investigate the existence of miti-
gating factors" [Summerlin v. Schiro, 427 F.3d 623 (9th Cir. 2005)].
This presumption of prejudice aside, in the Petitioner's case the
denial of effective counsel is clearly demonstrated and identifiable
in Trial Counsel's inability to adversarially challenge the Pro-
secution's allegations (see 9.4 below), and his ignorance in matters
that advocate the Petitioner's defense (9.5).  Additionally, indi-
cations of prejudice of Mr. Schaffer's deficient performance are
found in the Prosecutor's mockery of the Petitioner.  An example
of this is found in Prosecutor Pierce's closing remarks to the jury,
whereby Mr. Pierce essentially calls the Petitioner's defense and
testimony 'BS' (11RT2199), and as offer of proof for such deni-
gration, denotes that "He [Petitioner] has virtually zero docu-
mentation to support any of what his version of events" (11RT2136;
also see 11RT2205).  However this "zero documentation" is not pro-
bative of Petitioner's guilt as insinuated by the Prosecutor, but
it is the direct prejudicial byproduct of Trial Counsel Schaffer's
complete failure to provide any semblance of competent counsel.

9.3   TRIAL COUNSEL'S FAILURE TO FILE MOTIONS, AND TIMELY FILE
      MOTIONS WAS DEFICIENT PERFORMANCE AND PREJUDICIAL TO THE
      PETITIONER'S DEFENSE:   In Kimmelman v. Morrison [supra], the
Supreme Court found 'IAC' based on counsel's deficient performance
prior to trial by failing to timely file relevant motions.  In the
Petitioner's case, Trial Counsel Schaffer, while failing to pro-
perly prepare and investigate as noted in 9.2 above, also failed
to file motions that are obvious within the context of the case
and essential to effective representation.

(A)  Trial Counsel's Failure to File Motions Essential for
     Preparation and Investigation:  To assist in pre-trial pre-
paration and investigation, Mr. Schaffer should have filed motions
respective of the evidence, testimony and investigation identified
by the Petitioner through communications with defense counsel (see

ATTACHMENT 'C':  PAGE 83

9.2 above).  Trial Counsel's failure to file the following motions constitutes 'IAC':

(i)  Discovery Motion (CPC §1054.5):  The Petitioner through defense counsel prior to the representation of Trial Counsel Jerry Schaffer, requested discovery of relevant materials and information as also identified through the correspondences with counsel.  These items, as demonstrated by Petitioner in the eventual CPC §1054.5 Motion filed pro per after trial (see 10CT2204-2237), are discoverable materials possessed by the Prosecution.  Along with the proper requests for disclosure made on 3/07/2014 (11CT2475), 4/03/2014 (11CT 2478), and 9/22/2014 (11CT2479-2481); pursuant to CPC §1054 and constitutional due process, the disclosure of this information from the Prosecution is warranted.  However as noted by the Petitioner in his CPC §1054.5 motion and contended in CLAIM 7.3 above, the Prosecution failed to provide the requested materials and information. With these explicit discovery requests being made over a year before trial and disclosure required at least 30 days prior to trial (CPC §1054.7), Trial Counsel Schaffer should have moved for the Trial Court to make any order necessary to enforce the constitutionally mandated release of this favorable information (CPC §1054.5(b)). Moreover, because this information  as requested through discovery included 'VCF' Claims, Lund Investigation, Accounting of all financial activity, Proof of Prosecution's "interest" characterizations, and Arrest particulars, these items also constituted the same evidence specifically identified by Petitioner that was earmarked for Trial Counsel to prepare and investigate (see Exhibit 10).  Therefore concurrent with failing professional norms by neglecting to prepare and investigate, Trial Counsel Schaffer compounds the Prosecution's suppression of this evidence by ignoring the statutory safeguard of CPC §1054.5 that is designed to ensure the duty of due process disclosure.  With this information to be disclosed that illustrates the fatal flaw in the allegations and Petitioner's factual innocence (see CLAIM 3.8(D)), Mr. Schaffer's incompetence while inexplicable, is definitely deficient and prejudicial.

(ii)  Search and Seizure Motion (CPC §1538.5):  Identified

by **Petitioner** in his correspondences with counsel (see Exhibit 10),
and evident by the lack of any documentation that corroborates the
Prosecutor's version of an international warranted arrest and lawful
extradition (see CLAIM 4.2(A)), the common sense conclusion of com-
petent counsel would be exercising the right to fully litigate the
legality of the means and method employed for the Petitioner's
seizure, restraint, and conveyance from the country of Panama.  Con-
sidering that investigation of the tactics of arrest were identified
by Petitioner (Exhibit 10), and disclosure of particulars were dis-
covery requested on 9/22/2014 (11CT2480-2481)-- along with this
international rendition being conducted under specious pretense by
members of the Prosecution Team responsible for probable cause,
investigation and prosecution (4.2)-- an objective standard of rea-
sonableness dictates the filing of a search and seizure motion.  In
California according to CPC §1538.5(c)(1), this motion would require
the Trial Court in order to establish issues of fact necessary for
proper determination, to introduce into evidence such documentation
that would demonstrate the violations associated with the Peti-
tioner's abduction and conveyance (see CLAIM 4.3-4.5; 4.8).  Thus
the failure of Trial Counsel to file is 'IAC'.

   (iii)  Trombetta-Youngblood Motion:  As eventually raised
through Petitioner's pro per filing (10CT2256-2275), and noted in
CLAIM 7.6 above, the charged enhancement of CPC §186.11 provides
for the provisional protection of assets transferred by a defendant
named in the action.  In the Petitioner's case, as acknowledged by
FBI Agent Murray's '302' report (11CT2509), he transferred an entire
asset base to Restoration Holdings, LLC (RH,LLC).  This entity, made
up of alleged investor-victims, was managed and fund-controlled by
their attorney Patrick Lund (see 11CT2540-2548).  As noted on record
at Preliminary Hearing, Patrick Lund came under criminal investi-
gation by the OCDA as a result of his conduct related to these
assets (4CT817), which according to RH,LLC  member, William Steiner,
involved Lund's secreting away of these assets and derivative in-
come (11CT2537-2538).  Concurrent with these activities, Petitioner
through discovery notice dated 4/03/2014 (11CT2478), requested the
OCDA's inclusion of these noted transferred assets in their forensic

ATTACHMENT 'C':  PAGE 85

analysis, as evidence of consideration provided is especially
important and exculpatory considering the enhancement allegation
that charges actual and determinable loss. However despite the due
process requirement to preserve evidence-- and the statutory pro-
visions contained within these enhancements allegations that are
specifically designed to do so-- this evidence favorable and miti-
gative to these charges is lost even though the OCDA was criminally
investigating the one secreting away the assets. Thus by Trial
Counsel Schaffer's failure to file a Trombetta-Youngblood motion
that would expose the intentionality, bad faith, and improper mo-
tivation behind the Prosecution's protection of an incompetent in-
vestigation that relied on attorney Lund for information and docu-
mentation (see 10CT2255-11CT2275), the Petitioner was deprived of
appropriate sanctions or possible dismissal of the charges.

    (iv)  Motion for Appointment of Experts:  The Petitioner's
right to effective assistance of counsel entitles him as an indi-
gent defendant, access to public funds for expert services [Ake v.
Oklahoma, 470 US 68 (1985)]; and his constitutional right to equal
protection requires the court to appoint an expert needed to assist
an indigent defendant when shown the need for such an appointment
[People v. Faxel (1979) 91 CA3d 327, 330].  This need was arti-
culated by Petitioner to Trial Counsel Schaffer incessantly through
his pre-trial communications relative to numerous issues that in-
clude accounting and industry-specific information (see 9.2(A)).
When facing a prosecution that employed their own forensic accoun-
tant who spent 500 hours in review (4RT829), and defending against
a specialized unit dealing with the subject matter of real estate
and mortgage fraud (see 11CT2476), the Petitioner's need for expert
testimony well versed in the industry-specific facts in order to
counter the allegations is obvious to competent counsel and should
have been self-evident to Mr. Schaffer.  However in spite of the
Petitioner's explicit requests and common sense, Trial Counsel
Schaffer failed to move for any appointment of any expert.

  (B)  Trial Counsel's Failure to File Motions Protective of
      Petitioner's Constitutional Rights:  The Petitioner was

denied effective assistance of counsel by the failure of Trial Counsel Schaffer to file various motions designed to guarantee the Petitioner's rights as accorded him through the U.S. and CA Constitutions.

(i)  Writ of Mandate for Disqualification of Trial Judge: As noted in CLAIM 2, Petitioner was denied his constitutional right to an impartial judge as a result of erroneous decisions made by the Master Calender Court.  However pursuant to California's CCP §170.3(c), Mr. Schaffer was able to file a Writ of Mandate with the appropriate review court seeking corrective action that should have disqualified the Trial Judge.  The result of Mr. Schaffer's neglect subjected the Petitioner to a trial by a judge that in the verbiage of CCP §170.6(a) "shall not try" the Petitioner's criminal action.

(ii)  Challenges to the Accusatory Pleading:  As noted in CLAIM 5, the Prosecution amended the Information to, include charges that are factually irreconcilable with the concurrent allegations based on the same acts (see CLAIM 5.4);  add an offense based on a transaction dismissed at Preliminary Hearing (5.6), and; add an overall scheme charge that is multiplicitous and barred by statute of limitations (5.7).  The failure of Trial Counsel to file any motions applicable to these improprieties furthered the violations of the Petitioner's respective constitutional rights.

(iii)  Challenges to the Competency of Investigation and the Selectiveness of the Prosecution:  As noted by Petitioner in the concurrent claim of Prosecutorial Misconduct (CLAIM 7), the case against him is a result of an unqualified determination of probable cause derived from FBI Agent Murray's reckless disregard for objective investigation and her incredible use of Attorney Patrick Lund as her source of information and documentation (see CLAIM 7.4).  The aftermath of this abandonment of due process led to a selective prosecution of the Petitioner that was protective of Agent Murray, Lund and the alleged victims and their illicit acts associated (see 7.5).  The incapability of Agent Murray as the affiant of probable cause and the discriminatory intent

ATTACHMENT 'C':  PAGE 87

and effect of the Prosecution Team's allegations against the Petitioner would cause effective counsel to challenge such through appropriate pre-trial motions (e.g. Franks Hearing, Murgia Motion). In the Petitioner's case due to the prejudicial effect of these improprieties in his criminal proceedings as raised in CLAIM 5, the failure of Trial Counsel Schaffer to file and challenge is 'IAC'.

## 9.4   TRIAL COUNSEL'S PERFORMANCE IS DEFICIENT AND PREJUDICIAL WHEN FAILING TO SUBJECT THE PROSECUTION'S CASE TO ANY MEANINGFUL ADVERSARIAL TESTING:

Under the Fifth Amendment, the Prosecution must prove every element of a criminal offense beyond a reasonable doubt [Patterson v. New York, 432 US 197, 210 (1977)]. Thus a tactic of effective representation is disputing the sufficiency of the evidence presented by the adversarial testing of the Prosecution's theories and the elements on which they are presumed. Consequently, if counsel fails to subject the theories, elements and presumptions to any meaningful challenge, the judicial process itself becomes presumptively unreliable [United States v. Cronic, supra].

(A)   Trial Counsel Fails to Challenge the Grand Theft by False Pretense Allegations:   In the Petitioner's case, as raised in the concurrent CLAIM 3, the Prosecution has built the Grand Theft charges of CPC §487(a) (counts 1-4,6,8,10-12,15-17,22-26; see 4CT 893-902) on a theory of  verbal representations of a false pretense (see CLAIM 3.1). This False Pretense was that each investor believed they were actual lenders of private mortgages based on the alleged verbal representations of the Petitioner.

(i)   Element of False Pretense Required for Conviction:   To convict Petitioner on these allegations, the element of 'reliance' is required to be proven by the Prosecution beyond a reasonable doubt (see 5CT1086-1087). However as demonstrated in CLAIM 3.2-3.3, the Prosecution ignores the obligation to establish the evidentiary fact of  investment-specific "interest" characterizations, that then allows them to presume other evidentiary facts of 'no return of principal', leading them to presume elemental facts of 'loss', and ultimately 'reliance'.

(ii)   Evidence of Trial Counsel's Deficient Performance:

(a)   Failure to Prepare Precludes Expert Testimony:
After the start of trial, Trial Counsel Schaffer in chambers attempts to argue the concept of "interest" within the context of the allegations and the element of 'reliance'.  However in these discussions the Trial Court takes issue with Mr. Schaffer's timing by responding "this seems like something everybody should have been aware of and should have been dealt with in our 402's, not in the stand" (1RT193).  When Mr. Schaffer continues the argument, the Trial Court who has already adopted the inappropriate presumption as fact (see CLAIM 3.4; CLAIM 8.3), again replies "I'm not about to, under [CEC] 352, as an undue consumption of time, opening up a whole nother pandora's box then having to bring in- somebody having to bring in a CPA... that would add weeks into his trial" (1RT202).  Thus Trial Counsel Schaffer's failure in pre-trial preparations precluded introduction of expert opinion (CPA) that would not only demonstrate the impropriety of the Trial Court's wrongful disposition, but also illustrate the fallacy of the allegations of false pretense and the perjury being conveyed to the jurors as evidentiary fact.  Moreover, these false characterizations of "interest"  could have also been demonstrated by Trial Counsel through discovery enforcement (CLAIM 7.3(B)) and introduction of all 'VCF' claims (7.3(A)), but Mr. Schaffer's failure to file an appropriate pre-trail motion prejudiced the Petitioner by precluding the information that challenges and disproves the evidentiary presumptions being used.

(b)   Failure to Prepare Results in Trial Counsel's
Inability to Understand the Actual Defense and the
Incapability to Challenge the Elements of Grand
Theft:  The Petitioner attempted to explain the
concept of "interest" being improperly presumed by the Prosecution and stressed to Trial Counsel that his use of the Prosecution's terminology of "interest" and "principal" actually helps the Prosecutor in conveying to the jury particular characterizations that advocate the alleged false pretense.  The Petitioner repeatedly told

ATTACHMENT 'C':  PAGE 89

Trial Counsel that every time he referred to "interest" or "prin-
cipal", he was establishing in the minds of the jurors a dispo-
sition that accepts the false pretense theory and establishes their
finding of the element of 'reliance'. The Petitioner instead asked
Trial Counsel to refer to the correct defense terminology of "cap-
ital", "disbursements", "return of capital", "return on capital or
investment". However Trial Counsel Schaffer was unable to grasp
the defense concept, and throughout trial reinforced the false cha-
racterizations being presumed as evidentiary fact. An example of
this is seen in Mr. Schaffer's questioning of alleged investor-
victim Larry Richardson about monies received from Petitioner,
Schaffer asks "How much?". To which Richardson replies "Principal,
or Principal and Interest?"; Schaffer responds "Principal and In-
terest" (1RT241). Unfortunately, Trial Counsel Schaffer's use of
these false characterizations of "interest" and "principal" that
establish evidentiary fact are found from start to finish of trial
(see Exhibit 4, No. 6), and by his doing, he not only fails to ad-
versarially challenge the Prosecution's theory of false pretense,
but along with his failure to prepare, actually advocates the ele-
ments required to convict.

   (B) Trial Counsel Fails to Challenge the Allegations of Forged
           Documents with the Specific Intent to Defraud: As stated
by Prosecutor Pierce during his opening statement, nine of the counts
against the Petitioner (counts 5,7,9,13-14,18-21; 4CT893-902), relate
to forged documents with specific intent to defraud (1RT55-56). The
allegations of CPC §470, as Mr. Pierce explains, involve "forgery
of a specific document, and those documents...are actually recorded
deeds of trust" (1RT52). However as demonstrated by Petitioner in
CLAIM 6.3, the Prosecutor's representation of "actually recorded
deeds" is actually false; a fact that was never clearly challenged
by Trial Counsel Schaffer. Moreover with these allegations re-
quiring proof of an intent to defraud (see 5CT1094), the CA. Penal
Code §8 states that "it is sufficient if an intent appears to de-
fraud". Therefore tax-reporting testimony from an industry expert
that establishes that these investors did not report income with
the belief that these documents were "actually" recorded, would be

ATTACHMENT 'C': PAGE 90

sufficient to show the jurors that the investors were not deceived
and thus not defrauded (also see 3.8(C)).   This tax-reporting re-
ality was  requested by Petitioner of Trial Counsel through pre-
trial communications (see Exhibit 10), also requested by Petitioner
from the Prosecution through discovery request (11CT2475), and
apparent through 'VCF' statements of no tax-reporting of investment
transactions (see 9.2(A)(ii) above); as well as available to Trial
Counsel through appropriate motion (9.3(A) above).   Thus with mul-
tiple options to demonstrate to the jury that the alleged investor-
victims were not deceived nor defrauded, by establishing the fact
they never tax-reported consistent with a belief in a deed of trust
actually recorded or even thought to be, Trial Counsel Schaffer neg-
lects to challenge the forgery allegations by failing to introduce
or compel introduction of the industry-specific information that
disproves the elements of the charges.

   (C)   Trial Counsel Fails to Challenge the Allegations of Untrue
            Statements in Sale of a Security:  Raised in CLAIM 5.2, the
Prosecution added counts 27-37 (CCC §25401) after the extradition
date of the Petitioner and in violation of the 'Doctrine of Spe-
cialty'.   Thus Trial Counsel Schaffer's failure to investigate the
'extradition' of Petitioner as requested in pre-trial correspondence
(9.2(B)(ii) above), resulted in his neglect to challenge the trying
of the Petitioner for offenses that according to this Doctrine, he
is not triable.   Furthermore, Petitioner through discovery requests
made by prior counsel, asked for information and material relevant
to the Prosecution's expert witnesses (see 11CT2480).   Thus if this
material would have been disclosed through sanctioned discovery as
it should/would have been by competent counsel prior to trial (e.g.
CPC §1054.5), then Petitioner's defense could be prepared for what
was revealed at trial to be factually irreconcilable and divergent
theories existing between the new CCC §25401 charges and the ori-
ginal offenses of CPC §487(a) (see CLAIM 5.4); and the dependence
of these new charges on the elementally-oxymoronic testimony of
Prosecution expert witness, Marlou De Luna (also see CLAIM 6.5).
Therefore the failure of Trial Counsel Schaffer to compel disclosure
of requested information, left him ill-prepared and thereby unable

ATTACHMENT 'C':  PAGE 91

to adversarially challenge the Prosecution's diametric theories.

(D)  Trial Counsel Fails to Challenge the Allegation of an
Overall Scheme to Defraud:  Included in the offenses added
after the extradition date is count 38 (CCC §25541), which according
to Prosecutor Pierce represents the "overall accusation of operating
a scheme to fraudulently sell securities" (11RT2108).  However as
raised by Petitioner in CLAIM 5.7 above, the charging of this count
violates the 'Doctrine of Specialty' as well as subjects the Peti-
tioner  to double jeopardy due to its multiplicitous nature.  More-
over because this allegation involves a course of business that pre-
dates predicate offenses by up to 10 years, it is barred by statute
of limitation.  These procedural bars notwithstanding, but this al-
legation of a scheme to sell securities is incumbent upon qualifying
the investment transactions as 'securities' as defined by the "Howey
Test".  As described by Prosecution expert witness Marlou De Luna
(see CLAIM 5.4(B)), this test requires amongst other things, a
"reasonable expectation of profit".  The Petitioner in 5.5(B) above
demonstrates that this 'reasonableness' in the investors' expect-
ations is challenged if these alleged victims are confronted with
their belief they were entitled to all disbursements irrespective
of borrower defaults.  These facts of profiting from their invest-
ments despite any economic realities would also be demonstrated
through proper accounting as requested of Trial Counsel in pre-
trial preparation (9.2(A)(i)), as well as being requested of the
Prosecution through pre-trial discovery (11CT2475).  Therefore the
failure of Trial Counsel to prepare accounting (9.2(A)(i)), compel
accounting disclosure (9.3(A)(i)), or move the Trial Court for an
appointment of an expert to prepare accounting (9.3(A)(iv)), is
deficient performance that prejudices the Petitioner by depriving
him of the evidence and argument that adversarially challenges the
elements of the "overall scheme to defraud" allegation.

(E)  The Failure of Trial Counsel to Adversarially Challenge
the Allegations is Deficient Performance and Prejudicial:
Prejudice is presumed in situations where the likelihood of counsel
having provided effective assistance is extremely small, as in

instances where counsel failed completely to subject the prosec-
ution's case to any meaningful adversarial testing [United States
v. Cronic, supra].  Nonetheless, the prejudice of Trial Counsel
Schaffer's deficient performance is prominently displayed by the
Prosecutor's ridicule of Petitioner and equating his testimony and
credibility with the lack of evidence introduced by counsel. The
Prosecutor in his closing remarks states "So I would submit to you
that what the...defense in this case rests on essentially [is] Mr.
Tarbutton's testimony [which] is ['BS']; a baloney sandwich" (11RT
2199).  Pierce continues "The only thing that has [been] presented
really to refute [the charges], the heart of it is what? The defen-
dant's testimony with virtually no documentary evidence" (11RT2205).
The Prosecutor has also told the jury "He has virtually no documen-
tation, he has virtually zero documentation to support any of what
his version of events" (11RT2136); and Mr. Pierce also intimates
the failure of Trial Counsel when he states "I would also point out
that defense also has the power of subpoena.  But there is no docu-
mentary evidence... there's just the defendant's story versus the...
evidence that has been presented by the People" (11RT2205).  It is
important to note that Prosecutor Pierce's closing remarks come
after the Prosecution failed to comply with the discovery requests
made by the Petitioner pre-trial (see CLAIM 7.3) and after sup-
pressing the tax-reporting reality that refutes all charges (CLAIM
3.6).  This misconduct of the Prosecutor aside, but Trial Counsel
could compel discovery of this evidence or introduce through proper
preparedness, investigation and expert testimony (see 9.2 above).
Unfortunately, Trial Counsel failed in all respects, and his decision
to introduce absolutely zero evidence that was derivative of his
representation is inexplicable and indefensible.

9.5  THE FAILURE OF TRIAL COUNSEL TO ADVOCATE THE PETITIONER's
     AFFIRMATIVE DEFENSE WAS DEFICIENT AND PREJUDICIAL:  Another
tactical defense strategy is an affirmative assertion of facts, that
if true, defeats the prosecution's allegations.  Ordinarily, this
defense strategy requires the production of evidence to support the
defendant's assertions [Martin v. Ohio, 487 US 228 (1987)].  In the

ATTACHMENT 'C':  PAGE 93

Petitioner's communications with defense counsel leading up to trial, he had explained the actual premise of investment that was established with the original investor, William Steiner, and then used as the prevailing premise for every investor introduced as a direct or indirect result of Mr. Steiner's influence.  These assertions were finally introduced through Petitioner's testimony on 1/12/2016 (10RT1735-1739), a month after the start of the trial (see CLAIM 8.7), and accompanied by what the Prosecutor describes as "virtually zero documentation" (11RT2136).  This affirmative defense was supposed to attest that the investors were investing in the Petitioner's company and not in specific mortgages.  Also to be asserted was that the civil and criminal actions against the Petitioner were a result of the confluence of an economic recession, the devious machinations of attorney Patrick Lund ('VCF' Claims, see 7.5(A) above), and the unrealistic expectations of the investors (see CLAIM 5.5(B)).  To demonstrate the prevailing premise as originated with Mr. Steiner, Petitioner requested Trial Counsel for preparation and introduction of evidence that included:

(A)  Acts of Ownership Typical of a Mortgage Beneficiary:  The Petitioner's request of Trial Counsel-- and discovery requested of the Prosecution-- for proper accounting (see Exhibit 10; 11CT2475-2478), would demonstrate to the jury that it was the Petitioner who exercised all acts of ownership for the subject private mortgages by bearing all expenses (without reimbursement) for the servicing of these loans.  These expenses include advances to senior liens, respective title and hazard insurance fees, legal fees, loss mitigation, foreclosure costs, REO expenses, etc.  Also requested of Trial Counsel was expert opinion to provide industry-specific information that details the obligations and liabilities of a junior lien holder (9.2(A)(iv)(d) above)).  This testimonial and documentary evidence establishing the Petitioner as the one exercising all acts of ownership (as sworn to in Exhibit 11), if introduced by Trial Counsel would according to CA Evidence Code §638, establish the presumption that the Petitioner was the recognized and understood owner of these assets.  The effect of this presumption in the context of the affirmative defense would 'require the jury' to

ATTACHMENT 'C':  PAGE 94

assume the existence of the presumed fact unless and until evidence
is introduced which would support a finding of its nonexistence
(CEC §604).  With the Prosecution failing to provide any accounting
evidence showing any investor exercising any act of ownership over
any mortgage that according to the False Pretense theory they be-
lieved they owned, the jury should have gone to deliberation with
the rightful presumption that the Petitioner was the known owner
of the subject mortgage transactions.  Inasmuch as the 'Doctrine of
Equitable Judicial Estoppel' [CEC §632; New Hampshire v. Maine, 532
US 742, 751 (2001)] should preclude the contradiction of the est-
ablished conduct of the investors, the contrariety of their subse-
quent testimony of a feigned reliance on a supposed False Pretense
would have been impermissable had Trial Counsel provided or compelled
proper accounting.

(B)  Genealogy and Commonalities of Investors:  To affirmatively
establish the existence of the prevailing premise of investment that
started with William Steiner in 1998 (see 10CT1735-1738), the Peti-
tioner requested of Trial Counsel to prepare the genealogy of in-
vestors originating from Mr. Steiner.  These relationships are demon-
strated by the Petitioner in the Addendum 'E' attached to his CPC
§1181 Motion (11CT2346-2351).  The purpose of this documentation is
to show the jurors the commonalities of these investors' actions,
that are consistent with the 'prevailing premise' of investment and
in contradiction to the 'ad hoc premise' devised in order to submit
fraudulent claims to the 'VCF'.  The absolute and unwavering conduct
of these investors that were introduced to the Petitioner by Steiner--
either directly or indirectly-- that collectively betray the theory
of False Pretense, are put in proper context for jury consideration
when viewed in conjunction with the affirmative defense of the pre-
vailing premise.

Also  shown to the jurors would be the commonalities such as the
complete lack of documentation that is intrinsic and crucial to an
actual lender.  Of particular note is the investors' failure to pos-
sess any protection from forfeiture of their investment due to title
defects or damage to the collateralized asset.  One necessity for

ATTACHMENT 'C':  PAGE 95

an actual lender is being named as an insured entity and loss payee
on the subject property owner's insurance policy (see 11CT2355-2356),
which insures payment in the event of damage/loss to/of the res-
pective property.  The failure to possess such insurance policy,
risks loss in certain events.  Despite this risk of loss, investors
like Ray Infantino (counts 15-17,31), a retired insurance broker
(5RT857) who made a living based on insuring others against these
types of risks, seems unconcerned about his failure to possess any
policy for his own protection on investments that he supposedly be-
lieves subjects him to this type of loss (5RT909).  This mindset
that is shared in common with all investors in regards to any acts
of ownership (see Exhibit 4, No.8), is consistent with the pre-
vailing premise of investment initiated with Steiner in 1998.  How-
ever absent the preparation and introduction of this information
that shows the interrelationships of investors and commonality of
their conduct, Petitioner was deprived of his right to effective
counsel by Mr. Schaffer's failure to properly advocate the pre-
vailing premise of investment.

(C)  Patrick Lund and 'VCF' Claims:  A component of the Peti-
tioner's affirmative defense is the assertion that the allegations
of Grand Theft by False Pretense are rooted in the 'ad hoc' premise
devised by attorney Lund and investors for their use in submitting
applications for payment to the 'VCF'.  As noted in 9.2(A)(ii) and
9.2(B)(i) above, Petitioner requested Trial Counsel Schaffer, along
with investigation of Patrick Lund's criminal activities, to also
secure the two most flagrantly fraudulent 'VCF' claims of Steiner
and Almquist.  These two false claims of loss are applications for
payment from the 'VCF' in an aggregated amount estimated by Peti-
tioner at $8M to $9M.  Proper preparation/investigation would show
these two investors starting to invest with Petitioner in 1998/1999
(see 11CT2346-2351);  receiving disbursements from Petitioner for
every month investing until the summer of 2010 (see 3CT632; 5RT986);
meeting with attorney Lund while still receiving disbursements from
Petitioner (3CT497), and; according to Mr. Steiner's son-in-law
Jesse Bagley, are "heading up" the transfer of assets from the Peti-
tioner and the 'VCF' claims with attorney Lund (4CT762).  One reason

ATTACHMENT 'C':  PAGE 96

for Petitioner requesting this info/investigation from Trial Coun-
sel is to show the jurors the financial benefit a criminal prose-
cution of the Petitioner provides in the processing of the 'VCF'
claims and the obvious economic bias of the alleged investor-
victims.  Also revealed to the jury would be the symbiotic link
between the 'ad hoc' premise used for the 'VCF' claims and the
Grand Theft prosecution that relies on the same theory as its ele-
ments for the allegations.  Petitioner had also discovery-requested
this information from the Prosecution (11CT2475-2478), but despite
their eventual criminal investigation of Lund, they suppressed all
evidence related to these events and documentation (CLAIM 7.3(A)).
Therefore the failure of Trial Counsel Schaffer to introduce this
information and evidence through preparation, investigation, or
compelled disclosure, ultimately deprived the Petitioner of proper
advocacy of affirmative defense and effective counsel.

## 9.6   TRIAL COUNSEL FAILED TO ACT IN A MANNER EXPECTED OF A
        REASONABLY COMPETENT ATTORNEY ACTING AS A DILIGENT ADVOCATE:

The Sixth Amendment's right to effective counsel guarantees reason-
able competence [Yarborough v. Gentry, supra], and an attorney acting
with due diligence to ensure fundamental fairness in the proceedings
[Knowles v. Mirzayance, supra].  Also, to preserve issues for appeal,
it is generally required for a specific and timely objection to be
made at or before trial, or prior to sentencing [Puckett v. United
States, 556 US 129, 133 (2009)], and has been found to be 'IAC' by
failing to object [Williams v. Taylor, 529 US 362 (2000)].  In the
Petitioner's case, Trial Counsel Jerry Schaffer's deficient per-
formance at and before trial, and before eventual sentencing, was
incompetent and lacking in any indicia of due diligence.  His
failure to object to any of the issues raised in the concurrent
claims of this petition falls below professional norms and consti-
tutes ineffective counsel.  The deficient and prejudicial performance
in failing to contest/object includes:

(A)  CLAIM 1:  The Prosecution's variance, constructive amend-
ment, duplicity in the charges was not objected to or contested in
any way by Trial Counsel Schaffer.  The Trial Court's misstating of

ATTACHMENT 'C':  PAGE 97

procedural facts and misinstructing the jury was not objected to
or contested by Trial Counsel Schaffer.

(B)  CLAIM 2:  The Petitioner's rights were jeopardized and for-
feited by Trial Counsel's conduct which includes his failure to file
a Writ of Mandate to ensure an impartial judge and a fair trial.

(C)  CLAIM 3:   Prosecution using  false presumptions and per-
jured testimony as evidentiary fact that was foundational to all
charges is allowed due to Trial Counsel's failure to prepare expert
testimony demonstrating the fallacy of the allegations.  The defi-
cient performance of Trial Counsel Schaffer permitted the Peti-
tioner's conviction based on false/perjurious testimony.

(D)  CLAIM 4:  The failure of Trial Counsel to investigate and
litigate the outrageous conduct of abduction/conveyance deprived
the Petitioner of evidence that impeaches the credibility and com-
petency of the Prosecution Team, forfeits jurisdiction of the Trial
Court, and warrants dismissal of the charges.

(E)  CLAIM 5:  The failure of Trial Counsel to be competent and
diligent allowed the Petitioner to be tried and punished for charges
that are precluded by the 'Doctrine of Specialty', procedural due
process, and double jeopardy.

(F)  CLAIM 6:  The failure of Trial Counsel to prepare information
and expert testimony allowed the Prosecution to introduce documentary
evidence and testimony that was unqualified, known to be false, and
perjurious.

(G)  CLAIM 7:  The failure of Trial Counsel to object, or chal-
lenge the Prosecution's misconduct that pervaded the criminal process
from investigation through trial, deprived the Petitioner of any
meaningful adversarial testing of the action taken against him.

(H)  CLAIM 8:  The failure of Trial Counsel to object to the
erroneous statute of limitation decisions, the ex parte communi-
cations, the jurisdictional defects, and the disqualifying interest
of the Trial Court deprived the Petitioner of due process, an im-
partial judge, and a fair trial.

ATTACHMENT 'C':  PAGE 98

(I)  Post-Trial:  As noted in Petitioner's affidavit identi-
fied as 11CT2449-2465, he attempted more than twelve times fol-
lowing conviction to facilitate the filing of a motion for new
trial (CPC §1181).  Despite Trial Counsel's representations that
he would get this filed, and his neglect to do so, the Petitioner
offered to draft it for review and ultimately to have it filed.
The Petitioner's ambition to do this was caused by Trial Counsel's
procrastination in doing anything productive for post-trial relief,
and this includes his failed promises to provide the Petitioner
with discovery evidence, trial transcripts and trial exhibits.

(J)  Conduct Throughout the Proceedings:  The Petitioner through
written correspondence and face to face conversations with Mr. Jerry
Schaffer belabored the point that tax-reporting is the proof and
the evidence that disproves the "interest" and "principal" pre-
sumptions being used by the Prosecution.  He repeatedly asked Mr.
Schaffer not to use these descriptive terms that advocate the Pro-
secution's allegations and to introduce expert testimony that would
illustrate the tax reality that as described in CLAIM 3.6, precludes
the practical possibility of investors tax-reporting as they even-
tually testified.  In response to Petitioner's incessant pleas, Trial
Counsel Schaffer failed to introduce any expert testimony and com-
pounded the prejudice by engaging in questions with the alleged
investor-victims that actually endorse the false presumptions of
the Prosecution.  Another example of what is seen throughout trial
is found in Mr. Schaffer's examination of Debra Duncan, when he
suggests, "Okay, and the interest that you earned from your in-
vestments, I take it that was reported on all your tax returns for
all the years you invested, is that right?"; to which Ms. Duncan
replied "Correct" (8RT1555).  Not only does Trial Counsel convey
to the jury that Ms. Duncan tax-reported the income received as
"interest" consistent with her alleged reliance in the false pre-
tense, but by failing to show the jury that this is a tax-reporting
impossibility due to Ms. Duncan's failure to notify any borrowers
of 'interest paid' (see CLAIM 3.7), Mr. Schaffer's counsel is ad-
vocating Petitioner's guilt.

ATTACHMENT 'C':  PAGE 99

9.7  TRIAL COUNSEL POSSESSED A CONFLICT OF INTEREST THAT DEPRIVED
     PETITIONER OF EFFECTIVE ASSISTANCE OF COUNSEL:  Conflicts of
interest arise when counsel's personal interests diverge from those
of the defendant's [Rubin v. G.E., 292 F.3d 396 (4th Cir. 2002)].
Courts need to examine the facts on a case by case basis to deter-
mine if an actual conflict exists, and an appellant/petitioner need
not offer direct proof where circumstantial evidence is sufficient
to show the conflict of interest [United States v. Register, 182
F.3d 820 (11th Cir. 1999)].  In the Petitioner's case, this cir-
cumstantial evidence when viewed in conjunction with Trial Counsel's
deficient performance is sufficient to show the apparent conflict.

   (A)  Circumstantial Evidence and Deficient Performance:  Trial
Counsel Jerry Schaffer is a former prosecutor with the Orange Co.
District Attorney's office and was a co-worker of Prosecutor Pete
Pierce.  Mr. Schaffer also maintains a social relationship with FBI
Agent Jessie Murray and her husband Michael Murray of the OCDA,
having known them for several years and having been to their house
multiple times (1RT09).  The frequency of social visits describes
a relationship that is more than a casual acquaintance, and de-
notes a friendship that fostered Mr. Schaffer's predisposition and
bias that consciously, or subconsciously, hindered Mr. Schaffer's
adversarial confrontation of the Prosecution Team and tactics that
ultimately deprived the Petitioner of effective representation.  As
noted in Exhibit 10, Petitioner provided Trial Counsel with infor-
mation that with proper investigation and due diligence would result
in evidence of the 'bad acts' attributable to Jessie Murray (11CT
2317-2326), Prosecutor Pierce (11CT2327-2331), and Lund/Investors
(11CT2294-2316).  Therefore Mr. Schaffer was aware of the illicit
conduct to some degree that unconflicted investigation would reveal
to be acts indicative of kidnapping, false imprisonment, commis-
sioning of abduction/conveyance, etc. (see CLAIM 4.4).  However
despite Petitioner's explicit requests, there is no indication that
suggests Mr. Schaffer made any effort to discover, litigate or in-
troduce any evidence of these 'bad acts' that could implicate and
impeach the Prosecution and their process employed.  Therefore, the
pre-existing friendships of Mr. Schaffer and the prejudicial slant

that harbors and protects those within his social circle deprived
the Petitioner of any truly adversarial confrontation of the case
brought against him.  Thus with Mr. Schaffer's social interests
conflicting witn the Petitioner's liberty interest, Trial Counsel
was ineffective.

(B)  The Prejudice of Mr. Schaffer's Conflict of Interest:  The
actions and attitude resulting from Trial Counsel Schaffer's loyalties
and partisanship, effectively left the Petitioner without a mouth-
piece and consequently no advocacy for his defense.  This absence
of any real support in tandem with the void of expert testimony
and failure to introduce any evidence essentially abandoned the Peti-
tioner to the unchallenged machinations of the Prosecution.  The
resulting prejudice of Mr. Schaffer's conflict of interest kept
the jury from any information/evidence of the Prosecution's 'bad
acts' and precluded any consideration of that which spotlights their
reckless disregard of the investigation and prosecutorial process.

9.8  APPELLATE COUNSEL'S FAILURE TO RAISE SIGNIFICANT AND OBVIOUS
     ISSUES ON DIRECT APPEAL WAS DEFICIENT PERFORMANCE AND
     PREJUDICIAL TO THE PETITIONER'S RIGHT TO EFFECTIVE COUNSEL:
The Petitioner's constitutional right to effective assistance of
counsel extends to the direct appeal of his conviction [Smith v.
Robbins, supra].  In the Petitioner's case, with the issues add-
ressed herein preserved in Trial Court by the pro per pleadings
filed by the Petitioner prior to sentencing, Appellate Counsel's
failure to raise on direct appeal is ineffective assistance.

(A)  These Issues Were Cognizable on Appeal:  The Petitioner as
declared in Exhibit 1, communicated through numerous correspondences
with Appellate Project and Counsel, the paramount issues to be
raised on direct appeal.  These issues were preserved in the appel-
late record despite Trial Counsel's deficient performance, by
Petitioner's motions, declarations and addenda that were filed after
Trial Counsel Schaffer finally conflicted off a year after the ver-
dict (see CLAIM 2.1(D)).  Thus pursuant to the 'contemporaneous ob-
jection' rule and other authorities, these issues were preserved
and cognizable on appeal [e.g. Puckett v. United States, supra].

ATTACHMENT 'C':  PAGE 101

Included as a result of Petitioner's filings in Trial Court is the
claim of 'IAC' of **Trial** Counsel Schaffer by its sufficient develop-
ment in the CPC §1181 Motion for New Trial found in the appellate
record at 1OCT2126-2148 [<u>United States v. Nickerson</u>, 556 F.3d 1014,
1017 (9th Cir. 2009)].

(B)  The Issues Preserved Were Significant and Obvious:  In as-
sessing whether an appellate attorney was ineffective for failing
to present an issue, courts look to see if the attorney missed a
significant and obvious issue.  If so, the court compares the neg-
lected issues to those actually raised and if the ignored issues
were clearly stronger, then appellate counsel was deficient.  To
show prejudice, a petitioner must show that there's a reasonable
probability the omitted claims would have altered the outcome of
the appeal had they been raised [<u>Stallings v. United States</u>, 536
F.3d 624, 627 (7th Cir. 2008)].  In the Petitioner's case, these
issues as spelled out in the concurrent claims-- and set forth in
Petitioner's request to consolidate his state Habeas Petition with
the direct appeal No.G055717 during its pendency (see Exhibit 17)--
include structural errors (CLAIMS 1,2,3);  jursidictional defects
(CLAIMS 4,8);  procedural bars (CLAIMS 4,5);  prejudicial mis-
conduct and performance that merit reversal and dismissal (CLAIMS
4,6,7,9), and; the demonstration of factual innocence (CLAIM 3).
Not one of the issues raised by appellate counsel in Petitioner's
direct appeal of No. G055717 approach the magnitude and significance
of any of the Habeas contentions as included herein.

(C)  Appellate Counsel's Failure to Raise is Deficient and Pre-
          judicial:  Despite the Petitioner calling attention to
these issues through direct correspondence with Appellate Project
and Appellate Counsel Valerie Wass, the real indication of ineffect-
iveness is the fact that Ms. Wass failed to raise any of these
issues that merit post-conviction relief.  Comparison of the issues
raised by Ms. Wass versus those omitted is best illustrated by Ms.
Wass's Argument I of the Appellant's Opening Brief that raises the
issue of Trial Court failing to instruct the jurors on unanimity
related to the two theories of Grand Theft.  However Ms. Wass's

ATTACHMENT 'C':  PAGE 102

Argument I is irrelevant when considering Petitioner's CLAIM 1
raises the impermissable constructive amendment after the close of
evidence and the structural errors of the Trial Court to allow
such procedural dysfunction that then set the stage for the improper
jury instruction that lacked unanimity and special findings.  The
Petitioner had preserved these issues in Trial Court-- and in the
appellate record-- and in so doing used <u>People v. Dominguez</u> (2008)
166 CA4th 858, where the appellate court reversed a conviction on
due process grounds by the prosecution adding an alternative basis
for conviction after the close of evidence, as the Prosecution did
in the Petitioner's case (see CLAIM 1).  Moreover, an authority
cited by the appellate court for their decision in <u>Dominguez</u> is
<u>People v. Burnett</u> (1999) 71 CA4th 151 where the review court re-
versed due to trial counsel's failure to object to an impermis-
sable amending of the charges after the close of evidence.  Not
only did Appellate Counsel of the Petitioner miss completely the
preservation of the constructive amendment impropriety and the
'IAC' of Trial Counsel to allow it to occur without a motion from
the Prosecution nor an objection from Mr. Schaffer, but then
raises the failure of the Trial Court to instruct on unanimity; an
issue that is rendered insignificant if the structural matters of
constructive amendment, variance and duplicity are properly add-
ressed.  Therefore the issues raised by Ms. Wass in the 'AOB' of
Petitioner's direct appeal of No.G055717, which mostly deal with
sentencing issues and trial errors, are less significant than the
errors of constitutional materiality raised herein as CLAIMS 1
through 9.  Thus the deficient performance of Appellate Counsel not to
address any of the issues raised in the verified claims of this
Habeas Petition is ineffective assistance.

<u>9.9  THIS CLAIM MERITS FEDERAL REVIEW AND REMEDY</u>:  This Claim and
the issues raised merit Federal Review pursuant to 28 U.S.C. 2254
as the facts and evidence presented are properly before the Court.
With the Petitioner's conviction and state custody a direct result
of the violation of the Constitution, Laws, and Treaties of the
United States, proper remedy is warranted.

**ATTACHMENT 'C':  PAGE 103**

(A)  Issues Preserved in Trial Court:  In Case No. 11CF2747 of
Orange County Superior Court, the Petitioner through pro per plea-
dings filed in Trial Court prior to sentencing, properly preserved
the issues identifiable in CLAIM 9 above.  These 'objections' are
found in the appellate record as:  Failure to Prepare and Invest-
igate (CPC §1181 Motion at 1OCT2130-2136);  Failure to File Motions
(CPC §1181 at 1OCT2136-2139);  Failure to Subject Prosecution's
Case to Adversarial testing (CPC §1181 at 1OCT2143-2145);  Failure
to Properly Advocate Affirmative Defense (CPC §1181 at 1OCT2145-
2147);  Failure to be Competent and Diligent (CPC §1181 at 1OCT2139-
2143);  Conflict of Interest (CPC §1181 at 1OCT2147-2148).  As noted
in 3C of the Procedural History included in the **PETITION OVERVIEW**,
all pro per motions and actions were denied by the Trial Court prior
to sentencing; and in so doing offered no factual findings, applied
no decisional law addressing the materiality or prejudiciality of
the issues associated, nor compelled any evidence/testimony to re-
solve credible, disputed issues of fact.

(B)  Issues Exhausted in State Court:  As noted in the Procedural
History included in the **PETITION OVERVIEW**, the Petitioner motioned
the Appellate Court to set aside his direct appeal brief as filed
by Appellate Counsel due to the omission of issues of greater sign-
ificance.  After the Appellate Court disregarded this request/motion,
the Petitioner filed a State Habeas Petition concurrent with his
direct appeal in which the issues raised in CLAIM 9 above were in-
cluded as CLAIM IX of that petition.  That state petition (No.
G058686) was denied on 6/04/2020.  Petitioner filed virtually the
same petition in the California Supreme Court on 7/31/2020.  This
state petition (Case No.S263665) was denied on 2/20/2021.  Both
state denials provided no factual findings, no explanation, no ap-
plication of decisional law (state or federal), no evidentiary
action to resolve any credible, disputed issues of fact, nor gave
any indication whatsoever that any adjudication of any issue was
considered or administered.

(C)  Evidence and Authorities Presented in State Court:  In sub-
mitting these issues in state court, the Petitioner presented such

on the same facts and evidence referenced herein by attached Exhibit,
Declaration, and Request for Judicial Notice (Exhibit 5).  As to
applicable federal law as established by U.S. Supreme Court decision,
the Petitioner offered such authorities that included:  Strickland
v. Washington, 466 US 668 (1984) [Deficient and Prejudicial Per-
formance]; Wiggins v. Smith, 539 US 510 (2003) [Failure to Inves-
tigate]; Cuyler v. Sullivan, 446 US 335 (1980) [Conflict of In-
terest]; U.S. v. Cronic, 466 US 648 (1984) [Failure to Adverarially
Challenge]; Smith v. Robbins, 528 US 259 (2000) ['IAC' of Appellate
Counsel].

   (D)  Review and Remedy:  In the PETITION OVERVIEW attached to
the Federal Habeas Form CV-69, the Petitioner demonstrates that this
CLAIM merits de novo review due to the fact that there is no state
ruling to review with AEDPA deference.  In this de novo review as
prayed for by the Petitioner, he also requests Judicial Notice of
the evidence as presented in Exhibit No.5 [Page 40 of ATTACHMENT 'D'].
In the Court's determination of issues presented in this CLAIM,
the Petitioner prays for resolution of all disputed facts by refe-
rence to that which is judicially noticeable, and also that which
is obtainable by Evidentiary Hearing as incorporated by Exhibit
No. 20 [Page 127 of ATTACHMENT 'D'].  As it relates to the conflict
of interest as raised in 9.7 above (Page 100), notice must be taken
of Petitioner's attempts for explanation from Trial Counsel for what
he claims is deficient performance [See Exhibit No. 12 at Page 67
of ATTACHMENT 'D'].  No response has ever been received from Trial
Counsel as to the issue of conflict of interest or any issue what-
soever.  Since exhausting all CLAIMS in state court, Petitioner has
discovered evidence of this actual conflict of interest and such
will be introduced at an evidentiary  hearing  in Federal Court,
submitted for exhaustion in state court, or both.

As to relief, Petitioner prays for all just and proper including
but not limited to reversal of the conviction based on the argu-
ments and authorities as presented above.

ATTACHMENT 'C':  PAGE 105

# ATTACHMENT

# D

CONTENTS:

Evidence Presented in State Courts through Exhibits, Declarations, and Request for Judicial Notice

> Exhibit Index Page                              Page   1
> Request for Judicial Notice [Exhibit 5].        Page  40
> Request for Evidentiary Hearing [Exhibit 20]    Page 127

## ATTACHMENT 'D'

### Exhibits Presented in State Court

## EXHIBIT INDEX PAGE

EXHIBIT No. 1:  Declaration of Correspondences with
                Appellate Counsel                        Pg.  3

EXHIBIT No. 2:  Declaration Due Diligence after the
                Filing of the Appellant's Opening Brief  Pg.  5

EXHIBIT No. 3:  Declaration of prepared Writ  of Mandate  Pg. 13

EXHIBIT No. 4:  Transcript References                    Pg. 32

EXHIBIT No. 5:  Motion for Request for Judicial Notice   **Pg. 40**

EXHIBIT No. 6:  Declaration of 'Supplemental Report'     Pg. 49

EXHIBIT No. 7:  Declaration of knowledge of items not
                identified in OCDA's Forensic Spreadsheets Pg. 53

EXHIBIT No. 8:  Copies of Letters sent to the Governor
                and Attorney General of California        Pg. 55

EXHIBIT No. 9:  Declaration of Addendum 'U' and corre-
                spondence attempts with Trial Counsel    Pg. 57

EXHIBIT No.10:  Declaration of Knowledge regarding
                Attorney Patrick Lund                    Pg. 61

EXHIBIT No.11:  Declaration of Acts of Ownership         Pg. 65

EXHIBIT No.12:  Copies of letters sent to Trial Counsel
                Jerry Schaffer; and Appellate Counsel
                Valerie G. Wass                          Pg. 67

EXHIBIT No.13:  Declaration of Due Diligence in Filing
                State Habeas Petition No.G058686         Pg. 72

EXHIBIT No.14:  Pro Per Filings of Documents in Support  Pg. 76

EXHIBIT No.15:  Copy of Letter sent to CA State Bar
                regarding Patrick Lund Information        Pg. 80

EXHIBIT No.16:  Motion to Discover OCDA's Lund
                Investigation                            Pg. 87

ATTACHMENT 'D':  PAGE 1

CLAIM 1: ALTERNATIVE BASIS FOR CONVICTION

(iv) 'CONFRONTATION DENIAL' – POINTER v. TEXAS 380 U.S. 400 (1963)

(v) 'VARIANCE' – RUSSELL v. U.S.369 U.S. 749 (1962)

(C.) PRAYER FOR RELIEF: Petitioner respectfully requests relief that includes but is not limited to:

(i) ANY EVIDENTIARY HEARING required to properly adjudicate the issues raised herein

(ii) THE COURT GRANT THE WRIT AND REVERSE THE PETITIONER'S CONVICTION

(iii) ALL OTHER APPROPRIATE RELIEF

EXHIBIT No.17: Declaration and Formal Request to Consolidate Habeas Petition No.G058686 with ongoing Direct Appeal No.G055717 Pg. 96

EXHIBIT No.18: Copy of People's Exhibit No. 61 Pg.109

EXHIBIT No.19: Reply Addendum filed in Habeas Petition No.G058686 Pg.115

EXHIBIT No.20: Request/Motion for Evidentiary Hearing Pg.127

In providing these Exhibits that were presented in State Court, the respective declarations are submitted under penalty of perjury as evidenced by my signature on each document. In addition to these declarations are included copies of documents, which in providing such to the Federal Court, I am doing so while certifying that each copy is a true and genuine reproduction of the original.

Sworn to under penalty of perjury, this the 22nd day of June, 2021,

By: ______________________

Thomas Tarbutton CDCR# BE8274
Petitioner in pro se
Folsom State Prison

# EXHIBIT NO. 1

## PROCEDURAL HISTORY:

1.) Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.) Submitted with State Habeas Petition No. S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

## CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit except for an updated signature date and Housing Location.

ATTACHMENT 'D':  PAGE 3

<u>EXHIBIT NO. 1</u>    <u>Declaration of correspondences sent to appellate counsel</u>

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The purpose of this declaration is to make record of my correspondence sent to appellate counsel, Ms. Valerie G. Wass, with the expressed intent of communicating the significant and obvious issues to be raised on direct appeal. Commencing with the assignment of Appellate Defenders, Inc. and continuing with the appointment of Ms. Wass, I made multiple attempts including numerous written requests for the appeal to focus on specific issues of law. Not one of these written correspondences was ever returned to me as 'undeliverable' or 'unclaimed' so I can presume that these letters, mailed over an approximate nine month period, were received. These letters and correspondences to Appellate Defenders, Inc. and/or Ms. Wass include those sent on or about the following dates: 12/19/17; 1/08/18; 1/23/18; 3/04/18; 4/25/18; 6/30/18; 8/29/18; and 9/04/18. In response to my attempts, I received no indication from Ms. Wass as to the issues excluded until after her filing of the 'Appellant's Opening Brief'. It wasn't until I received correspondence from Ms. Wass and a copy of the 'AOB' on 10/29/18 and 10/30/18 that I was informed by Ms. Wass of the contentions filed in the 'AOB' on or about 10/25/18. Following receipt of the 'AOB' on 10/30/18, I again attempted to communicate with Ms. Wass as to the need to amend or refile the 'AOB' due to the omitted issues. These letters to Appellate Defenders, Inc. and/or Ms. Wass include those sent on or about the following dates: 10/29/18; 11/05/18; 11/08/18; 11/28/18; 12/02/18; 12/11/18; 12/13/18; 12/18/18; and 12/27/18. Despite my instructions to set aside or amend the 'AOB', Ms. Wass has refused to do so. Instead, she has indicated that I have the possible option of filing a Writ of Habeas Corpus to be considered alongside the 'AOB' brought on grounds of ineffective assistance of appellate counsel.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of the events described and verifying the veracity of the statements contained herein. Respectfully submitted this _22nd_ day of _June_, 2021

By:_____

Thomas Tarbutton CDCR#BE8274
Folsom State Prison  Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D':  PAGE 4

# EXHIBIT NO. 2

**PROCEDURAL HISTORY:**

1.) Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.) Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit except for an updated signature date and Housing Location.

<u>EXHIBIT NO. 2    Declaration for motion sent to set aside 'AOB'</u>

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The purpose of this declaration is to make record and provide support of my efforts to ensure that my 'Appellant's Opening Brief' would address the most significant issues. When I finally found out after the filing of the 'AOB' that these issues were omitted by appellate counsel, I, along with my request/instruction to Ms. Wass for amending of the 'AOB', also moved the appellate court to set aside the 'AOB' to allow its re-filing with these issues included. This motion to set aside the 'AOB' is attached and as noted by the date stamp, it was received by the court on January 16, 2019.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of events described and verified as to the veracity of the statements contained herein.

Respectfully submitted this the _____ day of _____, 2021

By:_____

Thomas Tarbutton CDCR#8274
Folsom State Prison  Housing: #1-C1-11
P.O. Box 715071
Represa, California 95671

DECLARATION AND REQUEST TO REFILE

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT, DIVISION THREE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA<br>PLAINTIFF AND RESPONDENT,<br><br>V.<br><br>THOMAS FRANKLIN TREVITON,<br>DEFENDANT AND APPELLANT | No. G055717 |

ORANGE COUNTY SUPERIOR COURT NO. 11CF2747
THE HONORABLE LANCE P. JENSEN, JUDGE

APPELLANT'S DECLARATION AND REQUEST TO REFILE

THOMAS FRANKLIN TREVITON
CDCR NO. EE8274
NORTH KERN STATE PRISON - HSG: B1-226
PO BOX 4999
DELANO, CA 93216

I, THOMAS FRANKLIN TREVITON, THE DEFENDANT AND APPELLANT
IN APPEAL NO. G055717, UNDER PENALTY OF PERJURY, DO HEREBY
SUBMIT THIS DECLARATION WITH THE DUAL INTENTION OF MAKING
RECORD OF MY OPPOSITION AND DISAPPROVAL OF THE

ATTACHMENT 'D':   PAGE 7

DECLARATION AND REQUEST TO REFILE · PAGE 2 OF 5

APPELLANT'S OPENING BRIEF [ HEREAFTER 'AOB' ] EXECUTED BY
APPOINTED COUNSEL, VALERIE G. WASS, ON OCTOBER 25, 2018; AND
REQUEST THE OPPORTUNITY FOR THE REFILING OF A REVISED 'AOB',
WHICH REQUIRES AN EXTENSION OF TIME REASONABLY NECESSARY TO
DO SO.

     IT IS IMPORTANT TO NOTE THAT I HAVE ACTED WITH AN ABUNDANCE
OF CAUTION AND REASONABLE DUE DILIGENCE THAT SHOULD HAVE
PRECLUDED THE NEED FOR THIS DECLARATION AND REQUEST. STARTING
WITH MY NOTIFICATION OF THE ASSIGNMENT OF APPELLATE-DEFENDERS,
INC. AND CONTINUING WITH THE APPOINTMENT OF MS. WASS TO MY
APPEAL NO. G056717, I HAVE WRITTEN APPROXIMATELY FIVE TO SIX
LETTERS BETWEEN DECEMBER 2017 AND AUGUST 2018. PRACTICALLY
ALL OF THESE LETTERS CONTAINED THE SAME URGENT PLEA FOR
APPELLATE COUNSEL REVIEW OF MY FILINGS MADE AS A PROPIA PERSONA
DEFENDANT FOR MY CASE NO. 11CF2747. THESE FILINGS, THAT WERE
PRESENTED TO TRIAL JUDGE, INCLUDE BUT ARE NOT LIMITED TO:
CPC 1185 MOTION; CPC 1181 MOTION; CPC 1520.5 MOTION; CPC 1054.5
MOTION; TROMBETTA-YOUNGBLOOD MOTION; MOTION FOR APPOINTMENT
OF EXPERTS; MOTION FOR DISCOVERY OF THIRD PARTY INVESTIGATION;
CCP 170 CHALLENGES FOR CAUSE AND; RESPONSE TO PEOPLE'S
OPPOSITION. I ALSO REQUESTED COUNSEL TO REVIEW THE WRITS I
FILED WITH THE APPELLATE COURT.

     DESPITE MY INCESSANT REQUESTS FOR COUNSEL REVIEW
OF THE ENTIRE CASE PRESENTED TO THE TRIAL JUDGE, I NEVER
RECEIVED ANY PERSONALIZED RESPONSE FROM 'AOB' OR MS. WASS.

ATTACHMENT 'D':  PAGE 8

DECLARATION AND REQUEST TO REFILE. PAGE 3 OF 5
BECAUSE I NEVER RECEIVED ANY OF MY LETTERS RETURNED AS
UNDELIVERABLE OR UNCLAIMED, I REASONABLY CONCLUDED THAT THEY
WERE RECEIVED. THE ONLY CORRESPONDENCE RECEIVED BY ME
WERE BOILERPLATE INTRODUCTORY INFORMATION AND PERFUNCTORY COPIES
OF EXTENSION REQUESTS. THE EXCEPTION TO THIS IS A LETTER FROM MS.
WASS DRAFTED ON SEPT. 19 2016 [POSTMARKED SEPT. 30] BUT
I RECEIVED 40 DAYS LATER ON OCT. 29 2016. ON THE FOLLOWING
DAY, OCT. 30, I RECEIVED THE APPELLANT'S APENING BRIEF ['AOB']
WHICH WAS EXECUTED ON OCT. 25 2016.

UPON RECEIPT ON OCT. 29th OF MS. WASS SEPT. 19 LETTER, AND
CONFIRMED BY MY OCT 30th RECEIPT OF THE 'AOB', IT WAS OBVIOUS
TO ME THAT THE BRIEF WAS PREPARED AND FILED WITHOUT REVIEW
OF THE ENTIRE CASE PRESENTED TO THE TRIAL JUDGE BECAUSE
IT NEGLECTED VIRTUALLY ALL OF THE ISSUES OF LAW RAISED IN
MY FILINGS. I IMMEDIATELY ATTEMPTED TO CONTACT MS. WASS BY
LETTERS WRITTEN ON OCT. 29; OCT. 31; NOV. 5 AND NOV. 8. AS OF
THE DATE OF THIS DECLARATION, MORNING OF NOV. 20th, I'VE RECEIVED
NO RESPONSE FROM MS. WASS.

I AM NOT LAYING BLAME OR ACCUSATION FOR THE CURRENT
SITUATION NOR IS IT MY INTENTION TO BELITTLE OR DEMEAN THE
THE ARGUMENTS CONTAINED IN THE 'AOB'. THOSE ARGUMENTS, WHILE
NOTWITHSTANDING, PALE IN MAGNITUDE AND CONSEQUENCE TO THE
ISSUES OF LAW SET FORTH IN MY FILINGS. THE 'AOB' AS FILED
IS INCOMPLETE DUE TO THE LIMITED SCOPE OF REVIEW AND THUS

ATTACHMENT 'D': PAGE 9

DECLARATION AND REQUEST TO REFILE - PAGE 4 OF 5

is deficient in the performance duly ascribed.

Of further note is my current housing conditions at North Kern State Prison, which has denied me access to my property which includes my legal files and legal research. Additional material adverse affect is the inability to make outgoing phone calls resulting in my reliance on written correspondence. I have (and am) sought administrative remedy to the conditions stated. I am not under any administrative/disciplinary segregation and have been given no explanation from 'NKSP'.

I am unaware of all legal options, remedies and rights pursuant to the issues raised herein. I am also unaware of the legal process or protocol and legal filings or mechanism to properly effectuate my request to refile the 'AOE'. I am unaware of the consequences for filing this declaration and I do not intend to waive any right or abandon any opportunity. I did not anticipate the need for this declaration due to my precautions and diligence as stated. The need has arisen due to the events as set forth and any error in my pursuit of remedy is affected by and subject to the hardships and conditions of my current confinement — which I believe has deprived me of a meaningful opportunity to present a cogent declaration, and as a result, reasonable access to the courts.

I was informed by the trial judge that I have the right to appeal. I believe such right to encompass all issues of law presented in my case brought in front of the trial

ATTACHMENT 'D':   PAGE 10

DECLARATION AND REQUEST TO REFILE · PAGE 5 OF 5

JUDGE. I HAVE MADE RECORD OF THESE ISSUES AND HAVE EXPLICITLY ARTICULATED SAID ISSUES IN MY FILINGS. THEREFORE THE 'AOB' AS FILED, WITHOUT THESE ISSUES OF LAW AND WITHOUT COUNSEL'S REVIEW OF THESE ISSUES, IS NOT THE "APPELLANT'S" OPENING BRIEF AND DOES NOT FULFILL THE RIGHT GIVEN ME FOR APPEAL. FURTHERMORE, THIS DECLARATION AND REQUEST- IRRESPECTIVE OF DEFECT IN FORM, FORMAT, PROCEDURE OR PROTOCOL - SHOULD SERVE AS JUST CAUSE FOR THE APPELLATE COURT TO CONSIDER AND GRANT THE REQUEST AS SUBMITTED FOR THE REFILING OF THE 'AOB' AND THE EXTENSION OF TIME REQUIRED TO SO.

I AM NOT REQUESTING APPOINTMENT OF DIFFERENT COUNSEL UNLESS MS. WEES IS NOT READY, WILLING AND ABLE TO PREPARE AND REFILE THE 'AOB'. LASTLY, IF I AM NOT WITHIN MY RIGHTS TO MAKE THE REQUEST FOR REFILING OR MY REQUEST IS FATALLY DEFECTIVE IN ITS CURRENT FORM, I ENCOURAGE THE COURT - IN ORDER TO ENSURE THE INTEGRITY OF THE APPELLATE PROCESS AND/OR TO AMELIORATE THE HARM AND CONSTITUTIONALLY PREJUDICIAL EFFECTS OF THE EVENTS TO DATE — CONSIDER, SUA SPONTE, THE REFILING OF THE 'AOB' AND EXTENSION OF TIME TO DO SO.

I AM SUBMITTING THIS DECLARATION AND REQUEST AT MY EARLIEST PRACTICABLE OPPORTUNITY AND DO HEREBY SUBMIT UNDER PENALTY OF PERJURY - THIS THE MORNING OF THE 20th DAY OF NOV. 2018.

RESPECTFULLY -

THOMAS FRANKLIN TARLETON :

CDCR NO. BEB274. 'NKSP'. HSG: B1-226 · PO BOX 4999 · DELANO · 93016

ATTACHMENT 'D':  PAGE 11

COURT OF APPEAL - 4TH DIST DIV 3
RECEIVED

JAN 1 6 2019

ATTACHMENT 'D':  PAGE 12

# EXHIBIT NO. 3

PROCEDURAL HISTORY:

1.) Submitted with State Habeas Petition No.G058686 to State
    Appellate Court

2.) Submitted with State Habeas Petition No.S263665 to State
    Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to
    Exhaust all State Remedies

CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit except for an updated
signature date and Housing Location provided on the Declaration
Page.

EXHIBIT NO.3   Declaration of Prepared Writ of Mandate

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The purpose of this declaration is to make a record of facts and events as herein described. Following Judge Jensen's Verified Answer and Striking of my CCP170.3 Challenge for Cause filed on 12/07/17 [12CT2839-2844], I prepared and signed a petition for a writ to be filed in appellate court. This petition was signed by me on 12/17/17 and mailed from Wasco State Prison on or about that date. This writ was prepared as a result of the Trial Court's actions taken during sentencing that include but are not limited to: Failure to self-recuse; Denial of Due Process and sentencing based on accurate information; Denial of statutory right to present evidence on factors of mitigation; Denial of Constitutional Right to counsel; Sentencing contrary to federal law as established by U.S. Supreme Court decision, and significant judicial abuse of discretion.

For reasons unknown, there appears to have been a slip from the cup to the lip in the serving, filing and/or processing of this writ. It is my understanding it was served on the trial court, the OCDA and filed with the appellate division. However, I cannot find a record of this writ in the Clerk's Transcripts or an assigned Appeal number. The disposition of this writ and issues raised is unclear to me. A copy of the writ is attached hereto.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of the events described and verified as to the veracity of the statements contained herein.

Respectfully submitted this the _____ day of _____, 2021

By:_____

Thomas Tarbutton CDCR#8274
Folsom State Prison  Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D':  PAGE 14

**APP-151**

**Petition for Writ (Misdemeanor, Infraction, or Limited Civil Case)**

Clerk stamps date here when form is filed.

THOMAS FRANKLIN TERREYTON
_____
**Petitioner**
_(fill in the name of the person asking for the writ)_

v.

**Superior Court of California, County of** ORANGE

JUDGE LANCE JENSEN - W-9
_____
**Respondent**
_(fill in the name of the court whose action or ruling you are challenging)_

ORANGE COUNTY DISTRICT ATTORNEY
_____
**Real Party in Interest**
_(fill in the name of any other parties in the trial court case)_

Clerk will fill in the number below:

**Appellate Division Case Number:**

☑ **Stay requested**
_(see item ⑫ c. on page 6)_

## Instructions

- This form is only for requesting a writ in a misdemeanor, infraction, or limited civil case, or a writ challenging a postjudgment enforcement order in a small claims case (see below*).

- Do _not_ use this form for other writs and for appeals. You can get forms to use for those at any courthouse or county law library or online at _www.courts.ca.gov/forms._

- Before you fill out this form, read _Information on Writ Proceedings in Misdemeanor, Infraction, and Limited Civil Cases_ (form APP-150-INFO) to know your rights and responsibilities. You can get form APP-150-INFO at any courthouse or county law library or online at _www.courts.ca.gov/forms._

- Unless a special statute sets an earlier deadline, you should file this form no later than 30 days after the date the trial court took the action or issued the ruling you are challenging in this petition (see form APP-150-INFO, page 7, for more information about the deadline for filing a writ petition). It is your responsibility to find out if a special statute sets an earlier deadline. If your petition is filed late, the appellate division may deny it.

- Fill out this form and make a copy of the completed form for your records and for the respondent (the trial court whose action or ruling you are challenging) and each of the real parties in interest (the other party or parties in the  trial court case).

- Serve a copy of the completed form on the respondent and on each real party in interest and keep proof of this service. _Proof of Service (Appellate Division)_ (form APP-109) or _Proof of Electronic Service (Appellate Division)_ (form APP-109E) can be used to make this record. You can get information about how to serve court papers and proof of service from _What Is Proof of Service?_ (form APP-109-INFO) and on the California Courts Online Self-Help Center at _www.courts.ca.gov/selfhelp-serving.htm._

- Take or mail the completed form and your proof of service on the respondent and each real party in interest to the clerk's office for the appellate division of the superior court that took the action or issued the ruling you are challenging.

- Small Claims cases. If you are a party in a small claims case, this form is only to be used for requesting a writ relating to a postjudgment enforcement order of a small claims division. For writs relating to other acts of a small claims division, the form to use is the _Petition for Writ (Small Claims)_ (form SC-300). See also Cal. Rules of Court, rules 8.970–8.977. For writs relating to acts of a superior court in a small claims appeal, see Cal. Rules of Court, rules 8.485–8.493.

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2017, Optional Form
California Rules of Court, rules 8.930–8.936

**Petition for Writ**
**(Misdemeanor, Infraction, or Limited Civil Case)**

APP-151, Page 1 of 7
➞

ATTACHMENT 'D':   PAGE 15

Appellate Division
Case Name: _____

| Appellate Division Case Number: |
|---|
|  |

① **Your information**

   a. Petitioner (the party who is asking for the writ):

     Name: THOMAS TARBUTON · CDC# BE8274 c/o WSP R/C

     Street address: WSP R/C · LKG#D-4-253 · PO BOX 7700 · WASCO CA · 93280
            *Street*                            *City*        *State*   *Zip*

     Mailing address (*if different*): _____
                                *Street*                  *City*        *State*   *Zip*

     Phone: _____ E-mail: _____

   b. Petitioner's lawyer (*skip this if the petitioner does not have a lawyer for this petition*):

     Name: _____ State Bar number: _____

     Street address: _____
                        *Street*               *City*        *State*  *Zip*

     Mailing address (*if different*): _____
                                *Street*           *City*        *State*  *Zip*

     Phone: _____ E-mail: _____
     Fax: _____

**The Trial Court Action or Ruling You Are Challenging**

② I am/My client is filing this petition to challenge an action taken or ruling made by the trial court in the following case:

   a. Case name (*fill in the trial court case name*): PEOPLE V. TARBUTON

   b. Case number (*fill in the trial court case number*): NO. 11CF2747

③ The trial court action or ruling I am/my client is challenging is (*describe the action taken or ruling made by the trial court*): JUDGE JENSEN's "ORDER TO STRIKE" IN RESPONSE TO MY CCP170.3 CHALLENGE FOR CAUSE

_____

_____

_____

✓ ④ The trial court took this action or made this ruling on the following date (*fill in the date*): Received 12-17-17

⑤ If you are filing this petition more than 30 days after the date that you listed in ④, explain the extraordinary circumstances that caused the delay in filing this petition: _____

_____

_____

_____

**Petition for Writ**
(Misdemeanor, Infraction, or Limited Civil Case)

APP-151, Page 2 of 7
→

ATTACHMENT 'D':  PAGE 16

Appellate Division
Case Name: _____

Appellate Division Case Number: _____

## The Parties in the Trial Court Case

**(6)** I/My client *(check and fill in a or b):*

a. ☑ was a party in the case identified in **②**.

b. ☐ was not a party in the case identified in **②** but will be directly and negatively affected in the following way by the action taken or ruling made by the trial court *(describe how you/your client will be directly and negatively affected by the trial court's action or ruling):*

_____
_____
_____
_____

**(7)** The other party or parties in the case identified in **②** was/were *(fill in the names of the parties):*
ORANGE COUNTY DISTRICT ATTORNEY · PETER PIERCE : SENIOR
DEPUTY DISTRICT ATTORNEY

## Appeals or Other Petitions for Writs in This Case

**(8)** Did you or anyone else file an appeal about the same trial court action or ruling you are challenging in this petition? *(Check and fill in a or b):*

a. ☑ No

b. ☐ Yes    *(fill in the appellate division case number of the appeal):* _____

**(9)** Have you filed a previous petition for a writ challenging this trial court action or ruling? *(Check and fill in a or b):*

a. ☑ No ✱ NO PETITION FILED FOR THIS SPECIFIC ACTION, HOWEVER PETITIONS HAVE

b. ☐ Yes *(Please provide the following information about this previous petition.)* BEEN FILED FOR OTHER

    ACTIONS OF JUDGE

(1) Petition title *(fill in the title of the petition):* _____

(2) Date petition filed *(fill in the date you filed this petition):* _____

(3) Case number *(fill in the case number of the petition):* _____

*If you/your client filed more than one previous petition, attach another page providing this information for each additional petition. At the top of each page, write "APP-151, Item 9.")*

## Reasons for This Petition

**(10)** The trial court made the following legal error or errors when it took the action or made the ruling described in **③** *(check and fill in at least one):*

a. ☑ The trial court has not done or has refused to do something that the law says it *must* do.

(1) Describe what you believe the law says the trial court must do:
SEE ATTACHED "APP-151, ITEM 10a" : PAGES 1-3

(2) Identify the law (the section of the Constitution or statute, published court decision, or other legal authority) that says the trial court must do this:
SEE ATTACHED "APP-151, ITEM 10a" : PAGES 1-3

**Petition for Writ**
(Misdemeanor, Infraction, or Limited Civil Case)

→

ATTACHMENT 'D':  PAGE 17

**Appellate Division**
**Case Name:**

| Appellate Division Case Number: |
|---|
| |

(10) (continued)

(3) *Identify where in the supporting documents (the record of what was said in the trial court and the documents from the trial court) it shows that the court did not do or refused to do this:*

SEE ATTACHED "APP-151, ITEM 10a": PAGES 1-3

☑ *Check here if you need more space to describe the reason for your petition and attach a separate page or pages describing it. At the top of each page, write "APP-151, item 10a."*

b. ☑ The trial court has done something that the law says the court *cannot or must not* do.

(1) *Describe what the trial court did:*

SEE ATTACHED "APP-151, ITEM 10b": PAGES 1-6

(2) *Identify where in the supporting documents (the record of what was said in the trial court and the documents from the trial court) it shows that the court did this:*

SEE ATTACHED "APP-151, ITEM 10b": PAGES 1-6

(3) *Identify the law (the section of the Constitution or statute, published court decision, or other legal authority) that says the trial court cannot or must not do this:*

SEE ATTACHED "APP-151, ITEM 10b": PAGES 1-6

☑ *Check here if you need more space to describe the reason for your petition and attach a separate page or pages describing it. At the top of each page, write "APP-151, item 10b."*

c. ☑ The trial court has performed or said it is going to perform a judicial function (like deciding a person's rights under law in a particular situation) in a way the court does not have the legal power to do.

(1) *Describe what the trial court did or said it is going to do:* PRE-EXISTING LEGAL GROUNDS FOR THE TRIAL JUDGE'S "DC" NOTWITHSTANDING — HE HAS MAINTAINED JURISDICTION FOR THE PURPOSE OF RESTITUTION.

(2) *Identify where in the supporting documents (the record of what was said in the trial court and the documents from the trial court) it shows that the court did or said it was going to do this:* AS STATED IN ATTACHED AFFIDAVIT AND REFERENCED NO. 13 BELOW. TRANSCRIPTS AND MINUTES HAVE BEEN REQUESTED WHICH WILL SHOW THE JUDGE'S ACTIONS AS NOTED HEREIN.

**Petition for Writ**
(Misdemeanor, Infraction, or Limited Civil Case)

ATTACHMENT 'D': PAGE 18

Appellate Division
Case Name: _____

Appellate Division Case Number:
_____

(10) (continued)

(3) *Identify the law (the section of the Constitution or statute, published court decision, or other legal authority) that says the trial court does not have the power to do this:*
"CODE OF JUDICIAL ETHICS" 3E(1): "A JUDGE SHALL DISQUALIFY HIMSELF... IN ANY PROCEEDING IN WHICH DISQUALIFICATION IS REQUIRED BY LAW"
ALSO SEE CCP 170.1

☐ *Check here if you need more space to describe this reason for your petition and attach a separate page or pages describing it. At the top of each page, write "APP-151, item 10c."*

☐ *Check here if there are more reasons for this petition and attach an additional page or pages describing these reasons. At the top of each page, write "APP-151, item 10d."*

(11) This petition will be granted only if there is no other adequate way to address the trial court's action or ruling other than by issuing the requested writ.

a. *Explain why there is no way other than through this petition for a writ—through an appeal, for example—for your arguments to be adequately presented to the appellate division:*
"THE DETERMINATION OF THE QUESTION OF THE "BIAS" OF A JUDGE IS NOT AN APPEALABLE ORDER AND MAY BE REVIEWED ONLY BY A WRIT OF MANDATE..." CCP 170.3(d)

b. *Explain how you/your client will be irreparably harmed if the appellate division does not issue the writ you are requesting:* BECAUSE SENTENCING CHOICES IN DEFIANCE OF THE LAWS TO 34 YEARS FACTORS IN MANY ISSUES THAT ARE IRRITATABLE: PRISON POINTS FOR HAVING INCORPORATES LENGTH OF SENTENCE THE, THE HIGHER POINTS TYPICALLY HOUSE AN INMATE WITH VIOLENT OFFENDERS AND PAROLE ELIGIBILITY IS ADVERSELY AFFECTED BY DATE OF ELIGIBILITY AND THE ABSENCE OF FACTORS IN MITIGATION FOR CONSIDERATION
"C. See "App 151, 16m 11b" attached"

## Order You Are Asking the Appellate Division to Make

(12) I request that this court *(check and fill in all that apply):*

a. ☑ order the trial court to do the following *(describe what, if anything, you want the trial court to be ordered to do):* i.) DISQUALIFY HIMSELF
ii.) SET ASIDE ALL RULINGS OF JUDGE JENKEN INCLUDING: CPC 1181 · CPC 1185 · CPC 1054.5, CPC 1528.5 ; TROMBETTA-YOUNGBLOOD; APPOINTMENT OF EXPERTS
iii.) SET ASIDE SENTENCING ORDER

b. ☑ order the trial court not to do the following *(describe what, if anything, you want the trial court to be ordered NOT to do):* TAKE ANY FURTHER ACTION THAN THAT MENTIONED ABOVE IN NO. 12a

Revised January 1, 2017

**Petition for Writ**
(Misdemeanor, Infraction, or Limited Civil Case)

APP-151, Page 5 of 7

→

ATTACHMENT 'D': PAGE 19

Appellate Division
Case Name:

| | Appellate Division Case Number: |
|---|---|

(12) (continued)

c. ☑ issue a stay ordering the trial court not to take any further action in this case until this court decides whether to grant or deny this petition *(describe below why it is urgent that the trial court not take any further action and check the Stay requested box on page 1 of this form):*

THE JUDGE APPEARS TO BE UNABLE/UNWILLING TO ACCORD ME WITH
ANY CONSTITUTIONAL AND STATUTORY RIGHTS

I/My client:

(1) ☐ asked the trial court to stay these proceedings, but the trial court denied this request *(include in your supporting documents a copy of the trial court's order denying your request for a stay).*

(2) ☑ did not ask the trial court to stay these proceedings for the following reasons *(describe below why you did not ask the trial court to stay these proceedings):*

THE JUDGE DENIES RECEIVING CORRESPONDENCE FROM ME INCLUDING
REQUESTS FOR CONTINUANCE AND MOTION FOR DISCOVERY OF EVIDENCE
IN MITIGATION — THUS A REQUEST FOR STAY SEEMS FUTILE

d. ☑ take other action *(describe):* VACATE VERDICT DUE TO SPECIFIC FACT PATTERNS
DEMONSTRATING BIAS, PREJUDICE AND PARTIALITY THAT HAVE
PERVADED VIRTUALLY ALL PROCEEDINGS WITH JUDGE JENSEN

e. ☑ grant any additional relief that the appellate division decides is fair and appropriate.

## Supporting Documents

(13) Is a record of what was said in the trial court about the action or ruling you are challenging attached as required by rule 8.931(b)(1)(D) of the California Rules of Court?

a. ☐ Yes, a transcript or an official electronic recording of what was said in the trial court is attached.

b. ☑ No, a transcript or official electronic recording is not attached, but I have attached a declaration (a statement signed under penalty of perjury) *(Check (1) or (2):*

(1) ☑ stating the transcript or electronic recording has been ordered, the date it was ordered, and the date it is expected to be filed.

(2) ☐ explaining why the transcript or official electronic recording is not available and providing a fair summary of what was said in the trial court, including the petitioner's arguments and any statement by the trial court supporting its ruling.

Revised January 1, 2017

**Petition for Writ**
(Misdemeanor, Infraction, or Limited Civil Case)

APP-151, Page 6 of 7 →

ATTACHMENT 'D': PAGE 20

| Appellate Division Case Name: | Appellate Division Case Number: |
|---|---|
| | |

(14) Are the following documents attached as required by rule 8.931(b)(1)(A)–(C):

- The trial court ruling being challenged in this petition
- All documents and exhibits submitted to the trial court supporting and opposing the petitioner's position
- Any other documents or portions of documents submitted to the trial court that are necessary for a complete understanding of the case and the ruling being challenged? *(Check a or b):*

a. ☑ Yes, these documents are attached. ✱

b. ☐ No, these documents are not attached for the following reasons *(explain why these documents are not attached and give a fair summary of the substance of these documents. Note that rule 8.931 provides that, in extraordinary circumstances, the petition may be filed without these documents, but the petitioner must explain the urgency and the circumstances making the documents unavailable):*

✱ ATTACHED ARE THE COURT'S CHALLENGE FOR CAUSE AND THE JUDGE'S "ANSWER" — THE MINUTES/TRANSCRIPTS TO BE PROVIDED UPON RECEIPT

**Verification**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 12-17-17

THOMAS FRANKLIN THURSTON
*Type or print your name*

*Signature of petitioner or attorney*

**Petition for Writ**
**(Misdemeanor, Infraction, or Limited Civil Case)**

APP-151, Page 7 of 7

ATTACHMENT 'D': PAGE 21

(over)   P.t 2 to follow

"APP 191, ITEM 10a" - PAGE 1/3

1  NO. 10a (1)(2):  DESCRIBING WHAT THE TRIAL COURT MUST DO AND IDENTIFYING

2  THE LAW THAT SAYS THE TRIAL COURT MUST DO THIS:

3  A.) ADJUDICATION IN ACCORDANCE WITH THE LAW:  THE TRIAL COURT

4  MUST PROVIDE THE DEFENDANT THE OPPORTUNITY TO HAVE HIS MATTER

5  FAIRLY ADJUDICATED IN ACCORDANCE AND CONSISTENT WITH THE LAW.

6  SEE "CODE OF JUDICIAL ETHICS" 3B(8) .  "LAW" IS DEFINED AS

7  CONSTITUTIONAL PROVISIONS, STATUTES, COURT RULES, AND DECISIONAL

8  LAW [ SEE "TERMINOLOGY" OF "CODE OF JUDICIAL ETHICS" PAGE 5, LINE: 21 ]

9  B.) AVOID IMPROPRIETY:  THE TRIAL JUDGE MUST AVOID IMPROPRIETY

10  AND THE APPEARANCE OF IMPROPRIETY IN ALL OF HIS ACTIONS [ SEE

11  "CODE OF JUDICIAL ETHICS"- CANON 2 ].  "IMPROPRIETY" IS DEFINED AS

12  CONDUCT THAT VIOLATES THE "LAW" [ SEE LINES 6-7 ABOVE ], COURT

13  RULES OR PROVISIONS OF THE CODE OF JUDICIAL ETHICS [ SEE "TERMINOLOGY"

14  PAGE 4, LINES: 39-40 ]

15  C.) DUTY OF DISQUALIFICATION:  THE TRIAL JUDGE MUST DISQUALIFY

16  HIMSELF IN ANY PROCEEDING IN WHICH DISQUALIFICATION IS REQUIRED

17  BY LAW ["CODE OF JUDICIAL ETHICS" 3E (1) ].  "LAW" REQUIRING DQ

18  INCLUDES BUT IS NOT LIMITED TO:

19  i.) STATUTORY:  A JUDGE SHALL BE DISQUALIFIED WHEN

20  "A PERSON AWARE OF THE FACTS MIGHT REASONABLY ENTERTAIN A DOUBT

21  THAT THE JUDGE WOULD BE ABLE TO BE IMPARTIAL" [ CCP 170.1(a)(6)(A)(iii) ]

22  ii.) DECISIONAL LAW:  THE JUDGE HAS A CONTINUING OBLIGATION

23  TO "DQ" HIMSELF AT ANY TIME AN OBJECTIVE OBSERVER MIGHT REASONABLY

24  QUESTION THE JUDGE'S IMPARTIALITY [ SEE LILJEBERG V. HEALTH SERVICES

25  ACQUISITION CORP., 486 U.S 847, 108 S. Ct. 2194 (1988) ]

26  iii.) CONSTITUTIONAL:  DISQUALIFICATION IS REQUIRED WHEN THE

27  JUDGE'S ACTIONS EXHIBIT A PROBABILITY OF ACTUAL BIAS THAT IS TOO

28  HIGH TO BE CONSTITUTIONALLY TOLERABLE.  THE DUE PROCESS CLAUSE

10a- PG. 1

Cover

Part 2

10 of 10

'APP-151, MEM 10a' - PAGE 2/3

1   OF THE U.S. CONSTITUTION REQUIRES JUDICIAL DISQUALIFICATION [SEE
2   CAPERTON V. A.T. MASSEY COAL CO., INC. (2009) _ US _, 129 S. CT. 2252,
3   172 L Ed 2d 1208]

4

5

6   NO. 10a (3):   IDENTIFYING WHERE IN THE SUPPORTING DOCUMENTS IT SHOWS
7              THAT THE COURT DID NOT DO OR REFUSED TO DO:
8              A.) NOV. 3RD 2017 PROCEEDING=   THE DEFENDANT IN NOV. 4TH
9   2017 EXECUTED A WRITTEN REQUEST FOR MINUTES AND TRANSCRIPTS FOR THIS
10  PROCEEDING [SEE NO. 13 BELOW].  A SUMMARY OF EVENTS IS INCLUDED AS
11  NO. 3 OF DEFENDANT'S CCP170.3 CHALLENGE FOR CAUSE SIGNED NOV. 16, 2017.
12  PLEASE CONSIDER THE EVENTS AND THE JUDGE'S CONDUCT THAT INCLUDES BUT
13  IS NOT LIMITED TO:  DENIAL OF "VALENCIA" RIGHTS [NO. 8A. PAGE 6; LINES
14  2-4];  DENIAL OF DUE PROCESS AND SENTENCING BASED ON ACCURATE
15  INFO [NO. 8A. PAGE 6; LINES: 5-7];  DENIAL OF STATUTORY RIGHT TO
16  PRESENT EVIDENCE AS FACTORS IN MITIGATION [NO. 8A. PAGE 6; LINES 7-8] -
17  DENIAL OF STATUTORY TALLY TO ADDRESS RESTITUTION DURING SENTENCING
18  [NO. 8A PAGE 6; LINES: 8-9];  DENIAL OF CONSTITUTIONAL RIGHT TO
19  EFFECTIVE ASSISTANCE OF COUNSEL AND RIGHT TO COMPULSORY PROCESS
20  [NO. 8B. PAGE 6; LINES 12-17];  DENIAL OF APPOINTED COUNSEL [NO. 8B
21  PAGE 6; LINES: 17-21];  SENTENCING IN DEFIANCE OF THE LAW [NO. 8C
22  PAGE 6; LINE: 22 - PAGE 8; LINE 18]

23

24  TAKEAWAY FROM JUDGE'S CONDUCT OF NOV. 3RD 2017 PROCEEDING:  IT IS
25  OBVIOUS TO THE DEFENDANT AS IT WOULD BE TO HYPOTHETICAL OBJECTIVE
26  OBSERVER, THAT THE JUDGE'S ACTIONS THAT DEFY CONSTITUTIONAL,
27  STATUTORY AND DECISIONAL LAW EXHIBIT CONDUCT THAT IS
28  PURPOSELY AND WILLFULLY VIOLATIVE OF HIS DUTY OF FAIR ADJUDICATION

10a - PG. 2

"APP-191, ITEM 10a" - PAGE 3/3

IN ACCORDANCE WITH THE LAW. SUCH FLAGRANT DISREGARD OF HIS
DUTY TO AVOID IMPROPRIETY BY DEPRIVING DEFENDANT OF CRITICAL
CONSTITUTIONAL AND STATUTORY RIGHTS EFFECTUATE LEGAL GROUNDS
FOR HIS DISQUALIFICATION [SEE NO. 10a (1/2)(c) ABOVE]. FURTHERMORE
WHEN A JUDGE'S DISPOSITION DURING SENTENCING COULD CAUSE A REASONABLE
PERSON TO QUESTION THE IMPARTIALITY OF THE JUDGE, THEN THE DEFENDANT
HAS BEEN DEPRIVED OF DUE PROCESS AND THE JUDGE HAS ABUSED
HIS DISCRETION [SEE STATE V. PATTNO, 254 NEB. 732, 579 N.W. 2d 503 (1998)]



10a - pg. 3

"APP-161, ITEM 10b" - PAGE 1/6

1   NO. 10b(.X=Xs): DESCRIBING WHAT THE TRIAL COURT DID; WHERE

2   IN THE SUPPORTING DOCUMENTS IT SHOWS THIS AND; IDENTIFYING

3   THE LAW THAT SAYS THE TRIAL COURT CANNOT OR MUST NOT DO THIS:

4   A.) NOVEMBER 3rd 2017 PROCEEDING:  THE DEFENDANT ON

5   NOV. 4th 2017 EXECUTED A WRITTEN REQUEST FOR MINUTES AND

6   TRANSCRIPTS FOR THE NOV. 3rd 2017 PROCEEDING. UNTIL RECEIVED,

7   SUMMARY OF EVENTS IS INCLUDED AS NO.3 OF DEFENDANT'S

8   CCP170.5 CHALLENGE FOR CAUSE SIGNED NOV. 15, 2017.  AS

9   SET FORTH IN THIS "CHALLENGE", AND AGAIN REFERENCED

10  ABOVE IN NO. 10a(3)(A), THE JUDGE'S DELIBERATE ACTIONS

11  ARE LISTED FOR PURPOSE OF ARGUMENT.

12  B.) ABUSE OF DISCRETION:  AS STATED IN CALIFORNIA

13  CODE OF CIVIL PROCEDURE SECTIONS 1084-1097 AND 1102-

14  1105   THE TRIAL COURT MUST NOT ABUSE ITS DISCRETION.

15  THIS JUDICIAL ABUSE OF DISCRETION MEANS THAT THE REASONS

16  OR RULINGS OF THE TRIAL JUDGE ARE CLEARLY UNTENABLE,

17  UNFAIRLY DEPRIVING A LITIGANT OF A SUBSTANTIAL RIGHT AND

18  A DENYING A JUST RESULT  SEE STATE V. EGGER, 237 NEB.

19  688, 467 N.W. 2d 411 (1991); UNDERLINE ADDED

20  C.) EXAMPLES AND PREJUDICIAL EFFECT OF JUDICIAL

21  ABUSE OF DISCRETION

22  i.) DENIAL OF DEFENDANT'S CONSTITUTIONAL RIGHT TO

23  APPOINTED COUNSEL   US CONST VI AM, CA CONST. SEC. 15

24  IN DENYING DEFENDANT HIS EXPLICITLY ARTICULATED INVOKING OF

25  RIGHT TO APPOINTED COUNSEL, THE TRIAL JUDGE CLEARLY

26  DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHTS OF SUCH.

27  ASIDE FROM CONSTITUTIONAL LAW, DECISIONAL LAW IS FULLY

28  SUPPORTIVE OF DEFENDANT'S RIGHT TO COUNSEL:

10b- Pg. 1

"APP-163, ITEM 10b" - PAGE 2/6

1          a.) SELF-REPRESENTED MOTION FOR APPOINTED
2  COUNSEL AT SENTENCING SHOULD BE GRANTED [ SEE U.S.
3  V. ROBINSON 913 F.2d 712 (9th CIR. 1990); STATE V. WILLIAMS,
4  199 CONN. 30, 505 A.2d 699 (1986)
5          b.) DEFENDANT HAS CONSTITUTIONAL RIGHT TO
6  COUNSEL AT THE TIME JUDGMENT IS PRONOUNCED [ SEE MEMPA
7  V. RHAY (1967) 389 US 128, 19 L Ed 2d 336, 86 S. CT.; IN RE
8  ROBERTS (1953) 40 C2d 745, 748, 255 P2d 782; IN RE
9  CORTEZ (1971) 6 C3d 78, 88, 98 CR 307 ]
10          c.) "THE TOTAL DENIAL OF COUNSEL AT A CRITICAL
11  STAGE SUCH AS SENTENCING IS PRESUMPTIVELY PREJUDICIAL AND
12  IS NOT TO BE DEEMED HARMLESS ERROR" [ GOLDEN V. NEWSOME
13  755 F.2d 1478 (11th CIR. 1985) ]
14         ii.) DENIAL OF DEFENDANT'S COMPULSORY PROCESS AND
15  CONFRONTATIONAL RIGHTS [ US CONST V, VI, XIV AM's [: IN DENYING
16  DEFENDANT OF HIS EXPLICITY ARTICULATED REQUESTS AND PROCEEDING
17  TO PRONOUNCEMENT OF JUDGMENT, THE TRIAL JUDGE CLEARLY
18  DEPRIVED DEFENDANT OF CONSTITUTIONAL RIGHTS TO SUCH. ASIDE
19  FROM CONSTITUTIONAL LAW, DECISIONAL AND STATUTORY LAW ARE
20  FULLY SUPPORTIVE OF DEFENDANT'S RIGHTS :
21          a.) DEFENDANT HAS THE RIGHT TO PRESENT
22  EVIDENCE ON HIS BEHALF, BEFORE JUDGMENT, ON FACTORS
23  IN MITIGATION [ PEOPLE V. VALDIVIA (1960) 182 CA2d 145, 148,
24  5 CR 832; CPC 1170(b); CPC 1204; CAL RULES OF COURT 4.421,
25  4.423 ]
26          b.) DEFENDANT IS ENTITLED TO A MEANINGFUL
27  OPPORTUNITY TO RESPOND TO THE COURT'S PROPOSED SENTENCING
28  CHOICES [ PEOPLE V. GONZALES (2003) 31 C4th 745, 3 CR3d 676;

               10b- PG. 2

"APP-151, ITEM 10b" · PAGE 3/6

1  PEOPLE V. SCOTT (1994) 9 CA⁴ᵗʰ 331, 36 CR2d 627 ]

2          c.) DEFENDANT IS ENTITLED TO A HEARING THAT

3  AFFORDS DUE PROCESS AND TO A SENTENCING BASED ON ACCURATE

4  INFO  PEOPLE V. PETERSON (1973) 9 C3d 717, 726, 108 CR 835;

5  PEOPLE V. ECKLEY (2004) 123 CA4ᵗʰ 1072, 20 CR2d 555 ]

6          iii.) DENIAL OF DEFENDANT'S CONSTITUTIONAL

7          RIGHT TO DUE PROCESS [ US CONST XIV Am ] :

8  IN DENYING DEFENDANT OF HIS EXPLICITLY ARTICULATED REQUESTS

9  AND PROCEEDING TO SENTENCING, THE TRIAL JUDGE CLEARLY

10 DEPRIVED DEFENDANT OF HIS RIGHT TO DUE PROCESS. ASIDE

11 FROM CONSTITUTIONAL LAW — DECISIONAL AND STATUTORY LAW

12 ARE FULLY SUPPORTIVE OF SUCH:

13          a.) CONSTITUTIONAL RIGHT TO COUNSEL AND DUE

14 PROCESS REQUIRE THAT DEFENDANT BE GIVEN A REASONABLE

15 CONTINUANCE TO SECURE COUNSEL [ PEOPLE V. COURTS (1985) 37

16 C2d 784, 789, 210 CR 193 ] AND; CONTINUANCE WILL ALLOW

17 TIME TO RESEARCH OBJECTIONS IN CASES WITH COMPLEX

18 SENTENCING [ TURNER V. CALDERON (9ᵗʰ CIR 2002) 281 F3d

19 851, 895 )

20          b.) DUE PROCESS IN SENTENCING : DUE

21 PROCESS ISSUES IN SENTENCING MUST BE VIEWED IN COMPLETE

22 CONTEXT TO ASSESS THEIR SIGNIFICANCE [ SEE APPRENDI

23 V. NEW JERSEY, 530 U.S. 466, 120 S. CT. 2348, 147 L. Ed. 2d

24 435 (2000) ]

25          c.) DUE PROCESS GUARANTEE INCLUDES RIGHT

26 TO REBUT EVIDENCE PRIOR TO SENTENCING [ SEE STATE V.

27 SPEARS, 227 WIS. 2d 445, 596 N.W. 2d 375 (1999) ]

28          d.) DEFENDANT IS ENTITLED TO A HEARING

10b · Pg. 3

"APP-15", ITEM 10b" - PAGE 4/6

1   THAT AFFECTS DUE PROCESS : [SEE PEOPLE v
2   PETERSON, SUPRA ; PEOPLE V. ECKLEY, SUPRA ]
3       IV.) DENIAL OF DEFENDANT'S CONSTITUTIONAL RIGHTS
4          TO EQUAL PROTECTION OF THE LAWS : IN DENYING
5   DEFENDANT OF HIS EXPLICITLY ARTICULATED REQUESTS AND
6   SENTENCING DEFENDANT BY USING BOTH ENHANCEMENTS ;
7   COUNTS 27-38 AND ; COUNT NO. 38 FOR THE BASE TERM
8   CALCULATION — THE TRIAL JUDGE DEPRIVED DEFENDANT OF
9   HIS CONSTITUTIONAL RIGHTS TO EQUAL PROTECTION OF THE
10  LAWS [ XIV AM ] .  DECISIONAL AND STATUTORY LAW ARE
11  FULLY SUPPORTIVE AS SHOWN BY :
12       a.) CPC 1200 · ALLOCUTION : "WHEN THE
13  DEFENDANT APPEARS FOR JUDGMENT HE MUST BE INFORMED BY
14  THE COURT... OF THE NATURE OF THE CHARGE AGAINST HIM... AND
15  MUST BE ASKED WHETHER HE HAS ANY LEGAL CAUSE TO SHOW
16  WHY JUDGMENT SHOULD NOT BE PRONOUNCED AGAINST HIM"
17       b) DOCTRINE OF SPECIALITY :   WHEN JUDGE
18  JENKEN SENTENCED DEFENDANT USING COUNT NO. 38 FOR THE
19  BASE TERM AND CONSECUTIVE TERMS FOR COUNTS 27-37, HE
20  VIOLATED THE "SUPREME LAW OF THE LAND" AND IT'S "TREATIES
21  MADE" [ SEE US CONST ARTICLE VI ] WHICH INCLUDE THE U.S.-
22  PANAMA BI-LATERAL EXTRADITION TREATY  WHICH PROHIBIT
23  THE TRYING / TRYING AND PUNISHING OF A DEFENDANT
24  FOR CHARGES ADDED AFTER EXTRADITION [ SEE ARTICLE VIII
25  OF US-PANAMA TREATY ]. THIS IS ALSO UPHELD BY THE
26  COURTS EVEN FOR CHARGES BASED ON THE SAME ACT
27  [ SEE UNITED STATES V. RAUSCHER, 119 U.S. 407 (424 (1886);
28  UNITED STATES V. SACCOCCIA, 58 F.3d 754, 766 (1st CIR 1995);

10b-pg.4

ATTACHMENT 'D':  PAGE 28

"APP-151, ITEM 10b" - PAGE 5/6

1. FIOCCONI V. ATTORNEY GENERAL OF THE UNITED STATES, 462 F.2d 475,
2. 480 (2d CIR. 1972); UNITED STATES V. KHAN, 993 F.2d 1368, 1373
3. (9th CIR. 1993)]. IRRESPECTIVE OF THE ILLEGALITY/UNLAWFULNESS
4. OF DEFENDANT'S PANAMANIAN "ARREST AND EXTRADITION" [SEE
5. CPC 1181 MOTION FILED 08/15/17, SUB-MOTION III "ILLEGAL RESTRAINT"]
6. THE JUDGE IS PROHIBITED FROM PUNISHING DEFENDANT FOR
7. COUNTS 27-38 ADDED AFTER "EXTRADITION".
8.        c.) STAY OF ENHANCEMENTS : WHEN A DEFENDANT
9. IS CHARGED WITH BOTH ENHANCEMENTS OF CPC 186.11 AND
10. CPC 12022.6, THE COURT MUST STAY CPC 12022.6 [PEOPLE V.
11. LAI (2006) 138 C.A.4th 1227, 1237 42 CP3d 444]. IN
12. THE DEFENDANT'S CASE, JUDGE JENSEN IGNORED SUCH DECISIONAL
13. LAW - SENTENCING DEFENDANT TO BOTH ENHANCEMENTS AND
14. RUNNING THEM CONSECUTIVELY.
15.        d.) SENTENCING CREDITS: ACCORDING TO ORANGE
16. COUNTY "INMATE JAIL RULES 'JGM' SECTION 1600.3(P)(=)":
17. INMATES DO NOT EARN PAY FOR THEIR WORK ASSIGNMENT, HOWEVER,
18. WORKING INMATES EARN CREDIT FOR ACCEPTABLE SERVICE. ONE (1)
19. DAY "WORK TIME" CREDIT FOR EACH 6 DAYS SERVED WILL BE
20. DEDUCTED FROM THEIR SENTENCE". IT IS THE DEFENDANT'S
21. UNDERSTANDING THAT THIS CREDIT INCREASED TO TWO (2)
22. DAYS PER 6 DAYS SERVED. IN DEFENDANT'S CASE HE
23. BECAME A "WORKER" IN MAY OF 2014 AND WORKED UNTIL HE
24. LEFT FOR WASCO STATE PRISON ON NOV. 21, 2017. USING THE
25. CREDIT AS SET FORTH ABOVE, DEFENDANT IS ENTITLED TO
26. ANOTHER 301 DAYS CREDIT ON TOP OF THE 2,842
27. GIVEN BY JUDGE JENSEN ON NOV. 3rd 2017. THE CORRECT
28. TOTAL SHOULD BE 3,143 DAYS CREDIT AS OF NOV. 3, 2017.

       10b - PG. 5

ATTACHMENT 'D':  PAGE 29

"CPP-151, ITEM 10b" - PAGE 6/6

1   TAKEAWAY FROM JUDICIAL ABUSE OF DISCRETION: AT WHAT POINT
2   DOES "ABUSE OF DISCRETION" TURN INTO "ABSENCE OF DISCRETION"?
3   WITH JUDGE JENSEN'S DISPOSITION AND CONSTANT CONDUCT THAT
4   DELIBERATELY AND WILLFULLY DEPRIVES DEFENDANT OF CRUCIAL
5   RIGHTS AT CRITICAL TIMES, IT IS APPARENT TO THE DEFENDANT AS
6   IT SHOULD BE TO AN OBJECTIVE OBSERVER THAT THE TRIAL
7   JUDGE HAS CROSSED THAT BOUNDARY. IN SO DOING, HE HAS
8   VIOLATED CONSTITUTIONAL, DECISIONAL AND STATUTORY MANDATES
9   AND HAS PREJUDICED THE DEFENDANT BY WHAT CAN ONLY BE
10  DESCRIBED AS A PERSONAL BIAS. THE JUDGE'S ACTIONS AND
11  THEIR INTENT ARE DEFINITIVE EXAMPLES OF LEGAL GROUNDS FOR
12  HIS DISQUALIFICATION.

13
14  FURTHERMORE, WHEN CAPRICIOUSNESS, ARBITRARINESS OR FAILURE
15  TO ADEQUATELY INVESTIGATE THE NECESSARY FACTS REQUIRED FOR
16  INTELLIGENT EXERCISE OF THE TRIAL COURT'S SENTENCING POWER,
17  SUCH CONDUCT DEFINES ABUSE OF DISCRETION [SEE STATE V.
18  GANNON, 130 ARIZ. 592, 638 P.2d 206 (1981)] AND; WHEN A
19  PERSONAL BIAS IS MANIFESTED, AN APPELLATE TRIBUNAL
20  WILL ORDER RESENTENCING BEFORE A DIFFERENT JUDGE
21  [SEE COM. V. MILLS, 436 MASS. 387, 764 N.E. 2d 854 (2002)]

10b - Pg. 6

ATTACHMENT 'D': PAGE 30

"APP. 151, ITEM 11b"

No. 11b CONTINUED – IRREPARABLE HARM:   PROPOSITION 57
PROVIDES THAT A NON-VIOLENT OFFENDER IS ELIGIBLE FOR
PAROLE AFTER SERVING THE MAXIMUM TERM FOR HIS PRIMARY
OFFENSE.   IN THE DEFENDANT'S CASE, THE JUDGE DECIDED
TO USE COUNT NO. 3B AS THE PRIMARY OFFENSE WHICH CARRIES
A MAXIMUM TERM OF FIVE YEARS.   HIS DECISION WAS MADE
KNOWING THAT COUNT NO. 3B WAS ADDED AFTER "EXTRADITION"
AND SUBJECT TO THE DOCTRINE OF SPECIALITY WHICH PROHIBITS
THE TRYING AND TRYING/PUNISHING OF SUCH CHARGES.   THE MAXIMUM
TERM FOR THE "PRE-EXTRADITION" CHARGES IS THREE YEARS  [CPC 487]
THE DEFENDANT HAS ALREADY SERVED FOUR (4) ACTUAL YEARS AND
THUS WOULD BE ELIGIBLE FOR PROP. 57 PAROLE IMMEDIATELY IF THE
JUDGE DID NOT VIOLATE CONSTITUTIONAL AND FEDERAL LAW IN HIS
SENTENCING CHOICES.   THEREFORE EVERYDAY THAT DEFENDANT IS
DEPRIVED OF HIS CONSTITUTIONAL RIGHT . [PROP. 57 = CA CONST. 32]
FOR NON-VIOLENT PAROLE CONSIDERATION DUE TO JUDGE JENSEN'S
PEJUDGEMENT BIAS IN SENTENCING IS LOST AND THE HARM AS A
RESULT, IRREPARABLE.

ATTACHMENT 'D':  PAGE 31

# EXHIBIT NO. 4

**PROCEDURAL HISTORY:**

1.) Submitted with State Habeas Petition No.G058686 to State Apellate Court

2.) Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit except for an updated signature date and Housing Location provided on the Declaration Page as well as a re-typing of the Transcript References for sake of legibility.

<u>EXHIBIT NO. 4 Declaration for Transcript References</u>

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The purpose of this declaration is to swear as to the accuracy of the Transcript References submitted herewith. These references are categorized as follows:

1.) Interest Payment and Interest Income Characterizations found in Trial and Preliminary Hearing testimony
2.) No Return of principal representations made by the Prosecution and its witnesses
3.) Actual and determinable loss representations made by the Prosecution team and its witnesses
4.) Judicial disposition of a specific interest characterization
5.) Actual and constructive knowledge of facts serving as the basis for later criminal allegations
6.) Trial counsel's advocacy of Prosecution's Presumptions.
7.) Prosecution's representations of 'No Investing unless Secured'
8.) Transcript References that demonstrate 'No Acts of Ownership'
9.) Transcript References of Investors continuing to receive Disbursement from Petitioner.
10.) Investor statements that they did not provide 'Interest Paid' notices
11.) Investor's use of Tax Professionals
12.) Prosecution's representations that forged documents were intended to deceive.
13.) Testimony for investors that they held no Promissory Notes.

The Transcripts references provided in support of the contentions raised in the accompanying Writ of Habeas Corpus are true and accurate to the best of my knowledge.

I am submitting this declaration swearing that the statements contained and the references provided are correctly identified.

Respectfully submitted this the _____22ⁿᵈ_____ day of ____June____, 2021

By:_____

Thomas Tarbutton CDCR#BE8274
Folsom State Prison Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D': PAGE 33

**EXHIBIT No. 4:   Transcript References**

1.)   "Interest", 'interest payment', 'interest income' represen-
      tations:

    (A)   Larry Richardson:
        (i)   Per FBI Agent Murray's Prop. 115 Testimony: 2CT258;
        2CT259

        (ii)   Per Richardson:  2CT429; 2CT442; 2CT443; 2CT444;
2CT475; 1RT129; 1RT131; 1RT157; 1RT162; 1RT209; 1RT241

    (B)   Martin Almquist:
        (i)   Per Almquist: 3CT595; 3CT605; 3CT607; 3CT608; 3CT
629; 3CT636; 3CT649; 3CT652; 3CT656; 2RT259; 2RT260; 2RT264; 2RT265;
2RT300; 2RT301; 2RT303; 2RT304; 2RT305; 2RT346; 2RT348; 2RT357; 2RT
374; 8RT1537; 8RT1550

    (C)   Linda Mathis:  2CT455; 3CT476; 3CT479; 3CT480; 3CT483;
3RT589; 4RT709; 4RT720; 4RT721; 9RT1647

    (D)   Jack Leever:
        (i)   Per Agent Murray's Prop. 115 Testimony: 2CT326; 2CT327
        (ii)   Per Leever:  3CT669; 3CT678; 3CT679; 3CT680; 4CT714;
3RT417; 3RT419; 3RT429; 3RT490; 9RT1653-1654

    (E)   Jesse Bagley: 4CT738; 4CT742
    (F)   Robert Pinault:
        (i)   Per Agent Murray's Prop. 115 Testimony: 2CT330; 2CT331
        (ii)   Per **Pinault:** 4CT796; 4CT798; 4CT807; 4CT829; 5RT
1010; 5RT1022; 6RT1168; 9RT1624

    (G)   Bob Falterman:
        (i)   Per Murray's Prop. 115 Testimony:  2CT334
        (ii)   Per Falterman:  3RT549; 3RT562; 9RT1614

    (H)   George Kentner:
        (i)   Per Murray's Prop. 115 Testimony: 2CT**334**
        (ii)   Per Kentner:  4RT769; 4RT803

    (I)   Ray Infantino: 5RT869; 5RT898
    (J)   William Steiner:
        (i)   Per Murray's Prop. 115 Testimony: 2CT273; 2CT366
        (ii)   Per Steiner:  5RT934; 5RT978; 5RT987

    (K)   Debra Duncan:  5RT1077; 6RT1148; 8RT1556

(L)  Karen O'Connell:  6RT1193; 6RT1229; 6RT1236

(M)  Prosecutor Pete Pierce:  1RT111; 1RT162; 1RT186; 1RT192; 2RT270; 2RT300; 2RT303; 2RT304; 2RT305-306; 3RT417; 3RT526; 3RT556; 3RT590; 3RT637; 4RT720; 4RT721; 4RT769; 4RT773; 4RT780-781; 4RT808; 5RT869; 5RT872; 5RT934; 5RT956; 5RT1010; 5RT1022; 5RT1077; 7RT1307; 7RT1308; 7RT1309; 7RT1311; 8RT1549; 9RT1647; 9RT1721

(N)  Judge Jensen:  1RT193-205; 1RT213; 1RT214; 1RT216; 1RT218; 1RT219; 1RT230; 3RT510; 5RT1054

## 2.)  'No Return of Principal':

(A)  Larry Richardson:
    (i)  Per FBI Agent Murray's Prop. 115 Testimony: 2CT262
    (ii)  Per Richardson: 3CT531; 3CT532; 1RT185

(B)  Martin Almquist:  3CT625; 3CT656; 3CT657; **2RT332-333**

(C)  Linda Mathis:  3CT476; 3CT478; 3CT482; 3RT590; 4RT720

(D)  Jack Leever:
    (i)  Per Murray's Prop. 115 Testimony: 2CT328
    (ii)  Per Leever:  4CT706; 3RT526; 3RT527-530

(E)  Jesse Bagley:
    (i)  Per Murray's Prop. 115 Testimony: 2CT395

(F)  Robert **Pinault**:
    (i)  Per Murray's Prop. 115 Testimony: 2CT331
    (ii)  Per Pinault: 4CT**806**

(G)  Brian Falterman:  3RT561

(H)  George Kentner:  4RT797

(I)  Ray Infantino:  5RT891

(J)  William Steiner:
    (i)  Per Murray's Prop. 115 Testimony:  2CT273
    (ii)  Per Steiner:  5RT971

(K)  Debra Duncan:  5RT1076-1077; 5RT1081

(L)  Karen O'Connell:
    (i)  Per Murray's Prop. 115 Testimony:  2CT338
    (ii)  Per O'Connell: 6RT1229

(M)  Prosecutor Pete Pierce:  Along with the solicitation of the testimony noted above, Mr. Pierce makes such representations in the following instances:  1RT197; 1RT214; 1RT218; 2RT332-334; 4RT720

3.) **Actual and Determinable Loss:**

(A)   Enhancement of CPC §12022.6(a)(4):  Page 9 of the Information filed on 8/21/2014 (4CT893-902) alleges a determinable loss amount in excess of $3.2M

(B)   Enhancement of CPC §186.11 (a)(1)/(2):  Page 9 of the Information filed on 8/21/2014 (4CT893-902) alleges a determinable loss in excess of $500K

(C)   FBI Agent Murray's Probable Cause Spreadsheet (11CT2484) lists determined loss amounts of:

      (i)   Almquist:  $4.3M
      (ii)   Balgey:  $60K
      (iii)  Falterman:  $30K
      (iv)   Infantino:  $275K
      (v)   Kentner:  $649K
      (vi)   Leever:  $764.5K
      (vii)  Mathis:  $89K
      (viii)  O'Connell:  $1M
      (ix)   Pinault:  $925,866
      (x)   Richardson:  $702K
      (xi)   Steiner:  $3.4M

(D)   Richardson's Loss Amount per Murray's Prop. 115 Testimony: 2CT355

(E)   Richardson's Loss Amount per Richardson:  1RT240-241

(F)   Almquist's Loss Amount per Almquist: 3CT613; 3CT618; 2RT333-334

(G)   Pinault and O'Connell's Combined Loss Amount per Pinault: 6RT1168

(H)   Prosecutor Pierce reiterating Enhancement Loss Amounts: 1RT53; 1RT101

(I)   Trial Court's acknowledgement of Enhanced Loss Amounts: 4RT683

(J)   Steiner Loss Amounts per Steiner:  5RT971; 9RT1633

(K)   O'Connell Loss Amounts per O'Connell:  6RT1230

4.) **Judicial Disposition of "Interest":**

(A)   Judge Jensen:  1RT194-195; 1RT213; 1RT214; 1RT216; 1RT218;

1RT219; 1RT220

    (B)  Judge Jensen's Undue Consumption of Time Usage:  1RT202; 1RT223; 2RT350

**5.)  Actual or Constructive Knowledge of the Investors:**
    (A)  Mathis:  2CT461; 3RT575
    (B)  Richardson:  3CT543; 3CT586; 3CT587; 1RT134; 1RT146
    (C)  Almquist:  3CT661
    (D)  Leever:  3CT683; 3CT687; 3CT688; 3CT689
    (E)  Bagley:  4CT750
    (F)  Pinault:  5CT828; 9RT1621-1622
    (G)  Steiner:  11CT2537-2538 [Murray's '302' Report]

**6.)  Trial Counsel Jerry Schaffer's Advocacy of Prosecution's Presumptions:**
    (A)  Extradition and Arrest on Warrant:  1RT14; 1RT17; 1RT18; 8RT1589-1591
    (B)  Limiting 'VCF' Exposure:  1RT228; 5RT1053; 6RT1165-1168; 8RT1507; 9RT1624-1625
    (C)  Advocates Presumption of Actual Loss:  1RT230
    (D)  Advocates False "Interest" Characterization and Presumption: 1RT241; 2RT392; 3RT494; 3RT513; 4RT807; 6RT1148; 6RT1241; 9RT1624; 9RT1640
    (E)  Advocates Property-Specific Investment Premise Which is
        Elemental to the Prosecution's Theory of False Pretense: 1RT242; 3RT500; 3RT523; 4RT728; 5RT894; 5RT896-899; 6RT1150

**7.)  'No Investing Unless Secured' Representations:**
    (A)  Richardson:  1RT147; 1RT159
    (B)  Almquist:  3CT627; 2RT279; 2RT298
    (C)  Mathis:  Inferred in Count 34 wording of Information filed
             8/21/2014 (see 4CT893-902)
    (D)  Bagley:  4RT669-670
    (E)  Pinault:  5RT1028
    (F)  Falterman:  3RT561
    (G)  Kentner:  4RT806
    (H)  Infantino:  5RT907

    (I)   steiner:  5RT992
    (J)   Prosecutor Pete Pierce:  2RT279; 4RT806; 5RT907; 5RT992

**8.)  No Acts of Ownership:**
    (A)   Mathis:  2CT464; 3CT495; 3CT496; 9RT1643
    (B)   Richardson:  3CT543; 8RT1499; 3CT573; 5CT579; 8RT1500-1502; 3CT552; 3CT565-568; 8RT1502-1504
    (C)   Almquist:  2RT366-367; 8RT1531; 3CT553; 2RT344; 2RT367; 8RT1530; 8RT1534; 3CT636-639; 2RT374; 8RT1534-1535
    (D)   Leever:  3CT690-691; 4CT738; 4CT709; 4CT714; 4CT715; 4CT718; 9RT1651-1653
    (E)   Bagley:  4CT772; 3RT672-673; 3RT670; 4CT752; 4CT760; 8RT1560; 4CT758
    (F)   Pinault:  4CT788-789; 5RT1028; 4CT808; 4CT823; 4CT834-835; 5RT1016
    (G)   Kentner:  4RT779
    (H)   Infantino:  5RT909
    (I)   Steiner:  5RT975-976; 5RT994; 5RT985-986; 5RT986-987
    (J)   O'Connell:  6RT1213

**9.)  Payments Received:**
    (A)   Mathis:  3CT567; 3CT569; 3CT584
    (B)   Richardson:  1RT192
    (C)   Almquist:  3CT607; 2RT343
    (D)   Leever:  3CT680; 3RT424
    (E)   Pinault:  4CT812
    (F)   Steiner:  5RT986
    (G)   O'Connell:  6RT1224; 6RT1226

**10.)  No Tax Notices of Interest Paid:**
    (A)   Mathis:  9RT1641
    (B)   Richardson:  3CT564-565; 8RT1506
    (C)   Almquist:  3CT635-636; 2RT346; 8RT1533
    (D)   Leever:  4CT714; 9RT1655-1656
    (E)   Bagley:  8RT1561-1562
    (F)   Pinault:  9RT1627
    (G)   Falterman:  9RT1615

(H)  Kentner:  9RT1665
(I)  Infantino:  9RT1661
(J)  Steiner:  5RT984; 9RT1631
(K)  Duncan:  8RT1556
(L)  O'Connell:  6RT1234

**11.)  Investors' Use of Tax Professionals:**
(A)  Mathis:  9RT1643
(B)  Richardson:  3CT551; 3CT564; 1RT206
(C)  Almquist:  3CT636; 2RT376
(D)  Leever:  4CT731; 9RT1655; 9RT1659
(E)  Pinault:  5RT1004; 9RT1624
(F)  Falterman:  3RT558
(G)  Steiner:  5RT989-990
(H)  O'Connell:  6RT1185; 6RT1187-1188; 6RT1235

**12.)  Forged Documents Intended to Deceive:**
(A)  Almquist:  1RT259
(B)  Infantino:  5RT880
(C)  Prosecutor Pierce:  1RT51; 1RT55-56; 4RT796; 5RT861; 8RT1515; 11RT2112-2113

**13.)  No Promissory Notes Held By Investors:**
(A)  FBI Agent Murray:  2CT363; 2CT369; 2CT392; 9RT1713-1714
(B)  Mathis:  3CT490; 4RT728-729; 9RT1645; 9RT1649
(C)  Richardson:  3CT522; 3CT565; 3CT581; 3CT583-584
(D)  Almquist:  3CT630; 2RT342; 2RT367
(E)  Leever:  4CT709; 9RT1651
(F)  Bagley:  4CT748; 3RT665; 8RT1559-1560
(G)  Pinault:  4CT808-809; 9RT1621; 9RT1623
(H)  Faltermand:  9RT1615-1616
(I)  Kentner:  See Murray's Hearsay Testimony of 9RT1713-1714
(J)  Infantino:  5RT902
(K)  Steiner:  5RT975; 9RT1634-1635
(L)  O'Connell:  See Murray's Hearsay Testimony of 9RT1713-1714

ATTACHMENT 'D':  PAGE 39

# EXHIBIT NO. 5

**PROCEDURAL HISTORY:**

1.) Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.) Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust All State Remedies as well as for Pragmatice Purposes of Reference

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit except for an update signature date and Housing Location provided on the Declaration Page as well as the AMENDMENT included for purposes of Requesting Judicial Notice in Federal Court pursuant to Federal Rules of Evidence.

EXHIBIT NO. 5 Declaration of true and correct copy

I, Thomas Tarbutton, the appellate in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, so hereby submit this declaration under penalty of perjury. The purpose of this declaration is to swear as to the accuracy and authenticity of the Request of Judicial Notice attached here to. The copy accompanying this declaration is a true and accurate copy of the Request for Judicial Notice filed prior to or concurrent herewith.

This declaration is being submitted under penalty of perjury and I swear as to the accuracy of events described and verified as to the veracity of the statements contained.

Respectfully submitted this _____ day of _____, 2021

By: _____

Thomas Tarbutton CDCR# BE8274
Folsom State Prison Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

**AMENDMENT TO DECLARATION:**

The Facts presented for Judicial Notice in State Court are also being presented to the Federal Court under Federal Rule of Evidence, Rule 201 as such are not subject to reasonable dispute [Rule 201(b)]. Insomuch that these facts, propositions and appellate record references are judicially noticeable by the Federal Court [See Miles v. California, 320 F.3d 986, 987 fn.1 (9th Cir.)], the request to do so is being submitted at this time as I feel it necessary for proper determination of fully factually-developed claims [Rule 201(f)].

Submitted Under Penalty of Perjury this the _____ day of _____, 2021

By: _____

Thomas Tarbutton, Petitioner

PROPOSED ORDER:  Request for Judicial Notice

Thomas Tarbutton     CDCR#BE8274
Folsom State Prison    Housing# 1-B1-09
P.O. Box 715071
Represa, California 95671

California Supreme Court
350 McAllister Street
San Francisco, California 94102
Petitioner:     Thomas Tarbutton
Respondent:  Folsom State Prison, Warden Rick Hill

   1.) Name of Party Submitting the Proposed Order;
      Thomas Tarbutton
   2.) Title of Proposed Order:
      Request for Judicial Notice pursuant to California Rules of Court, Rule 8.252(a);
      CA Evidence Code Sections 451, 452, 453, 459
   3.) The Proceeding to which the Proposed Order relates: Writ of Habeas Corpus -
      Thomas Tarbutton, Petitioner v. Folsom State Prison - Warden Rick Hill,
      Respondent
   4.) Proposed Order and Request for Judicial Notice served on:
      A.) Warden Rick Hill, Folsom State Prison
      B.) State Attorney General Xavier Becerra
      C.) Orange County District Attorney
      D.) Trial Counsel, Jerry Schaffer
      E.) Appellate Counsel, Valerie G. Wass
      F.) Orange County Public Defender's Office
      G.) California State Board of Parole Hearings
   5.) Attachments: Requests for Judicial Notice
Respectfully Submitted this the____15th____day of ___July___, 2019

By:_____
Thomas Tarbutton

ATTACHMENT 'D':  PAGE 42

## REQUEST FOR JUDICIAL NOTICE

The Petitioner, Thomas Tarbutton, hereby moves the court to take judicial notice of court records, documents, facts, propositions, treaties, law of organization of nations, law of foreign nations and industry information that is not reasonably subject to dispute. This request for judicial notice is made pursuant to California Rules of Court, Rule 8.252(a) and California Evidence Code Sections 451, 452 453, and 459.

With the exception of requesting notice of the proceedings/filings of the Petitioner identified as No. G058686, none of these items for which judicial notice is sought involve matters or events occurring after the entry of judgment. Judicial notice was informally sought by Petitioner in Trial Court through his pre-sentencing motions, declarations and addenda filed in Orange County Superior Court. These efforts of the Petitioner are identified in the Clerk's Transcripts of Case No. 11CF2747 [Appeal No. G055717] and will be used to reference such herein. All motions and assertions including those subjected to judicial notice were denied by the Trial Court on 9/15/17 [1CT204-205]. Writ review of Trial Court's failure to take judicial notice was filed by Petitioner as Appeal No. G055568 [12CT2596-2623]. This writ was denied on 10/27/17 [12CT2690]. The relevancy of these matters relative to the contentions raised by Petitioner in his Habeas Corpus and the applicability of CEC451-453 are set forth herein.

This request for judicial notice is based on the following Points and Authorities

## MEMORANDUM OF POINTS AND AUTHORITIES

The Petitioner is requesting this court to take judicial notice of the following matters:

## 1.) RECORD OF DIRECT APPEAL NO. G055717 and HABEAS RECORD OF No. G058686:

Included in the appellate record of No. G055717 are the clerk and reporter transcripts from Petitioner's Case No.11CF2747.  Concurrent with the direct appeal is the Habeas Petition, its orders and filings of Case No. G058686.  Because the matters subject to judicial notice, as well as issues of law and fact serving as the bases for the Habeas claims, are of record – these records of the respective courts are subject to judicial notice

REQUEST FOR JUDICIAL NOTICE

pursuant to CEC452(d) and supported by decisions of this Court in Stephenson v. Drever (1997) 16 C4th 1167, 1170 fn.1.

2.) TAX-REPORTING FACTS AND PROPOSITIONS:

A.) The reciprocal reporting of Borrower and Lender: California Civil Code 2954.2(a) requires a lender (mortgagee) to notify a borrower (mortgagor) of 'interest paid' for every calendar year. This 'interest paid' notification given to the borrower, in turn serves as the source and reciprocal amount of 'interest income' to be tax-reported by lender. Because the 'interest paid' and 'interest income' relationship within the context of borrower and lender are mutually corresponding and NOT mutually exclusive; the failure to notify a borrower of 'interest paid' precludes the practical possibility of tax-reporting income as 'interest income' specifically as a mortgage beneficiary.

B.) Actual recording serves as public record: When a deed of trust securing a promissory note is recorded with the county recorder in which the subject property is located - it creates and serves public notice to a taxable event thus establishing the transaction and the means it will be treated for tax-purpose.

C.) Tax-deferred investments: In a tax-deferred investment, the income is reported - it is the taxation of the income that is deferred.

D.) Relevancy and judicial noticeability: The importance of these facts and propositions and their relevance to the particulars of Petitioner's conviction cannot be overstated - in that, as raised in CLAIM III and noted throughout the Writ of Habeas Corpus, the Prosecution has relied on presumptions based on false characterizations as evidentiary fact. Therefore, these matters that are not reasonably subject to dispute demonstrate the fallacy perpetrated by the Prosecution. Because these facts and propositions are of generalized knowledge, common sense conclusions and/or are readily ascertainable - they are subject to judicial notice pursuant to CEC451(f) and/or CEC452(h).

E.) Presented in Trial Court: The Petitioner has raised these matters in Trial Court through his CEC1181 Motion [10CT2037-2038; 10CT2097-2100] and affidavits filed in support thereof [11CT2402].

REQUEST FOR JUDICIAL NOTICE

## 3.) TREATIES, LAW OF ORGANIZATION OF NATIONS, LAW OF FOREIGN NATION:

The Petitioner requests judicial notice of treaties in force that include the US-Panama Bilateral Extradition Treaty, the Charter of the Organization of American States, the United Nations Charter and the Vienna Convention. Petitioner also requests notice of the laws of the country of Panama.

A.) Relevancy and Judicial Noticeability: These treaties and laws are relevant to the particulars of Petitioner's forcible transnational abduction from the country of Panama as raised in CLAIM IV of his Writ of Habeas Corpus. Because of the method employed by the Prosecution team to commission, carry out and conceal their acts that are in violation of articles and laws as set forth by these agreements - it is important and therefore relevant to take notice of such and thus define the degree of outrageous conduct. Article VI of the U.S. Constitution includes treaties made in the supreme law of the land, therefore the U.S.- Panama treaty, the Charter of the Organization of American States, the U.N. Charter and the Vienna Convention are subject to judicial notice pursuant to CEC451(a). Additionally, the Charter of the 'OAS' and the laws of the country of Panama are subject to judicial notice pursuant to CEC452(f).

B.) Presented in Trial Court: These matters have been raised by the Petitioner in Trial Court through his introduction of the U.S.-Panama Treaty [11CT2466-2470] and references to the 'OAS' and U.N. Charters in his pre-sentencing motion of CPC1538.5 [10CT2242-2247]. The exception to this is the Vienna Convention which was not raised by name in Trial Court, however this Treaty is named in the CA Penal Code(e.g. CPC834c), therefore judicial notice of such is required without formal request pursuant to CEC451(a).

## 4.) MATHEMATICAL CALCULATIONS: Courts properly take judicial notice of the results of simple mathematical calculations because they are easily verified [See Miller v. Fed. Land Bank of Spokane, 587 F2d 415, 422 (9th Cir. 1978)]

A.) Relevancy: As raised by Petitioner in CLAIM III, CLAIM VI and CLAIM VII, the Prosecution relies on false presumptions and false evidence to establish the element of actual and determinable loss. However, as produced by Petitioner through his pre-sentencing pleadings and affidavits, the concept of loss is negated by application of simple and basic mathematical calculations. This is demonstrated by Petitioner in his Accounting affidavit filed in Trial Court as 11CT2370-2401.

REQUEST FOR JUDICIAL NOTICE

     B.) Authorities: Because these simple math calculations are easily verified, they are of generalized knowledge not reasonably subject to dispute and therefore judicially noticeable pursuant to CEC451(f). Furthermore, because all bank records were not used by the Prosecution despite being discovery-requested by Petitioner [11CT2475], the Petitioner has used the method of taking averages of a set of figures from the bank records that was reviewed by the OCDA. This simple computation of taking averages has been found to be judicially noticeable because the results can be accurately and readily verified [See e.g. Leeward Capital L.P. v. Archon Corp., 759 F. Supp. 2d 1249, 1255-58 (D. Nev. 2010)]

     C.) Presented in Trial Court: As mentioned above, these mathematical calculations have been presented in Trial Court through Petitioner's Accounting affidavit [11CT2370-2401]. Also, these issues were raised by Petitioner in his pre-sentencing motions that include his CPC1181 motion for a new trial [10CT2151].

5.) INDUSTRY-SPECIFIC INFORMATION: The OCDA despite using their fraud unit that specializes in the subject matter involved in the allegations, have prosecuted the Petitioner with an intentional ignorance of industry information that is specific to their specialty. These facts and the Prosecution team's reckless disregard has been raised by Petitioner in his CLAIM III and CLAIM VII. Therefore to demonstrate the Prosecution's inexcusable negligence it is important and thus relevant to take judicial notice of industry-specific information that is of reasonably indisputable accuracy.

     A.) Document of Indebtedness ('DOI'): Inherent in an agreement by and between an entity borrowing money and the entity lending is the contract that defines the debt and the terms/conditions for its repayment. This document of indebtedness, 'DOI', also referenced as promissory note/loan agreement - once executed and the lending consummated, serves as the borrower's promise to repay as therein stipulated. It is this 'DOI' that defines a default/breach of the terms and conditions of the borrower's promise to repay as agreed. Consequently, if an entity fails to hold/own the 'DOI' or be vested as the lender - they are ignorant of the terms and conditions set forth, incapable of identifying a breach of those terms/conditions, and impotent to act on any foreclosure arrangement that requires a declaration of such default. Thus, an entity that believes they are vested on a trust deed but is incapable of defining and declaring a default due to the absence of a valid/actionable 'DOI', is unable to foreclose on a debt, the terms/conditions of which is unknown to them.

ATTACHMENT 'D': PAGE 46

REQUEST FOR JUDICIAL NOTICE

B.) Notice of Default, Notice of Sale, Foreclosure: The industry information that involves a non-judicial foreclosure in the State of California includes public recordings of a Notice of Default ('NOD') and the Notice of Sale ('NTS'). The prosecution has introduced searches that show this type of foreclosure action taken by the Petitioner [See People's Exhibits No.14, 15], therefore industry information that establishes the obvious and common sense connection between a filed 'NOD' and 'NTS' with a cessation of payments from the respective borrowers - renders investor belief they were actual lenders preposterous, especially when considering and comparing the foreclosure filing dates to investor testimony of receiving disbursements from Petitioner uninterrupted to mid-2010.

C.) Actions, Obligations and Liabilities of a Lender: As demonstrated by Petitioner in his affidavit filed in Trial Court [11CT2355-56], the vesting of a mortgage beneficiary is not a passive activity. This is relevant to the Petitioner's CLAIM III and CLAIM VI because all alleged investor-victims have failed to produce any evidence of taking any such action or exhibiting any conduct conducive of the investment pretense alleged by the Prosecution. Thus, to demonstrate equitable judicial estoppel pursuant to CEC623, it is relevant to take judicial notice that will define conduct that indicates belief.

D.) Licensing requirement for Equity Lines of Credit: Because the Prosecution has entered into evidence examples of documents used by the Petitioner to secure revolving equity lines of credit - the regulatory requirements for this type of lending is important to establish that the alleged investor-victims were not properly licensed to act as lenders in such financial transactions. This information is also relevant to the testimony of Prosecution expert Marlou De Luna [CLAIM VII]. Ms. De Luna is senior counsel for the Department of Business Oversight, the California department that issues and oversees this licensing. Therefore when Ms. De Luna testified, she did so concealing information that is exculpatory to the Petitioner's defense.

E.) Subject to Judicial Notice: Because these facts and propositions are readily ascertainable through sources that include persons learned in the subject matter, they are therefore not only judicially noticeable per CEC452(h) but also probative of misconduct of the OCDA's Fraud Unit that self-professes to be such sources.

REQUEST FOR JUDICIAL NOTICE

6.) FORMAL REQUEST FOR JUDICIAL NOTICE: For the foregoing reasons, the
Petitioner request judicial notice to be taken of the matters as listed as well as
reasonable extensions and extrapolations derived therefrom.

Respectfully submitted this the ___5ᵗʰ___ day of ___July___, 2020

By: _____
Thomas Tarbutton CDCR#BE8274
Folsom State Prison  Housing #1-B1-09
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D':  PAGE 48

# EXHIBIT NO. 6

## PROCEDURAL HISTORY:

1.)   Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.)   Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.)   Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

## CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit except for an updated signature date and Housing Location provided on the Declaration Page.

EXHIBIT No. 6: Declaration of 'Supplemental Report'

I, Thomas Tarbutton, the Appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The purpose of this declaration is to make record of the Document entitled 'Supplemental Report' prepared by OCDA Investigator, Dave Melnyk on 12/18/13. A copy of this attached hereto. This document is referenced in my pre-sentence pleadings that include but is not limited to the CPC1181 Motion [10CT2063]. As noted in that motion, this report was supposed to be attached and is referenced as Addendum 'W', Exhibit No. 10. However, in looking at the filed Addenda and specifically at this Addendum 'W', this Exhibit No. 10 is missing – going from Exhibit No. 9 to Exhibit No. 11 [11CT2510-2511]. This is not deliberate and appears to have been a mistake in the copying of the original file and/or filing. Therefore, while this document is in discovery of my Case No. 11CF2747 [Bate Stamp No. __00373__ ], it does not appear to be a part of the appellate record as a result of unintentional error. To correct this mistake, I am submitting it as an attachment to this declaration.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of events described and verifying as to the veracity of the statements contained herein.

Respectfully submitted this the _____ day of _____, 2021

By: _____

      Thomas Tarbutton  CDCR# BE8274
      Folsom State Prison  Housing# 1-C1-11
      P.O. Box 715071
      Represa, California  95671



**ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE**
**BUREAU OF INVESTIGATION**

11F15101

**SUPPLEMENTAL REPORT**

CASE NAME: THOMAS FRANKLIN TARBUTTON

CLASSIFICATION: GRAND THEFT - 487(A)PC

TYPE: FOLLOW-UP

AGENCY: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

On December 17, 2013, I was notified by Special Agent JESSIE T. MURRAY of the FBI that THOMAS TARBUTTON had been detained in Panama on a Federal arrest warrant for Unlawful Flight to Avoid Prosecution based on an arrest warrant issued in Orange County Superior Court Case #11CF2747. Panamanian Immigration agents, SILA SAAVEDRA and ALVARO MEJIA were accompanying TARBUTTON to the Los Angeles International Airport (LAX) on Capo Airlines flight #472 arriving on December 17, 2013, at 1548 hours.

I accompanied MURRAY to LAX where we met the aircraft with the assistance of Special Agent MICHAEL PADAR of the Los Angeles Office of the FBI. Customs and Border Patrol Officers SUTTON #4570 and SOTO #4534 took custody of TARBUTTON from Panamanian Immigration agents and processed him through Customs.

TARBUTTON was released to MURRAY and my custody at approximately 1620 hours. We transported TARBUTTON to the Orange County Men's Central Jail where he was booked under Booking #2801514. At the time of his booking, TARBUTTON had the following property in his possession which I later booked into evidence at the Orange County District Attorney's Office:

1) $1149.00 in US currency.

2) A Bank of America Business Debit Card and VISA #4635-8900-0302-0582 with an expiration date of 04/16, in the name of ARKADIAN BLACK and THOMAS TARBUTTON.

3) A Brazilian Visa #430491MA issued November 23, 2011, to TARBUTTON.

4) A Copa Airlines receipt for Flight #140 from Manaus, Brazil to Panama City, Panama, on December 9, 2013.

5) A Gmail Reservation Confirmation from Copa Airlines for Flight #140 dated December 7, 2013, emailed to TOM TARBUTTON at email tom.arkadia@gmail.com charged to a Visa account ending in 0582.

| Investigator: D. MELNYK #251 | *David E. Melnyk* | Approved By: *E. Auld* |
|---|---|---|
| Date of Report: 12/18/13 | | Date: 12/19/13 |

OCDA000373

Page 1 of 2

**ATTACHMENT 'D': PAGE 51**

*APPENDIX 10 ; EXHIBIT NO. 10 ; page 2/2.*

6) A checking account register for Westport Dynamics LLC in Irvine with account: 7024141416 and routing: 031000053 crossed out in black ink; and "031100157 Bank: Charles Schwab and Company, Inc." written in blue ink.

11F15101

7) A Radisson note with the number 4427 4340 1324 5129 written on it with apparent passwords "thom622" and "34thom46".

8) A black wallet containing numerous expired credit cards from Wells Fargo, Capital One, Applied Bank and Chase.

9) Miscellaneous papers.

I attached photocopies of items #1-8.

On December 18, 2013, at approximately 0500 hours I advised TARBUTTON per Miranda at the Orange County Men's Central Jail and he invoked his right to an attorney.

Investigator: D. MELNYK #251

Date of Report: 12/18/13

Approved By:

Date: 12/19/13

OCDA000374

**ATTACHMENT 'D': PAGE 52**

# EXHIBIT NO. 7

**PROCEDURAL HISTORY:**

1.) Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.) Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit except for an updated signature date and Housing Location provided on the Declaration Page.

<u>EXHIBIT NO. 7 Declaration of actual knowledge of items omitted</u>

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under the penalty of perjury. The purpose of this declaration is to make a record of facts and events - and my actual knowledge of such. It is my declaration that the bank records of the corporate entities under my operation contain evidence of payments to investors and payments to service the asset base. It is also my sworn statement that the forensic spreadsheets prepared by OCDA's Scott Weitzman following his analysis, do not identify many of the disbursements to investors and fails to identify virtually all of the payments made to properly service the asset base. It is my sworn statement that an objective review of these bank accounts will demonstrate my exclusive actions taken to effectively administer and manage the corporately owned asset base. It is also my sworn statement that I have properly requested and instructed members of the Prosecution team to procure and review all bank activities for the purpose of discovery of this exculpatory evidence. These attempts include:

    1.) Face to Face Interview with FBI Agent Murray - 11CT2482-2483
    2.) Discovery Request 3/07/14 - 11CT2475
    3.) Discovery Request 4/03/14 - 11CT2478
    4.) Discovery Request 9/22/14 - 11CT2479-2481

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of the described events and verified the veracity of the statements contained herein.

Respectfully submitted this the _____ 22nd _____ day of ____June____ , 2021

By: _____

Thomas Tarbutton   CDCR#8274
Folsom State Prison   Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

**ATTACHMENT 'D': PAGE 54**

# EXHIBIT NO. 8

## PROCEDURAL HISTORY:

1.)   An original letter was mailed to the Governor of California
with a seperate original copy mailed to the Attorney General
of California.  A copy of this letter was submitted as Exhibit
No. 8 with the State Habeas Petition No. G058686 to the State
Appellate Court

2.)   Another original letter was mailed to the Governor of California
with another separate original copy mailed to the Attorney
General of California.  A copy of this mailing was submitted
as Exhibit No. 8 with the State Habeas Petition No. S263665
to the State Supreme Court.

3.)   A True and Original Copy is included Herein as Proof of Due
Diligence in Seeking to Exhaust all State Remedies

## CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit

## VERIFICATION:

I, Thomas Tarbutton, do hereby swear under penalty of perjury that
the attached letter included as Exhibit No. 8 is a true and correct
copy of the letters sent to the Governor and Attorney General of
California.  I also swear that I have received no response to the
request made nor have I received any rational justification for the
conduct of the state actors as named.

By: _____   Date: 6/22/2021

Thomas Tarbutton

**ATTACHMENT 'D':  PAGE 55**

<u>EXHIBIT NO. 8 Copy of letter sent to Governor and Attorney General</u>

June 26, 2020

Governor Gavin Newsom                          Attorney General Xavier Becerra
State Capitol, Suite 1173                          State of California
Sacramento, California 95814                     1300 I Street, Suite 125
                                                              Sacramento, California 95824

Dear Sir,

Enclosed herewith is my Writ of Habeas Corpus as it relates to my illegal restraint resulting
from the numerous cognizable claims raised therein. Included in these claims is the contention
of outrageous conduct of government officials including those representing the People of
California. The subject of outrageous conduct, as raised in CLAIM IV, is my forcible
transnational abduction from the country of Panama that was commissioned, carried out and
concealed by members of the Orange County District Attorney and the Prosecution team in my
Case No. 11CF2747. The purpose of this letter, along with providing noticeable service of legal
documentation, is to respectfully request a formal response to these actions of those in
representation of the People of California. Such conduct is discriminatory in intent and effect
when compared to the administration's support of sanctuary cities in California. It is important
to note that I was traveling on a valid U.S. passport; and after legally entering and exiting the
country of Panama, I was abducted, held and eventually conveyed by force and fraud under the
false pretense of authority communicated by those representing the State of California. Thus,
my _illegal deportation_ while _traveling legally_ is in diametric opposition to the PEOPLE'S support
of sanctuary cities, protecting those _traveling illegally_ from _legal deportation._ I am not asking for
anything other than equal treatment under what is being recognized and enforced as binding
law. I believe equal treatment accorded by the California Constitution requires your immediate
and appropriate intervention in my case. I appreciate your time and consideration.

Respectfully,

Thomas Tarbutton CDCR#8274
Folsom State Prison  Housing #1-B1-09
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D':  PAGE 56

# EXHIBIT NO. 9

**PROCEDURAL HISTORY:**

1.)   Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.)   Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.)   Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit except for an updated signature date and Housing Location provided on the Declaration Page.

<u>EXHIBIT NO. 9 Declaration of attempts for communication with trial counsel</u>

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration page and the accompanying two pages under penalty of perjury. The following two pages is an affidavit I prepared as an addendum to be filed in support of my CPC1181 Motion filed in Orange County Superior Court. Due to reasons and circumstances beyond my control, the affidavit was not filed. This affidavit demonstrates my reasonable due diligence in ensuring that trial counsel would prepare, investigate and produce specific, relevant, and material information at trial.  This affidavit was prepared under penalty of perjury and this statement declares the same.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of events described and verified as to the veracity of the statements contained herein.

Respectfully submitted this the _____ day of _____, 2021

By:_____

Thomas Tarbutton CDCR#8274
Folsom State Prison  Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D': PAGE 58

AFFIDAVIT FOR ADDENDUM - "U", PG 1:

THOMAS TARBUTTON, PRO PER

CC-CHILLED N. FLOWER ST. SANTA ANA, 92703

SUPERIOR COURT OF STATE OF CALIFORNIA

COUNTY OF ORANGE, WEST JUSTICE CENTER

| PEOPLE OF STATE OF CALIFORNIA | CASE NO. 11CF1747 |
|---|---|
| PLAINTIFF | |
| VS. | AFFIDAVIT IN SUPPORT OF |
| | ADDENDUM - "U" |
| THOMAS FRANKLIN TARBUTTON | |
| DEFENDANT | |

I, THOMAS FRANKLIN TARBUTTON, UNDER PENALTY OF PERJURY, HEREBY SWEAR
AND AVOW: I HAVE ACTED WITH REASONABLE DUE DILIGENCE IN ATTEMPTS
FOR INVESTIGATION, PRODUCTION OF AND/OR ACCESS TO RELEVANT AND
MATERIAL INFORMATION AS DEMONSTRATED BY REQUESTS TO DEFENSE
COUNSEL. THESE REQUESTS INCLUDE BUT ARE NOT LIMITED TO CERTAIN AND
SPECIFIC EXCULPATORY EVIDENCE EXHIBITED BY AND EXEMPLIFIED IN MY
WRITTEN CORRESPONDENCE ASKING FOR INVESTIGATION AND PRODUCTION OF :
ACCOUNTING OF PAYMENTS MADE TO INVESTORS ; ACCOUNTING OF COSTS AND
EXPENSES PAID TO SERVICE ASSET BASE ; ACCOUNTING OF ASSETS
TRANSFERRED TO INVESTORS AND/OR FUND ; ACCOUNTING OF PASSIVE
INCOME RECEIVED FROM TRANSFERRED ASSETS ; VCF CLAIMS ; DUE
CLAIMS ; DOC/DBO AUDIT OF VILLA CAPITAL ; TAX REPORTING
REQUIREMENTS ; FORECLOSURE REQUIREMENTS ; EXTRADITION
REQUIREMENTS ; CONTRACT REQUIREMENTS ; COGNITIVE PSYCHOLOGY
AND ; EXPERT TESTIMONY AS TO SUCH MATTERS.

PAGE: 1

**ATTACHMENT 'D':  PAGE 59**

AFFIDAVIT FOR EXTENSION - "C" - PG 2/2                    CASE No [illegible]

THESE CALLS/SENTENCES ARE STILL: 06.16.14; [illegible]; 01.17.14;

01.19.14; 12.21.14; 01.8.15; 01.8.15; 03.06.15; 03.15.15; 03.24.15;

03.28.15; 04.06.15; 04.06.15; 04.12.15; 04.18.15; 06.24.15; 08.17.15;

07.04.15; 09.58.15; 07.24.15; 11.15.15; 12.02.15; 12.12.15; 01.05.16;

01.14.16; 03.07.16; 04.06.15; 05.15.16; 06.28.16 | COPIES AVAILABLE

UPON REQUEST|. IT IS IMPORTANT TO NOTE THAT THIS IS NOT AN

EXHAUSTIVE LIST NOR DOES IT INCLUDE A LIST OF ATTEMPTED PHONE

CALLS TO COUNSEL IN EFFORTS TO FOLLOW-UP ON REQUESTED

INVESTIGATION, EXPERT WITNESS, ETC.  FOR EVIDENCE OF CALLS,

I HAVE MADE MULTIPLE REQUESTS FOR A "CALL LOG" THROUGH

"INMATE REQUEST SLIP" WITH NO RESPONSE WHATSOEVER.  I

AM SEEKING PRODUCTION OF THIS INFO THROUGH A SUBPOENA TO BE

SERVED ON "GLOBAL TECH" [SEE ADDENDUM-"X"]. I ESTIMATE

THE UNANSWERED CALL ATTEMPTS AT APPROXIMATELY 25 OVER A

6 MONTH TIME FRAME PRE, DURING AND POST TRIAL.


RESPECTFULLY SUBMITTED UNDER PENALTY OF PERJURY, THIS THE

13TH DAY OF SEPTEMBER, 2017

BY: [signature]

    LOUIS FRANKLIN PRO SE - BOOKING NO. 2801514

PAGE: 2

ATTACHMENT 'D':  PAGE 60

# EXHIBIT NO. 10

## PROCEDURAL HISTORY:

1.) Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.) Submitted with State Habeas Petition No. S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

## CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit except for an updated signature date and Housing Location provided on the Declaration Page

<u>EXHIBIT NO. 10 Declaration of knowledge regarding Patrick Lund</u>

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached
Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The
purpose of this declaration is to assert my actual knowledge of information pertaining to Patrick
Lee Lund. I am actually aware of the California State Bar disbarring Mr. Lund in 2014 for
misappropriating funds deposited into his client trust account. I am also aware of a criminal
prosecution of Mr. Lund for conduct that includes alleged offenses committed in 2013.  I was
also made aware through my Preliminary Hearing proceedings that Mr. Lund was the subject
of a criminal investigation by the Orange County District Attorney's office resulting from his
mismanagement of my transferred assets and the alleged misappropriation of those funds. I am
also aware that after I transferred those assets to a Lund-managed entity, Mr. Lund paid
$130,500.00 to an aggrieved party from whom he misappropriated funds leading to his
disbarment. What I'm NOT aware of is the source of the $130.500.00. While this $130,500.00
payback occurred after I transferred assets to him, it is not clear if those assets, and income
derived from such, was the source of the funds to pay a party unrelated to my case. I am also
declaring that in order to find out this and other information, I filed a motion to discover the
records of the OCDA's investigation that occurred as a result of his mismanagement and
alleged misappropriation of assets transferred and income derived therefrom. I sent the motion
to Orange County Superior Court, West Justice Center and also the OCDA. Despite my
preparation and service by mail, this motion has never been calendared. The motion was mailed
by me on 10/28/17.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of events
described and verified as to the veracity of the statements contained herein. Also attached is a
two (2) page printout from the State Bar's website dated in May of 2014 following Mr. Lund's
disbarring. I believe this printout to be true and accurate.

Respectfully submitted this the _____ 22nd _____ day of ___ June ___, 2021

By:_____

Thomas Tarbutton CDCR#8274
Folsom State Prison   Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

THE STATE BAR OF CALIFORNIA

Tuesday, May 13, 2014

ATTORNEY SEARCH

Patrick Lee Lund - #86371

Current Status:  Not eligible to practice law (Not Entitled)

See below for more details.

Profile Information

The following information is from the official records of The State Bar of California.

| | | | |
|---|---|---|---|
| Bar Number: | 86371 | | |
| Address: | Lund Law Group<br>4590 Macarthur Blvd Ste 500<br>Newport Beach, CA 92660<br>Map it | Phone Number: | (949) 260-4230 |
| | | Fax Number: | (949) 250-4503 |
| | | e-mail: | Not Available |
| County: | Orange | Undergraduate School: | Azusa Pacific Univ; Azusa CA |
| District: | District 4 | | |
| Sections: | None | Law School: | Pepperdine Univ SOL; Malibu CA |

Status History

| Effective Date | Status Change |
|---|---|
| Present | Not Eligible To Practice Law |
| 2/2014 | Not Eligible To Practice Law |
| /1979 | Admitted to The State Bar of California |

Explanation of member status

Actions Affecting Eligibility to Practice Law

| Effective Date | Description | Case Number | Resulting Status |
|---|---|---|---|
| | Disciplinary and Related Actions | | |

Overview of the attorney discipline system.

| | | | |
|---|---|---|---|
| 2014 | Ordered inactive | 13-O-17595 | Not Eligible To Practice Law |
| 2012 | Discipline, probation; no actual susp. | 11-O-11135 | |
| 2011 | Public reproval with/duties | 08-O-11293 | |

Administrative Actions

This member has no public record of administrative actions.

ATTACHMENT 'D': PAGE 63

Copies of official attorney discipline records are available upon request.

Explanation of common actions

## State Bar Court Cases

**NOTE:** *The State Bar Court began posting public discipline documents online in 2005. The format and pagination of documents posted on this site may vary from the originals in the case file as a result of their translation from the original format into Word and PDF. Copies of additional related documents in a case are available upon request. Only Opinions designated for publication in the State Bar Court Reporter may be cited or relied on as precedent in State Bar Court proceedings. For further information about a case that is displayed here, please refer to the State Bar Court's online docket, which can be found at: http://apps.statebarcourt.ca.gov/dockets/dockets.aspx*

**DISCLAIMER:** *Any posted Notice of Disciplinary Charges, Conviction Transmittal or other initiating document, contains only allegations of professional misconduct. The attorney is presumed to be innocent of any misconduct warranting discipline until the charges have been proven.*

| fective Date | Case Number | Description |
|---|---|---|
| /5/2012 | 11-O-11135 | Stipulation (PDF) (HTML) |
| 1/2011 | 08-O-11293 | Stipulation (PDF) |

rt New Search »

ut Us | Site Map | Privacy Policy | Notices | Copyright | Accessibility | FAQ
ight © 2014, The State Bar of California

ATTACHMENT 'D':  PAGE 64

# EXHIBIT NO. 11

## PROCEDURAL HISTORY:

1.) Submitted with State Habeas Petition No.G058686 to State Appellate Court

2.) Submitted with State Habeas Petition No.S263665 to State Supreme Court

3.) Included Herein as Proof of Due Diligence in Seeking to Exhaust all State Remedies

## CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit except for an updated signature date and Housing Location provided on the Declaration Page

EXHIBIT NO. 11 Declaration of acts of ownership

I, Thomas Tarbutton, the appellant in Appeal No. G055717 and the Petitioner in the attached Writ of Habeas Corpus, do hereby submit this declaration under penalty of perjury. The purpose of this declaration is to make record of my 'Acts of Ownership' in servicing of the asset base that included but was not limited to: Private Mortgage transactions; 'REO' properties; Rental Contracts; Development Projects; associated legal issues; collections; foreclosure; financial obligations, and general administration. These acts that include the specific actions, obligations and liabilities are, as stated in a declaration filed as 11CT2355-2356, typical of a lender/beneficiary of a mortgage. All of these acts were performed by me and/or those in my employ.  At no time, did any of the alleged investor-victims take any action, recognize any obligation, assume any liability or advance any funds that are typical and required of a lender/beneficiary. There is absolutely no example of any investor exhibiting any act of ownership.

I am submitting this declaration under penalty of perjury, swearing as to the accuracy of events described and verified as to the veracity of the statements contained herein.

Respectfully submitted this the ___22nd___ day of ___June___, 2021

By:_____

Thomas Tarbutton CDCR#8274
Folsom State Prison  Housing #1-C1-11
P.O. Box 715071
Represa, California 95671

# EXHIBIT NO. 12A/12B

**PROCEDURAL HISTORY:**

1.)  An original letter was sent to Trial Counsel as well as Appellate Counsel with a true and correct copy of each submitted with State Habeas Petition No.G058686 to the State Appellate Court.

2.)  An original letter was sent to Trial Counsel as well as Appellate Counsel with a true and correct copy of each submitted with State Habeas Petition No.S263665 to the State Supreme Court.

3.)  True and Correct copies of each letter sent is being included herein as proof of due diligence in seeking to exhaust all state remedies.

**CHANGES MADE TO DOCUMENT:**

No changes have been made to any attached document

**VERIFICATION:**

I, Thomas Tarbutton, do hereby swear under penalty that the attached documents are true and correct copies of the originals.  I also swear that these letters were sent to respective counsel along with copies of the Habeas Petitions submitted in state courts, and received absolutely zero response from either counsel.

By: _____     Date: _6/22/2021_
    Thomas Tarbutton

<u>EXHIBIT NO. 12A</u>

November 20, 2019

Ms. Valerie G. Wass
556 S. Fair Oaks Avenue, Suite 9
Pasadena, California 91105

Ms. Wass,

Enclosed please find my Writ of Habeas Corpus along with my Request to Consolidate this with the ongoing Appeal No. G055717. The need to file this request and Writ has been effectuated by what I'm declaring as your deficient performance in failing to raise these issues in the direct appeal. The purpose of this letter, along with providing service of the respective documentation and Writ of Habeas Corpus, is to request response and explanation of your decisions not to address these issues, advance the contentions or preserve these matters for post-conviction review that are identifiable in the appellate record.

This request is also being incorporated into the Writ as Exhibit No. 12A and I'm respectfully asking for you to provide your response to me at the address below with a copy sent to the Court of Appeal, Fourth Appellate District-Division Three.

Sincerely,

Thomas Tarbutton  CDCR# BE8274
Folsom State Prison  Housing# 1-B1-09
P.O. Box 715071
Represa, California 95671

EXHIBIT NO. 12A

June 26, 2020

Ms. Valerie G. Wass
556 S. Fair Oaks Avenue, Suite 9
Pasadena, California 91105

Ms. Wass,

Enclosed please find my Writ of Habeas Corpus along with my Request to Consolidate this with the ongoing Appeal No. G055717. The need to file this request and Writ has been effectuated by what I'm declaring as your deficient performance in failing to raise these issues in the direct appeal. The purpose of this letter, along with providing service of the respective documentation and Writ of Habeas Corpus, is to request response and explanation of your decisions not to address these issues, advance the contentions or preserve these matters for post-conviction review that are identifiable in the appellate record.

This request is also being incorporated into the Writ as Exhibit No. 12A and I'm respectfully asking for you to provide your response to me at the address below with a copy sent to the Court of Appeal, Fourth Appellate District-Division Three.

Sincerely,

Thomas Tarbutton  CDCR# BE8274
Folsom State Prison  Housing# 1-B1-09
P.O. Box 715071
Represa, California 95671

<u>EXHIBIT NO. 12B</u>

The Law Offices of Jerry Schaffer, Jr.
1851 East First Street
Suite 914
Santa Ana, California 92705

Mr. Schaffer,

Enclosed please find my Writ of Habeas Corpus along with a Request to Consolidate
this Writ with the ongoing Appeal No. G055717. Included in this Writ is my contention
of your ineffective assistance of counsel based on what I've declared as your deficient
performance in the capacity of Trial Counsel for my Case No. 11CF2747.

These issues were originally identified in my pre-sentencing pleadings that include the
claim of 'IAC' raised in the CPC1181 Motion for New Trial filed on 8/15/17. This claim
is found on Page 103 to 125 of that motion [10CT2126-2148]. You were served at that
time with a copy of that pleading and no response from you was received.

The purpose of this letter, along with providing service of the Writ of Habeas Corpus
and respective documentation, is to request response and explanations of your
decisions not to address these issues, advance these defense tactics or preserve through
objections the material matters set forth in the CPC1181 Motion and reiterated in the
enclosed Writ as Claim IX.

This request is also being attached to the Writ as Exhibit No. 12B and I'm asking you to
provide your response in writing to me at the address below with a copy being sent to
the Court of Appeal, Fourth Appellate District-Division Three with a reference to
Appeal No. G055717.

Respectfully,

Thomas Tarbutton   CDCR#8274
Folsom State Prison   Housing #1-B1-09
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D': PAGE 70

<u>EXHIBIT NO. 12B</u>

June 26, 2020
The Law Offices of Jerry Schaffer, Jr.
1851 East First Street
Suite 914
Santa Ana, California 92705

Mr. Schaffer,
Enclosed please find my Writ of Habeas Corpus along with a Request to Consolidate this Writ with the ongoing Appeal No. G055717. Included in this Writ is my contention of your ineffective assistance of counsel based on what I've declared as your deficient performance in the capacity of Trial Counsel for my Case No. 11CF2747.

These issues were originally identified in my pre-sentencing pleadings that include the claim of 'IAC' raised in the CPC1181 Motion for New Trial filed on 8/15/17. This claim is found on Page 103 to 125 of that motion [10CT2126-2148]. You were served at that time with a copy of that pleading and no response from you was received.

The purpose of this letter, along with providing service of the Writ of Habeas Corpus and respective documentation, is to request response and explanations of your decisions not to address these issues, advance these defense tactics or preserve through objections the material matters set forth in the CPC1181 Motion and reiterated in the enclosed Writ as Claim IX.

This request is also being attached to the Writ as Exhibit No. 12B and I'm asking you to provide your response in writing to me at the address below with a copy being sent to the Court of Appeal, Fourth Appellate District-Division Three with a reference to Appeal No. G055717.

Respectfully,

Thomas Tarbutton   CDCR#8274
Folsom State Prison   Housing #1-B1-09
P.O. Box 715071
Represa, California 95671

ATTACHMENT 'D': PAGE 71

# EXHIBIT NO. 13

**PROCEDURAL HISTORY:**

1.) Submitted with State Habeas Petition No.S263665 to State
    Supreme Court

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit

EXHIBIT NO. 13: DECLARATION OF DUE DILIGENCE— Page One of Three

I, Thomas Tarbutton, the Petitioner in the Writ of Habeas Corpus
identified as In re Tarbutton (No.G058686), submit this Declaration
under penalty of perjury, swearing as to the accuracy of recounted
events and as to the veracity of the statements contained. Evidenced
by my signature below, I swear that I have been vigilant and acting
with reasonable due diligence to research, prepare and file the Writ
of Habeas Corpus; and its filing date of 12/19/2019 represents my
earliest practicable opportunity to do so.

In my efforts to expedite the preparation and filing of the Habeas
Corpus, I have sought administrative remedy for obstacles and atypical
hardships created by the arbitrary decisions of the CDCR that include
but are not limited to: Ex Parte Communications with the Trial Court;
withholding of my legal property for approx. 4 months; withholding
of my personal property for approx. 6 months; withholding of electric
typewriter purchased for Writ preparation; improper housing decisions,
and; transfer decisions made at times inconsistent with Title 15
regulations. The hardships created are evident and my due diligence
is demonstrated by review of chronological events occurring over the
past 15-16 months:

09/19/18: Taken from NKSP back to Orange County Jail due in part to
CDCR's ex parte communications with the Trial Court. All property
stored at NKSP
10/18/18: Taken from OCJ to CIM (Chino). No property provided
10/26/18: Taken from CIM back to NKSP but improperly housed on Rece-
ption yard without property or explanation
10/26/18 to 12/20/18: I file numerous requests (CDCR-22) and two
CDCR administrative appeals (CDCR-602) due to improper housing and
the withholding of my legal and personal property
12/21/18: I receive my legal property but I am still improperly
housed without my personal property and without any reasonable access
to legal research and the courts
01/16/19: Request is received by the Appellate Court to set aside
the 'AOB' as filed
02/14/19: Transferred from Reception Yard to mainline Orientation

EXHIBIT NO. 13: DECLARATION OF DUE DILIGENCE- Page Two of Three

but still without my personal property and confined to quarters

02/27/19: Interviewed by Committee and informed of pending transfer within two weeks. Rehoused on mainline yard but still without personal property

02/28/19: Submit Administrative Appeal (CDCR-602) due to decisions of the CDCR that created an atypical hardship that will delay the preparation and filing of legal pleadings. This Inmate Appeal, identified as Log No. NKSP-19-00762 and TLR Case No. 1903637, was submitted to 2nd Level Review on 3/28/19 and 3rd Level Review on 4/18/19. The appeal was denied at all three levels of review

03/15/19: Ordered electric typewriter from approved vendor. Typewriter was delivered to NKSP but never given to me. Returned by NKSP to vendor on or about 5/02/19

04/25/19: Transferred from NKSP to Folsom State Prison (FSP). All legal and personal property taken from for transfer

05/12/19: File numerous requests (CDCR-22) and an administrative appeal (CDCR-602) due to legal and personal property being withheld from me

05/21/19: Receive legal and personal property but no typewriter which unbeknownst to me as returned to vendor

05/30/19: File request for Priority Library User status due to need to expedite legal research. Request denied

06/01/19 to 07/01/19: Research conducted by me for Habeas Corpus preparation

07/01/19 through 08/31/19: Research of possible claims and rough-drafting of individual claims of the Writ

09/01/19 through 10/31/19: Handwriting of individual claims of Writ and formatting of the Petition

10/15/19 through 11/30/19: Mailing of the handwritten draft to family; converting of handwritten document to word document by family; mailing back and forth between me and family for corrections and revisions

12/01/19 through 12/19/19: Preparation of Request to Consolidate the Writ with the ongoing Appeal No.G055717; Signing, serving and filing of the Writ and Request to Consolidate on 12/19/19


I, Thomas Tarbutton, swear under penalty of perjury under the laws of the State of California that the foregoing statements are true and


ATTACHMENT 'D': PAGE 74

EXHIBIT NO. 13:  DECLARATION OF DUE DILIGENCE-  Page Three of Three

and correct, except to matters stated on my information and belief,
and as to those matters, I believe them to be true.  As to the CDCR-
22 Requests and CDCR-602 Inmate Appeals referenced herein, all are
available for review upon request.

This DECLARATION OF DUE DILIGENCE is being respectfully submitted this
the 26th day of June, 2020 under penalty of perjury

By: _____

Thomas Tarbutton   CDCR# BE8274
Folsom State Prison   Housing# 1-B1-09
PO Box 715071
Represa, CA  95671

ATTACHMENT 'D':  PAGE 75

# EXHIBIT NO. 14

## PROCEDURAL HISTORY:

1.)   Submitted with State Habeas Petition No.S263665 to the State
      Supreme Court

## CHANGES MADE TO DOCUMENT:

No changes have been made to the Exhibit

ATTACHMENT 'D':  PAGE 76

<u>Exhibit No. 14:</u>  Declaration of documents filed in support     Page 1

I, Thomas Tarbutton, the Appellant in Appeal No. G055717 and the
Petitioner in the Habeas Corpus petition of In re Tarbutton (No.
G058686), do hereby submit this declaration under penalty of per-
jury. The purpose of this declaration is to make record of the
pleadings filed as a pro per defendant in Orange County Sup. Ct.
Case No. 11CF2747 or as a pro per petitioner in the noted Habeas
proceeding. These filings and the issues raised therein are only
of record because of my actions as a pro per defendant/petitioner.
Therefore when I reference such in subsequent pleadings (e.g. Hab-
eas petition and follow-up), I am only able to do so because of this
and the amount of filings required is a direct result of the in-
effective assistance of respective counsel. These include:

1.) Three (3) Motions to appoint an investigator
2.) Motion to authorize a legal runner
3.) Affidavit in support of Motions: 10CT2017
4.) CPC1181 Motion for New Trial
     Claim I: Insufficiency of Evidence:  10CT2024
     Claim II: Unqualified Determination of Probable Cause: 10CT2046
     Claim III: Illegal Restraint: 10CT2062
     Claim IV: Prosecutorial Misconduct:  10CT2075
     Claim V: IAC of Trial Counsel:  10CT2126
     Claim VI: New Evidence: 10CT2149
     Claim VII:  Judicial Error: 10CT2157
     Claim VIII:  Juror Misconduct: 10CT2176
     Claim IX:  Excessive Bail: 10CT2180
5.) CPC1185 Motion in Arrest of Judgment:  10CT2194
6.) CPC1054.5 Motion for Sanctions:  10CT2204
7.) CPC1538.5 Motion for illegal seizure:  10CT2242
8.) Motion for Appointment of Experts:  10CT2251
9.) Trombetta-Youngblood Motion:  10CT2255
10.) Challenge for Cause:  10CT1967
11.) Challenge for Cause:  12CT2657
12.) Challenge for Cause:  12CT2827
13.) Writ of Mandate:  12CT2590
14.) Writ of Mandate:  12CT2630
15.) Writ of Mandate:  Exhibit No. 3 of Habeas Petition-Pg. 175

ATTACHMENT 'D':  PAGE 77

Exhibit No.14:   Declaration of documents filed in support      Page 2

16.) Affidavit of 'Bad Acts' of Prosecution Witnesses: 11CT2294
17.) Affidavit of 'Bad Acts' of Prosecution-Investigative: 11CT2317
18.) Affidavit of 'Bad Acts' of Prosecution-Prosecutorial: 11CT2327
19.) Affidavit of Transaction Histories and Business Specific
     Facts: 11CT2332
20.) Affidavit of Genealogy and commonalities of Investors: 11CT2346
21.) Affidavit of Typical Documentation, Actions and Obligations
     of a Mortgage Beneficiary: 11CT2355
22.) Affidavit for Document of Indebtedness, Defaults and Fore-
     closure: 11CT2358
23.) Accounting Affidavit conducted as a pro per defendant: 11CT2370
24.) Affidavit for tax-reporting specifics: 11CT2402
25.) Declaration as a pro per defendant regarding requests of
     trial counsel for documentation and evidence: 11CT2449
26.) US-Panama Bilateral Extradition Treaty: 11CT2466
27.) Affidavit of Panama arrest and rendition: 11CT2472
28.) Affidavit that controverts lawful extradition: 11CT2474
29.) Discovery Requests: 11CT2475
30.) Affidavit of FBI Interview conducted on 1/25/2011: 11CT2482
31.) Reference Documents (Documentary Evidence): 11CT2484
32.) Affidavit regarding subpoenas: 11CT2562
33.) Court Transcripts from Master Calender Court: 11CT2566
34.) Motion to set aside the 'AOB' as filed: Habeas Petition Pg.174
35.) Declaration and Formal Request to Consolidate the Habeas
     Corpus Petition with ongoing Appeal No.G055717: Habeas
     Petition Pg.ii
36.) Habeas Corpus Petition (In re Tarbutton-No.G058686), Pg.1
37.) Declaration of Correspondences with Appellate Counsel- Habeas
     Petition Pg.173 (No.G058686)
38.) Transcript Reference support- Habeas Petition Pg.176 (No.G058686)
39.) Request for Judicial Notice- Habeas Petition Pg.177 (No.G058686)
40.) Declaration re: 'Supplemental Report'- Habeas Petition Pg.184
41.) Declaration of knowledge of OCDA Weitzman's false documentary
     evidence- Habeas Petition Pg.185 (No.G058686)
42.) Copies of Requests sent to Gov. Newsom and AG Becerra-
     Habeas Petition Pg. 186 (No.G058686)

ATTACHMENT 'D':  PAGE 78

Exhibit No.14:  Declaration of documents filed in support      Page 3

43.) Declaration of correspondence attempts with Trial Counsel Habeas Petition Pg.187 (No.G058686)

44.) Declaration of knowledge re: Patrick Lund-Habeas Petition Page 188 (No.G058686)

45.) Declaration of Acts of Ownership-Habeas Petition Pg.189 (No.G058686

46.) Copies of letters to Trial/Appellate Counsel- Habeas Petition Pg.190 (No.G058686)

47.) Informal Reply dated 3/06/2020- attached as Addendum-'BB' to 5/20/20 Informal Reply (No.G058686)

48.) Objection to Response and Request for Sanctions- attached as Addendum-'AA' to 5/20/20 Reply (No.G058686)

49.) Informal Reply dated 5/20/20 (No.G058686)

50.) Declaration of due diligence- Ex. No.13 attached to Informal Reply (No.G058686)

51.) Index of support references (subject dec.; also No.G058686)

52.) Letter to State Bar re: Patrick Lund- attached as Ex.No.15 to Informal Reply (No.G058686)

53.) Motion to discover OCDA records of Lund investigation- attached as Ex. No.16 to Informal Reply (NO.G058686)

54.) Declaration of legal research affected by Covid-19- attached as Exhibit No.17 to Informal Reply (N₀.G058686)

It is important to note that all pleadings, affidavits, declarations, etc. as listed above are either a part of the appellate record or made part of the record by the filings of Habeas Corpus, Reply and support exhibits in Case No.G058686.  Therefore any posturing of a claim that this Petition lacks documentation or has failed to state facts with sufficient particularity, such attempt is either irresponsible or is in failure to consult/review the record of the Petitioner's proceedings.

I, Thomas Tarbutton, do hereby submit this declaration under penalty of perjury, this the 26ᵗʰ day of JUNE , 2020

Respectfully,

Thomas Tarbutton   CDR# BE8274
Folsom State Prison

ATTACHMENT 'D':  PAGE 79

# EXHIBIT NO. 15

**PROCEDURAL HISTORY:**

1.) Original letter sent to the California State Bar along with a copy of the State Habeas Petition No.G058686.

2.) Submitted with State Habeas Petition No.S263665 to the State Supreme Court

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit

Exhibit No. 15: Letter to State Bar

May 3rd, 2020

State Bar of California
845 South Figueroa Street
Los Angeles, CA  90017-2515

Regarding: Patrick Lee Lund (#86371)

1.) <u>Introduction:</u> Please consider this a formal request for information that includes but is not necessarily limited to the actions of Patrick Lee Lund during the period of time from 2010-2014. Mr. Lund, an attorney at the time (since-disbarred) paid at least $130,500.00 as restitution to a party from whom he had misappropriated funds. While this party is unknown to me and presumably unrelated to my interests, this payment by Mr. Lund occurred after my transfer/assignment of an asset base of significant value to an LLC managed by Mr. Lund. The members of this LLC (Restoration Holdings, LLC- hereafter 'RH, LLC') were comprised exclusively of alleged investor-victims in my criminal case, and my transfer of assets to this entity was done so for the proportional distribution of such to my former investors. However according to these individuals, they never received proper, or in some cases purportedly any, allocation from the transferred asset base prompting their complaints (disciplinary and criminal) that Mr. Lund was secreting away the assets and derivative income for his own use. The fact that Mr. Lund during this same period was paying restitution to another party persuades the objective mind to reasonably question the source of funds used by Mr. Lund to make these restitution payments. Because this information is likely to be exculpatory in material matters currently pending in my criminal proceedings and if so, carries a preponderant probability of evidence probative of complicit criminal conduct amongst those responsible for prudent investigation of Lund during that time, disclosure of this information is not only warranted but I argue also ethically and constitutionally compelled. Therefore I am requesting all information that pertains to the issues in question that include but are not limited to the source/sourcing of the funds used by Mr. Lund to pay restitution. In the event that this request is defective in form, format, procedure or protocol, please indicate such as I may be afforded opportunity

ATTACHMENT 'D':  PAGE 81

Exhibit No.15:   Letter to State Bar

to make corrections.  In the event that I do not receive any ob-
jection to the manner in which this request is made, I will consider
it proper and appropriate for the purposes intended.

To describe the reasonableness of this request, the materiality of
the information requested and to which proceedings that consideration
of such is meritorious, please see the following.  Please direct any
questions to me at the address provided as soon as possible- time is
of the essence.

2.) Pending Proceedings:   The information requested is relevant to
to proceedings that are currently pending in California courts to
which I am a party.  These include but are not limited to:  People
v. Tarbutton (Case No. 11CF2747- Orange Co. Sup. Ct.); People v.
Tarbutton (Direct Appeal No. G055717), and;  In re Tarbutton (No.
G058686).  This same information merits examination to ensure proper
administration of the several disciplinary complaints that I am sub-
mitting to the State Bar as a master complaint.  Mailing of this
master complaint will be mailed separately but made in conjunction
with this request.  For explanation purposes, due to the voluminous
nature of my case, rather than attach documents I will instead for
economical reference list Reporter/Clerk Transcript location for
applicable issues.  This will identify where in the Appellate Record
the respective documents may be found.  Any reference to arguments
raised in the Writ of Habeas Corpus, will list the page number of the
Petition.

3.) Events leading to Lund's Disbarment:   To make record of the
events leading to the State Bar's action against Mr. Lund, I am pro-
viding the following account based on my belief and understanding;
According to the information available to me, Mr. Lund was disbarred
for failing to maintain client funds in trust and misappropriation
of those funds.  In 2011 Mr. Lund was hired to represent a client in
a business dispute.  In this course of representation he received
two wire transfers totaling $200K, which he deposited into his client
trust account.  He was required to hold the money in trust until the
opposing party authorized him to release it.  Instead Mr. Lund mis-
appropriated $199,992.00 of the $200K for his own purposes.

ATTACHMENT 'D':  PAGE 82

Exhibit No.15: Letter to State Bar

In November of 2011 the opposing party authorized the release of the
funds, and the client asked Lund repeatedly to disburse them. In
January 2012 Lund told the client he had misappropriated the money
and eventually paid the client $130,500.00 as partial restitution.
The State Bar ordered Lund to repay the remaining balance, and Lund
agreed to be disbarred. The order took effect October 16, 2014.

4.) Lund's involvement in Instigating and Assisting in my Criminal
    Investigation: In 2010, individual investors retained Mr. Lund
in a civil action against me. In an effort to resolve grievances, I
assigned/transferred a significant asset base and derivative income
to 'RH,LLC' as requested by Lund. It is my understanding that this
LLC was held by the allegedly aggrieved investors and managed by Mr.
Lund (see 'RH,LLC' operating agreement: 11CT2540). Shortly after
receiving the transfer of assets, Lund and the respective investors
filed fraudulent applications for payment with the Victims Compen-
sation Fund ('VCF'), requesting payment in an amount I estimate to
be approximately $10,000,000.00 (11CT2294). As noted in my pleadings
filed in Trial Court (10CT2079-89; 10CT2089-92; 10CT2116), and raised
again in the Habeas Corpus (see pages 104, 109, 114), these false
claims to the VCF that conceal the transfer of assets  were sub-
mitted by Lund/Investors based on false allegations of criminal con-
duct; false claims of loss, and; perjurious statements that suppress
their involvement in 'RH,LLC' and any consideration implicit in its
holdings. After receiving the transferred assets and concurrent with
preparation/submission of these fraudulent VCF claims, these investors
and Lund were pressing for criminal charges against me (e.g. see 11CT
2514). This led to an FBI investigation with Mr. Lund being instru-
mental in assisting with Special Agent Jessie Murray's unqualified
finding of probable cause. Ms. Murray's incompetence in failing to
perform an objective investigation is evident in the contentions of
my Habeas Corpus (e.g. see Page 109) and post-trial motions (10CT2046-
2061). It is also clear and obvious in her probable cause that
accounts for no disbursements received by the investors whatsoever,
no acknowledgement of the transfer of assets and parrots the same
false particulars that Lund/Investors used to file fraudulent claims
with the VCF for an approx. amount of $10M (see 11CT2484). After the
FBI failed to file federal charges, Ms. Murray (married to Mike

Murray, who at the time was a Deputy DA in Orange Co.) instead gives
file to the OCDA and its Mortgage Fraud Unit; Peter Pierce.

5.) <u>Events occurring at the time of my Charging, Arrest and Trial:</u>
After getting the case from FBI Agent Jessie Murray, Peter Pierce
with the OCDA's Mortgage Fraud Unit file criminal charges against me
that blindly adopts the same false narrative included in Lund's false
VCF claims and based on the incompetent and unqualified finding of
probable cause (see Habeas Corpus page 109; 10CT2046). However after
the OCDA file charges on me on 10/12/2011, certain clients of Mr.
Lund (alleged investor-victims in my case) are complaining that they
are not receiving funds from the transferred asset base that were to
be distributed by Lund through the 'RH,LLC' vehicle (e.g. see 11CT
2537). This led to at least one of these individuals filing a State
Bar complaint against Lund (see 11CT2538), criminal complaints made
to the OCDA (e.g. see 11CT2537) and a criminal investigation by the
OCDA into Lund's handling of these assets (see 2CT404). Despite his
prominent role in assisting the FBI with its investigation and clear/
obvious examples of criminal conduct in the fraudulent VCF claims
and other illicit acts (see 11CT2294-2316), the OCDA fails to file
anything against Lund until after my conviction (Verdict on 1/20/16)
and when they finally do so, the charges are unrelated to my case
and the asset misappropriation (Habeas Corpus page no. 188).

6.) <u>Nexus of the State Bar's actions and my Case:</u> One point at
which the State Bar's prior action against Lund crosses the path of
my pending proceedings is the order for Lund to pay restitution for
the misappropriated funds of the client that led to his disbar.
According to the timeline as indicated, Lund paid at least $130.5K
as partial restitution but he did so after receipt of my transferred
asset base and during the time that my alleged investor-victims com-
plained of not receiving disbursements from these assets. Therefore
it is reasonable to consider that Lund used, at least in part, funds
ultimately derived from the transferred asset base to pay restitution
to a client from whom he had already admitted misappropriating funds.
Thus the source of funds used to pay restitution will reveal conduct
that is either appropriate or improper. However it is the prepon-
derant probability of impropriety in misappropriating funds if

ATTACHMENT 'D': PAGE 84

Exhibit No. 15: Letter to State Bar

ultimately derived from the transferred asset base to pay restitution that constitute conduct that is inarguably material to matters that are currently pending in appellate and superior court.

7.) Materiality of the Information Requested:

A.) Habeas Corpus- In re Tarbutton (No. GO58686): Raised in the Writ are verified claims to which the information is corroborative. These contentions include but are not limited to those argued in the Prosecutorial Misconduct CLAIM VII (see Page 100 et. seq.). My assertions as noted therein, include the incompetent investigation and unqualified probable cause finding that relied on Mr. Lund for assistance (see Page 109); the failure of the Prosecution to pre- serve evidence that enabled Lund to secret away the assets and/or income/revenue therefrom (see Page 116), and; the active concealing of Lund's illicit conduct and harboring from prosecution that not only obscured the Prosecution Team's implied complicity but also resulted in a selective/discriminatory action against me (see Page 114). When viewing the sum of these contentions and considering that the information requested may further indicate that Mr. Lund was misusing funds derived from the transferred asset base at a time that the Prosecution knew or should have known its happening, the materiality of accessory to Lund's conduct is of magnitude hard to fully quantify and implications that are far-reaching. Compounding its importance is the fact that all this information was explicitly discovery-requested pre-trial (see Page 104) and moved for pre- sentencing through my CPC1054.5 (10CT2204-2237).

B.) Superior Court Case No. 11CF2747: Pending in my criminal case is the matter of restitution. Therefore any information that indicates any consideration provided by me, irrespective of its misappropriation by Lund, is at least mitigative to this issue.

C.) State Bar Complaints: Submitted along with this request is the Master State Bar Complaint that I am filing against attorneys involved in my case. Therefore information requested that may re- veal criminal activity and an implied complicity in its conduct by attorneys that are subject of this complaint merit scrutiny and sub- sequent disclosure to ensure integrity and promote confidence in the proper administration of this disciplinary process.

ATTACHMENT 'D': PAGE 85

Exhibit No. 15:   Letter to State Bar

8.) <u>Formal Request for Information:</u>  For reasons that include those as set forth herein and for purposes not necessarily limited to that as stated above, I formally request that the information in question be provided  forthwith at the address listed below.  As noted, this request encompasses all information relating to the source of funds used by Mr. Lund in restitution payments and any attempts at sourcing such payments.  This is not intended to limit the scope of the information requested and this notice is to include any information that is related to the matters as referenced, relevant to the issues described and/or pertinent to proceedings that are pending.  Because this information may be demonstrable of conduct that I believe to be criminal, I am unaware of a privilege that will allow its withholding.

9.) <u>Verification:</u>  I, Thomas Tarbutton, as evidenced by my signature below, say:  I am the Defendant in Case No. 11CF2747 (OC Sup. Ct.); the Appellant in its direct appeal (No.G055717); the Petitioner in In re Tarbutton (No.G058686), and; the Complainant in the Master State Bar Complaint submitted against the licensed attorneys as noted therein.  I am submitting this request assertings that the allegations and statements contained are true and correct, except as to matters that are stated on my information and belief, and as to those, I believe them to be true.

In anticipation and appreciation of your timely cooperation and consideration, I am submitting this letter this the 3ᵈᵈ day of ‾‾‾‾‾‾‾ , 2020, and do so,

Respectfully,


Thomas Tarbutton  CDCR# BE8274
Folsom State Prison  Housing# 1-B1-09
PO Box 715071
Represa, CA  95671


ATTACHMENT 'D':  PAGE 86

# EXHIBIT NO. 16

**PROCEDURAL HISTORY:**

1.)   As declared in Exhibit No. 10, the motion to discover the OCDA's records pertaining to their investigation of Patrick Lund was mailed by Petitioner as a pro per Defendant to the Trial Court on 10/28/2017 from the Orange County Jail.  No motion/hearing date has ever been calendered.

2.)   A copy of this motion as attached as Exhibit No. 16, was submitted to the State Supreme Court with the State Habeas Petition No.S263665

**CHANGES MADE TO DOCUMENT**

No changes have been made to the Exhibit

ATTACHMENT 'D':  PAGE 87

Exhibit No.16:  Motion to discover Lund investigation

PROPOSED ORDER - CASE NO. 11CF2747

THOMAS TARBUTTON, PRO PER. - BOOKING 2801514

OC. CNTY. 550 N. FLOWER STREET - SANTA ANA - 92703

SUPERIOR COURT OF CALIFORNIA - COUNTY OF ORANGE

8141 13th STREET - WESTMINSTER · CA · 92683

WEST COURT. W-9 - JUDGE LANCE JENSEN

PLAINTIFF: PEOPLE OF THE STATE OF CALIFORNIA

DEFENDANT: THOMAS TARBUTTON

1.) NAME OF PARTY SUBMITTING THE PROPOSED ORDER:
    THOMAS TARBUTTON

2.) TITLE OF PROPOSED ORDER:
    MOTION TO PRODUCE REPORTS OF OTHER INVESTIGATIONS

3.) THE PROCEEDING IN WHICH THE PROPOSED ORDER RELATES:
    a.) SENTENCING / RESTITUTION - CASE NO. 11CF2747
    b.) DATE: TBD         TIME: TBD
    c.) PLACE: W-9

4.) THE PROPOSED ORDER WAS SERVED ON THE FOLLOWING PARTIES:
    a.) ORANGE COUNTY DISTRICT ATTORNEY

RESPECTFULLY SUBMITTED

THOMAS FRANKLIN TARBUTTON

ATTACHMENT 'D':  PAGE 88

MOTION TO PRODUCE REPORTS OF OTHER INVESTIGATIONS - PAGE 1/1 - CASE NO. 1102147

1.) MOTION AND GROUNDS FOR MOTION: THE DEFENDANT, UPON AND PURSUANT TO THE POINTS, AUTHORITIES AND ARGUMENTS AS SET FORTH HEREIN, HEREBY MOVES THE COURT TO COMPEL THE PROSECUTION TO PRODUCE REPORTS OF INVESTIGATIONS OF THIRD PERSONS TO ESTABLISH EVIDENCE THAT IS MATERIALLY FAVORABLE TO THE DEFENDANT, THE CHARGED OFFENSES AND/OR RELEVANT TO THE MITIGATION OF PUNISHMENT.

2.) AUTHORITIES FOR MOTION: THE DEFENDANT BRANKS THIS MOTION ON AUTHORITIES THAT MAY INCLUDE BUT NOT BE LIMITED TO:

A.) EVIDENCE CONTAINED IN INVESTIGATION REPORTS OF THIRD PERSONS THAT IS FAVORABLE TO THE DEFENDANT - SEE PEOPLE V. HALL (1986) 41 C3d 826, 226 CR 112; PEOPLE V. LITTLETON (1992) 7 CA4th 906, 9 CR2d 288; CITY OF ALHAMBRA V. SUPERIOR COURT (1988) 205 CA3d 1118, 252 CR 789.

B.) CONSTITUTIONAL DUE PROCESS AND EQUAL PROTECTION OF THE LAWS SUPPRESSION OF FAVORABLE EVIDENCE VIOLATES DUE PROCESS - SEE BRADY V. MARYLAND (1963) 373 U.S. 83, 87 83 S. CT. 1194, 10 L Ed 2d 215. SELECTIVE AND ARBITRARY TREATMENT OF EVIDENCE BY PROSECUTION DENIES DEFENDANT THE EQUAL PROTECTION OF THE LAW GUARANTEED BY THE FOURTEENTH AMENDMENT - SEE BALAUT V. SUPERIOR COURT (1996) (2 CA4th 826, 882, 50 CR2d 101.

C.) DISCOVERY PURSUANT TO CPC 1054(e) CPC 1051.1, CPC 1054.5

3.) STATEMENT OF FACTS: THIS MOTION IS INCORPORATING ALL RECORDS, FILINGS, MOTIONS AND TRANSCRIPTS OF DEFENDANT'S CASE AND JUDICIAL NOTICE OF SUCH IS REQUESTED PURSUANT TO CALIFORNIA EVIDENCE CODE 452(d)(3). OF THESE SPECIAL ATTENTION IS

ATTACHMENT 'D': PAGE 89

Motion for discovery and investigation

MOTION TO PRODUCE REPORTS OF OTHER INVESTIGATIONS - PAGE 2/7 - CASE NO. 11CF27A?
REQUIRED OF TRANSCRIPT REFERENCES TO THE FOLLOWING FACTUAL
EVENTS:

A.) TRANSFER OF ASSETS FROM DEFENDANT TO INVESTORS C/O
PATRICK LUND AND RESTORATION HOLDINGS LLC: THE
TRANSFER OF ASSETS BY DEFENDANT IS A MATTER OF RECORD AS EVIDENCED
BY TESTIMONY DURING PRELIMINARY HEARING AND TRIAL. THESE INCLUDE
BUT ARE NOT LIMITED TO:

    i.) JESSIE MURRAY "TRIAL" VOL.7 PAGE: 158A LINES: 4-8
    ii.) MARTIN AMQUIST "PRELIM" VOL.3 PAGE: 170 LINES: 11-14
    iii.) LARRY RICHARDSON "PRELIM" VOL.3 PAGE: 81 LINE: 25
    iv.) ROBERT PINAULT "PRELIM" VOL.5 PAGE: 26 LINES: 17-19
    v.) KAREN O'CONNELL "TRIAL" VOL.7 PAGE: 124B LINES: 9-26

PLEASE NOTE: PROSECUTOR PETER PIERCE IS ON RECORD ACKNOWLEDGING
THE TRANSFER OF ASSETS PRIOR TO FORMAL CHARGES BEING FILED
AGAINST DEFENDANT. THIS ACKNOWLEDGEMENT IS MADE BY PIERCE ON
09/15/17 IN COURTROOM C-27. DEFENDANT HAS REQUESTED TRANSCRIPTS
FOR THIS PROCEEDING ON 10/01/17.

B.) OCDA CRIMINAL INVESTIGATION OF LUND FOR CONDUCT
RELATING TO TRANSFERRED ASSETS: THE OCDA
CRIMINAL INVESTIGATION OF PATRICK LUND RELATING TO THE TRANSFERRED
ASSETS IS A MATTER OF RECORD AS EVIDENCED BY TESTIMONY DURING
PRELIMINARY HEARING. THESE INCLUDE BUT ARE NOT LIMITED TO:

    i.) JESSIE MURRAY "PRELIM" VOL.2 PAGE: 23, LINE: 9 - PAGE: 24 LINE: 12
    ii.) MARTIN AMQUIST "PRELIM" VOL.2 PAGE: 175 LINES: 12-14
    ii.) ROBERT PINAULT "PRELIM" VOL.5 PAGE: 26 LINES: 17-21

C.) DISCOVERY REQUEST INCORPORATING BILL STEINER'S
REQUEST FOR CRIMINAL INVESTIGATION OF LUND:
REFERENCE ADDENDUM-"T": EXHIBIT NO. 2 OF ADDENDA FILED

ATTACHMENT 'D': PAGE 90

MOTION TO PRODUCE REPORTS OF OTHER INVESTIGATIONS - PAGE 2/7 - CASE NO. 11CF2747

08/15/17 IN SUPPORT OF MOTIONS — A PARTIAL LIST OF TRANSFERRED

ASSETS WAS PROVIDED TO THE PROSECUTION IN APRIL OF 2014

    D.) <u>PATRICK LUND ARRESTED — PIERCE PROSECUTING:</u>

PATRICK LUND WAS ARRESTED EARLIER THIS YEAR FOR ACTIVITIES

PRESUMABLY UNRELATED TO DEFENDANT'S CASE. HOWEVER SENIOR

DEPUTY DA, PETER PIERCE IS THE PROSECUTOR ASSIGNED OR HAS

KNOWLEDGE OF THE PROSCRIBED CONDUCT.

    4.) STATEMENT OF CLAIM: WITH THE TRANSFER OF ASSETS FROM THE

DEFENDANT TO THE INVESTORS c/o PATRICK LUND/RESTORATION HOLDINGS,

LLC AND A CRIMINAL INVESTIGATION OF LUND BY THE OCDA AS A

RESULT OF HIS CONDUCT ASSOCIATED WITH THESE ASSETS, THE

DEFENDANT MOVES THE COURT TO COMPEL THE PROSECUTION TO

PRODUCE THEIR REPORTS PREPARED AS A RESULT OF THIS

INVESTIGATION. IT IS THE CLAIM OF THE DEFENDANT, THAT THIS

INVESTIGATION OF LUND BY THE OCDA FOR CONDUCT RELATING TO

THE ASSETS TRANSFERRED BY THE DEFENDANT, SHOULD CONTAIN, IF

PROPERLY AND OBJECTIVELY PERFORMED, EVIDENCE THAT IS: FAVORABLE

TO THE DEFENDANT; RELEVANT TO THE OFFENSES AND/OR; MATERIAL

OR MITIGATING TO ITS PUNISHMENT. THUS WITH A CONSTITUTIONAL

AND/OR ETHICAL DUTY TO DISCLOSE FAVORABLE INFORMATION

POST-CONVICTION AS SET FORTH HEREIN, THE PROSECUTION IS

REQUIRED AND THE TRIAL COURT SHOULD ENFORCE DISCOVERY

OF THESE REPORTS.

    5.) POINTS AND AUTHORITIES - PREFACE AND DISTINCTIONS:

    A.) DISCOVERY IS AN ONGOING RESPONSIBILITY: "THE

DUTY TO PROVIDE DISCOVERY IS NOT LIMITED TO THE TIME BEFORE

MOTION TO PRODUCE RECORDS OF OTHER INVESTIGATIONS - PAGE 4/7 · CASE No. 31CF279

TRIAL; DISCOVERY IS AN ONGOING RESPONSIBILITY WHICH EXTENDS

THROUGHOUT THE DURATION OF THE TRIAL AND EVEN AFTER CONVICTION"

[ PEOPLE V. KASIM (1997) 56 CA4th 1360, 1383, 66 CR2d A94 ]

   B.) ETHICAL DUTY TO DISCLOSE: " THE DUTY OF DISCLOSURE, HOWEVER,

DOES NOT END WHEN THE TRIAL IS OVER.. AFTER A CONVICTION THE

PROSECUTOR ALSO IS BOUND BY THE ETHICS OF HIS OFFICE TO INFORM

THE APPROPRIATE AUTHORITY OF AFTER-ACQUIRED OR OTHER INFORMATION"

THAT IS FAVORABLE TO THE DEFENDANT. [ SEE PEOPLE V. GARCIA (1993)

17 CA4th 1169, 1179, 22 CR2d 545 ]

   C.) DUTY TO DISCLOSE WITHOUT A REQUEST: A PROSECUTOR'S DUTY

TO DISCLOSE SUBSTANTIAL MATERIAL EVIDENCE FAVORABLE TO THE ACCUSED

EVEN WITHOUT A REQUEST DOES NOT END WHEN THE TRIAL IS OVER.

[ SEE PEOPLE V. GARCIA, SUPRA ]


   6.) POINTS AND AUTHORITIES - CONTEXT:

   A.) HEARING ON MITIGATING FACTORS AFFECTING SENTENCE:

BEFORE PRONOUNCEMENT OF JUDGMENT, THE DEFENDANT IS ENTITLED

TO A HEARING TO PRESENT EVIDENCE OF MITIGATING FACTORS

AFFECTING SENTENCE. [ CPC 1170(b); CPC 1204; CAL RULES OF COURT

4.423 ]

   B.) RIGHT TO HEARING REGARDING RESTITUTION: " THE DEFENDANT

HAS THE RIGHT TO A HEARING BEFORE A JUDGE TO DISPUTE THE

DETERMINATION OF THE AMOUNT OF RESTITUTION" [ CPC 1202.4(f)(1) ]

   C.) MEANINGFUL OPPORTUNITY TO RESPOND: THE DEFENDANT IS

ENTITLED TO A MEANINGFUL OPPORTUNITY TO RESPOND TO THE COURT'S

PROPOSED SENTENCING CHOICES [ SEE PEOPLE V. GONZALES (2003) 31

C4th 745, 3 CR3d 676 ]


ATTACHMENT 'D':  PAGE 92

MOTION TO PRODUCE REPORTS OF OTHER INVESTIGATIONS. PAGE 6/7. CASE NO. 11CF2747

7.) POINTS AND AUTHORITIES - JUDICIAL DUTY:

A.) THE FULL RIGHT TO BE HEARD: THE JUDGE SHALL ACCORD TO THE DEFENDANT "THE FULL RIGHT TO BE HEARD ACCORDING TO THE LAW" [ CODE OF JUDICIAL ETHICS. CANON 3B(6) ]

B.) RIGHT TO TRUTH IN EVIDENCE: IN ACCORDANCE WITH THE LAW INCLUDES "RELEVANT EVIDENCE SHALL NOT BE EXCLUDED IN ANY CRIMINAL PROCEEDING, INCLUDING ... POST CONVICTION MOTIONS AND HEARINGS..." [ CA CONST. ART I, SEC. 28 (f)(2) ]

8.) ARGUMENT IN SUPPORT: ACKNOWLEDGED BY THE PROSECUTION AND THE PROSECUTION WITNESSES [ SEE No.3 ABOVE ] ARE THE FACTS OF ASSETS TRANSFERRED BY THE DEFENDANT TO A PATRICK LUND CONTROLLED ENTITY AND AN OCDA CRIMINAL INVESTIGATION OF LUND AS A RESULT OF HIS CONDUCT RELATING TO THESE ASSETS. WHILE THE VALUATION OF THESE ASSETS IS SUBJECT TO MARKET CONDITIONS AND AUTHORIZED OPINIONS [ SEE CECB11-B22 ], THE FACT THAT TRANSFERS ARE PAYMENTS AND THUS RELEVANT AND MITIGATING TO CLAIMS OF LOSS, IS INDISPUTABLE AND A PROPOSITION OF GENERALIZED KNOWLEDGE [ CEC451(f) ]. THUS ANY EVIDENCE OF THESE TRANSFERS; THE DISPOSITIONS OF THESE ASSETS; ANY DERIVITIVE INCOME FROM THESE ASSETS AND; ANY INDICATION OR OPINION OF VALUE OF THESE ASSETS — ARE FAVORABLE AS OPPOSING LOSS OR IN MITIGATION TO SENTENCING/RESTITUTION AND THEREFORE DISCOVERABLE.

WITH A CONSTITUTIONAL AND ETHICAL "DUTY AS THE PART OF THE PROSECUTION, EVEN IN THE ABSENCE OF A REQUEST THEREFOR, TO DISCLOSE ALL SUBSTANTIAL MATERIAL EVIDENCE FAVORABLE TO AN ACCUSED, WHETHER SUCH EVIDENCE RELATES DIRECTLY TO THE QUESTION OF GUILT, TO MATTERS RELEVANT TO PUNISHMENT, OR TO THE CREDIBILITY OF A MATERIAL WITNESS" [ PEOPLE V. RUTHERFORD (1975) 14 Cal. 3d 399, 406

ATTACHMENT 'D': PAGE 93

MOTION TO PRODUCE RECORDS OF OTHER INVESTIGATIONS - PAGE 6/7 - CASE NO. 11CF2747

121 CA 261, 534 P. 2D 1341 ], THE PROSECUTION IS REQUIRED TO RELEASE ANY INFORMATION THAT IS IN THEIR CONSTRUCTIVE POSSESSION. PLUS WITH THIS "ONGOING RESPONSIBILITY" EXTENDING TO "EVEN AFTER CONVICTION" [ PEOPLE V. KASIM, SUPRA ], ESPECIALLY IN LIGHT OF THE DEFENDANT'S RIGHTS TO HEARINGS ON SENTENCING AND RESTITUTION [ SEE NO. 6A/6B ], THE DEFENDANT MOVES THE COURT TO COMPEL THE PROSECUTION TO RELEASE THE RECORDS OF THEIR INVESTIGATION OF PATRICK LUND AS A RESULT OF HIS HANDLING OF THE TRANSFERRED ASSETS.

IT IS IMPORTANT TO NOTE THAT THIS MOTION BASED ON THE AUTHORITIES QUOTED HEREIN, IS FOR RELEASE OF THE RECORDS OF THE OCDA INVESTIGATION REFERENCED IN NO. 3B ABOVE AND NOT FOR THEIR RECORDS OF THE INVESTIGATION REFERENCED IN NO. 3D. WHILE LUND'S ACTS OF MORAL TURPITUDE SHOULD BE DISCOVERABLE AS ARGUED BY DEFENDANT IN HIS CPC 1054.5 MOTION FILED 08/15/17, THE DEFENDANT, FOR THE PURPOSE OF THIS MOTION, IS SPECIFICALLY REQUESTING THE RECORDS ONLY FOR THE NO. 3B INVESTIGATION.

THEREFORE TO ACCORD THE DEFENDANT HIS RIGHTS TO BE HEARD AND ACCESS TO ALL RELEVANT EVIDENCE [ NO. 7A/7B ], AND TO ENSURE A MEANINGFUL OPPORTUNITY TO RESPOND AND LITIGATE SENTENCING AND RESTITUTION [ NO. 6A/6B/6C ], THE DEFENDANT IS MOVING THE COURT TO ORDER DISCLOSURE OF THE RECORDS IN QUESTION. FURTHERMORE, WITH THE PROSECUTION ARGUING AGGRAVATING FACTORS TO SUPPORT THEIR MAXIMUM SENTENCING RECOMMENDATIONS [ SEE PIERCE'S SENTENCING BRIEFS ], ANY AND ALL EVIDENCE THAT WILL COUNTER OR MITIGATE SUCH CLAIMS THAT IS IN THEIR POSSESSION SHOULD BE DISCLOSED TO DEFENDANT.

MOTION TO PRODUCE RECORDS OF OTHER INVESTIGATIONS - PAGE 7/7 - CASE NO. 11CF2747

9.) RELIEF SOUGHT:  WITH THE ESTABLISHED FACTS OF TRANSFERS OF ASSETS BY DEFENDANT TO A PATRICK LUND CONTROLLED ENTITY AND A RESULTING OCDA CRIMINAL INVESTIGATION OF LUND, THE DEFENDANT SEEKS RELIEF THAT INCLUDES BUT IS NOT LIMITED TO:

A.) DISCLOSURE OF EVIDENCE CONTAINED IN THE OCDA'S CRIMINAL INVESTIGATION OF LUND [ PEOPLE V. HALL, SUPRA ; PEOPLE V. LITTLETON, SUPRA ; CITY OF ALHAMBRA V. SUPERIOR COURT, SUPRA ] THAT IS MATERIALLY FAVORABLE TO THE DEFENDANT ;

B.) DISCLOSURE OF EVIDENCE CONTAINED IN THE OCDA'S CRIMINAL INVESTIGATION OF PATRICK LUND THAT DEMONSTRATES THAT THE PROSECUTION IS OR HAS BEEN CONDUCTED IN AN ARBITRARY, SELECTIVE OR DISCRIMINATORY MANNER AND THUS DENYING THE DEFENDANT OF EQUAL PROTECTION OF THE LAWS [ BALAYUT V. SUPERIOR COURT SUPRA ; ALSO e.g. GRIFFIN V. MUNICIPAL COURT (1977) 20 C3d 300, 306, 142 CR 286 ]

C.) ADDITIONAL RELIEF:  ANY AND ALL RELIEF AS MAY BE JUST AND PROPER UNDER THE CIRCUMSTANCES

I, THOMAS TARBUTTON, HERETOFORE "DEFENDANT", DO HEREBY SUBMIT THIS MOTION THIS THE 25th DAY OF OCTOBER, 2017, UNDER PENALTY OF PERJURY

RESPECTFULLY SUBMITTED

By:

THOMAS FRANKLIN TARBUTTON · BOOKING 2801514
OC-CMJ. 550 N. FLOWER STREET · SANTA ANA · CA · 92703

ATTACHMENT 'D':  PAGE 95

# EXHIBIT NO. 17

**PROCEDURAL HISTORY:**

1.) Submitted as a Request to Consolidate State Habeas Petition No.G058686 with Direct Appeal No.G055717 made to the State Appellate Court

2.) Submitted with State Habeas Petition No.S263665 to the State Supreme Court

3.) Included herein as proof of due diligence in seeking to exhaust all state remedies

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the Exhibit

Exhibit No.17:   Request to Consolidate                                    Page 1

PROPOSED ORDER:  Request to Consolidate Writ of Habeas Corpus with ongoing
Appeal No. G055717

Thomas Tarbutton  CDCR#BE8274
Folsom State Prison   Housing #1-B1-09
P.O. Box 715071
Represa, California 95671

COURT OF APPEAL OF THE STATE OF CALIFORNIA
Fourth Appellate District - Division Three
601 West Santa Ana Blvd., Santa Ana, California 92701
Petitioner of the Request to Consolidate:  Thomas Tarbutton

1.) Name of Party Submitting the Proposed Order:
    Thomas Tarbutton

2.) Title of Proposed Order:
    Request to Consolidate Writ of Habeas Corpus with pending Appeal No,
    G055717

3.) The Proceeding to which the Proposed Order relates: Writ of Habeas Corpus:
    Petitioner, Thomas Tarbutton v. Respondent, Warden Rick Hill of Folsom State
    Prison

4.) Proposed Order was served on the following:
    a.) Orange County District Attorney
    b.) Jerry Schaffer, Trial Counsel for Case No. 11CF2747
    c.) Valerie G. Wass, Appellate Counsel for Appeal No. G055717
    d.) Orange County Public Defender's Office
    e.) Attorney General of California, Xavier Becerra
    f.) Warden Rick Hill of Folsom State Prison, Respondent

5.) Table of Contents:
    a.) Proposed Order
    b.) Declaration and Request to Consolidate Writ and Appeal
    c.) Habeas Corpus Form MC-275 (HC-001)
    d.) Supporting Facts for CLAIMS I through IX
    e.) Exhibits and Declarations submitted in Support of CLAIMS
    f.) Supporting Case References for CLAIMS I through IX

ATTACHMENT 'D':  PAGE 97

## DECLARATION AND FORMAL REQUEST TO CONSOLIDATE THE WRIT OF HABEAS CORPUS WITH THE ONGOING APPEAL NO. G055717

This request to consolidate the attached Writ of Habeas Corpus with the ongoing Appeal No. G055717 is based on Appellate Counsel's omission of significant and obvious issues from the Appellant's Opening Brief ('AOB') that are clearly stronger than those raised. This request to consolidate the Writ of Habeas Corpus with Appeal No. G055717 into one proceeding and the claim of ineffective assistance of appellate counsel that necessitates the filing of the Habeas Corpus and this request, is submitted on Points and Authorities that include but are not limited to:

1.) Points and Authorities Supportive of Consolidating the Habeas Corpus with the ongoing Appeal:

     A.) Right to Effective Assistance of Counsel on Direct Appeal: The Due Process Clause of the Fourteenth Amendment guarantees the right of effective assistance of counsel on a first appeal as of right in state court (#A.1 'Evitts'). Appellate Counsel must be vigilant about raising all appealable issues to preserve further review (#A.2 'Harris').

     B.) Issues Cognizable on Appeal:  These issues raised in the attached Writ of Habeas Corpus were preserved by the Petitioner through his Arguments/Objections filed in Trial Court prior to his sentencing. Thus, these affected issues, identifiable in the Clerk and/or Reporter Transcripts, are incorporated into the Appellate Record and therefore, pursuant to the 'Contemporaneous Objection' rule (#A.3 'Puckett'), are cognizable on appeal.

     C.) Issues Communicated to Appellate Project and Appointed Counsel: As sworn to in Petitioner's Declaration attached as Exhibit No. 1 (see Page 173), he has acted with reasonable due diligence to impress upon appellate counsel the prominent and structural issues to be included in the 'AOB' of Appeal No. G055717. Upon learning after the filing of the 'AOB' that none of these issues are raised, the Petitioner, along with communicating to Appellate Counsel the deficiency of the 'AOB', also motioned the Appellate Court to set aside the 'AOB' so as to cure the prejudice of the brief as filed. This motion to set aside was received on January 16, 2019 by the Court of Appeal and is attached hereto as Exhibit No. 2 (see Page 191)

D.) Standard of 'IAC' on Appeal:  Courts have indicated and identified ineffective assistance of appellate counsel when failing to raise arguable issues (#A.4 'Delgado'). In addressing whether an attorney was ineffective for failing to present an issue, the court compares the neglected issues to those actually raised. If the ignored issues were clearly stronger, then appellate counsel was deficient. To show prejudice, a petitioner must show there's a "reasonable probability" the omitted claim would've "altered the outcome" of the appeal had it been raised (#A.5 'Stallings').

E.) Irreparable Harm resulting from the Potential of a Procedural Bar:  The failure of appellate counsel to raise cognizable issues on appeal presents the potential of these issues being procedurally barred from subsequent appellate review and appropriate remedy. (#A.2 'Harris'). When appellate remedy exists, failure to seek it in a timely manner may bar Habeas Corpus relief (#A.6 'Brown').

F.) Consolidation of Habeas Corpus with ongoing appeal: A person who has an ongoing direct appeal of a conviction and wants to raise issues challenging a conviction may file their Habeas Corpus in the Court of Appeal and ask that the appeal; and the Habeas Corpus be consolidated into one proceeding (#A.7 'Cotton').

2.) Issues Addressed in the Writ of Habeas Corpus: The contentions raised in the Petitioner's Writ of Habeas Corpus relate to issues that are either per se prejudicial by definition or reflective of defects of such magnitude that they violate the fundamental aspects of fairness resulting in a miscarriage of justice. The contentions of the Habeas Corpus involve the following issues:

A.) CLAIM I - Variance and Constructive Amendment:  The Prosecution, during trial and after the close of evidence, added an additional theory as an alternative basis for conviction on the 17 counts of Grand Theft. In so doing, the Prosecution created a variance on the dates of the offenses, a constructive amendment of the alleged acts and a prejudicial duplicity in the charged counts. For Summary of the Contentions, see Page 8; for Arguments in Support, see Page 10; for Supporting Case References, see Page 192.

B.) CLAIM II - Critical Stage Conducted in Petitioner's Absence:  A critical stage of the criminal proceedings was conducted in the Petitioner's involuntary absence. Compounding the prejudicial effect of this violation of constitutional rights is the subsequent deprivation of the statutory right of peremptory challenge. For

Summary of the Contentions, see Page 22; Arguments in Support, Page 23; Case References, Page 193.

C.) CLAIM III - Perjured Testimony used to Obtain a Conviction (Actual Innocence Claim): The Prosecution used a presumption as the exclusive basic and evidentiary foundation to presume the ultimate and elemental facts required for conviction. This action was aided by the Trial Court's predisposition that adopted the presumption void of established facts and resulted in a judicial advocacy of the Prosecution's theory used for conviction. This improper opinion of the Trial Court precluded the jury's determination of the material matters associated and removed the Prosecution's burden of proof beyond a reasonable doubt for the elements of the charged offenses. Even more prejudicial was this Trial Court's error allowed the Prosecution to suppress relevant information, especially discovery-requested by Petitioner, that demonstrates not only the actual innocence of the Petitioner but also the falsity of the presumption and the Prosecution's knowing use of perjured testimony to obtain a conviction. For Summary of Contentions, see Page 30; Argument in Support, Page 31; Case References, Page 194.

D.) CLAIM IV - Forcible Transnational Abduction (Outrageous Government Conduct Claim): The Prosecution Team, acting without authority and in violation of Treaties in Force, commissioned and compensated Panamanian Officials to forcibly abduct the Petitioner outside their collective territorial jurisdictions and convey him by force and fraud without warrant, cause or evidence of criminality. The actions of the Prosecution Team - and Panamanian Officials acting under a false pretense of U.S. authority - that conspires, carries out and conceals the Forcible Transnational Abduction of the Petitioner is conduct that offends a universal sense of justice and deserving of dismissal of Petitioner's case. For Summary of Contentions, see Page 44, Argument in Support, Page 45, Case References, Page 194.

E.) CLAIM V - Amending Allegations in violation of Procedural Due Process and clearly established federal law as determined by Supreme Court decision: The Prosecution, following the Initial Felony Complaint, added additional charges on three separate occasions. However, when doing so, they amend the allegations - actually and constructively - by adding offenses, that pursuant to the particulars of the Petitioner's arrest, are precluded by the 'Doctrine of Specialty' that prohibits the trying and punishing of additional charges at the time and manner executed by the Prosecution. Also included in these added offenses are charges based on the same

acts alleged in the original counts, but when brought to trial alongside these original counts, they are done so arguing elements that are inconsistent and factually irreconcilable with those concurrently alleged in the original offenses. Masking the contradicting theories, the Prosecution employs expert testimony that is elementally-oxymoronic followed by their material alteration of the respective jury instruction by eliminating operative terminology and guidance that would have highlighted the inconsistency in the divergent theories. Also in these added charges is the allegation of an overall scheme to defraud but despite the course of business that is the elemental subject of this count predating the charge and predicate offenses by at least ten years, the Prosecution - with actual and constructive knowledge exhibited by the alleged investor-victims - fails to allege facts to prevent the bar of the statute of limitations. For Summary of Contentions, see Page 71, Argument in Support, Page 73, Case References, Page 196.

F.) CLAIM VI - False Evidence:  False Evidence was offered against the Petitioner at trial by the Prosecution Team, their expert witnesses and the perjurious testimony of the alleged investor-victims. For Summary of Contentions; see Page 83, Argument in Support, Page 84; Case References, Page 196.

G.) CLAIM VII - Prosecutorial Misconduct: The Petitioner's conviction was obtained as a result of Prosecutorial Misconduct which so infected the integrity of the proceedings that the cumulative injurious effect denied the Petitioner his rights of fundamental fairness and due process. For Summary of Contentions; see Page 100, Argument in Support, Page 101, Case References, Page 197.

H.) CLAIM VIII - Trial Court lacking Fundamental Jurisdiction and the Appearance of a Disqualifying Interest: The Trial Court has acted without fundamental jurisdiction over the person of the Petitioner and the subject matter of the proceedings. Included in these acts in excess of authority is the Trial Court's failure to disclose what by all appearances is a disqualifying interest. For Summary of Contentions; see Page 130, Argument in Support, Page 131, Case References, Page 198.

I.) CLAIM IX - Ineffective Assistance of Counsel:  Trial Counsel acting on the Petitioner's behalf committed errors so serious or omitted actions of such importance that he was not functioning as counsel as accorded by the Sixth Amendment of the U.S. Constitution. In addition to Trial Counsel's 'IAC' is that of Appellate Counsel, that despite the Petitioner's insistence of these issues, including

'IAC', to be raised on direct appeal, not one is argued in the Appellant's Opening Brief of Appeal No. G055717. For Summary of Contentions; see Page 148, Argument in Support, Page 149, Case References, Page 198.

3.) <u>Significant and Obvious Issues:</u>  The Petitioner as declared in attached Exhibit No. 1, Page 173 and demonstrated by Clerk/Reporter Transcript reference as noted herein, has preserved these issues for appellate review on direct appeal. As also declared in Exhibit No. 1, Petitioner has communicated these significant and obvious issues to the Appellate Project and appointed appellate counsel. Because these issues are structural in nature or of such detriment to fundamental fairness and due process, they warrant consideration for appellate remedy. These issues that run the gamut of the criminal proceedings from Investigations (Claims III; VII); Arrest (Claim IV); Bail Determination (Claim VII); Charging (Claims I; V); Jurisdiction (Claims I; VIII); Discovery and Preservation of Evidence (Claims IV; VIII); Procedural Due Process (Claims I-V); Trial Defects (Claims I; III; V-IX); Introduction of Evidence (Claims I; III; IV; VI-IX); Jury Instructions (Claims I, III-V; VII-IX), to Sentencing (Claims VII; VIII; IX) - when viewed in totality, represent a quantifiable miscarriage of justice and therefore are all obvious candidates as issues meritorious of appellate review.

4.) <u>Issues raised in the Habeas Corpus are clearly stronger than those of the direct appeal:</u>  Because the structural and fatal flaws raised in the Habeas Corpus are of greater consequence and therefore significance than what appellate counsel has indicated to be essentially trial errors raised in the 'AOB', appellate counsel was deficient in neglecting these issues. In fact, proper argument and adjudication of the issues raised in the attached Writ render the contentions of the 'AOB' moot. To wit:

A.) Argument I of the 'AOB' (see Page 111 of No. G055717):  This contention of appellate counsel raises the issue of Trial Court failing to instruct on unanimity for the Grand Theft counts but fails to contest the Prosecution's adding of the alternative basis for conviction after the close of evidence that eventuates the need for the unanimity instruction. The more significant and obvious issues of the constructive amendment, variance and duplicity raised in Petitioner's CLAIM I renders Argument I of the 'AOB' academic and inconsequential.

B.) Argument II of the 'AOB' (see Page 126 of No. G055717): This contention of appellate counsel raises the issue of Trial Court failing to properly instruct the jury on counts 27, 28, 30-33 but fails to address the violations of federal law as established by Supreme Court decisions and international treaty that preclude the trying and punishing of these offenses. The issues of treaty violations and the outrageous government conduct taken to forcibly abduct and convey the Petitioner from the country of Panama that not only relegates Argument II of the 'AOB' into insignificance but also warrants dismissal of Petitioner's case is raised in prima facie specificity in Petitioner's CLAIMS IV and V.

C.) Argument III of the 'AOB' (see Page 135 of No. G055717): This contention of appellate counsel raises the issue of Trial Court failing to stay the sentences of Counts 27-37. However, this argument fails not only to argue the 'Doctrine of Specialty' preclusion of these added counts but also neglects to contest the factual irreconcilability and due process violations of these security fraud allegations when brought to trial alongside the Grand Theft counts. Furthermore, Argument III of the 'AOB' fails to acknowledge the duplicitous and elementally-oxymoronic expert opinion of Prosecution's witnesses and the material alteration of jury instructions that spotlight the contrariety of the allegations as a whole. Also missing is the procedural bar of statute of limitations and the structural flaws that are pervasive throughout the entire proceedings. These issues of greater significance, raised by Petitioner in CLAIMS V, VI, and VII, if argued in the 'AOB' would render any contention relative to sentencing irrelevant.

D.) Argument IV of the 'AOB' (see Page 147 of No. G055717): This contention of appellate counsel raises the issues of the repeal of the enhancement statute CPC12022.6(a)(4). This argument as it relates to the allegation of an actual and determinable loss amount, adopts and operates on the same presumption used by the Prosecution and Trial Court to establish evidentiary fact. However as raised by Petitioner in CLAIM III and VI, the characterizations and representations made by the Prosecution in their use of this presumption are false and known to be false by members of the Prosecution Team. Also, as raised by Petitioner in CLAIM VII of the Writ, this practice of presumption is founded in and identical to the theory used by the alleged investor-victims in their filing of fraudulent claims made to the 'VCF' for approximately $10,000,000; illicit acts, that as raised by Petitioner in CLAIM VIII received a de facto grant of immunity by the Trial Court acting in excess of its

authority. Therefore, not only does Argument IV of the 'AOB' perpetuate the false presumption of loss but it also continues to conceal the evidentiary facts that establish the actual innocence of the Petitioner.

E.) Argument V of the 'AOB' (see Page 160 of No. G055717): This contention of appellate counsel raises the issue of judicial abuse of discretion of the Trial Court in the sentencing phase. While this contention is valid it fails to acknowledge the jurisdictional defects and disqualifying interest of the Trial Judge as contended in Petitioner's CLAIM VIII. Also absent are the structural flaws in the criminal proceedings as raised in CLAIM II of the Writ that led to the assignment of a judge who is procedurally barred from the trying of Petitioner's case. Therefore, Argument V of the 'AOB' that argues abuse of discretion at sentencing turns a blind eye to the pattern of prejudicial partiality contended by Petitioner in CLAIM VIII, No.8, that pervaded the proceedings denying him of effective ascertainment and expeditious disposition.

5.) Deficient Performance and Prejudicial to the Petitioner: Because the significant and obvious issues raised in Petitioner's Writ of Habeas Corpus are clearly stronger than the contentions of the 'AOB', appellate counsel was deficient in the omission. The prejudice effectuated by this deficient performance is the potential procedural bar of these issues that with reasonable probability due to structural defects and claim of actual innocence would alter the outcome of the appeal that currently presents no arguments of such overt prejudiciality.

6.) New Evidence of the Habeas Corpus: Attached as Exhibit No. 12A and 12B, are copies of letters sent to the Trial and Appellate Counsel requesting their explanation or justifications on decisions not to address issues, advance contentions or preserve matters for review.  In establishing the Petitioner's claims of deficient performance of counsel in the actions addressed in the Writ of Habeas Corpus, he has solicited their responses to assist the court in their determination.  Aside from this evidence to establish deficient performance and prejudice, there is no new evidence submitted with the Writ of Habeas Corpus except that is required to: provide and cure errata and defects of Petitioner's pre-sentencing pleadings; make record of actual knowledge of applicable matters, and ; declare events occurring during the pendency of the appeal process. An example of this is the Request for Judicial Notice

filed in parallel with the Writ and also attached as Exhibit No.5 (see Page 178). While judicial notice was informally sought by Petitioner through declarations, addenda and motion for experts filed in support of his pre-sentencing pleadings, Petitioner is providing a formal request for judicial notice to ensure proper and procedural establishing of such. For an index of the Exhibits, please see No. 8 below.

7.) <u>Prayer for Relief</u>:  For reasons as described, the Petitioner faces the potential of irreparable harm due to a procedural bar of issues resulting from appellate counsel's failure to include such in the 'AOB' of Appeal No. G055717. Therefore, the Petitioner, as evidenced by his signature hereunder, hereby moves the court to consolidate the attached Writ of Habeas Corpus and the Appeal No. G055717 into one proceeding. The Petitioner submits this Affidavit and Request on authorities that include but are not limited to: People v. Cotton, (1990) 230 CA3d 1072. In the event that any discovery and/or evidentiary hearing is required to properly consider this request, the Petitioner requests that the court provide this relief and any other that may be appropriate.

8.) <u>Table of Contents</u>:
- Proposed Order for Request to Consolidate - Page (i)
- Request to Consolidate the Writ of Habeas Corpus with Appeal No. G055717- Page (ii)
- Habeas Corpus Form HC-001 - Pages 1 to 6
- Index of CLAIMS: Page 7
    - CLAIM I Summary Page: 8
        Supporting Facts: Page: 9
    - CLAIM II Summary Page: 22
        Supporting Facts Page 23
    - CLAIM III Summary Page: Page 30
        Supporting Facts Page 31
    - CLAIM IV Summary Page: Page 44
        Supporting Facts Page 45
    -CLAIM V Summary Page: Page 71
        Supporting Facts: Page 72

-CLAIM VI Summary Page: Page 83
Supporting Facts: Page 84
-CLAIM VII Summary Page: Page 100
Supporting Facts: Page 101
-CLAIM VIII Summary Page: Page 130
Supporting Facts: Page 131
-CLAIM IX Summary Page: Page 148
Supporting Facts: Page 149
- Index of Supporting Case References: Page 191
-CLAIM I:    Page 192
-CLAIM II:   Page 193
-CLAIM III:  Page 194
-CLAIM IV:   Page 194
-CLAIM V:    Page 196
-CLAIM VI:   Page 196
-CLAIM VII:  Page 197
-CLAIM VIII: Page 198
-CLAIM IX:   Page 198
- Index of Exhibits
-Exhibit No. 1:  Page 173
-Exhibit No. 2:  Page 174
-Exhibit No. 3:  Page 175
-Exhibit No. 4:  Page 176
-Exhibit No. 5:  Page 177
-Exhibit No. 6:  Page 184
-Exhibit No. 7:  Page 185
-Exhibit No. 8:  Page 186
-Exhibit No. 9   Page 187
-Exhibit No. 10: Page 188
-Exhibit No. 11: Page 189
-Exhibit No. 12A: Page 190
-Exhibit No. 12B: Page 190

ATTACHMENT 'D': PAGE 106

9.) Verification: I, Thomas Tarbutton, the Affiant and Petitioner of this Request and the attached Writ of Habeas Corpus, have read the foregoing request and the attached Writ. The facts as stated herein are true of my own knowledge, except as to matters that are stated on my own information and belief, and as to those matters I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed by me on ____27th____ day of November 2019 at Folsom State Prison, Folsom, California.

Respectfully Submitted,

By:_____

Thomas Tarbutton   CDCR# BE8274
Folsom State Prison   Housing# 1-B1-09
P.O. Box 715071
Represa, California  95671

REQUEST TO CONSOLIDATE: Supporting Case References

#A.1   Evitts v. Lucey, 469 US 387, 396-99 (1985)

#A.2   In re Harris (1993) 5 C4th 813, 829

#A.3   Puckett v. U.S., 556 US 129, 133 (2009)

#A.4   Delgado v. Lewis, 223 F.3d 976, 980-82 (9th Cir. 2000)

#A.5   Stallings v. United States, 536 F.3d 624, 627 (7th Cir. 2008)

#A.6   In re Brown (1973) 9 C3d 679

#A.7   People v. Cotton (1990) 230 CA3d 1072


CLAIM I:      Supporting Case References

#1.1   See e.g. U.S. v. Barnes, 158 F. 3d 662, 65-66 (2d Cir. 1998); In re Hess (19550 45 C2d 171, 175

#1.2   e.g. Hamling v. U.S., 428 US 87, 117-18 (1974)

#1.3   People v. Hernandez (1961) 197 CA2d 25, 31

#1.4   People v. Dominguez (2008) 166 CA4th 658

#.1.5   For testimonial references for representations of no investing unless secured- please see Exhibit No. 4 Listing #7

#1.6   e.g. US v. Ford, 872 F.2d 1231, 1236 (6th Cir. 1989)

#1.7   e.g. Stirone v. US, 284 US 217 (1960)

#1.8   Blockburger v. US, 284 US 299, 301 (1932)

#1.9   e.g. US v. Lazarenko, 564 F.3d 1026, 1034-37 (9th Cir. 2009)

#1.10  e.g. US v. Nattier, 127 F.3d 655, 658 (8th Cir. 1997)

#1.11  e.g. US v. Schlei, 122 F.3d 944, 979-80 (11th Cir. 1997)

#1.12  e.g. US v. Sturdivant, 244 F.3d 71, 76 (2d Cir. 2001)

#1.13  In re Jamil H. (1984) 158 CA3d 556

#1.14  Kirby v. Illinois, 406 US 682, 689-90 (1972)

#1.15  e.g. Maryland v. Craig, 497 US 836, 846 (1990)

#1.16  e.g. US v. Riggi, 951 F.2d 1368, 1375 (3d Cir. 1991)

#1.17  Delaware v. Fensterer, 474 US 15, 20 (1985)

#1.18  Strickland v. Washington, 466 US 668, 692 (1984)

#1.19  US v. Cronic, 466 US 648, 659 (1984)

#1.20  Satterwhite v. Texas, 486, US 249, 256 (1988)

#1.21  e.g. Brown v. Ohio, 432 US 161, 167-68 (1977)

#1.22  e.g. People v. Ortega (1998) 19 C4th 686

# EXHIBIT NO. 18

<u>PROCEDURAL HISTORY</u>:

1.)   The attached Exhibit was introduced by the Prosecution as People's Exhibit No. 61 during trial of Case No. 11CF2747 in Oraneg County Superior Court

2.)   This Exhibit was attached as Petitioner's Exhibit No. 18 in the State Habeas Petition No.S263665 submitted to the State Supreme Court

<u>CHANGES MADE TO DOCUMENT</u>:

No changes have been made to the Exhibit

ATTACHMENT 'D':  PAGE 109

Page 1

EXHIBIT NO. 61

Case No. **11CF2747**
☑ ID                     Date _____  JAN 0 9 2018
🗹 IN EVIDENCE       Date _____  JAN 0 6 2018

☑ **People**   ☐ Defendant   ☐ Joint
☐ Petitioner   ☐ Respondent   ☐ Court
☐ Other _____

PEOPLE OF THE STATE OF CALIFORNIA

vs.

THOMAS FRANKLIN TARBUTTON.

Defendant(s).

SIGNATURE-Atty/Party introducing sensitive Exhibit.

ALAN CARLSON, Clerk of the Court

By      ~~B. Pell~~, Deputy

Note: This item is a permanent Court record.
**DO NOT REMOVE** from courtroom.

Exhibit No.18:   Peoples No. 61                    Page 2



# Lawyers Title
## INSURANCE CORPORATION

**Primary Owner:** LUGO, BRIAN; LUGO, KARA

**Secondary Owner:**

**Mail Address:** 248 E PALO VERDE AVE
PALM SPRINGS CA 92264

**Site Address:** 248 E PALO VERDE AVE
PALM SPRINGS CA 92264

**County:** RIVERSIDE

**Assessor Parcel Number:** 508-291-033

**Housing Tract Number:**

**Lot Number:** 36,37

**Page Grid:**

**Legal Description:** Lot: 36,37  Abbreviated Description: LOT:36,37
CITY:PALM SPRINGS .28 ACRES NET IN POR LOT
37 AND LOT 36 MB 017/040 PALOS VERDES TR
City/Muni/Twp: PALM SPRINGS

### Property Characteristics

Bedrooms : 3
Bathrooms : 1 + 1 Partial
Total Rooms :
Zoning :
No of Stories : 1
Building Style :

Year Built : 1955
Garage : Attached 2
Fireplace : Yes
Pool :

Square Feet : 2,505 SF
Lot Size : 12,197 SF / 0.279 AC
Number of Units : 1
Use Code : Single Family Residential

### Sale Information

Transfer Date : 01/06/2009
Transfer Value : $360,000
Title Company : FIRST AMERICAN TITLE INS CO

Seller : US BANK NATIONAL ASSOCIATION,
Document # : 2009-0004215

Cost/Sq Feet : $143

### Assessment & Tax Information

Assessed Value : $456,000
Land Value : $137,000
Improvement Value : $319,000
Market Improvement Value :
Tax Year : 2009

Percent Improvement : 69.96%
Tax Amount : $8,196.10
Tax Account ID :
Market Land Value :

Homeowner Exemption :
Tax Rate Area : 11-003
Tax Status : Current
Market Value :

Data Deemed Reliable, But Not Guaranteed.
Copyright ©1998- 2010 TitleProfile.com All Rights Reserved.
All other trademarks and copyrights are the property of their respective holders.      Lawyers Title - Inland Empire

http://www.titleprofile.com/l

**ATTACHMENT 'D':  PAGE 111**

8/5/2010

OCDA003457

Exhibit No. 18:  People's No. 61                          Page 3



# Lawyers Title
## INSURANCE CORPORATION

## Subject Property History

**LUGO, BRIAN; LUGO, KARA**
248 E PALO VERDE AVE, PALM SPRINGS 92264-8422
APN: 508-291-033   RIVERSIDE COUNTY

Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 11/30/2009 | Document # | 2009-0614237 BK-PG - |
| Loan Amount | $549,537 | Loan Type | Building or Construction Loan |
| TD Due Date | 12/01/2039 | Type of Financing | |
| Interest Rate | | | |
| Lender Name | BANK2 | | |
| Lender Type | Bank | | |
| Borrowers Name | LUGO,BRIAN: LUGO,KARA | | |
| Vesting | | | |

**Legal Description**
Lot 36&37
City/Muni/Twp: PALM SPRINGS

Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 01/06/2009 | Document # | 2009-0 |
| Price | $360,000 | Document Type | Grant |
| First TD | $361,496 | Type of Sale | Full-Co |
| Mortgage Doc # | 2009-0004216 | Interest Rate | Tax |
| Lender Name | BANK2 | | |
| Buyer Name | LUGO, BRIAN: LUGO, KARA | | |
| Buyer Vesting | Joint Tenancy | | |
| Seller Name | US BANK NATIONAL ASSOCIATION, | | |

**Legal Description**
Lot: 36&37  Map Ref. MB17 PG40

Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 01/00/2009 | Document # | 2009- |
| Price | $360,000 | Document Type | N/A |
| First TD | N/A | Type of Sale | Price |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | N/A | | |
| Buyer Name | U S BANK NATL ASSN | | |
| Buyer Vesting | Trust | | |
| Seller Name | N/A | | |

**Legal Description**
Lot: 36,37
Abbreviated Description  .28 ACRES NET IN POR LOT 37 AND LOT 36 MB 017/040 PALOS
VERDES TR
City/Muni/Twp  PALM SPRINGS

*[handwritten: missing pages 3-5 of title search]*

http://www.titleprofile.com/P---

**ATTACHMENT 'D':  PAGE 112**



# Lawyers Title
## INSURANCE CORPORATION

## Subject Property History

**LUGO, BRIAN; LUGO, KARA**
**248 E PALO VERDE AVE, PALM SPRINGS 92264-8422**
**APN: 508-291-033   RIVERSIDE COUNTY**

### Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date | 11/30/2009 | Document # | 2009-0614237 BK-PG - |
| Loan Amount | $549,537 | Loan Type | Building or Construction Loan |
| TD Due Date | 12/01/2039 | Type of Financing | |
| Interest Rate | | | |
| Lender Name | BANK2 | | |
| Lender Type | Bank | | |
| Borrowers Name | LUGO,BRIAN; LUGO,KARA | | |
| Vesting | | | |

Legal Description
Lot: 36&37
City/Muni/Twp: PALM SPRINGS

### Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 01/06/2009 | Document # | 2009-0004215 BK-PG - |
| Price | $360,000 | Document Type | Grant Deed |
| First TD | $361,496 | Type of Sale | Full-Computed from Transfer Tax |
| Mortgage Doc # | 2009-0004216 | Interest Rate | |
| Lender Name | BANK2 | | |
| Buyer Name | LUGO,-BRIAN; LUGO, KARA | | |
| Buyer Vesting | Joint Tenancy | | |
| Seller Name | US BANK NATIONAL ASSOCIATION, | | |

Legal Description
Lot: 36&37  Map Ref: MB17 PG40

### Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 01/00/2009 | Document # | 2009-0004215 BK-PG - |
| Price | $360,000 | Document Type | N/A |
| First TD | N/A | Type of Sale | Price Unconfirmed |
| Mortgage Doc # | | Interest Rate | |
| Lender Name | N/A | | |
| Buyer Name | U S BANK NATL ASSN | | |
| Buyer Vesting | Trust | | |
| Seller Name | N/A | | |

Legal Description
Lot: 36,37
Abbreviated Description: .28 ACRES NET IN POR LOT 37 AND LOT 36 MB 017/040 PALOS VERDES TR
City/Muni/Twp: PALM SPRINGS

<u>Exhibit No.18:</u>   People's No. 61                   Page 5

| | | | |
|---|---|---|---|
| Borrowers Name | STORM,JAMES V; STORM,JACQUELYN T | | |
| Vesting | Joint Tenancy | | |
| Fixed Step | | | |
| Adjustable Rate Index | Libor | Change Index | 4.8% |
| Rate Change Frequency | Six months or Semi-annually | First Change Date | |
| Int Rate not < | | Int Rate not > | |
| Maximum Interest Rate | | Interest Only Period | |
| Prepayment Penalty Rider | No | Prepayment Penalty Term | |

Legal Description
Lot 36&37
Abbreviated Description: WESTERLY2 LOT37

Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date | 03/22/2001 | Document # | 2001-116720 BK-PG - |
| Price | $140,000 | Document Type | Individual Deed |
| First TD | $120,000 | Type of Sale | Full-Computed from Transfer Tax |
| Mortgage Doc # | 2001-116721 | Interest Rate | |
| Lender Name | PAUL KAMINS | | |
| Buyer Name | STORM, JAMES V; STORM, JACQUELYN T | | |
| Buyer Vesting | Joint Tenancy | | |
| Seller Name | KAMINS, PAUL; KAMINS, BIRTHE | | |

Legal Description
Lot 36&37  Map Ref MB17 PG40
Abbreviated Description: WESTERLY2 LOT37
City/Muni/Twp: PALM SPRINGS

Data Deemed Reliable, But Not Guaranteed.
Copyright ©1998- 2010 TitleProfile.com  All Rights Reserved.
All other trademarks and copyrights are the property of their respective holders                   **Lawyers Title – Inland Empire**

8/5/2010
ATTACHMENT 'A':   PAGE  114          OCDA003460

# EXHIBIT NO. 19

## PROCEDURAL HISTORY:

1.) The attached document was filed as a request for ruling in the State Habeas action in Appellate Court (No.G058686), after Petitioner was not provided with any request for extension by the Respondent or the Court's Granting of a request.

2.) The attached document was filed again in State Habeas No. G058686 as an exhibit to Petitioner's Informal Reply.

3. Exhibit also submitted with State Habeas Petition No.S263665 to the State Supreme Court.

## CHANGES MADE TO DOCUMENTS:

No changes have been made to the Exhibit

ATTACHMENT 'D':   PAGE 115

PETITIONER'S INFORMAL REPLY - Index Page                Exhibit No.19

This Informal Reply of Petitioner is being provided pursuant to CRC 4.551(b) and subject to this Court's Order identified as In re Tarbutton filed on O1/21/2020 (No.G058686).   As of today's date, the Petitioner has not received an Informal Response from Respondent.  Therefore this precautionary Reply is being submitted to reinforce the cognizability of issues presented in the Writ of Habeas Corpus and preemptively argue against any potential posturing of their procedural bar.  In support, the Petitioner offers argument and authority indexed as follows:

1.) Appropriate action is required and supported by procedural due process:
   A.) Petitioner has the clear, present and beneficial right to the actions requested
   B.) The Court has the clear, present and ministerial duty to act
   C.) There is no other plain, speedy and adequate remedy
2.) The Petitioner has made a request for specific action and has done so in a timely manner
3.) The Petitioner in his verified claims, has alleged facts with sufficient particularity based on issues preserved by timely objection.  Petitioner has exhausted other avenues for remedy, and in submitting his Writ, has done so in a manner that promotes judicial economy and provides the Court with all reasonably available documentary evidence
4.) The verified claims of the Writ address defects that are clearly fundamentally constitutional errors
5.) Appellate Counsel's deficient performance in failing to raise these issues on appeal is without any satisfactory justification and is inarguably prejudicial
6.) Petitioner also raises and preserves the contention of the Insufficiency of Evidence claim due to Appellate Counsel's failure to include on direct appeal
7.) Legal issues raised in the Writ are of great importance and prompt resolution is warranted to preserve judicial integrity and promote confidence in its due, fair and equal administration
8.) Reiteration and reinforcing Petitioner's Prayer for Relief
9.) Verification

Index Page
ATTACHMENT 'D':  PAGE 116

1.) Appropriate action is required and supported by Procedural Due
     Process:  The fundamental requirement of Due Process is the
opportunity to be heard "at a meaningful time and in a meaningful
manner" (See R1 'Armstrong').  The demonstrable reality as detailed
in Petitioner's verified claims is that he has been deprived of such
opportunity, and in the absence to date of substantive due process,
the meaningful time by defect is now and therefore by default, the
meaningful manner is thus.  To illustrate and support, the Petitioner
submits the following determinants of procedural due process.

   A.) Petitioner has the clear, present and beneficial right to
        the actions requested:  The Petitioner's right to appeal is
implemented by statute (CPC1235) and constitutionally enforced through
decisions of the U.S. Supreme Court (R2 'Douglas').  In exercising
this right, the Petitioner is not entitled to self-representation (R3
'Martinez') but is required to be represented by counsel (R4 'Scott').
Therefore to accord himself the right of appeal to the extent to which
legislature intended, the Petitioner is beholden to the effective
assistance of counsel- which itself is guaranteed the Petitioner
through the Due Process Clause of the U.S. Constitution (R5 'Evitts').
However when appellate counsel fails to raise issues of constitutional
magnitude that are cognizable on appeal, Courts have found such perfor-
mance deficient and prejudicial (R6 'Spears').  To remedy this ineffec-
tive and incompetent performance- and to litigate the omitted issues-
the Petitioner is provided with the constitutional and statutory right
of Habeas Corpus (CA Const. Art 1, Sec 11; CPC1473).  When like circum-
stances warrant, Courts have encouraged the aggrieved to join the veri-
fied Writ with an ongoing appeal (R7 'Mendoza Tello').  Thus the actions
requested by the Petitioner in his efforts to be provided with the
meaningful opportunity to be heard, are supported by his rights to
appeal, effective assistance of counsel and Habeas Corpus; which when
considered within the Petitioner's context, are collectively conducive
to procedural due process.

   B.) The Court has the clear, present and ministerial duty to act:
Courts have agreed that the State has a compelling "interest in
(e)nsuring an adequate  appellate review of judgments which deprive
individuals of their liberty" (R8 'Scott'), and to "promote judicial

ATTACHMENT 'D':  PAGE 117

economy in direct appeals", when issues presented on appeal do not
represent an adequate review, courts should join a Habeas Corpus with
an ongoing appeal (R9 'Pope').   Furthermore, review courts under their
inherent supervisory powers have the sense of legal obligation to pre-
serve judicial integrity by ensuring that a conviction has been obtained
by means that survive substantive due process scrutiny and by a method
implemented in a fair manner (R10 'Matta-Ballesteros'; 'Mathews').
Moreover, this sense of legal obligation extends to Treaties in Force
that bind juridicial decisions to the nonderogable peremptory norms
derived from values recognized and accepted by the International Com-
munity, which like statutory and conventional law are justiciable in
our courts (R11 'Struckman').   Therefore the Petitioner contends, sub-
ject to its jurisdiction as accorded by the CA Constitution, binding
law enforced by the Supremacy Clause of the U.S. Constitution (Art.
VI, Cl.2), and legal obligations cognizable in our courts, this Court
has a clear, present and ministerial duty inherent in its supervisory
powers to provide the Petitioner with a meaningful opportunity to be
heard.   But because these verified claims are representative of errors
of significant constitutional consequence and intoto make up the mosaic
of a miscarriage of justice, adequate appellate review and substantive
due process will only be respected by the joining of the Writ with the
ongoing appeal followed by a full and fair litigation of all claims
and issues associated.

     C.)  There is no other plain, speedy and adequate remedy:  The
courts have recognized a procedural default on issues that "could have
been, but were not, raised on timely appeal" (R12 'Dixon').   When a
state prisoner has defaulted due to a procedural standard, they face a
bar of subsequent review and remedy (R13 'Coleman').   Therefore a
decision of this Court, that would deny the consolidation of the Writ
with the ongoing appeal, will not only deprive the Petitioner of the
rights and remedy of timely/adequate appellate review, but will also
present him with the potential of being procedurally barred from any
litigation of these cognizable contentions of constitutional materiality
(R14 'Waltreus').   Furthermore, as noted in No.7 below, due to the
magnitude and scope of matters addressed in the Petition that are pre-
judicial to procedural integrity and potentially corrosive to the
public confidence in such, prompt and final conclusion is warranted.

ATTACHMENT 'D':  PAGE 118

2.)  The Petitioner has made a request for specific action and has
     done so in a timely manner:  On 12/19/2019 a Writ of Habeas Corpus
was filed with the subject Court along with a Request to Consolidate
this Petition with the ongoing Appeal No.GO55717.  The filing date of
12/19/19, as sworn to in attached Exhibit No.13 is indicative of
Petitioner's earliest practicable opportunity and represents the culmi-
nation of his reasonable due diligence in presenting these issues with-
out substantial delay- despite the ineffective assistance of appellate
counsel and the improper/atypical hardships created by the CDCR.  As
to the filing date and supportive of its designation as 'timely', the
Petitioner calls attention to the statements of the Court of In re
Robbins (R15), in which it essentially reiterates that a Writ of Habeas
Corpus is presumed timely when filed within 90 days of the final due
date for the filing of the Appellant's Reply Brief.  In the Petitioner's
Appeal No.GO55717, this date for the final due date of Reply Brief was
09/25/2019.  Therefore the filing date of Petitioner's Writ of Habeas
Corpus on 12/19/19, 85 days from the final due date for Appellant's
Reply Brief is presumed to be timely.

3.)  The Petitioner, in his verified claims, has alleged facts with
     sufficient particularity based on issues preserved by timely
     objection.  Petitioner has exhausted other avenues for remedy,
     and in submitting this Writ, has done so in a manner that promotes
     judicial economy and provides the Court with all reasonably
     available documentary evidence:
     A.)  Objection and Exhaustion:  The verified claims of the Habeas
Corpus represent the errors of constitutional magnitude as raised in
Petitioner's pre-sentnencing pleadings filed in the Trial Court.  In
presenting these issues through Habeas Corpus, Petitioner provides
specific reference to the Appellate Record where these errors have
been identified and to which had been objected.  Therefore pursuant to
the general principle that an objection which is ample and timely to
bring the alleged error to the attention of the Trial Court and enable
it to take corrective action, is sufficient to serve legitimate state
interest and preserve the claim for appellate review (R16 'Lee').
Providing these objections to the Trial Court also demonstrates the
Petitioner exhausting remedy due to the motions through which these

claims are raised. These pleadings that include: CPC1181 Motion for
New Trial (1OCT2017-2185); CPC1054.5 Motion for Sanctions (1OCT2204-
2237); CPC1538.5 Search/Seizure Motion (1OCT2240-2247); CPC1185 Motion
in Arrest of Judgment (1OCT2192-2200); Motion for Appointment of Experts
(1OCT2249-2254); Trombetta-Youngblood Motion (1OCT2255-11CT2275);
Challenge for Cause (1OCT1967-2014; 12CT2657-2663; 12CT2827-2836), etc.
are all examples of opportunity provided the Trial Court to take correc-
tive action. In Petitioner's Writ, he lists specific Clerk Transcript
reference where these issues are located and properly preserved for
appellate review (See No.9 of each CLAIM I through IX). It is impor-
tant to note that Petitioner extended this exhaustion through Writs of
Mandate that are identifiable in the Appellate Record (12CT2590-2623;
12CT2630-2650) and one attached to the Habeas Corpus as Exhibit No.3.
In these Writs, the Petitioner as the Defendant in the subject Case No.
11CF2747, requested an order compelling the Trial Court to take correc-
tive action. Thus the efforts of the Petitioner are commensurate with
proper objection and exhaustion. (R17 'Dexter').

        B.)  Petitioner has alleged facts with sufficient particularity:
In presenting the contentions of the Habeas Corpus, the Petitioner has
set forth all claims with ample and satisfactory specificity. Examples
of this include but are not limited to: CLAIM III, in which the
Petitioner provides the minutia relative to the tax-reporting require-
ments that demonstrate the perjured testimony used to obtain the
conviction; CLAIM VII, in which the Petitioner shows the Prosecution's
material alteration of jury instructions that delete conditional and
operative terminology/guidance as decided by U.S. Supreme Court rulings,
and; CLAIM IX, in which the Petitioner demonstrates the gross and
inexplicable negligence of Trial Counsel in failing to introduce ANY
evidence that would be probative of ANY investigation/preparation.
Therefore the Petition has been submitted with ample facts stated with
sufficient particularity (R18 'Swain').

        C.)  The Petition has been submitted with reasonably available
             documentary evidence: In providing the Petition the Peti-
tioner has not only submitted a Request to Judicially Notice the
Appellate Record currently before the Court, Treates in Force, and
laws of Foreign Nations/Organization of Nations- but to promote judi-
cial economy, he has under the encouragement of the Court of Mendoza

ATTACHMENT 'D':  PAGE 120

Tello (R7), joined the Writ with the ongoing appeal (Request for Judicial
Notice attached to Writ as Exhibit No.5). Furthermore, in his attempts
to access documentary evidence, the Petitioner has made Discovery Re-
quests (11CT2475-2481); made requests of Trial Counsel (1)CT2449-
2464; Exhibit No.9); filed Discovery Motions (10CT2204-2307); filed
Motion for Appointment of Experts (10CT2249-2254), and; attempted to
subpoena Documentation (11CT2465). Therefore with his actions that are
indicative of due diligence, the Petitioner has complied with state
procedure by providing all evidence that is reasonably available (N19
'Duvall').

4.) The verified claims of the Writ address defects that are clearly
    fundamentally constitutional errors: This Court in the Case of
In re Spears (R6) granted a Petitioner's Writ by determining the
asserted defect was a "clearly fundamentally constitutional error".
In the Petitioner's Case, not only has he detailed with sufficient
particularity the facts and events that are reflective of defects of
fundamental fairness, but he has also primitively identified the
structural and constitutional materiality of these errors. As noted
on the Index Page for each CLAIM and supported by case law reference
throughout, these violations of fundamental aspects that have infected
the Petitioner's entire proceedings meet the standard of significant
constitutional magnitude and are therefore cognizable and meritorious
of Writ review and remedy.

5.) The deficient performance of Appellate Counsel in failing to
    raise these issues on appeal is without any satisfactory justi-
    fication and inarguably prejudicial:
    A.) Deficient Performance: As noted in Petitioner's Writ and
Request to Consolidate, he asserts the constitutional defect that is
ineffective assistance of Appellate Counsel by failing to raise the
stated issues that are clearly stronger than those argued in the 'AOB'.
This claim of IAC is further supported by the above referenced case of
In re Spears (R6), whereby this Court held that counsel's omission and
failure to raise clear defects of constitutional materiality "amounted
to incompetence and deprived Defendant of effective assistance of
appellate counsel".
    B.) Prejudicial Effect: In the Petitioner's case, the demonstrable

reality of prejudicial effect of counsel's omissions of errors that if argued render moot the contentions of the 'AOB', is that the converse does not hold true. In fact, not only does the 'AOB' as filed deprive remedy for all jurisdiction and structural/per se reversible errors detailed in the verified claims of the Writ, but by failing to raise issues that could have been raised but were not, it potentially precludes the Petitioner from raising these issues in subsequent review (R12 'Dixon').

C.) No satisfactory justification: It must be noted that Petitioner through written correspondences addressed to Appellate Project and appointed counsel, identified the prominent issues to be raised on appeal (Exhibit No.1; No.2). In filing this Writ, Petitioner also requested an explanation from Appellate Counsel for insight into her decisions (Exhibit No.12). As of today's date not only has nothing been received but it is clear and obvious that there cannot be any satisfactory justification. If required to overstate the obvious, the Petitioner requests the Court to compare Contention I of the 'AOB' to CLAIM I of the Writ. In CLAIM I, the Petitioner sets forth the facts and effect of the Prosecution adding an additional theory as an Alternative Basis for Conviction after the close of evidence. This defect was presented to the Trial Court by the Petitioner as a Pro Per Defendant in which he cites People v. Dominguez (R20) as authority for corrective action (See 1OCT2123). In Dominguez, the Court of Appeal, in accepting the Attorney General's concession that the alternative basis for conviction was added in error, concluded that such error was reversible. The Dominguez review Court in reversing had considered People v. Burnett (R21) wherein that Court reversed based on IAC, holding that defense counsel failing to object to an alternative basis was inexplicable and constitutionally prejudicial. This defect of IAC in failing to object was also developed and preserved for appellate review by Petitioner in his request to Trial Court for corrective action on non-statutory grounds in his Motion for New Trial (1OCT2139). Therefore with multiple grounds based on constitutional defects preserved for appellate review, along with Attorney General's concession of error, Appellate Counsel instead argues the after-effect of the Trial Court failing to instruct on unanimity; an issue that was only brought about by the ignored reversible errors.

ATTACHMENT 'D': PAGE 122

6.) Resulting from Appellate Counsel's failure to include on appeal, the Petitioner raises and preserves the contention of the Insufficiency of Evidence ('IOE'); Courts have indicated a claim challenging the sufficiency of evidence must be raised on direct appeal before it can be considered on Habeas Corpus (R22 'Lindley'). Thus it should be noted that the Petitioner, as a Pro Per Defendant, raised the 'IOE' issue on statutory grounds in his CPC1181 Motion for New Trial (See 1OCT2024-2045). In that claim, Petitioner asserted that the evidence presented was unqualified and inadequate to support proof beyond a reasonable doubt for all elements of the charged offenses and therefore insufficient to sustain the verdict returned. The CPC1181 claim of 'IOE' cross-collateralized many of the issues now being raised in the Writ of Habeas Corpus, including but not limited to: CLAIM III's use of a false characterization to obtain the conviction (1OCT2040-43); CLAIM VI's false evidence introduced at trial (1OCT2043); CLAIM VII's unqualified determination of probable cause (1OCT2032-38), and; CLAIM VII's discovery violations (1OCT2038-39).

As a result of Petitioner including 'IOE' on statutory grounds in his CPC1181 Motion, he preserved the issue in the Appellate Record and thereby qualified it as cognizable on direct appeal. The materiality of these matters are set forth in that motion and contended through the various claims of the Writ. Thus the defect of 'IOE' due to its detrimental effect on due process is identifiable as an error of a certain constitutional magnitude of which Appellate Counsel's failure to argue on appeal is deficient and prejudicial.

Therefore, in the event that any ruling or subsequent review/ruling may require a finding of 'IOE', and due to any potential posturing of a procedural default resulting from its absence in the 'AOB' and the fact that Petitioner does not explicitly articulate such claim in the Writ, he hereby incorporates the contention of 'IOE' as set forth in his CPC1181 motion (1OCT2024-2045) and preserves all arguments if such need be considered to fully and fairly litigate all matters associated.

7.) Due to matters of critical importance, action is required to preserve judicial integrity and promote confidence in its due and fair administration: "Decency, security and liberty alike demand

ATTACHMENT 'D': PAGE 123

that government officials shall be subjected to the same rules of
conduct that are commands to the citizen...(for) to declare that in
the administration of the criminal law the end justifies the means--
to declare that the government may commit crimes in order to secure
the conviction of a private criminal-- would bring terrible retribution.
Against that pernicious doctrine this court should resolutely set its
face" (R23 'Olmstead').

In the Petitioner's case, the narrative established through the veri-
fied claims of the Writ is that of a corrupt and criminal process, will-
fully and knowingly executed by investigative and prosecutorial per-
sonnel acting under the color and representation of lawful procedure.
These state actors, while in collusion with Prosecution witnesses for
whom they are sheltering from their own illicit deeds, engaged in a
pattern and practice which by design is intended to effect and maintain
the false action against the Petitioner. Individually these claims of
the Writ are demonstrative of overt acts purposed to pervert and sub-
vert due process, but because this flagrant misconduct is pervasive
throughout the entire proceedings, when collectively considered they
are tantamount to a malicious method that offends the precepts of
decency and fairness. As such, in its regard of the constitutional
magnitude and due process prejudiciality, this Court should note the
full scope of all errors and the frequency they occur with a regularity
without reprieve. Therefore the Petitioner contends that these claims,
when viewed by the Court severally, jointly or in quantum sufficit,
establish by a preponderance of the evidence and with prima facie spe-
cificity a course of conduct that is corruptive of the judicial pro-
cess and corrosive to the confidence in its due, fair and equal admini-
stration. Thus in its exercise of judgment upon the whole of the pro-
ceedings, this Court, to restore some semblance of fundamental fair-
ness and attempt to ameliorate the systematic obliteration of the
Petitioner's constitutional protections, should take corrective action
to promote/preserve confidence in the judicial process by remedy that
includes but is not limited to dismissal with prejudice.

8.) Reiteration and reinforcing Petitioner's Prayer for Relief: In
this Reply, the Petitioner, in addition to reiterating the Prayer for

Relief found in No.9 of CLAIMS I through IX, requests the Court to:

A.)  Appoint Petitioner counsel pursuant to CRC4.551(c)(2) or applicable authority

B.)  Notify Petitioner of any defect of form/format for the Writ, Request to Consolidate and Request for Judicial Notice (Exhibit No.5), and provide the Petitioner with the opportunity to remedy any such defect.  In the event that no notice of defect is provided to Petitioner, Petitioner shall operate on the premise that these pleadings/briefs are acceptable in the form/format submitted and are suitable for the purposes intended.

9.)  Verification:  I, Thomas Tarbutton, as evidenced by my signature hereunder, state that I am the Petitioner as described in this Informal Reply; the Petitioner as noted in the Request to Consolidate and the Writ of Habeas Corpus (In re Tarbutton No.G058686); the Defendant in Case No.11CF2747 (Orange County Superior Court); and; the Appellant in Appeal No.G055717.  I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except to matters stated on my information and belief, and as to those matters, I believe them to be true.

This Informal Reply is hereby verified and respectfully submitted this the 6th day of March, 2020

By: _____

Thomas Tarbutton  CDCR# BE8274
Folsom State Prison  Housing# 1-B1-09
PO Box 715071
Represa, CA  95671

ATTACHMENT 'D':  PAGE 125

R1:  Armstrong v. Manzo, 380 US 545, 552 (1965)
R2:  e.g. Douglas v. California, 372 US 353 (1963)
R3:  Martinez v. Court of Appeal, 528 US 152 (2000)
R4:  People v. Scott (1998) 64 CA4th 550
R5:  Evitts v. Lucey, 469 US 387, 396-99 (1985)
R6:  In re Spears (1984) 157 CA3d 1203

R7:  People v. Mendoza Tello (1997) 15 C4th 264
R8:  People v. Scott (1998) 64 CA4th 550
R9:  People v. Pope (1979) 23 C3d 412
R10: United States v. Matta-Ballesteros, 71 F.3d 754 (9th Cir.
     1995);  Mathews v. Eldridge, 424 US 319 (1976)
R11: United States v. Struckman, 611 F.3d 560 (9th Cir. 2010)
R12: In re Dixon (1953) 41 C2d 756
R13: Coleman v. Thompson, 501 US 722 (1991)
R14: In re Waltreus (1965) 62 C2d 218
R15: In re Robbins (1998) 18 C4th 770
R16: Lee v. Kemna, 534 US 362 (2002)
R17: In re Dexter (1979) 25 C3d 921
R18: In re Swain (1949) 34 C2d 300
R19: People v. Duvall (1995) 9 C4th 464, 474
R20: People v. Dominguez (2008) 166 CA4th 658
R21: People v. Burnett (1999) 71 CA4th 151
R22: In re Lindley (1947) 29 C2d 709, 729
R23: Olmstead v. United States, 277 US 438 (1928)

ATTACHMENT 'D':  PAGE 126

# EXHIBIT NO. 20

**PROCEDURAL HISTORY:**

1.)   Submitted with State Habeas Petition No. S263665 to the
      State Supreme Court

**CHANGES MADE TO DOCUMENT:**

No changes have been made to the attached Exhibit

**ATTACHMENT 'D':  PAGE 127**

Exhibit No.20:   Motion for Evidentiary Hearing        Proposed Order Page

PROPOSED ORDER:   Request for Evidentiary Hearing


Thomas Tarbutton   CDCR# BE8274
Folsom State Prison   Housing# 1-B1-09
PO Box 715071
Represa, CA  95671


SUPREME COURT OF CALIFORNIA
350 McAllister Street
San Francisco, CA  94102

Petitioner of Request for Evidentiary Hearing:  Thomas Tarbutton
1.)  Name of Party Submitting the Proposed Order:
     Thomas Tarbutton as Petitioner in pro se
2.)  Title of Proposed Order:  Motion for Evidentiary Hearing
3.)  The Proceeding to which the Proposed Order relates:
     Petition for Writ of Habeas Corpus- Petitioner, Thomas Tarbutton
     v. Respondent, Warden Rick Hill of Folsom State Prison
4.)  Proposed Order was served on the following:
     A.)  Office of the Attorney General
     B.)  Respondent, Rick Hill, Warden of Folsom State Prison
     C.)  Orange County District Attorney
     D.)  Orange County Superior Court
     E.)  Valerie G. Wass, Appellate Counsel for Direct Appeal No.G055717
     F.)  Jerry Schaffer, Trial Counsel for Case No.11CF2747 (Orange Co.)
5.)  Table of Contents:
     1.)  Motion for Evidentiary Hearing
     2.)  History of Due Diligence
     3.)  Proposed Discovery Request- Interrogatories
     4.)  Proposed Discovery Request- Production of Documentation
     5.)  Proposed Discovery Request- Deposition
     6.)  Proposed Discovery Request- Admission
     7.)  Request for Expansion of Record
     8.)  Submitted on Authorities
     9.)  Declaration and Verification



ATTACHMENT 'D':  PAGE 128

**1.) Motion for Evidentiary Hearing:**  The Petitioner in his attached Habeas Petition has set forth through its verified claims specific factual allegations that are demonstrable of fundamentally constitutional errors meritorious of review. In addition to that which is presented by the contentions, exhibits, declarations and Request for Judicial Notice, the Petitioner has exercised reasonable due diligence in obtaining certain materials relevant for further factual development of the issues as raised. However, resulting from defects of due process implicit within the acts of Prosecutorial Misconduct (See CLAIM VII), Judicial Abuse of Discretion (See CLAIM VIII), and Ineffective Assistance of Counsel (See CLAIM IX), the Petitioner has been deprived of all discovery pertinent to the particulars of his criminal proceedings. Therefore the Petitioner requests and hereby moves the Court, in its consideration of the Petition inclusive of attachments and appropriate inferences, to resolve any issue of fact whose determination may be required for relief by the conduct of an evidentiary hearing and the discovery of materials and information requisite for such purpose. To show due diligence in his efforts to date and good cause for the Court's granting of this request, the Petitioner submits a brief history of attempts to develop all factual bases on which his Petition is founded.

**2.) History of Due Diligence:**  The Petitioner has exercised reasonable due diligence in his attempts for discovery. Identifiable in the proper pleadings filed by the Petitioner (See Exhibit No.14), these efforts and the respective claims of the Habeas Petition to which such evidence supports, include but are not limited to:

   A.) FBI Interview: On 1/25/2011, Petitioner requested Agent Murray to investigate the tax-reporting issue that is now raised in CLAIM III and VI (See affidavit at 11CT2482)

   B.) Pre-Trial Discovery Request: On 3/07/2014, Petitioner submitted an informal discovery request to the Prosecutor for production of evidence that was and still is relevant to the issues of fact raised in CLAIM III;V;VI;VII;VIII;IX. (See copy of discovery request at 11CT2475)

   C.) Pre-Trial Discovery Request: On 4/03/2014, Petitioner submitted discovery request for production of evidence that is still relevant to issues of fact raised in CLAIM VII (Copy of discovery request-11CT2478)

D.)  Pre-Trial Discovery Request:  On 9/22/2014, Petitioner submitted a discovery request for materials and information still relevant to issues of fact raised in CLAIM IV;VI;VII;VIII;IX (See copy of request at 11CT2479)

E.)  Requests made of Trial Counsel:  In Petitioner's declaration attached hereto as Exhibit No.9, he lists correspondence dates relative to requests made of Trial Counsel for preparation, investigation and/or introduction of materials and information that are exculpatory to his defense.  These items requested of counsel were and are required to fully develop the factual bases of the Petitioner's case as well as probative of the IAC raised in CLAIM IX (Also see 11CT2449)

F.)  Motion for Sanctions- CPC1054.5:  Petitioner filed a 1054.5 Motion in Trial Court resulting from Prosecution's failure to produce any of the Pre-Trial requested discovery.  Issues of fact attempted to develop by Petitioner include that of CLAIM III;IV;V;VI;VII;IX (For 1054.5 Motion see 1OCT2204)

G.)  Motion to compel evidence of illegal arrest/conveyance:  Filed in Trial Court through a CPC1538.5 Motion, Petitioner sought to move into evidence all documentation related to arrest, international warrant, passport, extradition order, deportation order, etc.  These issues of fact are the bases of CLAIM IV;V;VII;VIII;IX (See 1538.5 Motion at 1OCT2242)

H.)  Motion for Appointment of Experts:  Filed in Trial Court, Petitioner sought the appointment of experts for testimony of fact relative to issues now raised in CLAIM III,IV;V;VI;VII;IX (See copy of Motion at 1OCT2251)

I.)  Affidavits filed in Support of Motions:  Filed in Trial Court, Petitioner introduced issues of fact that are supportive of every CLAIM of the Habeas Petition (For affidavits see 1OCT2017; 11CT2294)

J.)  Motion for the Appointment of Investigator:  Petitioner filed a request for an investigator and after being denied twice, was provided one while in Trial Court.  However, as sworn to No.9 below, this investigator despite approximately 5 attempts by Petitioner for copies of his work to obtain documents including those requested through the Pre-trial discovery requests, has failed to provide anything.

H.)  Writ of Mandate:  Filed in the Appellate Court, the Petitioner sought action from the appellate court to compel the Trial Court to

ATTACHMENT 'D':  PAGE 130

take Judicial Notice of facts/propositions that are required to deve-
lop the bases of that as raised in CLAIM I;III;IV;VI (For copy of Writ,
see 12CT2590)

I.) CCP170.3 Challenge for Cause: Filed in Trial Court, Petitioner
sought Judge Jensen to answer the issue relative to a disqualifying
interest. This issue of fact is raised in CLAIM II;III;IV;VIII (Copy
of CCP170.3, See 1OCT1967)

J.) Requests made of Commission on Judicial Performance: The
Petitioner sought corrective relief and information from this Commission
after the Trial Court, Judge Jensen, refused to answer the question
relative to an undisclosed disqualifying interest as raised in Peti-
tioner's CCP170.3 ('One request made of the Commission is in the
appellate record at 12CT2655)

K.) Request for Judicial Notice: The Petitioner in submitting the
Habeas Petition to the Court of Appeal, attached a Request for Judicial
Notice for materials and information that are factual bases for CLAIM
III;IV;V;VI;VII (Case No.GO58686, Exhibit No.5)

L.) Request made to State Bar: Attached as Exhibit No.15 is an
example of requests made to the State Bar for release of information/
documentation relative to Patrick Lund and the source of funds he used
to pay restitution to an unrelated party. The materiality of this
evidence applies to issues of fact serving as bases for contentions
raised in CLAIM VI;VII;IX (Copy of exmaple is attached as Exhibit No.15)

M.) Motion to discover records of OCDA's Lund Investigation: In
attached Exhibit No.16 is a copy of the motion prepared and mailed by
Petitioner to the Trial Court prior to sentencing. The Trial Court
has declined to calender this motion. The issues of fact that are the
subject of this motion are also pertinent to contentions of Habeas
CLAIM III;IV;VII;VIII;IX (Copy of motion attached as Exhibit No.16)

Please note that this list is not exhaustive and does not include
Petitioner's attempts to fully develop the factual bases through his
CPC1181 Motion for New Trial (e.g. Insufficiency of Evidence @1OCT2024),
additional CCP170.3 Challenges (e.g. 12CT2657), follow-up Writs of
Mandate (e.g.12CT2630), and replies to Prosecution's opposition (See
9CT1946) and People's Informal Response (See Informal Reply of Case
No.GO58686).

ATTACHMENT 'D': PAGE 131

3.)  Proposed Discovery Request- Interrogatories:  With the display of
due diligence demonstrated through his actions as noted in No.2 above,
the Petitioner requests discovery of evidence disclosed by inter-
rogatories that include but are not limited to:

   A.)  Judge Lance Jensen:  As the Trial Court in Petitioner's Case
No.11CF2747 (Orange Co. Sup. Ct.), Judge Jensen has refused to answer
the question asked by Petitioner through his CCP170.3 Challenge (See
1OCT1967), whether or not he lent his prestige of judicial office or
assisted in any way with Mike Murray's candidacy for judgeship. While
Judge Jensen is within his right to do so, he is also required to dis-
close such if this position will influence or predict a ruling/decision.
The relevance in the Petitioner's case and good cause for discovery is
described in No.8 of CLAIM VIII (Page_____), where Petitioner  states
that an actual bias would be evident in the Trial Court's expectedly
obvious   partiality in favor of the wife of Mike Murray, Jessie
Murray, in decisions and rulings  that protect the Murrays and by
association, his own judicial prestige.  Because the Judge's endorse-
ment and/or assistance with Murray's running for judge, encourages
the Trial Court to rule/decide consistent and protective of such bias,
the prejudiciality inherent in the preponderant probability of a
partial judge is fatal to any semblance of structural integrity of the
Petitioner's criminal proceedings.  Thus with Judge Jensen's outright
refusal to answer the question as posed in No.8H(iii) (See 1OCT2009-
2011) of the CCP170.3, the corrosive effect of the appearance of im-
propriety can only be salved by Judge Jensen's appropriate and direct
response to the exact question of endorsement/assistance lent to Mike
Murray.   Of note is Judge Jensen's response to the CCP170.3 whereby
he answered and struck the challenge (See 12CT2579-2587). While these
two are mutually exclusive, the issues  addressed in his 'answer'
clearly and intentionally mischaracterizes the matter to be disclosed.
Judge Jensen only addresses a non-disqualifying social acquaintance
and purposely and conspicuously neglects the true and explicit request
of his assistance/endorsement of Mike Murray. This 'answer' that is
evasive and misdirective, effectuated an appearance of impropriety and
prompted the Petitioner to file a follow-up CCP170.3 as a result (See
12CT2657).

ATTACHMENT 'D':  PAGE 132

B.)  Prosecutor Pierce and FBI Agent Jessie Murray:  As raised in CLAIM IV of the attached Habeas Petition, the means and method employed Pierce and Murray to abduct, convey and conceal are tantamount to outrageous conduct that denies due process and destroys confidence in the Government's administration thereof.  In tandem with the issue of the Trial Court's improper partiality as noted in No.3A above that has allowed Pierce and Murray to shelter from their materially contradictory accounts of Petitioner's transnational arrest/conveyance (See CLAIM IV; No.2, Page_____), they are required to answer direct questions as to the legality of arrest and lawfulness of extradition.  In conjunction with the production of documentation as requested in No.4D below, that as noted controverts Pierce and Murray's irreconcilable versions, they will be asked to provide any testimony/evidence that corroborates their fantastical and materially false accounts.  Good cause for discovery is the proof of perjury and/or material misstatements provided through their respective representations that further factually develops the Outrageous Government Conduct that is warrantive of dismissal.

4.)  Proposed Discovery Request- Production of Documentation:  With the display of due diligence demonstrated through his actions as noted in No.2 above, the Petitioner requests discovery of evidence to be disclosed by the production of documentation that includes but is not limited to:

A.)  Tax-Reporting:  For further factual development of Petitioner's actual innocence CLAIM III, every alleged investor-victim is compelled to provide the irrefutable proof of the specific interest characterization being presumed as the evidentiary foundation for reliance, loss, theft, and the appearance of being deceived/defrauded.  This request will require each to submit tax-reporting documents corresponding to the years of alleged offenses to corroborate their testimony and allegations. Good cause for production is demonstrated in CLAIM III, No.6 and No.7, which details the facts/propositions of Judicial Notice that set forth the practical impossibility of their sworn characterization specific to the false pretense charges, and therefore proof of tax-reporting is not only overwhelmingly conclusive of their perjury, but also preponderantly probative of Petitioner's actual and factual innocence.

ATTACHMENT 'D':  PAGE 133

B.)  VCF Claims of Almquist and Steiner:  As noted throughout CLAIM
VII, the criminal prosecution of Petitioner is founded in and identical
to the theory used by Patrick Lund, Martin Almquist, William Steiner
and others to file fraudulent claims with the VCF. These applications
for payment that are based on the same false particulars of loss/re-
liance as the criminal allegations, have been discovery-requested by
Petitioner on 3/07/2014 (11CT2475) and identified to Trial Counsel as
imperative evidence to be introduced at trial (See Exhibit No. 9).  De-
spite his efforts to ensure discovery, which include requests made to
private investigator (See No. 2J above), Almquist and Steiner's claims-
believed to be the most damnable with an estimated requested payment
of $8M to $9M- have been effectively suppressed by misconduct and de-
ficient performance of trial counsel.  Good cause is demonstrated
in Petitioner's affidavit filed in Trial Court as 11CT2294 and further
factual development of the Habeas claims that include:  The incompetent
investigation of Jessie Murray who used Lund to assist with her in-
vestigation while the VCF claims were prepared and presented for pay-
ment (CLAIM VII; No. 4 and No. 6);  the bad acts of the prosecution wit-
nesses (CLAIM VII; No. 3E);  the selective/discriminatory prosecution
that shelters prosecution witnesses from impeachable acts (CLAIM VII;
No. 5); and the discovery violations of the Prosecution that suppresses
exculpatory evidence explicitly discovery-requested by Petitioner
(CLAIM VII; No. 3A).

C.)  Patrick Lund information:  Raised throughout the Petition in-
cluding No. 4 of CLAIM VII, is the Prosecution's use of since-disbarred
Patrick Lund to assist with their investigation.  The Prosecution's
subsequent failure to preserve evidence as detailed in No. 6 of CLAIM VII,
allowed Lund to secrete away the transferred asset base and derivative
income resulting in a loss of exculpatory evidence that negates and/or
mitigates the charges/enhancements of the Petitioner's proceedings.
As declared by Petitioner in attached Exhibit No. 10, during the time
of the Prosecution's investigation and prosecution of the Petitioner,
and while assisting with its conduct, Lund was misappropriating funds
from another client, being disbarred and eventually criminally inves-
tigated and charged.  Also during this time, and after receipt of the
transferred asset base from Petitioner, Lund was paying restitution
for misappropriated funds to an unrelated party.  Therefore good cause

for discovery of evidence that includes the source of funds used as payment of restitution, as requested of the State Bar in attached Exhibit No.15; and the records of the OCDA's criminal investigation of Lund relative to his handling of the transferred asset base (See Exhibit No.16)- is demonstrated by the further factual development of the incompetent investigation that used Lund to assist (CLAIM VII; No.4) and the Prosecution's intentional and bad faith failure to pre- serve evidence (CLAIM VII;No.6).

    D.) Petitioner's passport and 'Arrest' related evidence: Booked into evidence as noted in Exhibit No.6 (Bates Stamp OCDA000373), by OCDA Investigator Dave Melnyk, is the Petitioner's passport. The relevance of this documentation is the proof contained within that illustrates Petitioner entering and exiting Panama legally. The actions following this movement of the Petitioner as an unconstrained US citi- zen, that as verified through Habeas Petition CLAIM IV details his seizure outside the collective territorial jurisdictions by Panamanian Officials acting under a false pretense of US Authority, is corroborated by the exit stamp from the country of Panama entered into his passport upon departing. As raised in CLAIM IV is the contention of the methods employed and concealed are indicative of a forcible transnational ab- duction commissioned and coordinated by members of the Prosecution team. Good cause for production of this evidence along with all arrest reports, international arrest warrants, extradition order, deportation order, etc. is demonstrated by the absence of these documents despite Prosecutor Pierce and FBI Agent Murray testifying that such were used for the arrest/conveyance of Petitioner. This evidence, or notice that such does not exist, provides further factual development of Petitioner's assertions of CLAIM IV;No.2 that details the three contradictory ver- sions of arrest/conveyance entered into record by Pierce, Murray and Melnyk are all false. In addition to controverting the Prosecution team's repeated decrees that the seizure and conveyance was lawfully conducted, this evidence is probative of the deceit contained in their cover-up of the illicit conduct knowingly and willfully employed (See CLAIM IV;No.4).

5.) Proposed Discovery Request- Deposition: With the display of due diligence demonstrated through his actions as noted in No.2 above, the

Petitioner requests discovery of evidence disclosed by deposition
that include but are not limited to:

A.)  George Kentner:  Raised in CLAIM VII, No. 7A is the Prosecutor's
use of improper communications with jurors through the covert display
of a shared camaraderie between alleged investor-victim, George Kentner,
Prosecutor Pierce himself and certain members of the jury.  After an
objection filed by Petitioner in Trial Court through his CPC1181 Motion
for New Trial (See 1OCT2106), the Prosecutor failed to deny the factual
allegation in his response (See 9CT1934).  As this claim relates to
George Kentner and the purpose of the deposition, the Petitioner is
aware of a phone conversation between Mr. Kentner and a 3rd party in
which Mr. Kentner acknowledges wearing the military service pin in
view of the jurors while testifying. Therefore good cause for the
Kentner deposition is to make further factual development of these im-
proper communications with jurors.  The relevance of this is best ex-
plained in Remmer v. United States, 347 US 227 (1954), which states
"In a criminal case, any private communication, contact, or tampering,
directly or indirectly, with jurors during trial about matter pending
before the jury is deemed presumptively prejudicial".  A violation
of CPC95 as stated in CLAIM IV; No. 7A has been addressed by this Court
in the matter of In re Possino (1984) 37 C3d 163 and as noted therein
is condemnatory of such conduct indicating that a "blatant violation
of this rule demonstrates an unfitness to practice law".  Thus fact-
ual development of this issue is not only effective to establish the
prejudiciality of these actions but is also corroborative to Peti-
tioner's overall claim of prosecutorial misconduct  and the cumulative
injurious effect on due process.

6.)  <u>Proposed Discovery Request- Admission:</u>  With the display of due
diligence demonstrated through his actions as noted in No. 2 above, the
Petitioner requests discovery of evidence disclosed through admission.
Such facts/propositions not subject to reasonable dispute include but
are not limited to:

A.)  Facts/propositions of Judicial Notice:  In Petitioner's Habeas
Petition Case No. GO58686, the Attorney General as the Respondent filed
an Informal Response dated 5/04/2020.  In this response the AG failed
to factually rebut or contest the facts/propositions of Judicial Notice

ATTACHMENT 'D':  PAGE 136

pertinent to CLAIM III.  Again raised in CLAIM III and Judicial Notice
requested in Exhibit No.5, these facts/propositions that the AG has
not disputed are demonstrable of the perjured testimony to obtain the
conviction and probative of Petitioner's factual innocence.  Whereas
the Petitioner as noted in his Informal Reply dated 5/20/2020 for
Case No.G058686, asserted that the failure to challenge/oppose/deny
is a concession to such facts/propositions, the Petitioner for ex-
peditious conduct and resolution to these issues, requests the Court
to compel the Respondent's active admission to the matters of Judicial
Notice that they have already passively conceded.  Good cause for this
action is as noted the effect on swift conduct of post-conviction re-
lief when there are no disputed issues of fact.  Moreover, this ad-
mission is necessary to make record of the AG's position and  enforce
the Doctrine of Equitable Judicial Estoppel that the Petitioner "in-
voke(s) to prevent a party from changing its position over the course
of judicial proceedings when such positional changes have an adverse
impact on the judicial process" (Religious Technology Center, Church
of Scientology Intern., Inc v. Scott, 869 F.2d 1306,1311 (9th Cir.
1989)).  Furthermore, the Petitioner sees it necessary and appropriate
because as stated in New Hampshire v. Maine (532 US 742,751 (2001)),
"the party seeking to assert an inconsistent position would derive an
unfair advantage or impose an unfair detriment on the (Petitioner) if
not estopped".

7.)  Expansion of Record:  As noted in No.2 above, the Petitioner has
exercised due diligence in  his attempts to fully develop the factual
allegations and, in presenting the Habeas Petition, has done so with
all reasonably available documentary evidence.  Despite his efforts,
there exists the possibility of materials relevant to the disposition
of this Petition becoming available during the pendency of the Court's
review.  In this event, the Petitioner requests the Court to allow the
expansion of the record to assist with a full and proper determination
of all matters associated. In anticipation of the Court's allowance,
the Petitioner identifies possible sources of relevant materials that
may include but not be limited to:

   A.)  State Bar:  Attached as Exhibit No.15 is the request made of
the State Bar to provide the source of funds used by Lund.  Irrespective

of the discovery through production requested in No.4C above, there
exists the possibility that this information may become available from
the ongoing efforts of the Petitioner. In this event, the Petitioner
requests the Court to allow expansion of therecord to receive such
evidence.

     B.) Requests made of Trial Counsel; Appellate Counsel; Attorney
           General; Governor Newsom: Not included in the showing of due
diligence itemized in No.2 above, the Petitioner has been vigilant in
obtaining factual development from Counsel and the noted Government
Officials. Thus this information if provided as requested by Petitioner
becomes available, the Court is requested to expand the record to allow
such evidence. This includes but is not limited to:

     (i) Trial/Appellate Counsel: Attached as Exhibit No.12 are
copies of requests made of Trial Counsel and Appellate Counsel to pro-
vide their defense of actions that has been declared in the Petition as
ineffective assistance of counsel. These requests that were made in
December of 2019 and are again being sent out along with service of the
Petition, if answered, should be instrumental in factual development of
the claims. Therefore the Court is requested to allow the expansion of
record to accommodate such.

     (ii) Attorney General/Governor Newsom: In CLAIM VII;No.5D,
the Petitioner objects to the depriving of privileges of equal treat-
ment in his illegal abduction while traveling legally compared to the
sanctuary status given to those in the State traveling illegally. If
treated equally as his right under California and US Constitutional
articles/amendments, the Petitioner should be returned to his status
quo ante. As noted in Exhibit No.8, the Petitioner has been vigilant
in obtaining responses from AG and Governor as to this issue by asking
for factual development through direct corrspondences in December of
2019 and here again in June of 2020. These efforts of the Petitioner
while not listed in the due diligence itemization of No.2 above, if are
answered by the noted public officials, the Court is requested to ex-
pand the record to allow such evidence.

     C.)          Superior Court Case No.11CF2747: Still pending in
Orange County is the matter of restitution in the Petitioner's crimi-
nal case. Because restitution implies loss, and to prove loss requires
the establishment of the "interest" characterization that has been

falsely conveyed as asserted by Petitioner in CLAIM III, any evidence
generated through this yet to be scheduled hearing will be instrumental
in further factual development of the perjured testimony used to obtain
the conviction (See CLAIM III;No.6 and No.7). In this event, the Court
is requested to allow the expansion of record to accommodate this evi-
dence.

8.)  Authority for the Motion:  The Court is equipped and accorded the
authority to conduct an evidentiary hearing when relief depends on reso-
lution of an issue of fact (CRC 8.386(f)). With the Petitioner provi-
ding verified claims that demonstrate a prima facie case for relief, he
also presents specific factual allegations that show reason and good
cause for further factual development important to ultimate decisions
of remedy and factual innocence.  Thus pursuant to authorities that may
include Bracy v. Gramley, 520 US 899 (1997) and Pham v. Terhune, 400
F.3d 740, 743 (2005), the Petitioner respectfully contends that the
Court has a duty to grant this discovery request for the relevant mate-
rials including but not limited to that as referenced herein. As to
the request to expand the record, such action is made on the authority
that includes but not limited to Cooper-Smith v. Palmateer, 397 F.3d
1236,1241 (9th Cir. 2005).

9.)  Declaration and Verification:  I, Thomas Tarbutton as the Petitioner
herein, declare under penalty and perjury that I have exercised extreme
due diligence in fully developing the factual allegations presented in
the Habeas Petition.  In so doing, I have made extensive requests in my
efforts to obtain materials relevant to the resolution of any and all
issues of fact.  In addition to the actions noted in No.2 above and
referenced in Exhibit No.14, I have made numerous requests from an
appointed investigator, Richard Munoz, and have not received any response
from him whatsoever.  Also while attempting to conduct research for the
Petition, I have been subjected to limited access to the Law Library due
to the Covid-19 restrictions.  Thus with the atypical hardships as a
result, the extreme due diligence  in spite of these restrictions and a
sufficient showing of good cause for discovery of this evidence that to
date has been deprived me by the defects of due process, I pray the
Court to conduct an evidentiary hearing for a full and fair determination
of the matters as stated and those that are appropriately inferred. I

ATTACHMENT 'D':  PAGE 139

also state under penalty of perjury that the foregoing assertions are
true and correct, except as to matters that are stated on my information
and belief, and as those matters, I believe them to be true.  I hereby
submit this Motion based on the authorities as noted  this the 26th
day of JUNE , 2020 and do so respectfully,


By: _____

Thomas Tarbutton  CDCR# BE8274
Folsom State Prison  Housing# 1-B1-09
PO Box 715071
Represa, CA  95671

# ATTACHMENT E

CONTENTS:

Table of Authorities

|   | | |
|---|---|---|
| > Federal Cases | Page | 1 |
| > Treaties in Force | Page | 5 |
| > State Cases | Page | 7 |

## ATTACHMENT 'E'

The following is a table of authorities as presented in the
PETITION OVERVIEW and ATTACHMENTS 'A','B', and 'C'.  The page
listed for the respective authority will be designated by PO
for PETITION OVERVIEW, and A,B,or C for the applicable attach-
ment.  For example B23 will designate Page 23 of ATTACHMENT 'B'.

### Federal Cases

| | |
|---|---|
| Ake v. Oklahoma, 470 US 68 (1985) | C86 |
| Apprendi v. New Jersey, 530 US 466 (2000) | A45;A55 |
| Arizona v. Fulminante, 499 US 279 (1991) | A25;A26;A30;B38 |
| | C46;C58;C65;C67 |
| Arizona v. Youngblood, 488 US 51 (1988) | C24;C25;C42 |
| Bailey v. United States, 380 F.2d 305 (D.C. Cir. 1967) | C17 |
| Beck v. Ohio, 379 US 89 (1964) | C15;C16 |
| Berger v. U.S., 295 US 78 (1969) | A8;A21;B82; C3 |
| | C6;C39;C42 |
| Blakely v. Washington, 542 US 296 (2004) | A55 |
| Blockburger v. U.S., 284 US 299 (1932) | A9 |
| Brady v. Maryland, 373 US 83 (1963) | A15;A55;B24;B38;C4;C42 |
| Breard v. Greene, 523 US 371 (1998) | B17;B38;B44;B58 |
| Brecht v. Abrahamson, 507 US 619 (1993) | C3 |
| Brown v. Ohio, 432 US 161 (1977) | A14;B58 |
| Cage v. Louisiana, 498 US 39 (1990) | A45 |
| California v. Hodari, 497 US 621 (1991) | B8 |
| California v. Trombetta, 467 US 479 (1984) | C24;C25;C42 |
| Caperton v. A.T. Massey Coal Co., 556 US 868 (2009) | C68 |
| Chaker v. Crogan, 428 F.3d 1215 (9th Cir. 2005) | PO34 |
| Cole v. Arkansas, 33 US 196 (1948) | A3;A6;A11;A14;A21 |
| Cone v. Bell, 535 US 685 (2002) | A25 |
| Cook v. United States, 288 US 102 (1933) | B16 |
| Couch v. Booker, 632 F.3d 241 (6th Cir. 2011) | C73 |
| County Court of Ulster County v. Allen, 442 US 140 (1979) | |
| | C37;C38;C39;C40;C43 |
| Crawford v. Washington, 541 US 36 (2004) | A21 |
| Curiel v. Miller, 830 F.3d 864 (9th Cir. 2016) | PO33 |

**Cuyler v. Sullivan**, 446 US 335 (1980) — C105

Daniels v. Williams, 474 US 327 (1986) — B44

Darden v. Wainwright, 477 US 168 (1986) — C3;C12;C42

Delaware v. Fernsterer, 474 US 15 (1985) — A12

Early v. Packer, 537 US 3 (2002) — PO33

Estelle v. McGuire, 502 US 62 (1991) — A33;B54;B70

Evitts v. Lucey, 469 US 387 (1985) — A19;A31

Factor v. Laubenheimer, 290 US 276 (1933) — B6

Ford v. United States, 273 US 593 (1927) — B17

Francis v. Franklin, 471 US 319 (1985) — A52

Frisbie v. Collins, 342 US 519 (1952) — B11;B20

Gedders v. United States, 425 US 80 (1976) — A29;A33

Giglio v. United States, 405 US 150 (1972) — C4

Glasser v. United States, 315 US 60 (1942) — A18;C58

Hamling v. United States, 418 US 87 (1974) — A4;A5

Harris v. Reed, 489 US 255 (1989) — PO33

Hein v. Sullivan, 601 F.3d 897 (9th Cir. 2010) — C38

Henry v. Mississippi, 379 US 443 (1985) — A30

Henry v. United States, 361 US 98 (1959) — B18;B22

Hicks v. Oklahoma, 447 US 343 (1980) — A33;B56

Illinois v. Allen, 397 US 337 (1970) — A25;A33

Illinois v. Gates, 462 US 213 (1983) — C14

Imbler v. Pachtman, 424 US 409 (1976) — A15;B24

In re Winship, 397 US 358 (1970) — A37;A55

Johnson v. Williams, 568 US 289 (2013) — PO33

Kaoru Yamataya v. Fisher, 189 US 86 (1901) — B25

Kentucky v. Stincer, 482 US 745 (1987) — A25

Ker v. Illinois, 119 US 436 (1886) — B11;B12;B16;B18;B20;B33;B34

Kim Ho Ma v. Reno, 208 F.3d 815 (9th Cir. 2020) — B15

Kimmelman v. Morrison, 477 US 365 (1986) — A31;C73;C83

Kirby v. Illinois, 406 US 682 (1972) — A11;A17

Knowles v. Mirzayance, 556 US 111 (2009) — C73;C97

Kolender v. Lawson, 461 US 352 (1983) — A3;A10;A21

Kyles v. Whitley, 514 US 419 (1995) — C13

Lee v. Kemna, 534 US 362 (2002) — PO26

ATTACHMENT 'E':  PAGE 2

Liljeberg v. Health Services Corp., 468 US 847 (1988) B29;C66;C67
Liteky v. U.S., 510 US 540 (1994)                      A45;A51;C53
Mapp v. Ohio, 367 US 643 (1961)                                 B38
Martin v. Ohio, 487 US 228 (1987)                               C93
Maryland v. Craig, 497 US 836 (1990)                            A11
McCarthy v. Madigan, 503 US 140 (1992)                          B25
McCoy v. Louisiana, 138 S. Ct. 1500 (2017)                 A29;A33
McKaskle v. Wiggins, 465 US 168 (1984)                          A29
McNeal v. Adams, 623 F.3d 1283 (9th Cir. 2010)                  A28
Mickens v. Taylor, 535 US 162 (2002)                      C73;C101
Miller v. Johnson, 200 F.3d 274 (5th Cir. 2000)                PO33
Miller v. Pate, 386 US 1 (1967)                         B62;B82;C42
Napue v. Illinois, 360 US 764 (1959)                     A55;B82;C4
New Hampshire v. Maine, 532 US 742 (2001)                  C31;C95
Nguyen v. Lindsey, 232 F.3d 1240 (9th Cir. 2000)                B49
Ohio v. Johnson, 467 US 493 (1984)                              A14
Oregon v. Kennedy, 456 US 667 (1982)                             C3
Osborne v. Ohio. 495 US 103 (1990)                              B58
Parker v. Matthews, 132 S. Ct. 2148 (2012)                      C42
Patterson v. New York, 432 US 466 (1977)             A45;A51;C53;C88
Pennoyer v. Neff, 93 US 714 (1877)                          A16;C46
Perry v. Leake, 488 US 272 (1989)                               A29
Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002)           PO33;PO34
Pointer v. Texas, 380 US 400 (1965)                             A21
Powell v. Alabama, 287 US 45 (1932)                             A28
Puckett v. U.S., 556 US 129 (2009)                       A19;C97;C101
Reid v. Covert, 354 US 1 (1957)                          B23;B38;C55
Remmer v. United States, 347 US 227 (1954)               C29;C34;C42
Rock v. Arkansas, 483 US 44 (1987)                              A33
Rodriguez v. Copenhaver, 823 F.3d 1238 (9th Cir. 2016)          B27
Rubin v. G.E., 292 F.3d 396 (4th Cir. 2002)                    C100
Russell v. U.S., 369 US 749 (1962)                              A21
Satterwhite v. Texas, 486 US 249 (1988)                         A12
S.E.C. v. Joiner Leasing Co., 320 US 344 (1943)          B47;B51;B71
S.E.C. v. W.J. Howey Co., 328 US 293 (1946)          B47;B50;B51;B71
Sheppard v. Rees, 909 F.2d 1234 (9th Cir. 1990)                 A12

ATTACHMENT 'E':  PAGE 3

Siderman De Blake v. Republic of Argentina, 965 F.2d 679
                              (9th Cir. 1992)            B36
Smith v. Oregon Bd. of Parole, 763 F.3d 857 (9th Cir. 2013)   PO33
Smith v. Robbins, 528 US 259 (2000)                     C105
Stallings v. United States, 536 F.3d 624 (7th Cir. 2006)
                                            A19;A31;C102
State v. Egger, 237 Neb. 688 467 NW 2d 411 (1991)         A30
Stirone v. U.S., 361 US 212 (1960)                 A8;A9;A21
Stone v. Powell, 428 US 465 (1976)                   B39;C55
Strickland v. Washington, 466 US 688 (1984)     B58;B82;C73;C105
Sullivan v. Kidd, 254 US 433 (1921)                      B14
Summerlin v. Schiro, 427 F.3d 623 (9th Cir. 2005)         C78
Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,
             951 F.3d 1142 (9th Cir. 2020)               B36
Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004)          PO33
Terry v. Ohio, 392 US 1 (1968)                   B8;B38;C42
TWA, Inc. v. Franklin Mint Corp., 466 US 243 (1984)      B36
United States v. Alvarez-Machain, 504 US 655 (1992)      B35
United States v. Barrera-Moreno, 951 F.2d 1089 (9th Cir. 1991) B17
United States v. Bonano, 858 F.2d 1427 (9th Cir. 1988)    A4
United States v. Ceja, 543 Fed. Appx. 948 (11th Cir. 2013)   B11
United States v. Chiantese, 560 F.2d 1244 (4th Cir. 1977)   A52
United States v. Cotton, 535 US 625 (2002)           A9;C46
United States v. Evans, 728 F.3d 953 (9th Cir. 2013)      A17
United States v. Gagnon, 470 US 522 (1985)               A26
United States v. Jones, 982 F.2d 380 (9th Cir. 1992)      A11
United States v. Lambert, 46 F.3d 1064 (10th Cir. 1995)    B8
United States v. Martinez-Lopez, 864 F.3d 1034 (9th Cir. 2017) A14
United States v. Mason, 481 Fed. Appx. 815 (4th Cir. 2012)   C78
United States v. Matta-Ballesteros, 71 F.3d 754
                         (9th Cir. 1995)      B22;B26;B30
United States v. Melendez-Carrion, 479 US 978 (1986)      C40
United States v. Nickerson, 556 F.3d 1014 (9th Cir. 2009)   A32
United States v. Ramirez-Martinez, 273 F.3d 903
                         (9th Cir. 2001)                  A9

ATTACHMENT 'E':  PAGE 4

**United States v. Rauscher**, 119 US 407 (1886)
                    A15;A21;B6;B24;B43;B44;B58;C5;C56;C57

United States v. Register, 182 F.3d 820 (11th Cir. 1999)    C100

United States v. Simpson, 927 F.2d 1088 (9th Cir. 1991)    B30

United States v. Struckman, 611 F.3d 560 (9th Cir. 2010)   B30;B31

United States v. Toscanino, 500 F.2d 267 (2nd Cir. 1974)
                    B17;B20;B21;B22;B31;B44;C55

United States v. Valot, 625 F.2d 308 (9th Cir. 1980)       B20

United States v. Warshak, 631 F.3d 266 (6th Cir. 2010)     C38

United States v. Wright, 625 F.3d 583 (9th Cir. 2010)      C38

United States v. Young, 745 F.2d 733 (2nd Cir. 1984)       C17

U.S. v. Cronic, 466 US 648 (1984)       A12;C73;C88;C93;C105

U.S. v. Edward, 103 F.3d 90 (10th Cir. 1996)               B8

U.S. v. Gaudin, 515 US 506 (1995)                   A45;B52

U.S. V. Olano, 507 US 733 (1993)                     A27

U.S. v. Randall, 171 F.3d 195 (4th Cir. 1999)              A8

U.S. v. Randall, 947 F.2d 1314 (7th Cir. 1991)             B8

U.S. v. Russell, 411 US 423 (1973)          B17;B38;C5;C42

U.S. v. Sturdivant, 244 F.3d 71 (2nd Cir. 2001)           A10

U.S. v. Tsinhnahijinnie, 112 F.3d 988 (9th Cir. 1997)      A8

U.S. v. Universal CIT Credit Corp., 344 US 218 (1952)     B54

U.S. v. Wade, 388 US 224 (1967)                      A27

Village of Willowbrook v. Olech, 528 US 562 (2000)        B25

Wayte v. United States, 470 US 598 (1985)                C19

Wiggins v. Smith, 539 US 510 (2003)                 C73;C105

Williams v. Taylor, 529 US 393 (2000)               A28;C97

Yarborough v. Gentry, 540 US 1 (2002)               C73;C97

Yick Wo v. Hopkins, 118 US 356 (1886)               C19;C42

## Treaties in Force

Charter of the Organization of American States
                    B12;B13;B14;B22;B32;B33;B34

Charter of the United Nations          B14;B15;B22

International Convention on Civil and Political Rights    B15;B16

US-Panama Bilateral Extradition Treaty
                    A15;B13;B24;B43;C34;C56;C57

ATTACHMENT 'E':  PAGE 5

Vienna Convention and International Law Commission

B31;B32;B33;B34;B35;B36

## State Cases

| Case | Ref |
|---|---|
| Bullen v. Superior Court (1988) 204 CA3d 22 | C22;C37 |
| Del Bosque v. Singh (1937) 10 CA2d 487 | PC30 |
| Giometti v. Etienne (1934) 219 C 687 | C65 |
| In re Demillo (1975) 14 C3d 598 | A16;B52;B53;B55 |
| In re Dixon (1953) 41 C2d 756 | PO29;PO30 |
| In re Jamil H. (1984) 158 CA3d 556 | A10 |
| In re Sakarias (2005) 35 CA4th 284 | B49 |
| In re Sands (1977) 18 C3d 851 | C46 |
| In re Waltreus (1965) 62 C2d 218 | PO28;PO30 |
| In re Zerbe (1964) 60 C2d 666 | C46 |
| People v. Bamberg (2009) 175 CA4th 618 | A50;B65 |
| People v. Blackburn (1982) 139 CA3d 761 | A52 |
| People v. Burnett (1999) 71 CA4th 151 | A18;C103 |
| People v. Camarella (1991) 54 C3d 592 | C17 |
| People v. Clark (1992) 3 CA4th 41 | A52 |
| People v. Daniels (1991) 52 C3d 815 | A18 |
| People v. Dominguez (2008) 166 CA4th 658 | A18;B52;C54;C103 |
| People v. Hannon (1977) 19 C3d 597 | B56 |
| People v. Jacobs (2007) 156 CA4th 728 | A53 |
| People v. Lopez (1997) 52 CA4th 728 | A16 |
| People v. Mahoney (1927) 201 Cal. 618 | A45 |
| People v. Meredith (1981) 29 C3d 527 | C37 |
| People v. Neustice (1972) 24 CA3d 178 | B16;B17 |
| People v. Perez (1962) 58 C2d 229 | C38 |
| People v. Ramirez (1979) 25 C3d 260 | B55 |
| People v. Rhodes (1974) 12 C3d 180 | C37 |
| People v. Rutherford (1975) 14 C3d 399 | C13 |
| People v. Satchel (1971) 6 C3d 28 | B56 |
| People v. Stewart (2004) 33 C4th 425 | A25 |
| People v. Strickland (1974) 11 C3d 945 | C28 |
| People v. Superior Court (Maloy) (2001) 91 CA4th 391 | A31 |
| People v. Superior Court (Marks) (1991) 1 C4th 56 | C46 |
| People v. Wheeler (1992) 4 CA4th 284 | B26;C11 |
| People v. Whitfield (1986) 183 CA3d 299 | C65 |

# PETITION OVERVIEW

(10C17249-2254). In following up on these efforts, the Petitioner is moving the Court for an evidentiary hearing on any matter where such is required for full and fair determination of the associated issues.

6.) **Supplemental Requests:** Included as Exhibit No. 5 and Exhibit No. 20 are the supplemental requested actions of Judicial Notice and Evidentiary Hearing. Described in brief, these actions include:

A.) Request for Judicial Notice: Located on Page 144 as Exhibit No. 5 and based on the authorities presented therein, Petitioner requests notice of the records of related proceedings; tax-reporting facts and propositions; Treaties, Law of Organization of Nations, Law of Foreign Nation, Mathematical Calculations; and industry-specific information. The relevance and judicial noticeability of this evidence is noted in the Request as well as referenced where applicable in the Petition.

B.) Evidentiary Hearing: Located on Page 204 as Exhibit No. 20 is a request for Evidentiary Hearing. The matters of note include evidence of Patrick Lund's involvement as referenced in Petitioner's requests to the State Bar attached as Exhibit No. 15 and the motion to discover the records of the OCDA's investigation of Lund relative to his secreting away of the asset base transferred by Petitioner. This motion to discover is attached as Exhibit No. 16. Also included is the matter of the Petitioner's passport booked into evidence by the OCDA that shows evidence of his leaving Panama prior to his abduction as detailed in CLAIM IV.

7.) Requests made to Trial and Appellate Counsel, Attorney General and Governor Newsom: To assist the Court, the Petitioner has submitted requests to other parties for explanations of their actions as they related to the particulars of the Petitioner's proceedings.

A.) Trial and Appellate Counsel: It must be noted that as affirmed by the Appellate Court's Habeas ruling on the merits of No. G058686, the claims as presented were cognizable. This is consistent with the Petitioner's assertions identified in Exhibit No. 19 and reiterated in No. 4 above. Thus, a finding of IAC is not necessarily a predicate for these same issues addressed in the instant Petition. However, to support these claims and provide color for CLAIM IX, Petitioner again has requested Trial and Appellate Counsel for their defense of the deficient performance contentions as raised. Copies of the letters sent to Trial and Counsel are attached as Exhibit No. 12 Page 202) as are copies of the same letters sent in December of 2019 to which the Petitioner received no reply. The relevance of these requests is the state standard in addressing "IAC" on Habeas (See People v. Mendoza Tello (1997) 15 C4th 264, 266).

B.) Attorney General and Governor Newsom: Attached as Exhibit No. 8 are letters addressed to the Attorney General and Governor Newsom requesting

20

People v. Zamora (1976) 18 C3d 538

                                  B24;B53;B54;C29;C30;C31;C34;C50

Price v. State Bar (1988) 30 C3d 682                    C37

Ryan v. CIF San Diego Section (2001) 94 CA4th 1048      B55

Scherling v. Superior Court (1978) 22 C3d 493           C60

Solberg v. Superior Court (1977) 10 C3d 192        A27;A30

Stevens v. Superior Court (1997) 52 CA4th 55       A27;A30

Taliaferro v. County of Contra Costa (1960) 182 CA2d 587   B52

**CLAIMS INDEX PAGE**

CLAIM I: Alternate Basis for Conviction added after Close of Evidence
Facts in Support: Page No. 24-37
Supporting Case References: Page No. 211

CLAIM II: Critical State Conducted in Petitioner's Absence
Facts in Support: Page No. 38-45
Supporting Case References: Page No. 212

CLAIM III: Perjured Testimony used to obtain a conviction (Actual Innocence)
Facts in Support: Page No. 46-59
Supporting Case References: Page No. 213

CLAIM IV: Forcible Transnational Abduction (Outrageous Governmental Conduct)
Facts in Support: Page No. 60-86
Supporting Case References: Page No. 213

CLAIM V: Treaty and Due Process Violations
Facts in Support: Page No. 87-98
Supporting Case References: Page No. 215

CLAIM VI: False Evidence
Facts in Support: Page No. 99-115
Supporting Case References: Page No. 215

CLAIM VII: Prosecutorial Misconduct
Facts in Support: Page No. 116-145
Supporting Case References: Page No. 216

CLAIM VIII: Jurisdictional Defects
Facts in Support: Page No. 146-163
Supporting Case References: Page No. 217

CLAIM IX: Ineffective Assistance of Counsel
Facts in Support: Page No. 164-187
Supporting Case References: Page No. 217

PRIORITY MAIL
LARGE FLAT RATE
POSTAGE REQUIRED

UNITED STATES
POSTAL SERVICE ®

VISIT US AT USPS.COM ®
ORDER FREE SUPPLIES ONLINE

CLERK, U.S. DISTRICT COURT

JUL 15 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: DEPUTY

PRIORITY
★ MAIL ★

FROM:

Dan Doud
PO Box 1870
Newport Beach, Ca
92658

TO:

United States Courthouse
411 West Fourth St. Room 1053
Santa Ana, Ca 92701-4516

FOR DOMESTIC AND INTERNATIONAL USE

Label 228, March 2016





VISIT US AT USPS.COM
Label 106A, Nov 2018

To schedule free
Package Pickup,
scan the QR code.

USPS.COM/PICKUP

Retail

UNITED STATES
POSTAL SERVICE ®

US POSTAGE PAID
$21.90

Origin: 92662
07/14/21
0518000500 7

PRIORITY MAIL 1-DAY®

0 Lb 11.2 7z

C013

10C5

EXPECTED DELIVERY DAY: 07/15/21

SHIP
TO:
411 W 4TH ST
Santa Ana CA 92701-4500

USPS TRACKING® #

9505 5156 3703 1195 4143 34